**TRENK ISABEL SIDDIQI**
**& SHAHDANIAN P.C.**
Richard D. Trenk, Esq.
Robert S. Roglieri, Esq.
290 W. Mt. Pleasant Ave., Suite 2370
Livingston, New Jersey 07039
Telephone: (973) 533-1000
Email: rtrenk@trenkisabel.law
Email: rroglieri@trenkisabel.law

*Proposed Counsel to J.F.M. 6090, Inc. d/b/a Burger King*
*Chapter 11 Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| J.F.M. 6090, INC. d/b/a Burger King, | Case No. 26-15123 (___) |
| Debtor. | |

**DECLARATION OF PRESIDENT RANJANA JETHWA IN SUPPORT OF CHAPTER 11 FILING AND FIRST DAY MATTERS**

**RANJANA JETHWA,** of full age, pursuant to 28 U.S.C. § 1746, hereby certifies and declares as follows:

1.      I am the President of J.F.M. 6090, Inc. d/b/a Burger King ("**6090**"), the chapter 11 debtor and debtor-in-possession in the above-captioned case. I am fully familiar with the business and affairs of 6090, including the facts and circumstances set forth herein.

2.      I submit this declaration (the "**Declaration**") in support of 6090's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and the relief that 6090 has requested from the Court in various motions and applications filed contemporaneously herewith (the "**First-Day Pleadings**"). The relief sought in each of the First-

1

Day Pleadings: (1) is necessary to enable 6090 to operate in Chapter 11 with minimal disruption to its operations and without loss of value; and (2) best serves the interests of 6090's estate, creditors, and other parties in interest.

3.      Except as otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge, information supplied to me by other members of 6090's management or its professionals, information learned from my review of relevant documents, or my opinion based upon my experience and knowledge of 6090's operations and financial condition.  This Declaration is intended to provide a brief background of 6090, a description of 6090 and its services, the reasons for 6090's chapter 11 filing, 6090's objectives in the chapter 11 process, and a summary of the relief sought in each of the First-Day Pleadings.

4.      If called as a witness in 6090's Chapter 11 proceedings, I would testify to the best of my knowledge competently to the facts set forth in this Declaration.  Unless otherwise indicated, all financial information set forth in this Declaration is presented on an unaudited basis.

**Personal Background**

5.      I was born on December 14, 1952 and am currently 73 years old.

6.      I was born in Poona, India.

7.      I grew up in Bombay with my parents.

8.      I graduated with a Bachelor of Arts Degree from Elphinstone College in Bombay.

9.      I was married in 1978 to Ramesh Jethwa ("**Ramesh**").

10.     Ramesh was an electronic engineer who came to the United States of America in 1972 with $8.00.  He obtained a job with the State of Michigan and lived in Haslett which is a suburb of Lansing, the State Capital of Michigan.

11.     Ramesh studied electronic engineering at Michigan State University.    After graduation, he initially got a job with Bectel in Rahway, New Jersey before moving back to Lansing, Michigan.

12.     We had three (3) children in Michigan.

13.     We worked at and eventually bought a dry cleaning business in East Lansing which we sold in 1989.

14.     In or about 1990, we moved back to New Jersey.

15.     Initially, we lived in Ledgewood, Morris County, New Jersey and in 1990 bought a Burger King® located at the Willowbrook Mall in Wayne.  This store closed in or about 2002.

16.     Next, in approximately 1992, we purchased the Burger King® Store located at 12-14 Spruce Street in Paterson, New Jersey, which is the subject of this Chapter 11.

17.     In approximately 1994-1996, we sought to open a Burger King® at Short Hills Mall which eventually became an Everything Yogurt Salad Cafe.  This cost approximately $750,000 and was unsuccessful.

18.     Next, in approximately 1999, we bought a Burger King® in Secaucus at Mill Creek Mall.  This store closed in approximately 2004.

19.     In December 1998, we purchased our primary residence 194 Eileen Drive in Cedar Grove, New Jersey, where I have lived for approximately 28 years.  My residence has two (2) mortgages totaling approximately $600,000.

20.     In 2000, we purchased and built a Burger King® in Haledon, New Jersey.  We sold that property in December 2025 for approximately $4.5 million.  All of the net proceeds were paid to First Franchise Capital Corp. ("**FFCC**").

21.     In 2002-2004, we purchased the building and rights to operate a Burger King® on Hamburg Turnpike in Wayne.  We also sited a Popeye's at the location in 2008.  That property filed Chapter 11 bankruptcy in 2023 and closed.  *See In re JFM Hamburg LLC*, Case No. 23-10057 (JKS).  The Hamburg Chapter 11 was the subject of a settlement agreement which was approved and the proceedings dismissed.

22.     We owned two (2) Dunkin Donuts in Paterson beginning in 2003-2004.  These stores were sold in 2019 for approximately $1.8 million.

23.     In 2010, we purchased a Burger King® in Sparta which is still operating (operating as JFM Sparta, LLC ("**JFM Sparta**")).  As part of that transaction, we purchased a store in West Nyack, New York which has since closed.

24.     In 2006, we purchased a Burger King® in Spring Valley, New York for approximately $600,000 (operating as JFM Spring, LLC ("**JFM Spring**")).

25.     There are approximately 20 years left with regard to the Leases with extension for the Spring Valley and Sparta locations.

26.     In 2011, Jethwa Management hired Mayank Patel as Finance Controller.  Mr. Patel continues to serve with distinction.  His rate of compensation is $78,000 per annum.

27.     The three (3) remaining stores have gross sales of the following approximate amounts:  Paterson – approximately $2 million annually; Spring Valley - approximately $2 million annually; and Sparta - approximately $1 million annually.

28.     We owe New Jersey and New York sales tax of approximately $800,000 for all there (3) stores and some of the residual stores.

29.     Burger King® asserts it is owed royalties of approximately $590,000 with regard to the remaining stores.

30. Ramesh died suddenly on December 19, 2018.

## THE DEBTOR'S MANAGEMENT

31. 6090 is a New Jersey corporation formed in 1993 and operates from its headquarters at 12-14 Spruce Street, Paterson, New Jersey ("**Paterson Location**").

32. I own 100% of 6090's ownership interests.

## BACKGROUND OF THE DEBTOR

33. 6090 is a fast-food restaurant specializes in flame broiled burgers and other items. The Debtor operates as a Burger King® pursuant to a franchise agreement.

34. The Paterson Location consists of 34,488 square foot parcel of property, including an approximately 2,200 square foot storefront. The Paterson Location is the subject of a 40-year lease at $15,000 per month, which terminates on December 31, 2050. The Debtor leases its premises from Falls View, LLC ("**Falls View**"), a related entity. The Paterson Location was purchased in 1993 by Falls View for $475,000. The current lease is dated January 2011 for 40 years

35. 6090 employs approximately 21 employees, including a restaurant manager and various hourly employees.

36. 6090 has passed all state and local inspections and there are no pending fire code, health or other violations.

## THE DEBTOR'S ASSETS

37. The Debtor's assets consist of a restaurant operation including kitchen equipment, food stuffs, machinery, tables and chairs.

5

**CIRCUMSTANCES LEADING TO BANKRUPTCY**

38.    The Debtor was attempting to negotiate a consensual sale of the Spring Valley and Paterson operations but the amounts involved would not resolve the remaining debts.

39.    The Debtor believes it can implement a cost saving by eliminating the Burger King® royalties and mandated third-party vendors and promotions and discounts.

40.    Despite these operational issues, 6090 is confident that through the Chapter 11 process, it can reorganize and restructure its debts based upon its strong past performance and market experience.

**CAPITAL STRUCTURE**

**Secured Debt**

A.  **First Franchise Capital Corporation**

41.    On or about July 14, 2017, FFCC and Falls View, JFM Sparta Properties, LLC ("**JFM Sparta Properties**"), JFM Rochelle 13534 L.L.C. ("**JFM Rochelle**"), JFM Nyack, LLC ("**JFM Nyack**"), JFM Haledon Properties, LLC ("**JFM Haledon Properties**"), JFM Carlstadt Properties, L.L.C. ("**JFM Carlstadt Properties**"), JFM Wayne LLC ("**JFM Wayne**"), JFM Spring, JFM Spring Properties, LLC ("**JFM Spring Properties**"), JFM Rochelle Properties, LLC ("**JFM Rochelle Properties**"), JFM Haledon LLC ("**JFM Haledon**"), JFM Carlstadt 13850, L.L.C. ("**JFM Carlstadt 13850**"), JFM Wayne Properties, LLC ("**JFM Wayne Properties**"), JFM Sparta, and the Debtor (collectively, the "**Borrowers**") executed a Master Loan Agreement (the "**Loan Agreement**").

42.    The Loan Agreement was subsequently modified on July 8, 2019, April 5, 2020, June 3, 2020 and April 9, 2021.

43.     Pursuant to the Loan Agreement, as modified, FFCC issued three loans to the Borrowers for the Borrowers' use in operating approximately seven restaurant locations in two states franchised by Burger King®.

44.     Pursuant to the Loan Agreement, as modified, FFCC issued three loans to the Borrowers for the Borrowers' use in operating approximately seven restaurant locations in two states franchised by Burger King®.

45.     Specifically, on or about July 14, 2017, Borrowers executed and delivered to FFCC a secured promissory note in the original principal amount of $3,800,000.00 ("**Note A**").

46.     On or about July 14, 2017, Borrowers executed and delivered to FFCC another secured promissory note in the original principal amount of $3,350,000.00 ("**Note B**").

47.     On or about April 9, 2021, Note B was amended and restated by virtue of an Amended and Restated Secured Promissory Note in the original principal sum of $2,282,171.10 ("**Amended Note B**").

48.     On or about April 19, 2021, Borrowers executed and delivered to FFCC a third secured promissory note in the original principal amount of $133,500.00 ("**Note C**").

49.     In total, FFCC loaned Borrowers $7,283,500.00 in original principal pursuant to the Loan Agreement - as originally executed and then amended or modified from time to time - and the Notes.

50.     Pursuant to the Loan Agreement and to secure the Obligations, the following Security Agreements were executed in favor of FFCC: (a) Security Agreement dated as of July 14, 2017 from Falls View with respect to the collateral described therein; (b) Security Agreement dated as of July 14, 2017 from JFM Sparta Properties with respect to the collateral described therein; (c) Security Agreement dated as of July 14, 2017 from JFM Rochelle 13534 with respect

to the collateral described therein; (d) Security Agreement dated as of July 14, 2017 from JFM Nyack with respect to the collateral described therein; (e ) Security Agreement dated as of July 14, 2017 from JFM Haledon Properties with respect to the collateral described therein; (f) Security Agreement dated as of July 14, 2017 from JFM Carlstadt Properties with respect to the collateral described therein; (g) Security Agreement dated as of July 14, 2017 from JFM Wayne with respect to the collateral described therein; (h) Security Agreement dated as of July 14, 2017 from JFM Spring with respect to the collateral described therein; (i) Security Agreement dated as of July 14, 2017 from JFM Spring Properties with respect to the collateral described therein; (j) Security Agreement dated as of July 14, 2017 from JFM Rochelle Properties with respect to the collateral described therein; (k) Security Agreement dated as of July 14, 2017 from JFM Haledon with respect to the collateral described therein; (l) Security Agreement dated as of July 14, 2017 from JFM Carlstadt 13850 with respect to the collateral described therein,; (m) Security Agreement dated as of July 14, 2017 from JFM Wayne Properties with respect to the collateral described therein; (n) Security Agreement dated as of July 14, 2017 from JFM Sparta with respect to the collateral described therein; (o) Security Agreement dated as of July 14, 2017 from JFM 6090 with respect to the collateral described therein (collectively, the "**Security Agreements**").

51.     FFCC alleges that these security interests[1] were perfected by virtue of the filing of UCC Financing Statements.

52.     In addition to the Security Agreements, the following guaranties were executed in favor of FFCC: (a) Guaranty dated July 14, 2017, executed by me ("**Guaranty 1**"); and (b) Guaranty dated July 14, 2017, executed by Jethwa Management ("**Guaranty 2**" and, collectively with Guaranty 1, the "**Guaranties**").

---

[1] Collectively, FFCC's collateral under the relevant agreements shall be referred to as the "**FFCC Collateral**".

53.     Pursuant to Guaranty 2 and to secure the Obligations, Jethwa Management executed a Security Agreement in favor of FFCC dated as of July 14, 2017, with respect to the collateral described therein (the "**Guaranty Security Agreement**").   FFCC asserts that the Guaranty Security Agreement is secured by a UCC-1 filing.

54.     Due to COVID-19, the Borrowers fell out of compliance with the Loan Agreement.

55.     On February 23, 2022, FFCC and Borrowers entered into a Forbearance Agreement providing the Borrowers through June 9, 2022 to satisfy certain conditions regarding the existing defaults.

56.     By virtue of a Second Forbearance Agreement dated as of May 20, 2022, the Borrowers were provided through July 9, 2022 to satisfy certain conditions regarding the existing defaults.

57.     By virtue of a Third Forbearance Agreement dated as of July 29, 2022, the Borrowers were provided through October 9, 2022 to satisfy certain conditions regarding the existing defaults.

58.     The Third Forbearance Agreement required the Borrowers to pay all of the Obligations on or before October 9, 2022.

59.     As a result of these defaults, on October 2, 2023, FFCC filed a complaint in Superior Court of New Jersey, Bergen County, Law Division commencing an action captioned *First Franchise Capital Corporation v. Falls View, LLC* at Docket No. BER-L-5271-23 (the "**State Court Action**").

60.     On August 8, 2024, the State Court entered a default judgment against the Borrowers, including the Debtor, in the amount of $6,600,050.98 plus post-judgment interest (the "**Judgment**").

61. On December 18, 2025, Borrower Haledon Properties, LLC sold certain real estate and paid FFCC $4,194,310.96 from the proceeds of the sale.

62. On April 29, 2026, FFCC filed a Motion on Short Notice to Appoint Receiver in Aid of Execution Pursuant to N.J.S.A. 2A:17-66 (the "**Receiver Motion**"). The Receiver Motion was scheduled to be heard on May 8, 2026.

63. After applying the amount received, FFCC asserts that the balance of the Loans was $3,259,108.17 as of March 2, 2026.

## B. The Small Business Administration

64. On August 30, 2020, the U.S. Small Business Administration ("**SBA**") filed a UCC-1 against the Debtor. The SBA asserts a lien in, amongst other things, the Debtor's inventory, equipment, and accounts.

65. The SBA is owed approximately $153,304.

## Unsecured Debt

66. 6090 has always had strong and mutually beneficial relationships with its trade vendors. These claims are for the delivery of goods and services to 6090, which are used in the operation of the business. These creditors are essential to 6090's business.

67. In addition, Burger King® asserts that it is owed fees in the approximate amount of $295,000.

68. Sales taxes due are approximately $450,000.

## THE DEBTOR'S CHAPTER 11 FILING

69. 6090 filed a voluntary Chapter 11 petition on May 5, 2026 (the "**Petition Date**"). 6090 intends to continue operating its business. 6090 proposes to use its cash and future revenues

in accordance with the debtor-in-possession operating budget, which is annexed to the cash collateral motion as **Exhibit A**.

## REORGANIZATION PURPOSE

70.     6090 intends to continue operating its business in the ordinary course and needs the breathing room provided by the Bankruptcy Code in order to continue to operate effectively.  The goal is to maximize the value of 6090's assets and ongoing business operations.  6090 has a viable business.

## FIRST DAY MOTIONS

71.     Concurrently with the filing of its chapter 11 petition, 6090 has filed certain motions and proposed Orders (collectively, the "**First-Day Orders**").  6090 requests this Court enter each of the First-Day Orders described below, as each is critical to 6090 achieving a successful result in its chapter 11 case for the benefit of all parties in interest.

### A.  Motion for an Order Authorizing the Interim and Final Use of Cash Collateral

72.     6090 seeks entry of an order authorizing the interim and final use of Cash Collateral and submits further that FFCC will not be harmed by the use of the Cash Collateral because it is significantly oversecured.  Cash Collateral will be used solely in accordance with the budget annexed to the motion.

73.     Use of cash collateral is imperative as FFCC has a blanket lien on 6090's inventory, deposit accounts and other assets.  Without the use of cash, 6090 will be unable to fund essential payments, including payroll.

**B. Motion for an Interim Order and a Final Order (i) Prohibiting Utility Companies From Discontinuing, Altering, or Refusing Service; (ii) Deeming Utility Companies to Have Adequate Assurance of Payment; and (iii) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366**

74. 6090 seeks entry of (i) an Interim Order, and (ii) a Final Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) prohibiting the utility companies from discontinuing, altering or refusing service to 6090, except as set forth herein, (b) deeming the utility companies adequately assured of future performance on the basis of payment of a two-week security deposit, and (c) establishing procedures for resolving requests for additional assurance of payment.

75. Uninterrupted utility services are essential to 6090's ongoing operations and, therefore, to the success of 6090's chapter 11 efforts. Indeed, any disruption to 6090's businesses by virtue of the cessation of utility services by the utility companies will bring 6090's operations to a halt.

76. In accordance with Bankruptcy Code section 366(c)(1)(A), 6090 proposes to provide additional assurance of payment to each utility company.

**C. Motion for Authority to Continue to Use Existing Bank Accounts and Business Forms Pursuant to 11 U.S.C. §§ 105(a) and 363(c)**

77. Currently, 6090 has one (1) bank account with TD Bank (collectively, the "**Bank Account**"). In the ordinary course of its operations, 6090 receives deposits and issues checks, wire transfers and ACH transfers into and out of its Bank Account.

78. 6090 also seeks authority to continue to use their prepetition business forms including, but not limited to, letterhead, invoices, checks, *et cetera* (collectively, the "**Business Forms**"), without reference to their status as debtors-in-possession. Requiring 6090 to immediately print new Business Forms would be burdensome, expensive, and disruptive. 6090

12

will, however, either print or stamp "Debtor-in-Possession" on their checks, and when they replace

stock, will obtain checks marked "Debtor-in-Possession."

**D. Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 507(a)(4) and 507(a)(5): (i) Authorizing Debtor to Pay Certain Pre-Petition Wages, Salaries, Withholding and Payroll-Related Taxes for Pre-Petition Periods; (ii) Directing All Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Employee Obligations; and (iii) Authorizing Debtor to Honor Workers' Compensation and Certain Employee Benefit Obligations**

79.      6090 seeks authorization to (i) pay employee claims for wages, salaries, commissions, contractual compensation, sick pay, personal pay, holiday pay, other accrued compensation, withholding and payroll related taxes for the Current Pay Period (as defined therein); (ii) direct all banks to honor pre-petition checks for payment of employee obligations in the Current Pay Period; and (iii) honor workers' compensation and certain employee benefit obligations.

80.      Any payments in respect of prepetition wages, salaries, commissions, and other compensation and benefit programs will not exceed the employee limitation for the Current Pay Period allowable as a priority claim under Bankruptcy Code sections 507(a)(4) and (5).

81.      6090 believes that the payment of the employee obligations is critical in order to maintain the morale of the employees during the pendency of the chapter 11 case and to ensure that they remain with 6090.

I certify, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct.

_____
RANJANA JETHWA

Dated: May 5, 2026