**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**VENABLE LLP**
151 W. 42nd Street, 49th Floor
New York, NY 10036
Tel.: (212) 307-5500
Fax: (212) 307-5598
Attn: Michael A. Guerra
(MAGuerra@Venable.com)

- and -

801 Brickell Avenue, Suite 1500
Miami, Florida 33131
Tel.: (305) 349-2300
Attn: Glenn D. Moses (*pro hac vice*)
(GMoses@Venable.com)

*Counsel to Creditor Burger King Company LLC*

**In re:**

**J.F.M. 6090, INC.,**[1]

**Debtors.**

Case No.: 26-15123-JKS
(Jointly Administered)
Chapter: 11
Hon. John K. Sherwood

Hearing Date: August 25, 2026,
10:00 a.m.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO CONVERT CASES TO CHAPTER 7 PURSUANT TO 11 U.S.C. § 1112(b)**

Burger King Company LLC ("BKC"), files this Memorandum of Law in support of its Motion pursuant to 11 U.S.C. § 1112(b) for an order converting the jointly administered chapter 11 cases of J.F.M. 6090, Inc., JFM Spring LLC, and JFM Sparta LLC (the "Debtors") to cases under chapter 7 of the Bankruptcy Code. In connection therewith, BKC states as follows:

[1] The Debtors in these chapter 11 cases are J.F.M. 6090, Inc. [Case No. 26-15123], JFM Spring LLC [Case No. 26-15124], and JFM Sparta, LLC [Case No. 26-15275].

## PRELIMINARY STATEMENT

Cause exists to convert these cases to chapter 7 under 11 U.S.C. § 1112(b) because the Debtors cannot propose a confirmable plan, resulting in continuing loss to the estate and no reasonable likelihood of rehabilitation. The Debtors are bound by enforceable post-termination restrictive covenants that prohibit them from owning or operating any hamburger business at or within two miles of their former restaurant locations for one year following termination. Those restrictive covenants preclude Debtors from operating the proposed "Jumbo King Burger" restaurants, the sole source of revenue on which the Debtors' Plan of Reorganization depends upon.

BKC is entitled to injunctive relief, which it shall seek separately as necessary, to enforce both the restrictive covenants and its rights in the Burger King® marks. Such injunction would shut down Debtors' only revenue stream and render the Plan unworkable on its face. BKC has separately objected to the Debtors' Plan as it is patently unconfirmable. Nor is there an alternative: relocating beyond the restricted radius or converting to a non-hamburger concept would require new leases, buildout, equipment, staffing, marketing, and regulatory approvals, costs the estate cannot bear and that Debtors' own projections never contemplated. Meanwhile, operating expenses, administrative expenses, professional fees, and U.S. Trustee fees continue to accrue against a shrinking estate. With no viable path to reorganization, conversion to chapter 7 is in the best interests of creditors and the estate.

## RELEVANT BACKGROUND

1. On May 5, 2026, each of J.F.M. 6090 and JFM Spring filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The following week on May 11, 2026, JFM Sparta filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered.

2. BKC is engaged in the business of operating and granting franchisees the right to operate Burger King® restaurants using the Burger King® marks and system, including the uniform and comprehensive restaurant format and operating system containing a standardized design, decor, equipment system, color scheme, style of building and signage, as well as uniform operating and quality standards, specifications and procedures of operation, and uniformity of products and services offered, including all provisions of the Manual of Operating Data, as amended from time to time.

3. Prior to July 2026, each of the Debtors was a franchisee within the Burger King® system pursuant to separate Franchise Agreements (the "Franchise Agreements"). True copies of the Franchise Agreements are attached to the *Declaration of Dylan Mencia* submitted herewith (the "Mencia Declaration") as Exhibits A through C.

4. In connection therewith, J.F.M. 6090 was approved to operate a Burger King® restaurant at 12-14 Spruce Street, Paterson, New Jersey; JFM Sparta was approved to operate a Burger King® restaurant at 49 Sparta Avenue, Sparta, New Jersey; and JFM Spring was approved to operate a Burger King® restaurant at 160 Spring Valley Marketplace, Spring Valley, New York (collectively, the "Restaurants").

**Termination of the Debtors' Rights to Operate Burger King® Franchises**

5. Pursuant to the terms of a Settlement Agreement dated July 31, 2023 between BKC, the Debtors, and the Debtors' president and owner Ranjana Jethwa, and pursuant to BKC's notice of default dated April 2, 2026 (*see* Mencia Declaration, Exhibits D and E), all of the Debtors' rights under the Franchise Agreements were to be terminated effective as of June 1, 2026.

6. Due to the bankruptcy filings of J.F.M. 6090 and JFM Spring on May 5, 2026 and the bankruptcy filing of JFM Sparta on May 11, 2026 prior to termination, and by operation of

section 108(b) of the Bankruptcy Code, the rights of J.F.M. 6090 and JFM Spring to operate as a Burger King® franchisee expired on July 4, 2026, and the right of JFM Sparta to operate as a Burger King® franchisee expired on July 10, 2026.

7. As of the date hereof, despite the termination of the Franchise Agreements, the Debtors continue to operate as Burger King® restaurants, displaying Burger King® signage, trade dress, branding, menus, uniforms and other indicia of a Burger King® franchise. The Debtors continued unauthorized use of the Burger King® trademarks constitutes, among other things, (a) willful trademark infringement under the Lanham Act, and (b) a blatant violation of violation of the post-termination covenants of the Franchise Agreements, and (c) irreparable harm to the goodwill and reputation of the Burger King® brand as well as trademark dilution.[2]

**The Restrictive Covenants**

8. Each of the Franchise Agreements contain restrictive covenants (the "Restrictive Covenants") barring the Debtors, for one year after termination, from owning or operating any non-Burger King® hamburger business at or within two miles of its respective Restaurant. Paragraph 19 of each Franchise Agreement provides:

> Franchisee covenants and agrees for itself, its parent, subsidiaries and affiliated companies that during the Term of this Agreement they will not own, operate or have any interest in any hamburger business except other franchised BURGER KING Restaurants. Franchisee further covenants and agrees that for a period of one (1) year after any sale, assignment, transfer, termination or expiration of this Agreement, these entities will not own, operate or have any interest in any hamburger business, except other franchised BURGER KING Restaurants, either at or within two (2) miles of the Premises.

*See* Mencia Declaration, Exhibits A through C, ¶ 19.

[2] BKC reserves all rights and remedies in connection therewith.

**The Debtors' Plan and Disclosure Statement**

9. On July 20, 2026, the Debtors filed their Second Amended Plan of Reorganization (the "Plan") [ECF No. 72] and Second Amended Disclosure Statement describing the Plan (the "Disclosure Statement") [ECF No. 71]. The Plan is premised on the Debtors' ability to operate a hamburger business at each of the Restaurants in direct violation of the Restrictive Covenants. The Debtors brazenly call their new concept a "Jumbo King Burger" restaurant operation.[3] *See* Disclosure Statement, pg. 13.

10. On July 21, 2026, this Court entered an *Amended Order Conditionally Approving Second Amended Disclosure Statement* [ECF No. 75] which conditionally approved the Disclosure Statement and set August 25, 2016 at 10:00 a.m. as the final approval of the Disclosure Statement and confirmation of the Plan. BKC has separately filed an objection to the Plan on the basis that it is patently unconfirmable.

**LEGAL ARGUMENT**

**The Restrictive Covenants are Enforceable**

**Restrictive Covenants are Enforceable in Bankruptcy Cases**

11. Restrictive covenants, regardless of whether they are part of agreements that were terminated or rejected, are enforceable in bankruptcy against a debtor so long as they are valid under applicable state law. *Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001) (*citing In re Klein*, 218 B.R. 787 (Bankr. W.D. Pa. 1998) (Covenant not to compete in rejected franchise agreement remained effective insofar as it was enforceable under applicable law); *Jackson Hewitt Inc. v. Childress*, 2008 WL 834386 at *26 (D.N.J. Mar. 21, 2008) (holding covenant not to compete

[3] As set forth herein, BKC has challenged the Debtors' application with the US Patent and Trademark Office for the mark "Jumbo King Burger" on the basis that it is confusingly similar to BKC's marks in violation of Section 2(d) of the Trademark Act.

in a terminated franchise agreement survived the franchisee's bankruptcy); *All American Properties, Inc.*, 2010 WL 1541694 (Bankr. M.D. Pa. 2010) (Granting stay relief to enforce covenant not to compete in terminated franchise agreement); *Kennedy v. Medicap Pharmacies, Inc.*, 267 F.3d 493 (6th Cir. 2001) (franchisor authorized to pursue injunctive relief for violation of non-compete under agreement that was terminated pre-petition); *In re KBAR, Inc.*, 96 B.R. 158 (Bankr. C.D. Ill. 1988) (covenants not to compete survive pre-petition termination of a franchise agreement and are enforceable against debtors); *Sir Speedy Inc. v. Morse,* 256 B.R. 657 (D. Mass. 2000) (covenant not to compete in franchise agreement survives rejection); *In re Weathers*, 465 B.R. 782 (Bankr. N.D. Miss. 2011) (noncompete provision in employment agreement survived bankruptcy case); *In re Capps*, 2018 WL 3635708 (Bankr. D. Kan. 2018) (Former employer could enforce non-compete against chapter 7 debtor; right to enforce restrictive covenant was not a claim subject to discharge); *In re Steaks To Go, Inc.*, 226 B.R. 35 (Bankr.E.D.Mo.1998) (covenants not to compete in rejected franchise agreements remained enforceable); *In re Don & Lin Trucking Company, Inc.*, 110 B.R. 562, (Bankr. N.D. Ala. 1990) (Covenant not to compete in a rejected franchise agreement remained valid and enforceable).

**The Restrictive Covenants are Enforceable Under Applicable Law**

12. The Franchise Agreements provide that they are governed by Florida law. *See* Mencia Declaration, Exhibits A through C, ¶ 21.C(1). Under Florida law, restrictive covenants limiting a franchisee's ability to operate a competing business within two miles of the franchised restaurant for a period of one year after termination are enforceable.

13. Florida statutes provide that a restrictive covenant is enforceable if it is reasonable in time, area, and line of business and is reasonably necessary to support a legitimate business

interest. Fla. Stat. § 542.335(1).[4] The statute further presumes that a covenant sought to be enforced against a former franchisee or licensee of a trademark or service mark is reasonable in time if it is one year or less in duration. Fla. Stat. § 542.335(1)(d)(2).

14. There is no similar statutory presumption for geographic area. However, courts applying Florida law have upheld larger geographic restrictions with similar time restraints in franchise and other business agreements. *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1219 (S.D. Fla. 2014) (one year and eight mile geographic restriction in franchise agreement reasonable in time and scope); *Medi-Weightloss Franchising USA, LLC v. Medi-Weightloss Clinic of Boca Raton, LLC*, 2012 WL 260902 (M.D. Fla. 2012) (25 mile and two year restriction against franchisee was reasonable under Florida law); *JonJuan Salon, Inc. v. Acosta*, 922 So. 2d 1081, 1083 (Fla. 4th DCA 2006) (10 mile radius and 2 year restriction was not unreasonable).

15. The Restrictive Covenants meet all the enforceability requirements under Florida law. First, they protect the legitimate business interests of BKC. Through the franchise relationship, the Debtors were given access to BKC's proprietary trade secrets, including recipes, food preparation methods, proprietary sourcing arrangements, operational procedures, marketing strategies, and confidential business systems. These constitute both "trade secrets" and "valuable confidential business or professional information that otherwise does not qualify as trade secrets" under Fla. Stat. § 542.335 (1)(b). Absent enforcement of the covenant, the Debtors could exploit

[4] The statute enumerates protectable interests to include: (1) trade secrets; (2) valuable confidential business or professional information that does not otherwise qualify as a trade secret; (3) substantial relationships with specific prospective or existing customers, patients, or clients; (4) customer, patient, or client goodwill associated with: (a) an ongoing business or professional practice by way of trade name, trademark, service mark, or "trade dress"; (b) a specific geographic location; (c) or a specific marketing or trade area; and (5) extraordinary or specialized training. Fla. Stat. § 542.335 (1)(b).

this proprietary information to BKC's detriment by operating a competing quick-service hamburger restaurant - which is their stated intention. *See* Mencia Declaration, ¶ 7.

16. Similarly, BKC provides its franchisees with extraordinary and specialized training in its proprietary business systems, operational standards, food safety protocols, and management techniques. This training represents a substantial investment by BKC, and enforcement of the covenant prevents the Debtors, as former franchisees, from deploying that training for the direct competitive benefit of a rival operation. *See* Mencia Declaration, ¶ 8.

17. Second, the duration of the Restrictive Covenants (one year) is presumptively reasonable under Florida statutory authority. Lastly, the scope of the Restrictive Covenants (2-mile radius from each Restaurant) is reasonable in accordance with the caselaw interpreting Florida law.

18. Because the Restrictive Covenants are enforceable, the Debtors are prohibited from operating a hamburger business at the Restaurants until July 2027.[5]

**<u>RELIEF REQUETED</u>**

**<u>Conversion to Chapter 7 Under Section 1112(b)</u>**

19. Cause exists to convert these cases under section 1112(b). The Debtors are bound by the Restrictive Covenants barring them from owning or operating any hamburger business at or within two miles of the Franchised Restaurants for another year. The Plan depends entirely on operating the "Jumbo King Burger" restaurants at those very locations. Because that business cannot lawfully be operated, the Debtors cannot propose a confirmable plan, the estate continues to lose value, and rehabilitation is impossible.

---

[5] BKC has also asserted a formal challenge to the Debtors' application with the US Patent and Trademark Office for the mark "Jumbo King Burger" on the basis that it is confusingly similar to BKC's marks in violation of Section 2(d) of the Trademark Act. *See* Mencia Declaration, Exhibit F.

20. Section 1112(b)(1) of the Bankruptcy Code provides that “on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause.” Section 1112(b)(4) provides a non-exhaustive list of “cause” factors, which includes “substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation.” *Deshmukh v. United States Tr. Off.*, 2025 WL 2663696, at *6 (D.N.J. Sept. 17, 2025) (“Cause” is not limited to the list of enumerated examples included in Title 11; citing *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999)). Beyond the factors listed in section 1112(b)(4), the inability to propose a confirmable plan is itself a basis for “cause” to convert or dismiss a case. *In re Am. Capital Equip., LLC*, 688 F.3d 145, 162 (3d Cir. 2012) (The inability to effectuate a plan remains a viable basis for conversion or dismissal because the listed examples of cause are not exhaustive).

21. Once cause is established, the burden shifts to the debtor to prove “unusual circumstances” establishing that conversion is not in the best interests of creditors and the estate and that a plan will likely be confirmed “within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time.” 11 U.S.C. § 1112(b)(2); *Deshmukh*, 2025 WL 2663696, at *7 (“once the Bankruptcy Court found cause under Section 1112, the burden shifted to Appellant to prove each part of Section 1112(b)(2) and demonstrate that his case presented ‘unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate’”).

**“Cause” Exists Under Section 1112(b)(4)(A): The Debtors Cannot Propose a Confirmable Plan, Resulting in Continuing Loss and <u>No Reasonable Likelihood of Rehabilitation</u>**

22. "Cause" exists under section 1112(b)(4)(A) to convert these cases because the Debtors cannot propose a confirmable plan as a result of the Restrictive Covenants, entitling BKC to enjoin their violation, resulting in "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." Without the "Jumbo King Burger" revenue, there is neither a confirmable plan nor any prospect of rehabilitation.

23. In connection with the Debtors' violation of the Restrictive Covenants, BKC is entitled to injunctive relief. BKC would need to establish: (a) a likelihood of success on the merits; (b) that it will suffer irreparable harm if the injunction is denied; (c) that granting relief will not result in even greater harm to the nonmoving party; and (d) that the public interest favors such relief. *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010). Each factor favors BKC.

24. **Likelihood of Success on the Merits.** BKC is likely to succeed on both its non-compete and trademark infringement claims. The Restrictive Covenants are clear, reasonable in scope, one year and two miles, and enforceable under governing law. Despite the Restrictive Covenants, Debtors propose to operate a hamburger business at the very locations those covenants protect. BKC is equally likely to succeed on its Lanham Act claims. 15 U.S.C. §§ 1114, 1125(a). Under the Third Circuit's likelihood-of-confusion analysis, *see Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983) (laying out the factors courts evaluate when considering injunctive relief in the context of the Lanham Act), the factors weigh decisively in BKC's favor: Burger King® is among the most recognized marks in the restaurant industry, "Jumbo King Burger" appropriates two of its three words, the parties operate in the identical trade channel, and Debtors propose to do so at the same premises consumers have long associated with Burger King®.

25. **Irreparable Harm.** Violation of franchise non-compete covenants and trademark rights causes irreparable harm that money damages cannot remedy. The Debtors had access to BKC's trade secrets, the MOD Manual, operating systems, vendor relationships, and proprietary know-how throughout the franchise relationship. *See* Mencia Declaration, ¶ 7. The Third Circuit has affirmed injunctive relief in precisely this posture, recognizing that where a party with access to a competitor's confidential information takes a position in which that information could be used to the former principal's detriment, the resulting threat of harm is irreparable and not susceptible to calculation as damages. *Bimbo Bakeries*, 613 F.3d at 110 (affirming grant of preliminary injunction under Pennsylvania law where employee had access to trade secrets and then began working for a competitor).

26. **The Debtors Present the Same Risk.** They do not merely have access to BKC's proprietary system, they propose to deploy it to operate a competing hamburger restaurant under a confusingly similar name at the very premises they operated as Burger King® franchisees. That conduct inflicts ongoing injury to BKC's goodwill, brand integrity, and franchise system, and infringement by a former franchisee is especially injurious because the franchisor loses control over the quality of the goods and services offered under its marks, harm that no damages award can capture.

27. **No Greater Harm to Debtors and the Public Interest.** Enforcing the Restrictive Covenants would not cause Debtors greater harm than BKC would suffer absent an injunction. BKC seeks only enforcement of obligations Debtors voluntarily assumed and of trademark rights under which Debtors themselves once operated, and Debtors cannot claim cognizable hardship from being held to their own bargain. The Restrictive Covenants leave the Debtors free to operate any non-hamburger business at the Restaurants or a hamburger business more than two miles

away, so the restriction reaches only the narrow band of activity BKC bargained to prevent. The public interest likewise favors relief: enforcement of valid contracts, protection of intellectual property, and prevention of consumer confusion all weigh in BKC's favor, particularly where consumers at these locations would reasonably assume a continuing affiliation with Burger King®.

**The Debtors' Inability to Propose a Confirmable Plan Results in**
**<u>Substantial Loss to the Estate and No Prospect of Rehabilitation</u>**

28. The estate loses value every month these cases remain in chapter 11. The Debtors cannot operate a hamburger business at the Restaurants without violating the Restrictive Covenants. Meanwhile, BKC alone is owed approximately $590,000 in unpaid royalties, and the Debtors continue to incur operating expenses, administrative expenses, professional fees, and U.S. Trustee fees in pursuit of a Plan that cannot be confirmed. Every dollar the estate spends prosecuting that Plan is a dollar unavailable to creditors.

29. An injunction enforcing the Restrictive Covenants would eliminate Debtors' only source of operating revenue and render the Plan unworkable. The Debtors' own Disclosure Statement confirms that "the projections and other financial analysis conducted in connection with this Disclosure Statement are based solely on expected operating revenues from these new restaurants," and those are the very operations the Restrictive Covenants prohibit. Nor does it matter that BKC has not yet obtained an injunction. Section 1112(b)(4)(A) asks whether rehabilitation is reasonably likely, and a business whose sole revenue stream violates the Restrictive Covenants and is subject to a meritorious injunction action cannot be reestablished on that foundation. Once BKC establishes cause, it is Debtors who must show that a plan is confirmable within a reasonable time, and Debtors cannot carry that burden by putting together a plan in violation of the Restrictive Covenants.

30. Nor can Debtors rehabilitate by pivoting to a permitted line of business. The Restrictive Covenants leave the Debtors free to operate a non-hamburger concept at the Restaurants or a hamburger business beyond the two-mile radius, but neither alternative is achievable here. Each would require a complete concept conversion or new leases, together with buildout, equipment, staffing, marketing, and regulatory approvals, expenditures that must be funded from an estate that has no operating revenue without the "Jumbo King Burger" restaurants. Nor can Debtors simply wait out the restricted period until July 2027, because a year of accruing operating expenses, administrative expenses, professional fees, and U.S. Trustee fees without revenue would exhaust the estate long before any permitted operations could begin. Section 1129(a)(11) requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." *In re Am. Capital Equip.*, 688 F.3d at 155-56. A plan that depends on operations BKC can enjoin cannot satisfy that standard.

**Conversion, Rather Than Dismissal, is in the Best**
**<u>Interests of Creditors and the Estate</u>**

31. Debtors' estates retain value, leasehold interests, equipment, fixtures, and inventory, that a chapter 7 trustee can market and liquidate in an orderly fashion for the benefit of creditors, subject to the Bankruptcy Code's priority scheme and with the benefit of avoidance powers and independent oversight. Every month these cases remain in chapter 11, administrative expenses, professional fees, and U.S. Trustee fees continue to accrue against a shrinking estate while Debtors pursue a Plan they cannot confirm. Dismissal would produce a worse result, returning creditors to a race to the courthouse under state law with no orderly distribution and no trustee to investigate or recover estate assets. Conversion halts the erosion of estate value and preserves an equitable recovery for creditors.

WHEREFORE, BKC respectfully requests that the Court (i) convert these jointly administered chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; (ii) direct the appointment of a chapter 7 trustee; and (iii) grant such other and further relief as the Court deems just and proper.

Respectfully submitted on August 4, 2026.

**VENABLE LLP**

By: *\/s/ Michael A. Guerra*
Michael A. Guerra
151 W. 42nd Street, 49th Floor
New York, NY 10036
Telephone: (212) 307-5500
Facsimile: (212) 307-5598
MAGuerra@Venable.com

\- and -

Glenn D. Moses (*pro hac vice*)
801 Brickell Avenue, Suite 1500
Miami, Florida 33131
Telephone: (305) 349-2300
GMoses@Venable.com

*Counsel to Burger King Company, LLC*