**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**VENABLE LLP**
151 W. 42nd Street, 49th Floor
New York, NY 10036
Tel.: (212) 307-5500
Fax: (212) 307-5598
Attn: Michael A. Guerra
(MAGuerra@Venable.com)

- and -

801 Brickell Avenue, Suite 1500
Miami, Florida 33131
Tel.: (305) 349-2300
Attn: Glenn D. Moses (*pro hac vice*)
(GMoses@Venable.com)

*Counsel to Burger King Company LLC*

**In re:**

**J.F.M. 6090, INC., et al.**[1]

**Debtors.**

Case No.: 26-15123-JKS
(Jointly Administered)
Chapter: 11
Hon. John K. Sherwood

Hearing Date: August 25, 2026, 10:00 a.m.

**DECLARATION OF DYLAN MENCIA IN SUPPORT**
**OF MOTION TO CONVERT CASES TO CHAPTER 7**

I, Dylan Mencia, declare as follows:

1. I am Counsel, Franchising & Real Estate, US, to Restaurant Brands International US Services LLC. I am familiar with the facts set forth herein.

2. I submit this Declaration in support of Burger King Company LLC's Motion to Convert the Debtors' Cases to Chapter 7 proceedings.

[1] The Debtors in these chapter 11 cases are J.F.M. 6090, Inc. [Case No. 26-15123], JFM Spring LLC [Case No. 26-15124], and JFM Sparta, LLC [Case No. 26-15275].

3. Attached hereto as **Exhibit A** is a copy of the Franchise Agreement between Burger King Corporation ("BKC") and JFM Sparta.

4. Attached hereto as **Exhibit B** is a copy of the Franchise Agreement between BKC and JFM Spring.

5. Attached hereto as **Exhibit C** is a copy of the Franchise Agreement between BKC and JFM 6090.

6. Each Franchise Agreement contains restrictive covenants (the "Restrictive Covenants") barring the Debtors, for one year after termination, from owning or operating any non-Burger King® hamburger business at or within two miles of its respective Restaurant. Paragraph 19 of each Franchise Agreement provides:

> Franchisee covenants and agrees for itself, its parent, subsidiaries and affiliated companies that during the Term of this Agreement they will not own, operate or have any interest in any hamburger business except other franchised BURGER KING Restaurants. Franchisee further covenants and agrees that for a period of one (1) year after any sale, assignment, transfer, termination or expiration of this Agreement, these entities will not own, operate or have any interest in any hamburger business, except other franchised BURGER KING Restaurants, either at or within two (2) miles of the Premises.

7. The Restrictive Covenants protect the legitimate business interests of BKC. Through the franchise relationship, the Debtors were given access to BKC's proprietary trade secrets, including recipes, food preparation methods, proprietary sourcing arrangements, operational procedures, marketing strategies, and confidential business systems. Absent enforcement of the covenant, Debtors could exploit this proprietary information to BKC's detriment by operating a competing quick-service hamburger restaurant.

8. Similarly, BKC provides its franchisees with extraordinary and specialized training in its proprietary business systems, operational standards, food safety protocols, and management

techniques. This training represents a substantial investment by BKC, and enforcement of the Restrictive Covenant prevents the Debtors, as former franchisees, from deploying that training for the direct competitive benefit of a rival operation.

9. Attached hereto as **Exhibit D** is a copy of the July 31, 2023 Settlement Agreement between BKC, the Debtors and Ranjana Jethwa.

10. Attached hereto as **Exhibit E** is a copy of the BKC's April 2, 2026 Notice of Default issued to the Debtors.

11. Attached hereto as **Exhibit F** is a copy of BKC's Letter of Protest dated July 29, 2026 delivered to the United States Patent and Trademark Office concerning the application for the mark "Jumbo King Burger".

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 4th day of August, 2026 in Miami, Florida.

Dylan Mencia

# EXHIBIT A

# FRANCHISE AGREEMENT (Entity)
CONTENTS

**RESTAURANT #:1877**
**ADDRESS: 49 SPARTA AVENUE**
**SPARTA, NEW JERSEY 07871-1822**


| | | |
|---|---|---|
| | **INTRODUCTION** | 1 |
| **1.** | **FRANCHISE GRANT: TERM AND LOCATION** | 1 |
| **2.** | **FRANCHISE FEE** | 2 |
| **3.** | **ORGANIZATION OF FRANCHISEE** | 2 |
| **4.** | **FRANCHISEE ASSOCIATION AND ADVISORY COUNCIL** | 2 |
| **5.** | **STANDARDS AND UNIFORMITY OF OPERATION** | 3 |
| | A. M.O.D. Manual | 3 |
| | B. Franchised Restaurant | 4 |
| | (1) Repair and Maintenance | 4 |
| | (2) Current Image | 4 |
| | C. Signs | 4 |
| | D. Equipment | 5 |
| | E. Vending Machines, Etc. | 5 |
| | F. Menu and Service | 6 |
| | G. Hours of Operation | 6 |
| | H. Uniforms | 6 |
| | I. Advertising and Promotional Materials | 6 |
| | J. Right of Entry and Inspection | 6 |
| | K. Interference with Employment Relations of Others | 6 |
| | L. Management of Franchised Restaurant | 7 |
| **6.** | **SERVICES AVAILABLE TO FRANCHISEE** | 7 |
| **7.** | **THE FRANCHISED RESTAURANT** | 8 |
| **8.** | **TRAINING** | 8 |
| | A. Managing Owner/Managing Director | 8 |
| | B. Charges and Costs | 9 |
| | C. Franchisee Training and Restaurant Staffing | 9 |
| **9.** | **ROYALTY AND ADVERTISING CONTRIBUTION** | 9 |
| | A. Royalty | 9 |
| | B. Advertising, Sales Promotion and Public Relations | 9 |
| | C. Gross Sales | 10 |
| | D. Late Charge | 11 |
| | E. Payment | 11 |
| | F. Audit of Advertising Contributions | 11 |

| | | |
|---|---|---|
| | G. Alternative Method Of Payment | 11 |
| 10. | **ACCOUNTING PROCEDURES: RIGHT OF AUDIT** | 12 |
| | A. Accounting | 12 |
| | B. Annual Financial Statements | 12 |
| | C. Audits | 12 |
| | D. Release of Financial Information | 12 |
| 11. | **LIMITATIONS OF FRANCHISE** | 13 |
| | A. Trademarks, Trade Names, Service Marks and Trade Secrets | 13 |
| | B. Independent Contractor | 13 |
| 12. | **UNFAIR COMPETITION** | 14 |
| 13. | **INSURANCE; INDEMNIFICATION** | 14 |
| | A. Insurance | 14 |
| | B. Worker's Compensation | 14 |
| | C. Indemnity | 15 |
| | D. Defense of Claims | 15 |
| 14. | **TAXES** | 16 |
| 15. | **ASSIGNMENT: CONDITIONS AND LIMITATIONS** | 16 |
| | A. Transfer by Franchisee | 16 |
| | B. Transfer by Owners | 16 |
| | C. Transfer of Equity Securities | 16 |
| | D. Pledging of Franchise Agreement | 17 |
| | E. Notice of Proposed Transfer | 17 |
| | F. Conditions of Consent | 17 |
| | G. Consent to Transfer | 18 |
| | H. Continuing Liability | 18 |
| | I. Right of Re-Entry | 19 |
| | J. Notices to Transferor | 19 |
| | K. Acquisition of Additional Franchises | 20 |
| | L. Death or Mental Incapacity | 20 |
| | M. No Waiver | 20 |
| 16. | **RIGHT OF FIRST REFUSAL** | 20 |
| 17. | **OPTION TO OBTAIN SUCCESSOR FRANCHISE AGREEMENT** | 21 |
| 18. | **DEFAULT AND EFFECT OF TERMINATION** | 22 |
| | A. Default | 22 |
| | B. Effect of Termination | 25 |
| 19. | **RESTRICTIVE COVENANT** | 26 |
| 20. | **RESOLUTION OF DEVELOPMENT DISPUTES** | 26 |
| | A. Non-Binding Mediation | 26 |
| | B. Binding Dispute Resolution | 26 |
| | C. Modification of Procedures | 26 |
| | D. Institution of Legal Proceedings | 27 |
| 21. | **MISCELLANEOUS: GENERAL CONDITIONS** | 27 |

| | |
|---|---|
| A. Interpretation | 27 |
| B. Non-Waiver | 27 |
| C. *Governing Law, Forum and Compliance* | 27 |
| D. Severability | 28 |
| E. Notices | 28 |
| F. Modification | 28 |
| G. Binding Effect | 28 |
| H. Survival | 28 |
| I. Attorney's Fees | 29 |
| J. Entire Agreement | 29 |
| **EXHIBIT A - LEGAL DESCRIPTION** | 30 |
| **EXHIBIT B - OWNERS** | 31 |

## LIST OF ATTACHMENTS

The items checked below are hereby incorporated into and are made a part of this Franchise Agreement:

- ☐ Non-Traditional Facility Addendum
- ☐ Big Box Non-Traditional Facility Addendum
- ☐ Base DIP 2015 Addendum
- ☐ Multi-Unit DIP 2015 Addendum
- ☐ 2016 Food Court / Civil Servant Addendum
- ☐ Franchise Agreement Addendum (DIP)
- ☑ Replacement Franchise Addendum
- ☐ Investor Addendum
- ☐ ITP3 Successor Franchise Addendum
- ☐ ITP2A Successor Franchise Addendum
- ☐ ITP2 Successor Franchise Addendum
- ☐ SIO3 Successor Franchise Addendum
- ☐ Successor Franchise Addendum (Complete 20/20 Remodel)
- ☐ Successor Franchise Addendum (Phased 20/20 Remodel)
- ☐ Successor Franchise Addendum (BKLIP Complete 20/20 Remodel)
- ☐ Successor Incentive Addendum
- ☐ Successor Addendum
- ☐ Mall Incentive Program Addendum
- ☐ A-Site Incentive Addendum
- ☐ ERP Franchise Agreement Addendum
- ☐ Deferred Remodel Addendum
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of California
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of Illinois
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of Minnesota
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of North Dakota
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of Washington

**BURGER KING® RESTAURANT FRANCHISE AGREEMENT**
**(ENTITY)**

THIS BURGER KING® RESTAURANT FRANCHISE AGREEMENT (this "Agreement") is made as of the 13 day of July, 2015, by and between BURGER KING CORPORATION, a Florida corporation ("BKC") and JFM SPARTA, LLC ("Franchisee") a New Jersey limited liability company.

**INTRODUCTION**

A. BKC is the exclusive licensee of certain trademarks and service marks, including but not limited to BURGER KING® and HOME OF THE WHOPPER®, which are registered or pending with the United States Patent and Trademark Office, and is the owner or exclusive licensee of other trademarks and service marks authorized for use in BURGER KING Restaurants (the "BURGER KING Marks").

B. BKC is engaged in the business of operating and granting franchises to operate restaurants ("BURGER KING Restaurants") using the BURGER KING Marks and a uniform and comprehensive restaurant format and operating system developed by BKC (the "BURGER KING System"), including a standardized design, decor, equipment system, color scheme, style of building and signage, as well as uniform operating and quality standards, specifications and procedures of operation, and uniformity of product and services offered, including all provisions of the Manual of Operating Data, as amended from time to time (the "MOD Manual").

C. Franchisee desires to acquire a franchise to operate a BURGER KING Restaurant at the Premises for the entire Term specified in this Agreement. Franchisee acknowledges receipt of a copy of the Franchise Disclosure Document of BKC and Franchisee has had a full and adequate opportunity to be thoroughly advised of the terms and conditions of this Agreement by financial and legal counsel of Franchisee's own choosing at least fourteen (14) calendar days, prior to its execution, and is entering into this Agreement after having made an independent investigation of BKC's operations and not upon any representation as to the profits and/or sales volume which Franchisee might be expected to realize, nor upon any representations or promises by BKC which are not contained in this Agreement.

D. BKC has previously approved a plan for the distribution of securities of Franchisee (the "Franchise Entity Application").

In consideration of the mutual covenants contained in this Agreement, the parties agree as follows:

**1. FRANCHISE GRANT: TERM AND LOCATION**

BKC grants to Franchisee and Franchisee accepts a franchise for a period of twenty (20) years to use the BURGER KING System and the BURGER KING Marks only in the operation of a BURGER KING Restaurant at
more fully described in Exhibit A (the "Franchised Restaurant"), (the term "Franchised Restaurant" includes the real estate described on Exhibit A (the "Premises"), the restaurant "Building" and all "Improvements" constructed thereon wherever the context permits or requires). The term of this Agreement commences on the date the Franchised Restaurant opens for business (the "Commencement Date") and shall expire twenty (20) years thereafter (the "Term") unless sooner terminated in accordance with the provisions of this Agreement. Franchisee agrees to operate the Franchised Restaurant at the specified location for the entire twenty (20) year Term. Franchisee accepts this franchise with the full and complete understanding that the franchise grant contains no promise or assurance of renewal. The sole and entire conditions under which Franchisee will have the opportunity of obtaining a Successor BURGER KING Franchise Agreement at

expiration are those set forth herein in Section 17. This franchise is for the specified location only and does not in any way grant or imply any area, market or territorial rights proprietary to Franchisee.

**2. FRANCHISE FEE**

Franchisee acknowledges that the grant of this franchise constitutes the consideration for the payment by Franchisee to BKC of ($ ) Dollars, and that this sum shall be fully earned by BKC upon the execution and delivery of this Agreement.

**3. ORGANIZATION OF FRANCHISEE**

A. The individuals listed in Exhibit B to this Agreement are the "Owners" of Franchisee for purposes of this Agreement. Franchisee acknowledges its understanding of BKC's requirement that an individual "Managing Owner" be named and be granted the authority by Franchisee to bind Franchisee in any dealings with BKC and its affiliates and to direct any action necessary to ensure compliance with this Agreement and any other agreements relating to the Franchised Restaurant. Franchisee represents and warrants that the Managing Owner designated in Exhibit B presently has and will have, throughout the term of this Agreement, the authority to bind Franchisee in any dealings with BKC and its affiliates and to direct any action necessary to ensure compliance with this Agreement and any other agreements relating to the Franchised Restaurant. Franchisee has not taken and agrees that it will not hereafter take, whether directly or indirectly, any action to avoid the authority requirement for the Managing Owner through the entry of limiting board resolutions, management agreements, amendment of governing documents or any other similar device or arrangement. Franchisee agrees to furnish BKC with such evidence as BKC may request from time to time for the purpose of assuring BKC that the Managing Owner's authority remains as represented in this Agreement. No change in the Managing Owner may be made without the prior written consent of BKC. If the Managing Owner dies or becomes incapacitated, then within sixty (60) days thereafter, Franchisee shall name a new Managing Owner approved by BKC pursuant to BKC's then current criteria for approving Managing Owners.

B. Franchisee shall notify BKC of, and at BKC's request provide copies of, any amendments to the articles of incorporation, by-laws, partnership agreement, or other governing documents of Franchisee. No amendment to such governing documents may be made, nor may any resolution be adopted by the board of directors of Franchisee, if Franchisee is a corporation, without the written consent of an authorized officer of BKC, if such amendment or resolution would (1) change the description of the Franchisee's purposes or authorized activities; (2) change the designation of, or the procedures for designating, the Managing Owner; (3) change the authority delegated to the Managing Owner; or (4) materially alter promises or representations contained in the Franchise Entity Application approved by BKC.

C. Franchisee shall provide BKC annually with an updated list of all shareholders or general and limited partners of Franchisee and its parent, if any.

**4. FRANCHISEE ASSOCIATION AND ADVISORY COUNCIL**

BKC shall, on a periodic basis, consult with representatives of an independent association whose membership is comprised of at least fifty-one percent (51%) of all BURGER KING franchise-owned and operated restaurants in the U.S.A. (the "Franchisee Association") relative to those matters expressly described in Sections 5.B, 6, 8, 9 and 20.C of this Agreement. The representatives of the Franchisee Association shall be referred to herein as the "Franchisee Advisory Council." Membership by a Franchisee in the Franchisee Association shall be voluntary.

Franchisee agrees that BKC may consult with and consider the advice of the Franchisee Advisory Council.

For purposes of this Franchise Agreement, to qualify as the "Franchisee Association," the association must have been formed for the primary purpose of representing the rights of franchisees, and membership in such association must be limited solely to BURGER KING franchisees, or officers, directors, partners or shareholders of BURGER KING franchisees, who in either case are not owned or controlled by BKC or its parent, or any subsidiary or affiliate of BKC.

BKC shall not prohibit nor restrict Franchisee from associating with other franchisees, nor from forming, joining or participating in any franchisee trade association (the "activities"). BKC shall not retaliate against Franchisee because Franchisee engages in the activities. BKC's exercise and enforcement of its rights under any franchise agreement or the law shall not, by itself, constitute a breach of BKC's responsibilities under the preceding sentence.

**5. STANDARDS AND UNIFORMITY OF OPERATION**

BKC shall establish, and cause approved suppliers to the BURGER KING System to reasonably comply with, product, service and equipment specifications as established by BKC from time to time.

Suggestions from Franchisee for improving elements of the BURGER KING System, such as products, equipment, uniforms, restaurant facilities, service format and advertising, are encouraged and may or may not be considered by BKC when adopting or modifying standards, specifications and procedures for the BURGER KING System. Franchisee acknowledges that any such suggestions made by Franchisee hereunder shall become the exclusive property of BKC. BKC shall have no obligation to utilize suggestions and no obligation to provide compensation for any suggestion. Franchisee may not utilize any such suggestions in the Franchised Restaurant without the prior written consent of BKC.

**A. M.O.D. Manual**

Franchisee acknowledges and agrees that prompt adoption of and adherence to the BURGER KING System, including all of the provisions of the MOD Manual, as amended from time to time, are reasonable, necessary and essential to the image and success of all BURGER KING Restaurants. The MOD Manual, which is comprised of the BURGER KING Operations Manual, the Restaurant Equipment Manual, the RSI Equipment and Facilities E-Red Book, the Approved Brands and Distributors List, Approved Equipment List, the Brand Standards Guide, the Ops Emphasis Guide, alerts and amendments thereto, and applicable policies established by BKC, or the then-current equivalent printed or electronic versions of those documents, contains the official mandatory restaurant operating, equipment and product standards, specifications and procedures prescribed from time to time by BKC for the operation of a BURGER KING Restaurant. The MOD Manual and any revisions or updates thereto may be provided in electronic format including via internet, intranet, or other electronic means. Franchisee acknowledges that the MOD Manual is designed to protect BKC's standards, the BURGER KING System, and the BURGER KING Marks, and not to control the day-to-day operation of the Franchised Restaurant. Franchisee may not print a copy of the MOD Manual without BKC's prior written approval.

Franchisee agrees that changes in the standards, specifications and procedures may become necessary and desirable from time to time and agrees to accept and comply with such modifications, revisions and additions to the MOD Manual which BKC in the good faith exercise of its judgment believes to be desirable and reasonably necessary. The material and information set forth in the MOD Manual is confidential and proprietary to BKC and is to be used by Franchisee only in connection with

the operation of the Franchised Restaurant and other franchised BURGER KING Restaurants. The MOD Manual and other specifications, standards and operating procedures communicated in writing or electronically to Franchisee shall be deemed a part of this Agreement.

**B. Franchised Restaurant**

The Franchised Restaurant shall at all times be under the direct, on premises supervision of Franchisee or its manager. The Franchised Restaurant will be constructed and improved in the manner authorized and approved by BKC, and the appearance of the Franchised Restaurant will not thereafter be altered except as may be approved in writing by BKC.

**(1) Repair and Maintenance.**

Franchisee shall, at its expense, continuously throughout the Term of this Agreement maintain the Franchised Restaurant in good condition and repair in accordance with BKC's then current repair and maintenance standards.

**(2) Current Image.**

Franchisee shall, improve, alter and remodel the Franchised Restaurant to bring it into conformance with the national and local plans, specifications and/or other standards for new or remodeled BURGER KING Restaurants as may hereafter be reasonably changed and defined from time to time by BKC ("Current Image") in accordance with the following timetable:

(i) During the tenth year of the Term, Franchisee shall remodel, improve and alter the exterior of the Franchised Restaurant to conform with the Current Image in effect on the ninth anniversary of the date of this Agreement.

(ii) BKC and the Franchisee Advisory Council shall meet annually to discuss and establish the components of Current Image for the Franchised Restaurant. The Current Image as established by BKC and the Franchisee Advisory Council, from time to time, shall be binding upon Franchisee. If BKC and the Franchisee Advisory Council do not agree on the Current Image, BKC and the Franchisee Association shall settle the matter by Arbitration by a sole arbitrator in accordance with the then current non-administered arbitration rules of the Center for Public Resources. The arbitration shall be governed by the United States Arbitration Act (U.S.A.A.), and judgment upon the decision rendered by the arbitrator shall be binding on Franchisee and BKC and except as provided in Section 10(a) of the U.S.A.A., shall not be appealable in any forum. The decision may be entered by any court having jurisdiction thereof. The place of arbitration shall be Miami, Florida. Failure of Franchisee to comply with the terms of this Section 5.B shall be deemed a material default of this Agreement.

***C. Signs***

The BURGER KING Marks will only be erected and displayed in the manner and at such locations as are approved and authorized by BKC, in writing. Franchisee agrees to maintain and display signs reflecting the Current Image of BURGER KING Restaurants and shall not place additional signs or posters at the Franchised Restaurant without the prior written consent of BKC. Only signs from sources approved by BKC may be utilized at the Franchised Restaurant. Franchisee shall discontinue the use of and destroy such signs as are declared obsolete by BKC within the reasonable time specified by BKC. Such signs are fundamental to the BURGER KING Restaurant System and Franchisee hereby grants to BKC the right to enter the Franchised Restaurant to remove and destroy unapproved or obsolete signs in the event that Franchisee has failed to do so within thirty (30) days after the written request of BKC.

**D. Equipment**

(1) Only equipment approved by BKC which meets the criteria and performance standards of the BURGER KING Restaurant System may be used in the Franchised Restaurant. The equipment shall be maintained in a condition that meets operational standards specified in the MOD Manual and, as equipment becomes obsolete or inoperable, Franchisee will replace the equipment with the types and kinds of equipment as are then approved for use in BURGER KING Restaurants. If BKC determines that additional or replacement equipment is needed because of a change in menu items or method of preparation and service or because of health or safety considerations, Franchisee will install the additional equipment or replacement equipment within the reasonable time specified by BKC. Prior to mandating the use of a new or additional piece of equipment, BKC shall use reasonable efforts to field test the proposed new equipment.

(2) Franchisee must, at its sole cost and expense: (a) at all times operate at the Franchised Restaurant POS Systems (as hereinafter defined) approved by BKC; (b) upgrade or replace in whole or in part any POS Systems as BKC may reasonably deem necessary or desirable in the interest of proper administration of Burger King Restaurants throughout the Burger King Restaurant System, within such reasonable time as may be specified by BKC; (c) use the approved POS Systems at all times to record and process such information as BKC may from time to time require, including information regarding any other business carried on in or from any Burger King Restaurant with the consent of BKC, keep such information available for access by BKC on the POS System for such minimum period as BKC may require, and maintain and provide to BKC such information in the format, and using such data exchange standards and protocols as BKC may require; (d) effect the Polling (as hereinafter defined) operation at such time or times as may be required by BKC, but BKC may itself initiate Polling whenever it deems appropriate; (e) permit BKC or its agents to Poll any information contained in the POS System at any time; (f) permit BKC or its agent to obtain all of the information referenced in this Section 5.D. that may be in the possession of any third party vendor from whom Franchisee obtained an approved POS System; and (g) if required by BKC, download the information referenced in this Section 5.D. into machine readable information compatible with the system operated by BKC or its agents and to deliver that information to BKC by such method and within such timescale as BKC reasonably requires if for any reason Polling is not practicable. For purposes of this Agreement, the term "POS System" means a point of sale computerized system consisting of electronic hardware and software technology, which captures, records and transmits sales, taxes on sales, number, date and time of transactions, products and combinations of products sold and employees using the system and such other related information as may be required by BKC from time to time. For purposes of this Agreement, the term "Polling" means any process acceptable to BKC by which information or data about the Franchised Restaurant may be transmitted to or from a POS System or other system operated by Franchisee into a computer or system operated by BKC or its agents.

**E. Vending Machines, Etc.**

Public telephones, newspaper racks, juke boxes, cigarette, gum and candy machines, rides, lottery ticket terminals, video games or any other games, or vending or amusement machines will not be installed at the Franchised Restaurant without the prior written approval of BKC. In the event such items are installed at the Franchised Restaurant, then all sums received by Franchisee in connection with these items shall be included within "Gross Sales" as defined herein.

**F. Menu and Service**

All menu items, including without limitation, promotional and premium products which BKC may deem appropriate to take full advantage of the potential market and achieve standardization in the BURGER KING Restaurant System will be served, and no items which are not set forth in the MOD Manual or otherwise authorized and approved by BKC in writing will be served. Franchisee shall only sell the approved menu items at retail to consumers from and through the Franchised Restaurant

and shall not sell such items for redistribution or resale. Franchisee shall adhere to all specifications contained in the MOD Manual or as otherwise prescribed by BKC as to ingredients, methods of preparation and service, weight and dimensions of products served, and standards of cleanliness, health and sanitation. All food, drink and other items will be served and sold in packaging that meets BKC's specifications. Only food, supplies, paper products and packaging from sources approved by BKC shall be used in the Franchised Restaurant.

**G. Hours of Operation**

The Franchised Restaurant shall be open for business at a minimum from 7:00 A.M. to 11:00 P.M., seven (7) days a week, fifty-two (52) weeks a year, unless otherwise authorized or directed by BKC or unless prohibited by applicable law. The Franchised Restaurant may be closed on Thanksgiving Day and/or Christmas Day if a majority of the BURGER KING Restaurants in the market area (A.D.I.) in which the Franchised Restaurant is located elect to close on the holiday.

**H. Uniforms**

All employees shall only wear uniforms of such design and color as are from time to time specified by BKC.

**I. Advertising and Promotional Materials**

Only those advertising and promotional materials or items which are authorized by BKC in writing prior to use shall be used, sold or distributed, and no display or use of the BURGER KING Marks shall be made without the prior written approval of BKC. All materials on which the BURGER KING Marks are used must include the designation ® or such other designation as BKC may specify.

**J. Right of Entry and Inspection**

BKC shall have the unrestricted right to enter the Franchised Restaurant to conduct such activities as it deems necessary to ascertain Franchisee's compliance with this Agreement. The inspections may be conducted without prior notice at any time when one of Franchisee's employees is at the Franchised Restaurant. The inspections will be performed in a manner which minimizes interference with the operation of the Franchised Restaurant.

**K. Interference with Employment Relations of Others**

Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

**L. Management of Franchised Restaurant**

(1) Franchisee acknowledges its understanding of BKC's requirement that an individual "Managing Director" approved by BKC, trained in the BURGER KING System and periodically retrained in the BURGER KING System, be identified by Franchisee to BKC and be granted the authority by Franchisee to direct any action necessary to ensure that the day-to-day operation of the Franchised Restaurant is in compliance with the MOD Manual, with this Agreement, and with the terms of any lease and any other agreements relating to the Franchised Restaurant. The Managing Director shall

devote full time and best efforts to the overall supervision of the Franchised Restaurant and any other BURGER KING Restaurants owned by Franchisee as to which he/she is the Managing Director. The Managing Director shall live in the "vicinity" of the Franchised Restaurant, as the term "vicinity" is defined for Managing Directors by BKC from time to time, in its reasonable discretion. The current Managing Director is designated in Exhibit B. Franchisee represents and warrants that the Managing Director presently has and will have, throughout the term of this Agreement, the authority to direct any action necessary to ensure that the day-to-day operation of the Franchised Restaurant is in compliance with the MOD Manual, with this Agreement, and with the terms of any lease and any other agreements relating to the Franchised Restaurant. Franchisee has not taken and agrees that it will not hereafter take, whether directly or indirectly, any action to avoid the authority requirement for the Managing Director through the entry of limiting board resolutions, management agreements, amendment of governing documents or any other similar device or arrangement. Franchisee agrees to furnish BKC with such evidence as BKC may request from time to time for the purpose of assuring BKC that the Managing Director's authority remains as represented in this Agreement and to require that the Managing Director attend such additional and periodic training as BKC may reasonably require of Managing Directors. If the position of Managing Director becomes vacant for any reason, the vacancy shall be filled within sixty (60) days by a new Managing Director trained in the BURGER KING System and approved by BKC.

(2) At all times during the Term of this Agreement, Franchisee shall employ at least one (1) individual (the "Restaurant Manager") who is responsible for the direct, personal supervision of the Franchised Restaurant and who, within six (6) months after becoming Restaurant Manager, successfully completes the training program described in Section 8.C.

**6. SERVICES AVAILABLE TO FRANCHISEE**

BKC agrees to provide the following services to Franchisee and to use reasonable efforts to provide them in a manner reasonably designed for the BURGER KING System, including the use of technology deemed by BKC to be competitive in the quick service restaurant industry. Prior to making material changes to the content of, and manner by which, the following items or services are delivered to Franchisee, BKC shall consult with the Franchisee Advisory Council to receive input as to the proposed change. The content of and manner by which the following services are to be delivered by BKC shall be within BKC's sole reasonable discretion:

A. A reproducible copy of either (i) the standard architectural building plans and specifications for current approved freestanding buildings or double drive thru buildings, or (ii) such other standard approved restaurant facility, whichever is applicable. Any modifications of the standard plans and specifications, whether requested or required by planning and zoning boards, building codes or otherwise, must be approved in writing by BKC and are to be paid for by Franchisee.

B. A pre-opening training program conducted at BKC training facilities and certified BURGER KING Restaurants.

C. Pre-opening and opening assistance by personnel of BKC at the Franchised Restaurant for a period of time as BKC deems appropriate under the circumstances. BKC may, in its reasonable discretion, consider the following factors: the experience of the Franchisee, the type of facility being operated, whether the assistance is for a new opening or the reopening after a transfer of ownership of an already operating restaurant, the prior BURGER KING System experience of Franchisee's management, the projected volume of the restaurant, as estimated by Franchisee, and any other factors that BKC deems appropriate for consideration.

D. Opening promotion program. Franchisee may be eligible for a credit to its account in exchange for implementing grand opening promotions conducted after the Franchised

Restaurant opens, in accordance with BKC's policy (if any) at the time of opening. Costs in excess of the amount of the credit (if any) incurred in implementing the program shall be Franchisee's responsibility.

E. BKC's MOD Manual in an approved format, a copy of which will be loaned to Franchisee for the Term of this Agreement.

F. Such merchandising, marketing and advertising research data and advice as may be developed from time to time by BKC and deemed by it to be helpful in the operation of a BURGER KING Restaurant.

G. Communication of new developments, techniques and improvements of BKC in food preparation, equipment, food products, packaging, service and restaurant management which are relevant to the operation of a BURGER KING Restaurant.

H. Such ongoing support as BKC deems reasonably necessary to continue to communicate and advise Franchisee as to the BURGER KING System including the operation of the Franchised Restaurant.

**7. THE FRANCHISED RESTAURANT**

The site at which Franchisee shall operate the Franchised Restaurant is more fully described in Exhibit A. During the Term of this Agreement the site shall be used exclusively for the purpose of operating a franchised BURGER KING Restaurant.

In the event the Franchised Restaurant shall be damaged or destroyed by fire or other casualty, or be required to be repaired or reconstructed by any governmental authority, Franchisee shall, at its own expense, repair or reconstruct the Franchised Restaurant within a reasonable time under the circumstances. The minimum acceptable appearance for the restored Franchised Restaurant will be that which existed just prior to the casualty; however, every effort should be made to have the restored Franchised Restaurant reflect the then Current Image, design and specifications of BURGER KING restaurants. If the Franchised Restaurant is substantially destroyed by fire, or other casualty, Franchisee may, with BKC's agreement, terminate the Agreement in lieu of Franchisee reconstructing the Franchised Restaurant.

**8. TRAINING**

**A. Managing Owner/Managing Director**

The Franchised Restaurant shall not open unless the Managing Director, the Restaurant Manager and, at BKC's option, the Managing Owner, have successfully completed BKC's training program in Miami, Florida or at such other locations as may be specified by BKC (the "Initial Training"). BKC may, in its sole discretion, waive the Initial Training requirement for the Restaurant Manager. BKC shall provide, and the Managing Owner and Managing Director shall attend, continuing operations training programs from time to time as may be directed by BKC to re-enforce operational standards ("Continuing Operations Training"). The required frequency, duration and subject matter of the Continuing Operations Training shall be specified by BKC (the Initial Training and Continuing Operations Training programs are hereinafter collectively referred to as "Training Programs"). BKC and the Franchisee Advisory Council shall periodically review the Training Programs and BKC will consult with the Franchisee Advisory Council prior to making any material changes to the Training Programs. Such programs may be in Miami, Florida or at such other locations as may be specified by BKC.

**B. Charges and Costs**

Franchisee shall be responsible for reasonable charges and costs of any sort associated with such training but not limited to all travel and living expenses, compensation of and worker's compensation insurance for the attendees enrolled in the training program, any other personal expenses, course materials, training facility charges, and training staff charges (if any). If the Managing Owner and Managing Director fail to complete the orientation session at the next scheduled session after opening or acquisition, as applicable, BKC may declare Franchisee to be in default of this Agreement, in addition to its other rights under this Agreement.

**C. Franchisee Training and Restaurant Staffing**

Franchisee shall implement a training program for Franchised Restaurant employees in accordance with training standards and procedures prescribed by BKC and shall staff the Franchised Restaurant at all times during the Term of this Agreement with a sufficient number of trained employees including at least one (1) Restaurant Manager who has, within six (6) months after becoming manager, successfully completed BKC's training program for restaurant managers at an accredited location to ensure that the BURGER KING operational standards are met. Requests for exemption from the manager training requirement will be considered on an individual basis and will be granted only in those situations where the employees have prior operational management experience in a BURGER KING Restaurant and demonstrate to BKC a thorough knowledge and understanding of the BURGER KING System.

**9. ROYALTY AND ADVERTISING CONTRIBUTION**

**A. Royalty**

During the term of this Agreement, Franchisee agrees to pay to BKC a royalty of 4.5% of Gross Sales ("Royalty") for the use of the BURGER KING System and the BURGER KING Marks. Royalties shall be paid monthly by the tenth (10th) day of each month based upon Gross Sales for the preceding month.

**B. Advertising, Sales Promotion and Public Relations**

(i) Franchisee shall pay to BKC an amount equal to four percent (4%) of Franchisee's monthly Gross Sales by the tenth (10th) day of each month based upon Franchisee's Gross Sales for the preceding month (the "Advertising Contribution"). This sum, less direct administrative expenses, will be used for (a) market research expenditures directly related to the development and evaluation of the effectiveness of Advertising and sales promotions, (b) creative, production and other costs incurred in connection with the development of Advertising, sales promotions and public relations (as limited by Section (vi) below), both in the market area of the Franchised Restaurant, as reasonably defined from time to time by BKC, and on a national basis and (c) various methods of delivering the Advertising or promotional message, including without limitation, television, radio, outdoor and print ("Media"). The allocation of the Advertising Contribution between national, regional and local expenditures shall made by BKC in its sole business judgment.

(ii) Periodically, but no less frequently than once per year, BKC shall meet with the Franchisee Advisory Council to discuss and attempt to establish (a) the types of Media to be used by BKC (the "Media Mix") and (b) the percentage of the total annual Advertising Contribution to be expended on Media (the "Media Spending Goal").

(iii) If BKC and the Franchisee Advisory Council are unable to mutually establish the Media Spending Goal, BKC shall, subject to the limitation set forth in Section (v) below, have the right, in its sole business judgment, to establish the Media Spending Goal.

(iv) If BKC and the Franchisee Advisory Council are unable to agree on the Media Mix, BKC shall have the right, in its sole business judgment, to establish the Media Mix. If BKC unilaterally establishes the Media Mix as provided above, BKC shall in no event spend more than ten percent (10%) of the prior fiscal year's national Media expenditures for new Media channels and any such new Media channel(s) must be accessible to no less than two-thirds (2/3) of the then established areas of dominant influence ("DMA's") in the United States.

(v) BKC shall use reasonable efforts to meet the Media Spending Goal, subject to circumstances beyond its control; provided, however, that BKC shall spend no less than sixty-five percent (65%) of the total annual Advertising Contribution on Media.

(vi) The annual expenditure on public relations shall not exceed one-half of one percent of the total annual Advertising Contribution.

(vii) Certain Advertising funds shall be allocated for approved grand opening promotions in accordance with current company policy.

(viii) From time to time, BKC may seek support from FRANCHISEE, and all other franchisees in the Designated Marketing Area ("DMA") where the Franchised Restaurant is located, for an Investment Spending Program ("IS"). In the event that 66.7% or more of the other franchised and BKC-operated company restaurants in the DMA where the Franchised Restaurant exists execute binding IS contracts which commit such other franchisees to place a fixed monthly dollar amount or a percentage of their Gross Sales into an IS account with such money to be spent on local DMA marketing initiatives in a given year, then in such case, Franchisee shall execute an IS contract on exactly the same terms. Franchisee acknowledges that the terms of the IS contracts may change from year to year but that under no circumstances will any IS contract (1) bind the Franchisee to pay more than 2% of their Gross Sales into an IS fund; or (2) bind the Franchisee for a term longer than one year.

**C. Gross Sales**

The term "Gross Sales" as used in this Agreement includes all sums charged by Franchisee for goods, merchandise or services sold at or from the Franchised Restaurant, including all premiums unless exempted by BKC. The sale of BURGER KING products away from the Franchised Restaurant is not authorized; however, should any such sales be approved in the future, they will be included within the definition of Gross Sales. Gross Sales excludes any federal, state, county or city tax, excise tax, or other similar taxes collected by Franchisee from customers based upon sales, and cash received as payment in credit transactions where the extension of credit itself has already been included in the figure upon which the royalty and advertising contribution is computed.

D. Late Charge

Any royalty and advertising and sales promotion contribution not paid when due shall bear a late charge at the maximum rate allowed by Florida law or, if no maximum rate relating to this transaction is in effect in the State of Florida, 18% per annum. Nothing in this Agreement shall be construed to mean that Franchisee is to pay, or has contracted to pay, any sum in excess of that which may lawfully be charged or contracted for under any applicable law. The intention of the parties is

to conform strictly to applicable usury laws and it is agreed that if an excess is inadvertently collected it shall be applied to reduce the amount owed under Sections 9.A. and 9.B. above.

**E. Payment; Credits**

All payments required to be made to BKC under this Agreement shall be made in Miami, Florida, or at such addresses and to such parties as BKC may designate in writing from time to time. BKC may, in its sole discretion, elect to pay any amount owed by BKC to Franchisee by crediting any account of Franchisee or reducing any financial obligation of Franchisee to BKC.

**F. Audit of Advertising Contributions**

Not more than once annually, the Franchisee Association shall have the right, following reasonable notice to BKC, to audit BKC's fiscal year-end results with regard to the income and expenditures of the Advertising Contribution received by BKC for BURGER KING restaurants located in the U.S.A. The audit shall be conducted in accordance with the criteria established by BKC following consultation with the Franchisee Advisory Council. The audit shall be at the sole cost of the Franchisee Association unless (i) the audit discloses a misappropriation of funds or (ii) a discrepancy resulting from an accounting error, which is in excess of three percent (3%) of the total annual Advertising Contribution received by BKC, in either of which events BKC shall reimburse the Franchisee Association for the reasonable costs of the audit. Only records of the past two fiscal years will be produced for the audit. The results of the audit will be made available, on request, to Franchisee. Franchisee shall have no independent right to audit, provided however, if no Franchisee Association exists, franchisees owning collectively at least thirty percent (30%) or more of all BURGER KING franchisee-owned and operated restaurants in the U.S.A. shall have the right to audit under the same terms and conditions set forth in this Section 9.F.

**G. Alternative Method Of Payment**

BKC may, at its option, require payment of the royalty or advertising and sales contribution or both by making direct monthly withdrawals in the form of an electronic or similar funds transfer in the appropriate amount(s) from Franchisee's bank account. In the event that this option is exercised, Franchisee agrees to execute and deliver to its bank and to BKC those documents necessary to authorize such withdrawals and to make payment or deposit as directed by BKC. Franchisee further agrees that it will not thereafter terminate such authorization so long as this Agreement is in effect. Franchisee agrees that it will not close such bank account without prior notice to BKC and the establishment of a substitute bank account permitting such withdrawals. Franchisee also agrees that in the event that a direct electronic funds transfer or other withdrawal program is not available at the bank at which it currently does its business, it will take all reasonable and necessary steps to establish an account at a bank which does have such a program. In addition, BKC may require payment of Royalty, Advertising Contribution and any other fees required to be paid pursuant to this Agreement using BKC's internet web portal called "BK® ePay", or any other electronic or digital payment method that BKC may require in the future.

**10. ACCOUNTING PROCEDURES: RIGHT OF AUDIT**

**A. Accounting**

Franchisee agrees to keep true, accurate and complete records of its business in such form as BKC now or hereafter may require and to furnish BKC with a monthly and fiscal year to date profit and loss statement in the format prescribed by BKC. Franchisee shall also submit to BKC quarterly balance sheets, the first of which shall be for the period ending three (3) months after the Franchised Restaurant opens. All profit and loss statements and balance sheets should be prepared in accordance with generally accepted accounting principles and shall be submitted to BKC within twenty-five

(25) days after the end of the period covered by the report. In addition, Franchisee shall retain for a period of at least twenty-four (24) months and upon request submit to BKC copies of all state sales tax returns and all supporting data and records relating to sales made at or from the Franchised Restaurant and such other records as BKC may reasonably request from time to time. Franchisee shall also, upon request by BKC, provide BKC with detailed, itemized documentation showing the actual cost of building or remodeling the Franchised Restaurant.

**B. Annual Financial Statements**

Within one hundred twenty (120) days after the close of each fiscal year, Franchisee shall submit a full disclosure of all persons with any interest in the Franchised Restaurant and a complete annual financial statement for the Franchised Restaurant, which statement, if requested by BKC, shall be certified by a Certified Public Accountant.

**C. Audits**

Franchisee agrees that BKC or its representatives, at BKC's expense, shall, at all reasonable times, have the right to examine or audit the books, records, state sales tax returns or accounts of Franchisee. BKC shall similarly have the right to examine or audit the books, records, state sales tax return or accounts of any and all persons or entities who are guarantors of the Franchisee's performance under this Agreement in those instances in which Franchisee has failed to make payments of the royalty or advertising fees in a timely fashion or has otherwise defaulted under this Agreement. In the event the audit discloses an understatement of Gross Sales for any period or periods, Franchisee shall, within 15 days after receipt of the audit report, pay BKC the Royalty and advertising fee (including any IS fee) in the amount of the understatement plus the late charge identified in Section 9.D. of this Agreement from the date such payments were originally due. Additionally, in the event the audit discloses an understatement of Gross Sales which exceeds two percent (2%) for any period or periods, Franchisee shall, within fifteen (15) days after the receipt of the audit report, reimburse BKC for all costs of the audit including travel, lodging and wages, reasonably incurred.

**D. Release of Financial Information**

Except as otherwise provided in any lease between BKC, or any of its affiliates, and Franchisee, BKC shall not release to third parties financial or operational information specifically relating to Franchisee and/or the Franchised Restaurant without the consent of Franchisee unless otherwise required to do so by judicial or administrative order. If BKC is required to disclose such information, BKC shall use reasonable efforts to give Franchisee notice thereof. Notwithstanding the foregoing however, BKC may 1) release general financial or operational information relating to the BURGER KING System compiled in whole or in part from Franchisee and/or the Franchised Restaurant so long as Franchisee and/or the Franchised Restaurant are not specifically identified, and 2) publish operational metrics and scores of the Franchised Restaurant and its rank in comparison to other restaurants in the BURGER KING System as long as the publication of the metrics, scores and rankings are distributed only to other franchisees of BKC.

## 11. LIMITATIONS OF FRANCHISE

**A. Trademarks, Trade Names, Service Marks and Trade Secrets**

(1) Franchisee acknowledges that ownership of all right, title and interest to the BURGER KING System and the BURGER KING Marks, are and shall remain vested solely in BKC and Franchisee disclaims any right or interest therein or the good will derived therefrom. Franchisee

agrees that all materials loaned or otherwise made available to it and all disclosures made to Franchisee and not to the general public by or at the direction of BKC at any time before or during the Term of this Agreement relating to the BURGER KING System, including, without limitation, the MOD Manual in its entirety, financial information marketing strategy and marketing programs are to be considered trade secrets of BKC for purposes of this Agreement and shall be kept confidential and used by Franchisee only in connection with the operation of the Franchised Restaurant and other franchised BURGER KING Restaurants. Franchisee agrees not to divulge any of the trade secrets to any person other than its employees and then only to the extent necessary for the operation of the Franchised Restaurant and, specifically, that Franchisee will not, nor permit anyone to, reproduce, copy or exhibit any portion of the MOD Manual or any other trade secrets of BKC. At BKC's request, Franchisee shall require each Owner, and Managing Director to execute an agreement similar in substance to this Section in a form acceptable to BKC and naming BKC as a third party beneficiary with the independent right to enforce such agreement.

(2) Franchisee will not, directly or indirectly, at any time during the Term of this Agreement or thereafter, do or cause to be done any act or thing disputing, attacking or in any way impairing or tending to impair BKC's right, title or interest in the BURGER KING Marks or the BURGER KING System. Franchisee shall immediately notify BKC of all infringements or imitations of the BURGER KING Marks which come to Franchisee's attention or challenges to Franchisee's use of any of the BURGER KING Marks, and BKC shall exercise absolute discretion in deciding what action, if any, should be taken. Franchisee agrees to cooperate in the prosecution of any action to prevent the infringement, imitation, illegal use or misuse of the BURGER KING Marks and agrees to be named as a party in any such action if so requested by BKC. BKC agrees to bear the legal expenses incident to Franchisee's participation in such action, except for fees, expenses and other costs of Franchisee's personal legal counsel if Franchisee elects to be represented by counsel of its own choosing.

(3) Franchisee shall not use any of the BURGER KING Marks, any variations or abbreviations, or any words confusingly similar to the BURGER KING Marks as part of Franchisee's corporate or partnership name.

**B. Independent Contractor**

Franchisee is an independent contractor and is not an agent, partner, joint venturer, joint employer or employee of BKC, and no fiduciary relationship between the parties exists. Franchisee shall be the sole and exclusive employer of its employees with the sole right to hire, discipline, discharge and establish wages, hours, benefits, employment policies, and other terms and conditions of employment for its employees without consultation with or approval by BKC. Franchisee shall have no right to bind or obligate BKC in any way nor shall Franchisee represent that it has any right to do so. BKC shall have no control over the terms and conditions of employment of Franchisee's employees.

In all public records and in Franchisee's relationship with other persons, on stationery, business forms and checks Franchisee shall indicate independent ownership of the Franchised Restaurant and that it is operated under a Franchise granted by BKC.

Franchisee shall exhibit at the Franchised Restaurant in such places as may be designated by BKC, a notification that the Franchised Restaurant is operated by an independent operator and not by BKC.

**12. UNFAIR COMPETITION**

Franchisee acknowledges the uniqueness of the BURGER KING System and that BKC is making its knowledge, know-how and expertise available to it for the purpose of operating the Franchised Restaurant. Franchisee agrees that it would be an unfair method of competition for Franchisee

to use or duplicate or to allow others to use or duplicate any of the knowledge, know-how and expertise received from BKC for any use other than for the operation of franchised BURGER KING Restaurants. Franchisee, therefore, warrants that during the Term of this Agreement, it will utilize its best and continuing efforts to promote and develop the business at the Franchised Restaurant and during the Term hereof and at all times thereafter will not directly or indirectly engage in the operation of any restaurant, other than the Franchised Restaurant and other BURGER KING Restaurants franchised from BKC, which utilizes or duplicates the BURGER KING System, any trade secrets of BKC, the BURGER KING Marks or the present or any former BURGER KING Current Image.

**13. INSURANCE; INDEMNIFICATION**

**A. Insurance**

Franchisee agrees to carry at its expense during the Term of this Agreement Comprehensive General Liability insurance, including Products Liability and Broad Form Contractual Liability, in an amount of not less than ONE MILLION ($1,000,000) DOLLARS per occurrence for bodily injury and FIVE HUNDRED THOUSAND ($500,000) DOLLARS per occurrence for property damage, or in such increased amounts as BKC may reasonably request from time to time during the Term of this Agreement. Each policy will name BKC and its subsidiaries, its affiliated and parent companies as additional insured, will provide that the policy cannot be canceled without thirty (30) days prior written notice to BKC, and will insure the contractual liability of Franchisee under Section 13.C. Additionally, Franchisee agrees to carry, at Franchisee's expense, umbrella coverage in an amount of ONE MILLION ($1,000,000) DOLLARS over the basic Comprehensive General Liability insurance per restaurant except that if Franchisee owns more than ten (10) BURGER KING Restaurants, the umbrella coverage applicable to all such restaurants need not exceed TEN MILLION ($10,000,000) DOLLARS. The insurance afforded by the policy or policies respecting liability shall not be limited in any way by reason of any insurance which may be maintained by BKC. Before the Commencement Date, Franchisee shall furnish to BKC Certificates of Insurance reflecting that the insurance coverage is in effect pursuant to the terms of this Agreement. All policies shall be renewed, and a renewal Certificate of Insurance mailed to BKC in Miami, Florida, or at such other location as may be specified by BKC prior to the expiration date of the policies. This obligation of Franchisee to maintain insurance is separate and distinct from its obligation to indemnify BKC under the provisions of Section 13.C.

**B. Worker's Compensation**

Franchisee agrees to secure and pay premiums on a Worker's Compensation policy covering himself and all his employees, as required by law.

**C. Indemnity**

(1) Franchisee is responsible for all losses or damages and contractual liabilities to third persons arising out of or in connection with possession, ownership or operation of the Franchised Restaurant, and for all claims or demands for damages to property or for injury, illness or death of persons directly or indirectly resulting therefrom. Franchisee agrees to defend, indemnify and save BKC and its subsidiaries, its affiliated and parent companies harmless of, from and with respect to any such claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages, (including but not limited to reasonable attorney's fees) unless resulting from the negligence of BKC. BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law. The indemnification of BKC by Franchisee shall not be limited by the amount of insurance required under Section 13.A. This indemnity obligation shall include, but not be limited to, claims related to the employment of Franchisee's employees.

This obligation of Franchisee to indemnify and defend BKC is separate and distinct from its obligation to maintain insurance under the provisions of Section 13.A.

(2) Franchisee agrees to defend, indemnify and save BKC and BKC's officers, directors, agents, employees, attorneys, and accountants, subsidiaries, affiliated and parent companies, harmless of, from and with respect to any claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages any of them may incur (including, but not limited to, reasonable attorney's fees) arising from or relating to the sale of securities of Franchisee, including but not limited to claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages arising from or related to any alleged violation of any federal or state securities law in connection with a sale of securities of Franchisee. BKC shall notify Franchisee of any claims, and Franchisee shall be given the opportunity to assume the defense of the matter. If Franchisee fails to assume the defense, BKC may defend the action in the manner it deems appropriate, and Franchisee shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense, in addition to any sum BKC may pay by reason of any settlement or judgment against BKC. BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law. BKC and the other indemnitees shall, in all instances, have the right to be represented by counsel of its/their own choosing, at Franchisee's expense, and to participate in the defense of any such claim.

**D. Defense of Claims**

BKC shall notify Franchisee of any claims, and Franchisee shall be given the opportunity to assume the defense of the matter; however, BKC shall have the right to participate in the defense of any claim or action against it which is assumed by Franchisee, at BKC's own cost and expense. If Franchisee fails to assume the defense of any claim covered by the indemnification provisions of Section 13.C., BKC may defend the action in the manner it deems appropriate, and Franchisee shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense, in addition to any sum which BKC may pay by reason of any settlement or judgment against BKC. No settlement of any claim against BKC shall be made by Franchisee which is in excess of the amount of insurance referred to in Section 13.A or which would subject BKC to liability in any amount not covered by such insurance without the prior written consent of BKC. If the indemnifiable claim involves multiple franchisees and BKC reasonably determines that consolidation of all such claims would be in the best interests of BKC and the affected franchisees, including Franchisee (in which case any liability of Franchisee hereunder would be on a pro rata basis), BKC shall have the right to defend the claim, action or demand by appropriate proceedings with sole power to direct and control such defense with respect to BKC, and Franchisee shall pay to BKC a pro rata share of all costs, including reasonable attorneys' fees, incurred by BKC in effecting such defense and any subsequent legal appeal, in addition to any sums which BKC may pay by reason of any settlement or judgment against BKC.

**14. TAXES**

Franchisee shall pay when due all taxes levied or assessed in connection with the possession, ownership or operation of the Franchised Restaurant or in connection with amounts paid or received under this Agreement, including without limitation any sales, use or other ad valorem taxes (other than any tax that is measured by or related to the net income of BKC or to its corporate status in a state). If any such tax shall be paid by BKC, Franchisee shall promptly reimburse BKC the amount paid. In the event of any bona fide dispute as to the liability for a tax assessed against Franchisee, Franchisee may contest the validity or the amount of the tax in accordance with procedures of the taxing authority. Franchisee shall not permit a tax sale or seizure against the Franchised Restaurant or equipment.

## 15. ASSIGNMENT: CONDITIONS AND LIMITATIONS

Any purported assignment or transfer not in full compliance with this Section 15 shall be null and void and shall constitute a material breach of this Agreement, for which BKC may immediately terminate without opportunity to cure pursuant to Section 18.A of this Agreement.

THE GOVERNING DOCUMENTS OF THE FRANCHISEE ENTITY AND THE PARENT, IF APPLICABLE, MUST STATE THAT THE ENTITY'S SOLE BUSINESS ACTIVITY WILL BE THE DEVELOPMENT AND OPERATION OF BURGER KING RESTAURANTS. IN ADDITION, THE GOVERNING DOCUMENTS MUST MANDATE THE DESIGNATION OF A MANAGING OWNER AND DESCRIBE THE MANAGING OWNER'S AUTHORITY, AS DEFINED IN THE GUIDELINES FOR APPROVAL OF FRANCHISEE OWNERSHIP FRANCHISE ENTITY APPLICATIONS, TO BIND THE FRANCHISEE ENTITY AND TO DIRECT ANY ACTIONS NECESSARY TO ENSURE COMPLIANCE WITH A BURGER KING FRANCHISE AGREEMENT OR ANCILLARY AGREEMENT. NO AMENDMENTS INCONSISTENT WITH THE GUIDELINES FOR APPROVAL OF FRANCHISEE OWNERSHIP FRANCHISE ENTITY APPLICATIONS MAY BE MADE TO THE ARTICLES OF INCORPORATION, BY-LAWS, PARTNERSHIP AGREEMENT, OR OTHER GOVERNING DOCUMENTS OF THE FRANCHISEE ENTITY OR THE PARENT, IF APPLICABLE. EACH SUCH ENTITY MUST NOTIFY BKC, AND AT BKC'S REQUEST PROVIDE COPIES, OF ANY AMENDMENTS TO ITS GOVERNING DOCUMENTS.

### A. Transfer by Franchisee

Except with the prior written consent of an authorized officer of BKC, Franchisee shall not (1) assign or pledge this Agreement, or assign any of Franchisee's rights or delegate any of its duties hereunder; or (2) sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any equity securities of Franchisee; or (3) sell, assign, transfer, convey or give away substantially all of the assets of the Franchised Restaurant.

### B. Transfer by Owners

Except with the prior written consent of an authorized officer of BKC, no Owner shall sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any direct or indirect interest in Franchisee.

### C. Transfer of Equity Securities

Equity securities of Franchisee may not be transferred by Franchisee or by any Owner unless, in addition to obtaining the prior written consent of an authorized officer of BKC as required above, such transferor complies with all policies or guidelines BKC may then have in effect for approval of a proposed distribution of securities of franchisees. Franchisee and any other participants in any offering of securities of Franchisee shall fully indemnify BKC in connection with such offering, as provided in Section 13.C(2) of this Agreement.

### D. Pledging of Franchise Agreement

Notwithstanding any consent granted by BKC pursuant to Sections 15.A, B and C above, neither Franchisee nor Owner shall pledge, mortgage, hypothecate, give as security for an obligation or in any manner encumber this Agreement or the franchise granted herein except with the express written consent of BKC given in connection with the execution of BKC's then current third party intercreditor agreement. Franchisee shall pay BKC a transfer fee of Two Thousand ($2,000) Dollars for the costs and expenses incurred by BKC in connection with facilitating the execution of the intercreditor agreement. This fee is in addition to the transfer fee referenced in Section 15.F(8) of this Agreement.

**E. Notice of Proposed Transfer**

The proposed transferor shall notify BKC in writing of any proposed transfer of an interest referred to in Section 15.A or 15.B, as applicable, before the proposed transfer is to take place, and shall provide such information and documentation relating to the proposed transfer as BKC may reasonably require.

**F. Conditions of Consent**

BKC shall use reasonable efforts to provide consent of the proposed transfer, or communicate to Franchisee, notice of disapproval, within ninety (90) days (for transactions involving less than ten (10) restaurants the time frame shall be sixty (60) days) of receipt by BKC of Franchisee's notice of the proposed transfer and the furnishing of all reasonably requested information. BKC may condition its consent to the proposed transfer of an interest referred to in Section 15.A or 15.B of this Agreement on satisfaction of any or all of the following requirements:

(1) That all of Franchisee's accrued monetary obligations and all other outstanding obligations to BKC and its affiliates, whether arising under this Agreement or otherwise, have been satisfied;

(2) That Franchisee is not in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and BKC or its affiliates;

(3) That the transferee (or, if applicable, such owners of the transferee as BKC may request), in BKC's sole judgment, satisfies all of BKC's business standards and requirements; has the aptitude and ability to operate the Franchised Restaurant; and has adequate financial resources and capital to do so; and that transferee complete and be approved through BKC's standard franchisee application and selection process including satisfactorily demonstrating to BKC that transferee meets the financial, character, managerial, ownership and such other criteria and conditions as BKC shall then be applying in considering applications for new franchises, including transferee, and/or if applicable, Managing Owner and Managing Director satisfactorily completing all BKC's training requirements.

(4) That the transferee, at BKC's election, consistent with then current BKC policy, (a) enter into a written assignment, in a form satisfactory to BKC, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement, or (b) execute, for a term ending on the expiration date of this Agreement, BKC's then-current BURGER KING Restaurant Franchise Agreement applicable to such transferee and such other ancillary agreements as BKC may require for the Franchised Restaurant; provided, however, that the royalty and advertising contribution rates shall be the same as stated herein. If the transferee is required to execute a new franchise agreement, such agreement shall supersede this Agreement in all respects;

(5) That the transferee (or, if applicable, such owners of the transferee as BKC may request) meet all of the BKC requirements then applicable to ownership of franchises and execute a guarantee of the performance of Franchisee's obligations to BKC and BKC's affiliates. For the purposes of determining compliance, BKC shall have the right to examine and approve the form and content of all governing documents.

(6) That the Franchisee and each transferor execute a general release, in a form satisfactory to BKC, of any and all claims against BKC, its affiliates, and their respective officers, directors, agents, and employees, in their corporate and individual capacities.

(7) That the transferee (or, if applicable, the owners of the transferee and its Restaurant Managers and proposed Managing Director), at the transferee's expense, complete any applicable orientation and training programs then required by BKC;

(8) That the transferor pay a transfer fee of Two thousand Dollars ($2,000) in consideration of BKC's expenses in reviewing the proposed transfer and Five Hundred ($500.00) Dollars for each additional restaurant involved in the same transaction. In the event the transferee is not an existing approved BURGER KING franchisee, Franchisee seller shall pay BKC a New Franchisee Training Fee of Two Thousand ($2,000.00) Dollars in connection with the transfer of the first restaurant involved in the transaction.

(9) Approval by BKC of the terms of the contract of sale which impact the sufficiency of cash flow from the business after payment of debt service to provide for, among other things, any needed repairs to or remodeling of the Franchised Restaurant.

**G. Consent to Transfer**

If BKC does not accept the offer under Section 16.A below, Franchisee may conclude the sale to the purchaser who made the offer provided BKC's consent to the assignment or sale of stock be first obtained, which consent will not be unreasonably withheld upon compliance with the conditions imposed by BKC on such assignments or sales. Conditions may include, but are not limited to, the conditions set forth in Section 15.F above.

**H. Continuing Liability**

In the event of a sale, transfer, or assignment of any interest in this Agreement or the Franchised Restaurant, or merger, consolidation or reorganization of Franchisee or a transfer of all or any part of an Owner's interest in the Franchised Restaurant, Franchisee and/or the Owner (hereinafter collectively "Transferor") shall remain personally liable for all Royalty, Advertising Contribution and other payments which come due during the periods of time hereinafter described, in accordance with the following criteria:

(1) If Transferor has transferred Transferor's interest pursuant to a contract of sale which provides that installment payments of the purchase price are to be made to the Transferor or the Transferor's designee, the liability of the Transferor will continue for the longer of (i) twelve (12) months from the date of the transfer, or (ii) such time as the payments are to be made, including any extensions; provided, however, that after the first anniversary of such transfer, the liability of the Transferor shall be limited to the total amount of the original installment payments to be made under the contract for sale or other instrument evidencing the debt. If the holder of the note or other evidence of debt deems the obligation satisfied, Transferor will simultaneously be released from liability to BKC under this Agreement for Royalty and Advertising payments. Any contract for sale which provides for installment payments shall provide that such payments are subordinate to the payment of Royalty and Advertising Contributions called for in this Agreement and that the note or other evidence of the obligation shall not be assignable by the holder or payee.

(2) If Transferor has transferred Transferor's interest pursuant to a contract of sale which provides for cash payment in full, upon transfer of the entire purchase price, the Transferor's liability shall continue for a period of twelve (12) months from the date of the transfer, and shall be limited to the amount of Royalty fees and Advertising fees which accrued during such period and are not paid by Transferee. Upon payment of such amount, Transferor shall be automatically released for any continuing liability under this Agreement for Royalty and Advertising fees.

I. **Right of Re-Entry**

Following a transfer of all of Franchisee's interest, in the event BKC seeks to enforce continuing liability pursuant to Section 15.H above, the immediately preceding transferor of an interest in the franchise against whom liability is sought, will be afforded an opportunity to cure the default and the right to reassume the position of franchisee under the terms of this Agreement provided all of the following conditions have been met:

(1) At the time of transfer, the transferor must have been in good standing with BKC in accordance with the operational criteria then in effect for Franchise Approval;

(2) At the time of proposed re-entry, the transferor must be in good standing and be able to satisfy BKC's then current Franchise Approval Criteria and Expansion Approval Criteria and deliver to BKC appropriate application forms and such other documents and agreements as BKC may reasonably require evidencing the assumption by transferor of the rights and obligations under the remaining term of the Franchise Agreement.

(3) At the time of re-entry, BKC shall be paid, in full, all sums past due and owing under this Franchise Agreement and any agreement related to the Franchised Restaurant, as well as any past due sums related to products or supplies sold by BKC for use in the Franchised Restaurant, including without limitation, any pre- and post-petition amounts due from any franchisee with regard to the Franchised Restaurant which is the subject of a proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally.

(4) Transferor must take possession of and acquire control and dominion over substantially all of the tangible real and personal property associated with the operation of the Franchised Restaurant.

J. **Notices to Transferor**

During the period of time in which transferor remains liable pursuant to Section 15.H above, BKC shall use reasonable efforts to send simultaneous copies of notices of default under this Franchise Agreement to transferor. Transferor shall use reasonable efforts to send simultaneous copies of notices of default under any installment payment due to transferor from transferee. Failure of either party to provide copies of the notices of default shall not be an event of default under the terms of this Franchise Agreement. Transferor shall be afforded the same opportunity to cure as is set forth in the Notice of Default.

K. **Acquisition of Additional Franchises**

In addition, Franchisee agrees that, prior to acquiring any other BURGER KING Restaurant franchise which may be offered to him for sale or which he may offer to purchase, such franchise will first be offered to BKC on the same terms, conditions and price in accordance with Section 15.

L. **Death or Mental Incapacity**

Upon the death or mental incapacity of an Owner, the executor, administrator, or personal representative of such Owner shall transfer the Owner's interest in Franchisee or the Parent to a third party approved by BKC within a reasonable time after the Owner's death or mental incapacity. Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to BKC's right of first refusal under Section 16, or, if such right is not exercised, the same conditions as may

be imposed on any inter vivos transfer under this Section 15. In the case of transfer by devise or inheritance, if the heir is not approved or there is no heir, the executor shall use best efforts to transfer the Owner's interest to another party approved by BKC within twenty-four (24) months from the date of the Owner's death. If the conveyance of the Owner's interest to a party acceptable to BKC has not taken place within the twenty-four (24) month period, BKC shall have the option, to purchase the Owner's interest at fair market value.

**M. No Waiver**

BKC's consent to a transfer shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of BKC's right to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

**16. RIGHT OF FIRST REFUSAL**

A. In the event Franchisee or the Owners wish to accept a bona fide offer from a third party to purchase the Franchised Restaurant, or any portion thereof or interest therein, or any of the voting stock of Franchisee, Franchisee shall give BKC written notice setting forth the name and address of the prospective purchaser, the price and terms of the offer together with a franchisee application completed by the prospective purchaser, a copy of the Purchase and Sale Agreement, executed by both Franchisee and purchaser, and all exhibits, copies of any real estate purchase agreement or agreements, proposed security agreements and related promissory notes, assignment documents, title insurance commitment and any other information that BKC may request in order to evaluate the offer. BKC, its subsidiary or affiliated company (herein collectively "BKC") shall then have the prior option to purchase the interests covered by the offer at the price and upon the same terms of the offer. If the consideration is not money, the purchase price shall be cash equal to the fair market value of the consideration. BKC shall have twenty (20) business days, excluding weekends and federal holidays, after receipt of the notice of offer and the furnishing of all reasonably requested information within which to notify Franchisee or the Owners, as applicable, of BKC's intent to exercise its right hereunder. Silence on the part of BKC shall constitute rejection. If the proposed sale includes assets of Franchisee not related to the Franchised Restaurant, or the operation of other franchised BURGER KING Restaurants, BKC may, at its option, elect to purchase only the assets related to the operation of franchised BURGER KING Restaurants and an equitable purchase price shall be allocated to each asset included in the proposed sale. A bona fide offer from a third party includes any transfer, conveyance, assignment, consolidation, merger or any other transaction in which legal or beneficial ownership of Franchised Restaurant or the franchise granted by this Agreement is vested in a party other than Franchisee.

B. The election by BKC not to exercise its right of first refusal as to any offer shall not affect its right of first refusal as to any subsequent offer.

C. Any sale, attempted sale, assignment or other transfer of the interests described in Section 16.A. without first giving BKC the right of first refusal described above shall be void and of no force and effect.

**17. OPTION TO OBTAIN SUCCESSOR FRANCHISE AGREEMENT**

Franchisee shall have, exercisable on the expiration date of the Term of this Agreement, an option to obtain a Successor BURGER KING Franchise Agreement ("Successor Franchise Agreement") for a term of twenty (20) years, provided that:

A. Franchisee has given BKC written notice ("Notice") of its intention to exercise its Option to Obtain a Successor Franchise Agreement during the fourth year prior to the expiration of the Term of this Agreement.

B. Franchisee, at the time of the Notice and at the time of the expiration of the Term of this Agreement, is not in default of and has substantially complied with the terms and conditions of this Agreement and all other franchise agreements or other agreements with BKC that Franchisee, Managing Owner or Owners may be a party to consistently and throughout its Term, including but not limited to the following:

(1) Franchisee has operated the Franchised Restaurant in accordance with the terms and conditions of this Agreement, including, but not limited to, operating the Franchised Restaurant in compliance with the operating standards and specifications established from time to time by BKC as to quality of service, cleanliness, health and sanitation;

(2) Franchisee has satisfied, in a timely fashion, all financial obligations in accordance with the terms and conditions of this Agreement;

(3) Franchisee has maintained, improved, altered, replaced and remodeled the Franchised Restaurant including without limitation the Building, Premises, signs and equipment throughout the Term of this Agreement in accordance with the terms and conditions of this Agreement.

(4) Franchisee shall have completed, not more than three (3) years and not less than three (3) months prior to the expiration of the Term of this Agreement, the improvements, alterations, remodeling or rebuilding of the interior and exterior of the Franchised Restaurant so as to reflect the then Current Image of BURGER KING Restaurants, pursuant to such plans and specifications as BKC reasonably approves.

(5) Execution by Franchisee of a general release of BKC in a form satisfactory to BKC.

(6) Franchisee meets all then current financial ratios BKC uses to evaluate new franchisees for financial approval.

C. Within one hundred and twenty (120) days after receipt of the Notice, BKC shall advise Franchisee in writing if Franchisee is not eligible to obtain a Successor Franchise Agreement, specifying the reasons for such ineligibility, and identifying whether such deficiencies are capable of cure. Between the date of the Notice and the expiration date of the Term of this Agreement, if any act, circumstance or omission causes Franchisee to become ineligible to obtain a Successor Franchise Agreement then BKC shall advise Franchisee in writing thereof, specifying the deficiency and identifying a cure period if applicable.

D. Franchisee has the right to remain in possession of the Premises for the term of the Successor Franchise Agreement;

E. Franchisee shall execute the applicable form of the then current Successor Franchise Agreement, which may differ from this Agreement as to royalty, advertising contributions and ownership requirements, as well as other terms and conditions. Franchisee shall, upon execution of the Successor Franchise Agreement, pay to BKC the then current Franchise Fee.

## 18. DEFAULT AND EFFECT OF TERMINATION

### A. Default

If an act of default hereunder is committed by Franchisee, and Franchisee fails to cure the default after any required notice and within the cure period applicable, BKC may, at its option and without prejudice to any other rights or remedies provided for hereunder or by law, terminate this Franchise Agreement by written notice or otherwise. The applicable cure period shall be as described below but, if a cure period is not specifically mentioned, it shall be thirty (30) days. In some cases, as identified below, no cure period is allowed and no notice may be required. If any applicable law or rule requires a longer notice period or a longer cure period than that provided herein, then the period required under the law or rule shall be substituted for the requirements herein. The following are material acts of default and shall be good cause for termination:

(1) Franchisee fails to operate the Franchised Restaurant in accordance with the operating standards and specifications established from time to time by BKC as to service, cleanliness, health and sanitation. Franchisee shall have five (5) days after notice to cure the default. In the event that such default is deemed by BKC, in its reasonable discretion, to be of a nature so serious as to threaten the immediate safety or health of customers or employees of Franchisee, then, in such case, Franchisee will, after verbal notice from BKC to Franchisee, immediately cease operation of the Franchised Restaurant until such time as the serious health or safety default is rectified to BKC's satisfaction. Failure to close the Franchised Restaurant under these circumstances shall be an act of default. If this act of default shall occur, BKC shall have the right to immediately terminate this Agreement, such termination to be effective immediately and with no opportunity to cure.

(2) Franchisee sells any product which does not conform to BKC's specifications. Franchisee shall have five (5) days after notice to cure the default.

(3) Franchisee fails to sell products designated by BKC as required to be sold in the Franchised Restaurant. Franchisee shall have five (5) days after notice to cure the default, provided, however, if for reasons beyond the control of Franchisee, Franchisee is unable to obtain such products within the cure period, the default cure period shall be extended for a reasonable period of time provided Franchisee initiates and actively pursues substantial and continuing action within the cure period to cure such default.

(4) Franchisee sells products not approved by BKC. Franchisee shall have five (5) days after notice to cure the default.

(5) Franchisee uses equipment, uniforms or decor not approved by BKC.

(6) Franchisee fails to maintain the Franchised Restaurant in good condition and repair, or fails to make all improvements, alterations or remodelings as may be determined by BKC to be reasonably necessary to reflect the Current Image as provided in Section 5.B. of this Agreement, as and when required.

(7) Franchisee fails to pay when due any royalty or advertising and sales promotion contribution required to be paid under this Agreement. Franchisee shall have ten (10) days after notice to cure the delinquency.

(8) Franchisee (i) fails to submit any information required by Section 10 of this Agreement ("Accounting Procedures") or (ii) knowingly submits a financial statement or other

sales report which understates Gross Sales. If Franchisee knowingly and intentionally submits a financial statement or other sales report which understates Gross Sales, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee and with no opportunity to cure.

(9) Franchisee abandons the franchise relationship without the prior consent of BKC at any time during the Term of this Agreement. Franchisee shall have five (5) days after notice to cure the default. The cessation of operation of the Franchised Restaurant on the Premises other than with the consent of BKC, whether the Premises remain vacant or are converted to another use, shall be considered abandonment of the franchise relationship provided, however, that the Franchised Restaurant shall not be deemed abandoned if the cessation is due to circumstances beyond Franchisee's reasonable control (such as lack of electrical power, weather conditions, earthquakes, strikes and the like) and Franchisee diligently undertakes to resume operations after the reason for such cessation has been abated.

(10) Franchisee ceases to occupy the Premises. Franchisee shall have five (5) days after notice to cure the default. If the loss of possession is the result of governmental exercise of eminent domain, Franchisee may, with BKC's consent and subject to availability, relocate to other premises in the same market area for the balance of the Term of this Agreement.

(11) Franchisee files a petition or application seeking any type of relief under the Bankruptcy Code or any state insolvency or similar law, or someone files a petition or application seeking to have Franchisee adjudicated a bankrupt, or seeking other relief against Franchisee under the Bankruptcy Code or any state insolvency or similar law and the petitioner application is not dismissed within ninety (90) days after it is filed. Subject to the applicable law, this Agreement shall terminate without notice or cure period upon the occurrence of this act of default as if that date were the expiration date and Franchisee expressly and knowingly waives any rights that it may have under the provisions of the Bankruptcy Code and consents to the termination of this Agreement or any other relief which may be sought in a Complaint filed by BKC to lift the provisions of the automatic stay of the Bankruptcy Code. Additionally, Franchisee agrees not to seek an Injunctive Order from any court in any jurisdiction relating to insolvency, reorganization or arrangement proceedings which would have the effect of staying or enjoining this provision.

(12) Franchisee admits in writing its inability to pay its debts as they mature or makes an assignment for the benefit of creditors, or a receiver (permanent or temporary) for any part of its property is appointed by a court of competent authority. If this act of default shall occur, BKC shall have the right to immediately terminate this Agreement without notice or cure period.

(13) A final judgment against Franchisee (including a final judgment in favor of BKC or any affiliated party of BKC) remains unsatisfied of record for thirty (30) days (unless a supersedeas or other appeal bond has been filed), or if a levy of execution is made upon the franchise granted by this Agreement or upon any property used in the Franchised Restaurant, and said levy it is not discharged within five (5) days of said levying.

(14) Conviction of either Franchisee or the Managing Owner in a court of competent jurisdiction of (i) an indictable offense punishable by a term of imprisonment in excess of one (1) year, or (ii) any offense, regardless of how punishable, for which a material element is fraud, dishonesty or moral turpitude. If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee and with no opportunity to cure.

(15) Franchisee or any Owner uses or duplicates the BURGER KING System or engages in unfair competition in violation of Section 12 of this Agreement or discloses any trade secrets of BKC in violation of Section 11.A(1) of this Agreement. If this act of default shall occur, BKC shall

have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee but with no opportunity to cure.

(16) Franchisee denies BKC the right to inspect the Franchised Restaurant or to audit the sales and accounting records of the Franchised Restaurant.

(17) Conduct by Franchisee, the Managing Owner or the Managing Director which is deleterious to or reflects unfavorably on Franchisee or the BURGER KING Restaurant System by exhibiting a reckless disregard for the physical and mental well being of employees, customers, BKC representatives or the public at large including, but not limited to, battery, assault, sexual harassment or other forms of threatening, outrageous, willfully discriminatory or unacceptable behavior. An act of default under this Section 18.A.(17) does not require any criminal action to be brought against Franchisee. If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee and with no opportunity to cure.

(18) Failure by Franchisee to maintain a responsible credit rating by failing to make prompt payment of undisputed bills, invoices and statements from suppliers of goods and services to the Franchised Restaurant.

(19) Any sale, assignment, merger or transfer in violation of Sections 15 or 16 of this Agreement including without limitation, a change of control of Franchisee which occurs by means of a tender offer for publicly-traded securities of Franchisee or at the direction of a receiver or trustee in bankruptcy. If this act of default shall occur, BKC shall have the right to terminate this Agreement effective upon notice to Franchisee without opportunity to cure. Failure by Franchisee to effect a transfer of an Owner's interest in accordance with Section 15.L. of this Agreement shall be a transfer in violation of Section 15 for purposes of this Section 18.A.(19).

(20) Franchisee, without the written consent of BKC, enters into a management agreement or consulting arrangement relating to the Franchised Restaurant.

(21) Failure to restore the Franchised Restaurant after damage or destruction as provided in Section 7 of this Agreement.

(22) The submission by Franchisee, Managing Owner, or Owners of any application and/or management commitment form and/or other form or report which contains any false or misleading material statement or omits any material fact. If this act of default occurs, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee but with no opportunity to cure.

(23) Repeated breaches of provisions of this Agreement. If BKC intends to terminate this Agreement under this Section 18.A.(23), BKC shall provide notice to Franchisee that BKC considers that Franchisee has repeatedly breached this Agreement, and that BKC intends to terminate this Agreement if Franchisee breaches the Agreement at any time after said notice. If Franchisee after receiving such notice, subsequently breaches this Agreement in any manner, BKC shall have the right to terminate this Agreement upon notice with no further opportunity to cure.

(24) The acquisition of an interest in a restaurant business in violation of Section 19 of this Agreement.

(25) Failure by Franchisee to conduct the business of the Franchised Restaurant in compliance with all laws and regulations as required under Section 21.C.(3) of this Agreement.

(26) Failure by Franchisee to comply with any other provisions of this Agreement or any other agreement with BKC relating to the Franchised Restaurant.

(27) Any false or misleading representation of Franchisee or the Owners with respect to the Franchise Entity Application (including, without limitation, any representation regarding the uses of equity capital raised pursuant to the Franchise Entity Application) or Franchisee or any Owner fails in any undertaking pursuant to the Franchise Entity Application. If this act of default shall occur, BKC shall have the right to terminate this Agreement, effective immediately upon notice to Franchisee and without opportunity to cure.

The failure of BKC to terminate this Agreement upon the occurrence of one or more acts of default will not constitute a waiver or otherwise affect the right of BKC to terminate this Agreement because of a continuing or subsequent failure to cure one or more of the aforesaid acts of default or any other default.

**B. Effect of Termination**

(1) Upon termination or expiration of this Agreement, Franchisee's right to use the BURGER KING Marks and the BURGER KING System shall terminate. Franchisee shall not thereafter identify itself as a BURGER KING franchisee or publicly identify itself as a former BURGER KING franchisee or use any of BKC's trade secrets, promotional materials, the BURGER KING Marks or any mark confusingly similar, nor shall Franchisee disclose any of BKC's trade secrets. Upon termination or expiration of this Agreement, Franchisee will immediately return to BKC the MOD Manual loaned to it, together with all other material containing trade secrets.

(2) Franchisee grants to BKC, upon termination or expiration of this Agreement, the option to purchase all usable paper goods, containers and printed menus bearing the BURGER KING Marks at Franchisee's cost, and to purchase the restaurant equipment, furniture, fixtures and signs at fair market value.

(3) If the parties do not enter into a Successor Franchise Agreement, Franchisee agrees to immediately upon termination or expiration of this Agreement, make such removals or changes in signs and the Building as BKC shall request, so as to effectively distinguish the Building and Premises from its former appearance and from any other BURGER KING Restaurant. In the event Franchisee fails to make the changes, Franchisee consents to BKC entering the Building and Premises to make non-structural changes at Franchisee's expense.

(4) In the event of termination for any default of Franchisee, any damage suffered by BKC shall be a lien in favor of BKC against the personal property, machinery, fixtures and equipment owned by Franchisee on the Premises at the time of default.

(5) The foregoing shall be in addition to any other rights or remedies of BKC that exist under statute, regulation or common law.

**19. RESTRICTIVE COVENANT**

Franchisee covenants and agrees for itself, its parent, subsidiaries and affiliated companies that during the Term of this Agreement they will not own, operate or have any interest in any hamburger business except other franchised BURGER KING Restaurants. Franchisee further covenants and agrees that for a period of one (1) year after any sale, assignment, transfer, termination or expiration of this Agreement, these entities will not own, operate or have any interest in any hamburger business, except other franchised BURGER KING Restaurants, either at or within two (2) miles of the Premises . At BKC's request, Franchisee shall require each Owner, and Managing Director to execute an agreement similar in substance to this Section in a form acceptable to BKC and naming BKC as a third party beneficiary with the independent right to enforce such agreement.

**20. RESOLUTION OF DEVELOPMENT DISPUTES**

**A. Non-Binding Mediation**

BKC and Franchisee agree that they shall attempt to resolve any dispute ("Development Dispute") that arises out of a decision by BKC to develop or authorize development of a new restaurant ("Development Decision"), by negotiation between Franchisee and representatives of BKC who have authority to settle the Development Dispute. The BKC representative shall be at a higher level of management than the person with direct responsibility for the initial Development Decision. If the matter has not been resolved within Thirty (30) days of referral of the Development Dispute to the BKC representative for negotiation, BKC and Franchisee shall attempt to settle the Development Dispute by non-binding mediation. The mediation procedure to be followed by the parties shall be set forth in BKC's then current Procedures for Resolving Development Disputes (the "Procedures").

**B. Binding Dispute Resolution**

The Procedures shall also set forth a binding dispute resolution process which may be initiated pursuant to the Procedures at the sole election of Franchisee in the event the dispute is not resolved through the mediation process. Subject to modifications made pursuant to Section 20.C. below, the Procedures shall remain valid and enforceable by Franchisee and BKC for the term of this Agreement.

**C. Modification of Procedures**

The terms and conditions of the Procedures shall not be materially modified by BKC without the express written approval of the Franchisee Advisory Council.

**D. Institution of Legal Proceedings**

Franchisee shall not institute any legal or administrative proceeding for claims arising out of a Development Decision without first attempting to resolve the Development Dispute through negotiation and non-binding mediation. If the Development Dispute has not been resolved through negotiation or mediation pursuant to Sections 20.A and Franchisee has not timely elected the optional binding dispute resolution pursuant to 20.B above, either party may initiate litigation.

**21. MISCELLANEOUS: GENERAL CONDITIONS**

**A. Interpretation**

The Introduction and the addenda and amendments checked on the page entitled "List of Attachments" at the beginning of this document shall be considered a part of this Agreement. Section captions are used only for convenience and are in no way to be construed as part of this Agreement or as a limitation of the scope of the particular Sections to which they refer. Words of any gender used in this Agreement shall include any other gender, and words in the singular shall include the plural, where the context requires.

**B. Non-Waiver**

The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by Franchisee with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of this Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement. The rights or remedies set forth in this Agreement are in addition to any other rights or remedies which may be granted by law.

**C. Governing Law, Forum and Compliance**

(1) This Agreement shall become valid when executed and accepted by BKC. The parties agree that it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida.

(2) Franchisee and BKC acknowledge and agree that the U.S. District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Circuit (or its successor) in and for Miami-Dade County, Florida, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising either, directly or indirectly, under or in connection with this Franchise Agreement except to the extent otherwise provided in this Agreement and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

(3) Anything in this Agreement to the contrary notwithstanding, Franchisee shall conduct its business in a lawful manner and faithfully comply with applicable laws or regulations of the United States and the state, city or other political subdivision in which the Franchised Restaurant is located.

**D. Severability**

BKC and Franchisee agree that if any provision of this Agreement may be construed in two ways, one of which would render the provision illegal or otherwise voidable or unenforceable and the other of which would render the provision valid and enforceable, such provision shall have the meaning which renders it valid and enforceable. The language of all provisions of this Agreement shall be construed according to its fair meaning and not strictly against BKC or Franchisee. It is the desire and intent of BKC and Franchisee that the provisions of this Agreement be enforced to the fullest extent, and should any provision be invalid or unenforceable under Florida law, but valid under the laws of the state where the Franchised Restaurant is located, the provision shall be governed by the law of that state. In the event any court shall determine that any provision in this Agreement is not enforceable as written, BKC and Franchisee agree that the provision shall be amended so that it is enforceable to the fullest extent permissible under the laws of the jurisdiction in which enforcement is sought. The provisions of this

Agreement are severable and this Agreement shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained in the Agreement, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable.

**E. Notices**

(1) All notices to BKC shall be in writing and shall be delivered or sent by registered or certified mail, postage fully prepaid, addressed to it at its offices at P.O. Box 020783, General Mail Facility, Miami, Florida 33102-0783, Attention: General Counsel, or at such other address as BKC shall from time to time designate in writing.

(2) All notices to Franchisee shall be in writing and shall be hand delivered or sent by registered or certified mail or telegraph, addressed to Franchisee at the Franchised Restaurant or Franchisee's last designated in writing mailing address.

(3) Notices shall be deemed delivered on the earlier of actual receipt or the third (3rd) day after being deposited in the U.S. Mail.

**F. Modification**

This Agreement may only be modified or amended by a written document executed by BKC and Franchisee.

**G. Binding Effect**

This Agreement shall be binding upon the parties and their successors or assigns.

**H. Survival**

Any provisions of this Agreement, including but not limited to the insurance and indemnification provisions of Section 13, which impose an obligation after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and be binding on the parties.

**I. Attorney's Fees**

In any litigation to enforce the terms of this Agreement, all costs and all attorney's fees (including those incurred on appeal) incurred as a result of the legal action shall be paid to the prevailing party by the other party.

**J. Entire Agreement**

This Agreement, together with the Target Reservation Agreement, Franchise Application, Capitalization Plan, the Franchise Entity Application, the Owner's Guaranty, and Contribution Agreement, if applicable, submitted by Franchisee to BKC upon which BKC is relying in granting this franchise, constitute the entire agreement of the parties and supersedes all prior agreements, negotiations, commitments, representations and undertakings of the parties with respect to the subject matter of this Agreement.

**BURGER KING CORPORATION**

By: [signature]
Print Name: [illegible]
Its: [illegible]

**FRANCHISEE:**

**JFM SPARTA, LLC,**
a New Jersey limited liability company

By: [signature]
Ramesh Jethwa, Managing Owner

# EXHIBIT A

## LEGAL DESCRIPTION

## EXHIBIT B

## OWNERS

| | |
|---|---|
| Managing Owner | Ramesh Jethwa |
| *Owners* | Ranjana Jethwa |
| Managing Director | Roopali Jethwa |

**REPLACEMENT FRANCHISE**
**ADDENDUM**
**BURGER KING® Restaurant # 1877**

This Replacement Franchise Addendum ("Replacement Franchise Addendum") is made as of the 3 day of July, 2015, by and between Burger King Corporation, a Florida corporation, ("BKC"), and JFM Sparta, LLC, a New Jersey limited liability company ("Franchisee"). This Replacement Franchise Addendum is part of the franchise agreement entered into by parties on the same date (the "Agreement") under which Franchisee is licensed to own and operate the BURGER KING® Restaurant referred to as BK# 1877 (the "Franchised Restaurant"). In the event of any conflicts between the terms of the Agreement and the terms of this Replacement Franchise Addendum, the terms of this Replacement Franchise Addendum shall control. The Agreement replaces and supersedes a franchise agreement that was previously in effect for the Franchised Restaurant and is for a term equal to or less than the unexpired term of the previously effective franchise agreement.

1. **FRANCHISE GRANT: TERM AND LOCATION.** The following paragraph replaces Section 1 of the Agreement.

BKC grants to Franchisee and Franchisee accepts a franchise to use the BURGER KING System and the BURGER KING Marks only in the operation of a BURGER KING Restaurant at 49 Sparta Avenue, Sparta, New Jersey 07871-1822 more fully described in Exhibit "A" (the "Franchised Restaurant") (the term "Franchised Restaurant" includes the real estate described on Exhibit "A" (the "Premises"), the restaurant "Building" and all other "Improvements" constructed thereon wherever the context permits or requires). The term of this Agreement (the "Term") commences on July 13, 2015 (the "Commencement Date") and shall expire on December 31, 2033, unless sooner terminated in accordance with the provisions of this Agreement. Franchisee agrees to operate the Franchised Restaurant at the specified location for the entire Term. Franchisee accepts the franchise granted in this Agreement with the full and complete understanding that the franchise grant contains no promise or assurance of renewal. The sole and entire conditions under which Franchisee will have the opportunity of obtaining a Successor BURGER KING Restaurant Franchise Agreement at expiration are those set forth in Section 17. This franchise is for the specified location only and does not in any way grant or imply any area, market, or territorial rights propriety to Franchisee.

2. **FRANCHISE FEE; INITIAL OBLIGATIONS.** The following paragraph replaces Section 2 of the Agreement.

No initial franchise fee is payable by Franchisee in connection with the execution of the Agreement. Franchisee acknowledges and agrees that BKC has fully performed all of its contractual obligations in connection with the development and opening of the Franchised Restaurant. These include, but are not limited to, the furnishing of standard building plans as appropriate, a pre-opening training program, pre-opening and opening supervision and assistance at the Franchised Restaurant, assistance for the opening promotion program, and the loaning to Franchisee a copy of the MOD Manual. Franchisee acknowledges that BKC has no further obligation under the Agreement to perform such obligations, notwithstanding any contrary provisions of Section 6 of the Agreement.

This Replacement Franchise Addendum is hereby executed by the parties effective on the date indicated above.

**BURGER KING CORPORATION**

By: [signature]
Print Name: REBECA OSUNA
Its: MANAGER, FRM

**FRANCHISEE:**

**JFM SPARTA, LLC,**
a New Jersey limited liability company

By: [signature]
Ramesh Jethwa, Managing Owner

**OWNER'S GUARANTY**

This Owner's Guaranty is made and executed by the undersigned as of the 13 day of July, 2015. You, the undersigned (and each of you, if more than one) (hereinafter referred to as "you" or as "GUARANTOR") have an interest in JFM Sparta, LLC, a New Jersey limited liability company (hereinafter referred to as "FRANCHISEE"). FRANCHISEE is the franchisee under that certain BURGER KING® Restaurant Franchise Agreement (Entity) dated as of July 13, 2015 (the "Franchise Agreement") with respect to BURGER KING Restaurant #1877(the "Restaurant") and, if applicable, that certain Lease/Sublease for the Restaurant premises (the "Lease") with Burger King Corporation, a Florida corporation (hereinafter referred to as "BKC"). This Owner's Guaranty is incorporated and made a part of the Franchise Agreement and Lease and will be attached thereto.

1. Acknowledgments. You acknowledge and agree that BKC has entered into the Franchise Agreement and Lease with FRANCHISEE solely on the condition that each Owner of FRANCHISEE (as defined in the Franchise Agreement) be personally obligated and jointly and severally liable with FRANCHISEE (and with each other Owner of FRANCHISEE) for the performance of each and every obligation of FRANCHISEE (and its Owners) under the Franchise Agreement, Lease, any amendments or modifications to the Franchise Agreement or Lease, any extensions or renewals of the Franchise Agreement or Lease, and under each and every agreement ancillary to the Franchise Agreement or Lease that has been or hereafter may be entered by FRANCHISEE with BKC (all such agreements are collectively referred to as the "BKC Agreements").

2. GUARANTOR'S Covenants, Representations and Guaranty. In consideration of and as an inducement to the execution of the Franchise Agreement and Lease by BKC, you hereby personally, irrevocably and unconditionally:

(a) represent and warrant to BKC that Exhibit B to the Franchise Agreement is accurate and complete;

(b) agree to guarantee the prompt payment and performance of all Obligations (as hereinafter defined) of FRANCHISEE to BKC and its successors and assigns; and

(c) agree to be personally bound by, and personally liable for the breach of, each and every provision in the Franchise Agreement and each and every provision in any other BKC Agreement, as if you were the FRANCHISEE, including, without limitation, the provisions of Sections 12 (Unfair Competition), 15 (Assignment) and 19 (Restrictive Covenant) of the Franchise Agreement.

The term "Obligations" means the payment of all debts, liabilities and obligations of FRANCHISEE to BKC arising under the BKC Agreements, whether direct, indirect, absolute, contingent, matured or unmatured, extended or renewed, wherever and however incurred, together with all costs of collection, compromise and enforcement, including reasonable attorneys' fees, and the prompt performance of each and every covenant, agreement and condition set forth in any of the BKC Agreements.

3. Waivers by GUARANTOR. You hereby waive:

(a) acceptance and notice of acceptance by BKC of the foregoing guaranty;

(b) notice of demand for payment of any indebtedness or nonperformance by FRANCHISEE of any of the Obligations;

(c) presentment or protest of any instrument and notice thereof; and notice of default or intent to accelerate with respect to the indebtedness or nonperformance of any of the Obligations;

(d) any right you may have to require that an action be brought against FRANCHISEE or any other person as a condition of liability;

(e) the defense of the statute of limitations in any action hereunder or for the collection or performance of any Obligation;

(f) any and all rights to payments, indemnities and claims for reimbursement or subrogation that you may have against FRANCHISEE arising from your execution of and performance under this Guaranty;

(g) any defense based on any irregularity or defect in the creation of any of the Obligations or modification of the terms and conditions of performance thereof;

(h) any defense based on the failure of BKC or any other party to take, protect, perfect or preserve any right against and/or security granted by the FRANCHISEE or any other party;

(i) any and all other notices and legal or equitable defenses to which you may be entitled; and

(j) the right to trial by jury in respect of any litigation based on, or arising out of, under or in connection with this Guaranty.

4. Further Agreements and Understandings. You hereby consent and agree that:

(a) Your direct and immediate liability under this Guaranty will be joint and several with FRANCHISEE and each other GUARANTOR of FRANCHISEE;

(b) The death or incapacity of any GUARANTOR will not modify, amend or terminate this Guaranty;

(c) If you should die, become incapacitated, become insolvent or make a general assignment for the benefit of creditors, or if a proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally shall be filed or commenced by, against or in respect of you or any other GUARANTOR hereunder, any and all obligations of the GUARANTOR shall, at BKC's option, immediately become due and payable without notice;

(d) If any payment or transfer to BKC which has been credited against any Obligation is voided or rescinded or required to be returned by BKC, whether or not in connection with any event or proceeding described in Section 4(c), this Guaranty will continue in effect or be reinstated as though such payment, transfer or recovery had not been made;

(e) You will render any payment or performance required under the Franchise Agreement or any other BKC Agreement upon demand if FRANCHISEE fails or refuses punctually to do so;

(f) Your liability hereunder will be construed as an absolute, unconditional, continuing and unlimited obligation without regard to the regularity, validity or

enforceability of any of the Obligations, and without regard to whether any Obligation is limited, modified, voided, released or discharged in any proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally;

(g) Your liability hereunder will not be contingent or conditioned upon BKC's pursuit of any remedies against FRANCHISEE or any other person;

(h) This Guaranty will continue in full force and effect for and as to any extension of or modification or amendment to the Franchise Agreement or any other BKC Agreement and you waive notice of any and all such extensions, modifications or amendments;

(i) Your liability hereunder will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence, or any waiver that BKC may from time to time grant to FRANCHISEE or to any other person, including without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims (including the release of other Owners or guarantors), or the taking of any action by BKC which may have the effect of increasing your obligations, none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Franchise Agreement and so long as any performance is or may be owed under any of the BKC Agreements by FRANCHISEE or its Owners and so long as BKC may have any cause of action against FRANCHISEE or its Owners, subject to paragraph (k) below;

(j) Any and all present and future debts and obligations of the FRANCHISEE to you or any other GUARANTORS are hereby subordinated to the full payment and performance of the Obligations; and

(k) If you transfer, in compliance with the Franchise Agreement, any interest in the Franchise Agreement or FRANCHISEE in an installment sale, your liability for the Obligations under the Franchise Agreement will terminate upon the later of (i) one year from the date of transfer or (ii) the date of payment of the final installment of any purchase money debt, provided that, after the first anniversary of such transfer, your liability will be limited to the original amount of the purchase money debt. If you transfer, in compliance with the Franchise Agreement, any interest in the Franchise Agreement or FRANCHISEE for payment in cash, your liability for the Obligations under the Franchise Agreement will terminate one year from the date of transfer, and your liability will be limited to the amount of accrued but unpaid royalty and advertising fees due and payable under the Franchise Agreement during such period. Notwithstanding the foregoing, your liability hereunder for Obligations under the Lease or the other BKC Agreements will continue in full force and effect until FRANCHISEE has fully paid and performed all obligations thereunder.

5. Choice of Law; Jurisdiction and Venue. This Guaranty shall be governed by and construed in accordance with the laws of the State of Florida. You hereby irrevocably submit to the jurisdiction of the Federal District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Court (or its successor) in and for Dade County, Florida, and any appellate court thereof in any action or proceeding arising out of or relating to the Guaranty. You hereby irrevocably waive, to the fullest extent you may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding and any right to jurisdiction on account of your place of residence or domicile. You agree that a final judgment in any such action or proceeding shall be

conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

6. Severability. If one or more provisions contained in this Owner's Guaranty shall be invalid, illegal or unenforceable, in any respect under the laws of any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

You now execute this Guaranty on the date shown above.

**GUARANTOR(S):**

Ramesh Jethwa

Ranjana Jethwa

## CONDITIONAL CONSENT TO ASSIGNMENT OF FRANCHISE AGREEMENTS AND LEASES

AGREEMENT made this 13 day of July, 2015 but effective July 13 2015 by and between BURGER KING CORPORATION ("BKC"), the individual, individuals, entity, and/or entities whose names and addresses are set forth on Schedule 1 (individually, the "Assignor" and collectively, the "Assignors"), the individual, individuals, entity, and/or entities whose names and addresses are set forth on Schedule 2 (individually, a "Guarantor" and collectively, the "Guarantors"), the individual, individuals, entity, and/or entities whose names and addresses are set forth on Schedule 3 (individually, an "Assignee" and collectively, the "Assignees"), and the individual, individuals, entity, and/or entities, if any, whose names and addresses are set forth on Schedule 4 (individually, an "Owner" and collectively, the "Owners").

### INTRODUCTION

A. Each Guarantor owns an equity interest in Assignors.

B. Each Assignor is a party to certain franchise agreements (the "Franchise Agreements") with BKC relating to the operation of Burger King Restaurants (the "Restaurants"). A list of the Franchise Agreements and Restaurants is set forth on Schedule 5.

C. Each Assignor may also be a party to certain lease agreements (the "Leases") with BKC whereby Assignors lease the premises upon which certain of the Restaurants are located. A list of the Leases, if any, is set forth on Schedule 5.

D. Guarantors have jointly and severally guaranteed all of the obligations of Assignors to BKC.

E. Each Owner owns an equity interest in Assignees.

F. Assignors and Guarantors have requested that BKC consent to an assignment of the Franchise Agreements and Leases to Assignees.

### COVENANTS AND AGREEMENTS

In consideration of the foregoing, the parties agree as follows:

1. Assignment and Assumption. Each Assignor assigns all of its right, title and interest in the Franchise Agreements, Leases and, if applicable, any Investment Spending Contracts and Franchise Commitments relating to the Restaurants to Assignees, and Assignees assume all of Assignors' duties and obligations under those agreements. BKC consents to this assignment and assumption on the terms and conditions set forth in this Agreement.

2. General Release of BKC. Each of the Owners, Guarantors, Assignors and Assignees jointly and for themselves, their successors, assigns, heirs, personal representatives and affiliates (collectively, the "Releasing Parties") unconditionally and absolutely releases and forever discharges BKC, its successors, predecessors, counsel, insurers, assigns, officers, directors, employees, parent company, affiliates, subsidiaries and agents, past or present (collectively, the "Released Parties") from and against any and all claims, actions, causes of action, demands, damages, costs, suits, debts, covenants, controversies, and any other liabilities, whether known or unknown, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal or equitable, which the Releasing Parties may have that relate to or arise out of this Agreement, the Franchise Agreements, Leases, the operation of the Restaurants, or any other matter, cause or circumstance whatsoever from the beginning of the world through the date of this

Agreement, including without limitation any claim that BKC has made representations regarding any right to exclusive territory or trading areas, the economic viability or profitability of the Restaurants or current or potential sales at the Restaurants.

3. Unlimited Guaranty by Owners. Each Owner agrees to jointly, severally, irrevocably and unconditionally guarantee the payment and performance of all debts, obligations and liabilities of the Assignees to BKC arising pursuant to the Franchise Agreements, Leases, Investment Spending Contracts or any other agreement with BKC relating directly or indirectly to the Restaurants (the "BKC Agreements"), together with all costs of collection, compromise or enforcement, including reasonable attorneys' fees, incurred with respect to any such debts, obligations or liabilities or with respect to this or any other guaranty thereof or any proceeding under the United States Bankruptcy Code or any other proceeding or action affecting the rights of the Assignee's creditors generally (all of the foregoing being referred to collectively as the "Obligations"). This guaranty by the Owners shall continue in full force and effect until Assignees have fully paid and performed all of the Obligations.

4. Partial Release of Assignors and Guarantors. Nothing contained in this Agreement shall (a) release Assignors from continued liability under the Leases or (b) release any Assignor or any Guarantor from its liability for damages for any breach of the Franchise Agreements or Leases prior to the date of this Agreement. Except as provided below, Assignors and Guarantors are released from all other liability to BKC under the Franchise Agreements, unless an Assignor shall remain a franchisee under the Franchise Agreements, in which case such Assignor shall also be liable to BKC for any breach of the Franchise Agreements after the date of this Agreement.

5. Limited Guaranty of Assignors and Guarantors. Each Guarantor and Assignor agrees to jointly, severally, irrevocably and unconditionally guaranty the payment and performance of the Obligations by Assignees. Provided, however, that the guaranty by each Guarantor and Assignor of the obligations of Assignees under the Franchise Agreements only, and not their guaranty of the Obligations of Assignees under the Leases or any of the other BKC Agreements, shall terminate upon the later of (a) one year from the date of this Agreement or (b) the date of payment of the final installment of any purchase money debt owed by Assignees to Assignors, if, and only if, Assignees pay when due all financial obligations to BKC under the BKC Agreements between the date of this Agreement and such termination date, unless an Assignor or Guarantor is also an Owner, in which case this Paragraph shall be inapplicable and Paragraph 3 of this Agreement shall control.

6. General Terms and Conditions of Guaranties. In connection with the guaranties set forth above in Paragraphs 3 and 5 (collectively the "Guaranties"), the Owners, the Guarantors, and the Assignors hereby agree as follows:

(a) The Guaranties shall not be impaired by any modification, supplement, renewal, extension or amendment of the BKC Agreements or any of the Obligations, nor by any modification, release or other alteration of any of the Obligations hereby guaranteed, nor by any agreements or arrangements whatever with Assignees or any one else, nor by BKC's and any Assignee's execution of new franchise agreements which shall supersede and replace any and all of the Franchise Agreements;

(b) The liability of each guarantor hereunder is primary, direct and unconditional and may be enforced without requiring BKC first to resort to any other right, remedy or security;

(c) No guarantor hereunder shall have any right of subrogation, reimbursement or indemnity whatsoever, unless and until the Obligations are paid or performed in full;

(d) If any guarantor hereunder should at any time die, become incapacitated, become insolvent or make a composition, trust mortgage or general assignment for the benefit of creditors, or if a proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally shall be filed or commenced by, against or in respect of any guarantor

hereunder, any and all obligation of that guarantor shall, at BKC's option, immediately become due and payable without notice;

(e) If any payment or transfer to BKC which has been credited against any Obligation, is voided or rescinded or required to be returned by BKC, whether or not in connection with any event or proceeding described in Section 6(d), the Guaranties shall continue in effect or be reinstated as though such payment, transfer or recovery had not been made;

(f) Except as otherwise provided in this Agreement, each of the Guaranties shall be construed as an absolute, unconditional, continuing and unlimited obligation of the each guarantor hereunder without regard to the regularity, validity or enforceability of any of the Obligations, and without regard to whether any Obligation is limited, modified, voided, released or discharged in any proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally;

(g) Any termination of the Guaranties shall be applicable only to Obligations accruing after termination or having their inception after the effective date of such termination and shall not affect Obligations having their inception prior to such date;

(h) The death or incapacity of any guarantor hereunder shall not result in the termination of the Guaranties;

(i) Any and all present and future debts and obligations of the Assignee to any guarantor hereunder are hereby waived and postponed in favor of and subordinated to the full payment and performance of the Obligations;

(j) Each guarantor hereunder waives to the greatest extent permitted by law: notice of acceptance hereof; presentment and protest of any instrument, and notice thereof; notice of default or intent to accelerate; notice of foreclosure; notice of any modification, release or other alteration of any of the Obligations or of any security therefor and all other notices to which any guarantor hereunder might otherwise be entitled; and

(k) Each guarantor hereunder waives to the greatest extent permitted by law: any defense arising by virtue of the lack of authority, death or disability of such guarantor or any Assignee; or any defense based upon an election of remedies by BKC which destroys or otherwise impairs the subrogation rights of such guarantor or the right of such guarantor to proceed against the Assignees for reimbursement, or both.

7. Managing Owner and Director. The person set forth on Schedule 6 hereto is designated as the Assignees' "Managing Owner" under each of the Franchise Agreements. The person set forth on Schedule 6 is hereby designated as the Assignees' "Managing Director" under each of the Franchise Agreements.

8. No Default. Each Assignor represents and warrants that the Assignor is not in default under the Franchise Agreements, Leases, or any of the BKC Agreements.

9. Compliance with Guidelines. Assignors, Assignees, Guarantors and Owners each represent and warrant that they have complied with the Guidelines for Preparation of Corporate Governing Instruments or Guidelines for Approval of Franchisee Ownership Distribution Plans, if applicable.

10. Equity Ownership and Transfer Restrictions.

(a) Assignees and Owners each hereby represent and warrant that the equity ownership of the Assignees is as set forth on Schedule 7 and that they shall each comply with all of the provisions of

the Franchise Agreements regarding restrictions on the transfer, pledge and encumbrance of equity interests in Assignees.

(b) Any breach of the provisions of this Paragraph 10 shall constitute a material default under each of the BKC Agreements.

11. Proprietary Information, Etc. Assignees, Assignors, Owners, and Guarantors each represent and warrant that they shall comply and continue to comply with all of the provisions of the Franchise Agreements regarding the confidentiality of all proprietary property and information the restriction on the use of such information, and the limitation on competition with BKC. Any breach by any party of its obligations under this Paragraph 11 shall also constitute a material default under each of the BKC Agreements.

12. Accounts Receivable/Transfer Fee. Assignees, Assignors, Guarantors, and Owners each acknowledge and agree that the transfer fee and any New Franchisee Training Fee set forth in the Franchise Agreements and all currently due or past due charges payable to BKC must be paid in full upon execution of this Agreement, and that:

(a) There are certain charges, including royalties, advertising contributions, rent, real estate taxes, investment spending and other charges under the Franchise Agreements and Leases which have accrued, been assessed or otherwise become liabilities under the BKC Agreements, but are not yet due;

(b) Each Assignee, Assignor, Guarantor, and Owner is jointly and severally liable for such charges;

(c) BKC currently expects that Assignee shall pay such charges when due;

(d) Any proration, escrow or prepayment of such charges is the Assignees' sole responsibility;

(e) The failure to so prorate, escrow or prepay shall not excuse Assignees from paying such charges when due; and

(f) BKC has made no representation or warranty that such charges do not exist or exist in a specific amount.

13. Franchise Application. Assignees and Owners each represent and warrant that the representations set forth in their applications to BKC for approval as a BKC franchisee and for approval of the transaction referenced in Paragraph F above are true and correct as of the date hereof.

14. New Franchise Agreements. Simultaneously with the execution of this Agreement, Assignees, Owners and BKC shall enter into new franchise agreements with respect to the Restaurants (the "New Franchise Agreements") in the form set forth in BKC's Franchise Disclosure Document as appropriate to the Assignees' ownership structure. The term of the new Franchise Agreements shall correspond to the balance of the term of the Franchise Agreements listed on Schedule 5 hereto.

16. Miscellaneous.

(a) Choice of Law; Jurisdiction and Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida. The parties hereto acknowledge and agree that the United States District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Court (or its successor) in and for Dade County, Florida, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising, either directly or indirectly, under or in connection with this Agreement, the Franchise Agreements, Leases, related

documentation, or any other agreement with BKC, and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement, related documentation or any other agreement between BKC and Assignor, Assignee, Owners, and/or Guarantors in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

(b) Amendment. This Agreement and the other documents being executed and delivered pursuant hereto constitute the full and entire agreement and understanding between the parties hereto with respect to the subject matter hereof. No amendment hereto shall be effective unless it is in writing and signed by all of the parties hereto.

(c) Binding Effect. Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, successors, assigns, executors, personal representatives and administrators.

(d) Headings. The headings of the provisions of this Agreement are for convenience or reference only and are not to be considered in construing this Agreement.

(e) Severability. If one or more of the provisions contained in this Agreement or in any document contemplated hereby, or any application thereof, shall be invalid, illegal or unenforceable, in any respect under the laws of any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein and therein, and any application thereof, shall not in any way be affected or impaired thereby or under the laws of any other jurisdiction.

(f) Integration. This Agreement incorporates all prior discussions and negotiations among the parties hereto and constitutes the entire agreement among the parties hereto with respect to the subject matter of this Agreement. There are no other agreements of any kind whether oral or in writing between BKC and any other party, with respect to the matters covered herein.

(g) Assignability. The parties each agree that the rights and obligations of BKC under this Agreement and any related agreement shall be freely assignable by BKC without the consent of any other party. The other parties may not assign their rights or obligations under said agreements.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as a document under seal dated as of the day and year first written above.

**BURGER KING CORPORATION**

By:
Print Name
Its:

**OWNERS:**

Ramesh P. Jethwa

Ranjana R. Jethwa

**GUARANTORS:**

N/A

**ASSIGNORS:**

Ramesh P. Jethwa

Ranjana R. Jethwa

**ASSIGNEES:**

**JFM Sparta, LLC**
a New Jersey limited liability company

By:
Ramesh P. Jethwa, Managing Owner

**SCHEDULE 1**
**TO CONSENT TO ASSIGNMENT**

| Assignors | Address | Percentage of Ownership |
|---|---|---|
| Ramesh P. Jethwa | 194 Eileen Drive<br>Cedar Grove, NJ 07009 | 51.1% |
| Ranjana R. Jethwa | 194 Eileen Drive<br>Cedar Grove, NJ 07009 | 48.9% |

**SCHEDULE 2**
**TO CONSENT TO ASSIGNMENT**

| Guarantors | Address |
|---|---|
| N/A | |

**SCHEDULE 3**
**TO CONSENT TO ASSIGNMENT**

| Assignees | Address | Percentage of Ownership |
|---|---|---|
| JFM Sparta, LLC | 194 Eileen Drive<br>Cedar Grove, NJ 07009 | 100% |

**SCHEDULE 4**
**TO CONSENT TO ASSIGNMENT**

| Owners | Address |
|---|---|
| Ramesh P. Jethwa | 194 Eileen Drive,<br>Cedar Grove, NJ 07009 |
| Ranjana R. Jethwa | 194 Eileen Drive,<br>Cedar Grove, NJ 07009 |

**SCHEDULE 5**
***TO CONSENT TO ASSIGNMENT***

| BK # | Address | Date of Franchise Agreement as amended | Date of Lease as amended If Any |
|---|---|---|---|
| 1877 | 49 Sparta Avenue<br>Sparta, NJ 07871 | 7.13.15 | DTL |

**SCHEDULE 6**
**TO CONSENT ASSIGNMENT**

| | |
|---|---|
| Managing Owner: | Ramesh P. Jethwa |
| Managing Director: | Roopali Jethwa |

**SCHEDULE 7**
**TO CONSENT TO ASSIGNMENT**

Equity Ownership in Assignee

| Owner | Type of Equity Interest | Percentage Ownership |
|---|---|---|
| Ramesh P. Jethwa | Membership Units | 51% |
| Ranjana R. Jethwa | Membership Units | 49% |

# EXHIBIT B

**FRANCHISE AGREEMENT (Entity)**
**CONTENTS**

**RESTAURANT #:10481**
**ADDRESS: 160 SPRING VALLEY MARKETPLACE**
**SPRING VALLEY, NEW YORK 10977-5222**


| | | |
|---|---|---|
| | **INTRODUCTION** | 1 |
| **1.** | **FRANCHISE GRANT: TERM AND LOCATION** | 1 |
| **2.** | **FRANCHISE FEE** | 2 |
| **3.** | **ORGANIZATION OF FRANCHISEE** | 2 |
| **4.** | **FRANCHISEE ASSOCIATION AND ADVISORY COUNCIL** | 2 |
| **5.** | **STANDARDS AND UNIFORMITY OF OPERATION** | 3 |
| | A. M.O.D. Manual | 3 |
| | B. Franchised Restaurant | 4 |
| | (1) Repair and Maintenance | 4 |
| | (2) Current Image | 4 |
| | C. Signs | 4 |
| | D. Equipment | 5 |
| | E. Vending Machines, Etc. | 5 |
| | F. Menu and Service | 6 |
| | G. Hours of Operation | 6 |
| | H. Uniforms | 6 |
| | I. Advertising and Promotional Materials | 6 |
| | J. Right of Entry and Inspection | 6 |
| | K. Interference with Employment Relations of Others | 6 |
| | L. Management of Franchised Restaurant | 7 |
| **6.** | **SERVICES AVAILABLE TO FRANCHISEE** | 7 |
| **7.** | **THE FRANCHISED RESTAURANT** | 8 |
| **8.** | **TRAINING** | 8 |
| | A. Managing Owner/Managing Director | 8 |
| | B. Charges and Costs | 9 |
| | C. Franchisee Training and Restaurant Staffing | 9 |
| **9.** | **ROYALTY AND ADVERTISING CONTRIBUTION** | 9 |
| | A. Royalty | 9 |
| | B. Advertising, Sales Promotion and Public Relations | 9 |
| | C. Gross Sales | 10 |
| | D. Late Charge | 11 |
| | E. Payment | 11 |
| | F. Audit of Advertising Contributions | 11 |
| | G. Alternative Method Of Payment | 11 |

| | | |
|---|---|---|
| **10.** | **ACCOUNTING PROCEDURES: RIGHT OF AUDIT** | 12 |
| | A. Accounting | 12 |
| | B. Annual Financial Statements | 12 |
| | C. Audits | 12 |
| | D. Release of Financial Information | 12 |
| **11.** | **LIMITATIONS OF FRANCHISE** | 13 |
| | A. Trademarks, Trade Names, Service Marks and Trade Secrets | 13 |
| | B. Independent Contractor | 13 |
| **12.** | **UNFAIR COMPETITION** | 14 |
| **13.** | **INSURANCE; INDEMNIFICATION** | 14 |
| | A. Insurance | 14 |
| | B. Worker's Compensation | 14 |
| | C. Indemnity | 15 |
| | D. Defense of Claims | 15 |
| **14.** | **TAXES** | 16 |
| **15.** | **ASSIGNMENT: CONDITIONS AND LIMITATIONS** | 16 |
| | A. Transfer by Franchisee | 16 |
| | B. Transfer by Owners | 16 |
| | C. Transfer of Equity Securities | 16 |
| | D. Pledging of Franchise Agreement | 17 |
| | E. Notice of Proposed Transfer | 17 |
| | F. Conditions of Consent | 17 |
| | G. Consent to Transfer | 18 |
| | H. Continuing Liability | 18 |
| | I. Right of Re-Entry | 19 |
| | J. Notices to Transferor | 19 |
| | K. Acquisition of Additional Franchises | 20 |
| | L. Death or Mental Incapacity | 20 |
| | M. No Waiver | 20 |
| **16.** | **RIGHT OF FIRST REFUSAL** | 20 |
| **17.** | **OPTION TO OBTAIN SUCCESSOR FRANCHISE AGREEMENT** | 21 |
| **18.** | **DEFAULT AND EFFECT OF TERMINATION** | 22 |
| | A. Default | 22 |
| | B. Effect of Termination | 25 |
| **19.** | **RESTRICTIVE COVENANT** | 26 |
| **20.** | **RESOLUTION OF DEVELOPMENT DISPUTES** | 26 |
| | A. Non-Binding Mediation | 26 |
| | B. Binding Dispute Resolution | 26 |
| | C. Modification of Procedures | 26 |
| | D. Institution of Legal Proceedings | 27 |
| **21.** | **MISCELLANEOUS: GENERAL CONDITIONS** | 27 |
| | A. Interpretation | 27 |
| | B. Non-Waiver | 27 |

| | |
|---|---|
| C. Governing Law, Forum and Compliance | 27 |
| D. Severability | 28 |
| E. Notices | 28 |
| F. Modification | 28 |
| G. Binding Effect | 28 |
| H. Survival | 28 |
| I. Attorney's Fees | 29 |
| J. Entire Agreement | 29 |
| **EXHIBIT A - LEGAL DESCRIPTION** | 30 |
| **EXHIBIT B - OWNERS** | 31 |

## LIST OF ATTACHMENTS

The items checked below are hereby incorporated into and are made a part of this Franchise Agreement:

- ☐ Non-Traditional Facility Addendum
- ☐ Big Box Non-Traditional Facility Addendum
- ☐ Base DIP 2015 Addendum
- ☐ Multi-Unit DIP 2015 Addendum
- ☐ 2016 Food Court / Civil Servant Addendum
- ☐ Franchise Agreement Addendum (DIP)
- ☐ Replacement Franchise Addendum
- ☐ Investor Addendum
- ☐ ITP3 Successor Franchise Addendum
- ☐ ITP2A Successor Franchise Addendum
- ☑ ITP2 Successor Franchise Addendum
- ☐ SIO3 Successor Franchise Addendum
- ☐ Successor Franchise Addendum (Complete 20/20 Remodel)
- ☐ Successor Franchise Addendum (Phased 20/20 Remodel)
- ☐ Successor Franchise Addendum (BKLIP Complete 20/20 Remodel)
- ☐ Successor Incentive Addendum
- ☑ Successor Addendum
- ☐ Mall Incentive Program Addendum
- ☐ A-Site Incentive Addendum
- ☐ ERP Franchise Agreement Addendum
- ☐ Deferred Remodel Addendum
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of California
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of Illinois
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of Minnesota
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of North Dakota
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of Washington

**BURGER KING® RESTAURANT**
**FRANCHISE AGREEMENT**

THIS BURGER KING® RESTAURANT FRANCHISE AGREEMENT (this "Agreement") is made as of the 27 day of July, 2015, by and between Burger King Corporation, a Florida corporation ("BKC") and Ramesh P. Jethwa and Ranjana R. Jethwa ("Franchisee").

**INTRODUCTION**

A. BKC is the exclusive licensee of certain trademarks and service marks, including but not limited to BURGER KING and HOME OF THE WHOPPER®, which are registered or pending with the United States Patent and Trademark Office, and is the owner or exclusive licensee of other trademarks and service marks authorized for use in BURGER KING Restaurants (the "BURGER KING Marks").

B. BKC is engaged in the business of operating and granting franchises to operate BURGER KING Restaurants using the BURGER KING Marks and a uniform and comprehensive restaurant format and operating system, including a standardized design, decor, equipment system, color scheme, style of building and signage, as well as uniform operating and quality standards, specifications and procedures of operation, and uniformity of product and services offered, including all provisions of the Manual of Operating Data, as amended from time to time (the "MOD Manual")(the "BURGER KING System").

C. Franchisee desires to acquire a franchise to operate a BURGER KING Restaurant at the Premises for the entire Term specified in this Agreement. Franchisee acknowledges that Franchisee has received a copy of the Disclosure Document of BKC and has had a full and adequate opportunity to be thoroughly advised of the terms and conditions of this Agreement by financial and legal counsel of Franchisee's own choosing at least fourteen (14) calendar days prior to its execution, and is entering into this Agreement after having made an independent investigation of BKC's operations and not upon any representation as to profits and/or sales volume which Franchisee might be expected to realize, nor upon any representations or promises by BKC which are not contained in this Agreement.

In consideration of the mutual covenants contained in this Agreement, the parties agree as follows:

## 1. FRANCHISE GRANT: TERM AND LOCATION

BKC grants to Franchisee and Franchisee accepts a franchise for a period of twenty (20) years to use the BURGER KING System and the BURGER KING Marks only in the operation of a BURGER KING Restaurant at 160 Spring Valley Marktplace, Spring Valley, New York 10977-5222 USA more fully described in Exhibit A (the "Franchised Restaurant"), (the term "Franchised Restaurant" includes the real estate described on Exhibit A (the "Premises"), the restaurant "Building," and all "Improvements" constructed thereon wherever the context permits or requires. The term of this Agreement commences on March 16, 2015 (the "Commencement Date") and shall expire March 15, 2035 (the "Term") unless sooner terminated in accordance with the provisions of this Agreement. Franchisee agrees to operate the Franchised Restaurant at the specified location for the entire twenty (20) year Term. Franchisee accepts this franchise with the full and complete understanding that the franchise grant contains no promise or assurance of renewal. The sole and entire conditions under which Franchisee will have the opportunity of obtaining a Successor BURGER KING Franchise Agreement at expiration are those set forth herein in Section 17. This franchise is for the specified location only and does not in any way grant or imply any area, market or territorial rights proprietary to Franchisee.

**2. FRANCHISE FEE**

Franchisee acknowledges that the grant of this franchise constitutes the consideration for the payment by Franchisee to BKC of TWENTY THREE THOUSAND ONE HUNDRED THIRTEEN and 01/100 ($23,113.01) Dollars, and that this sum shall be fully earned by BKC upon the execution and delivery of this Agreement.

**3. FRANCHISEE REPRESENTATIONS**

Franchisee acknowledges its understanding of BKC's franchising policy of requiring all individuals who have any interest in the Franchised Restaurant, whether directly, beneficially or contingently, to be named in and be a party to the Franchise Agreement. If Franchisee consists of more than one individual, the group must include an Operating Partner who, throughout the Term of the Agreement, lives in the locality of the Franchised Restaurant. The Operating Partner must have a minimum fifty percent (50%) unencumbered equity ownership (including profits) and a minimum fifty percent (50%) controlling interest through any voting apparatus in the Franchised Restaurant and must devote his full time and best efforts to the day-to-day operation of the Franchised Restaurant with no operational or management commitments in other businesses (except other BURGER KING Restaurants operated under franchises granted to such person by BKC). Franchisee agrees that it has not avoided and will not hereafter, directly or indirectly, avoid the financial interest requirements and the direct operation requirements set forth above through entry into a management agreement, consulting agreement or any other such artificial device or arrangement. Franchisee agrees to furnish BKC with such evidence as BKC may request from time to time for the purpose of assuring BKC that Franchisee's efforts and equity interest remain as represented in this Agreement.

**4. FRANCHISEE ASSOCIATION AND ADVISORY COUNCIL**

BKC shall, on a periodic basis, consult with representatives of an independent association whose membership is comprised of at least fifty-one percent (51%) of all franchisee-operated BURGER KING Restaurants in the U.S.A. (the "Franchisee Association") relative to those matters expressly described in Sections 5.B, 6, 8, 9 and 20.C of this Agreement. The representatives of the Franchisee Association shall be referred to herein as the "Franchisee Advisory Council." Membership by a Franchisee in the Franchisee Association shall be voluntary.

Franchisee agrees that BKC may consult with and consider the advice of the Franchisee Advisory Council.

For purposes of this Franchise Agreement, to qualify as the "Franchisee Association," the association must have been formed for the primary purpose of representing the rights of franchisees, and membership in such association must be limited solely to BURGER KING franchisees, or officers, directors, partners or shareholders of BURGER KING franchisees, who in either case are not owned or controlled by BKC or its parent, or any subsidiary or affiliate of BKC.

BKC shall not prohibit nor restrict Franchisee from associating with other franchisees, nor from forming, joining or participating in any franchisee trade association (the "Activities"). BKC shall not retaliate against Franchisee because Franchisee engages in the Activities. BKC's exercise and enforcement of its rights under any franchise agreement or the law shall not, by itself, constitute a breach of BKC's responsibilities under the preceding sentence.

Franchisee agrees that BKC may consult with and consider the advice of the Franchisee Advisory Council.

For purposes of this Franchise Agreement, to qualify as the "Franchisee Association," the association must have been formed for the primary purpose of representing the rights of franchisees, and membership in such association must be limited solely to BURGER KING franchisees, or officers, directors, partners or shareholders of BURGER KING franchisees, who in either case are not owned or controlled by BKC or its parent, or any subsidiary or affiliate of BKC.

BKC shall not prohibit nor restrict Franchisee from associating with other franchisees, nor from forming, joining or participating in any franchisee trade association (the "activities"). BKC shall not retaliate against Franchisee because Franchisee engages in the activities. BKC's exercise and enforcement of its rights under any franchise agreement or the law shall not, by itself, constitute a breach of BKC's responsibilities under the preceding sentence.

**5. STANDARDS AND UNIFORMITY OF OPERATION**

BKC shall establish, and cause approved suppliers to the BURGER KING System to reasonably comply with, product, service and equipment specifications as established by BKC from time to time.

Suggestions from Franchisee for improving elements of the BURGER KING System, such as products, equipment, uniforms, restaurant facilities, service format and advertising, are encouraged and may or may not be considered by BKC when adopting or modifying standards, specifications and procedures for the BURGER KING System. Franchisee acknowledges that any such suggestions made by Franchisee hereunder shall become the exclusive property of BKC. BKC shall have no obligation to utilize suggestions and no obligation to provide compensation for any suggestion. Franchisee may not utilize any such suggestions in the Franchised Restaurant without the prior written consent of BKC.

**A. M.O.D. Manual**

Franchisee acknowledges and agrees that prompt adoption of and adherence to the BURGER KING System, including all of the provisions of the MOD Manual, as amended from time to time, are reasonable, necessary and essential to the image and success of all BURGER KING Restaurants. The MOD Manual, which is comprised of the BURGER KING Operations Manual, the Restaurant Equipment Manual, the RSI Equipment and Facilities E-Red Book, the Approved Brands and Distributors List, Approved Equipment List, the Brand Standards Guide, the Ops Emphasis Guide, alerts and amendments thereto, and applicable policies established by BKC, or the then-current equivalent printed or electronic versions of those documents, contains the official mandatory restaurant operating, equipment and product standards, specifications and procedures prescribed from time to time by BKC for the operation of a BURGER KING Restaurant. The MOD Manual and any revisions or updates thereto may be provided in electronic format including via internet, intranet, or other electronic means. Franchisee acknowledges that the MOD Manual is designed to protect BKC's standards, the BURGER KING System, and the BURGER KING Marks, and not to control the day-to-day operation of the Franchised Restaurant. Franchisee may not print a copy of the MOD Manual without BKC's prior written approval.

Franchisee agrees that changes in the standards, specifications and procedures may become necessary and desirable from time to time and agrees to accept and comply with such modifications, revisions and additions to the MOD Manual which BKC in the good faith exercise of its judgment believes to be desirable and reasonably necessary. The material and information set forth in the MOD Manual is confidential and proprietary to BKC and is to be used by Franchisee only in connection with

the operation of the Franchised Restaurant and other franchised BURGER KING Restaurants. The MOD Manual and other specifications, standards and operating procedures communicated in writing or electronically to Franchisee shall be deemed a part of this Agreement.

**B. Franchised Restaurant**

The Franchised Restaurant shall at all times be under the direct, on premises supervision of Franchisee or its manager. The Franchised Restaurant will be constructed and improved in the manner authorized and approved by BKC, and the appearance of the Franchised Restaurant will not thereafter be altered except as may be approved in writing by BKC.

**(1) Repair and Maintenance.**

Franchisee shall, at its expense, continuously throughout the Term of this Agreement maintain the Franchised Restaurant in good condition and repair in accordance with BKC's then current repair and maintenance standards.

**(2) Current Image.**

Franchisee shall, improve, alter and remodel the Franchised Restaurant to bring it into conformance with the national and local plans, specifications and/or other standards for new or remodeled BURGER KING Restaurants as may hereafter be reasonably changed and defined from time to time by BKC ("Current Image") in accordance with the following timetable:

(i) During the tenth year of the Term, Franchisee shall remodel, improve and alter the exterior of the Franchised Restaurant to conform with the Current Image in effect on the ninth anniversary of the date of this Agreement.

(ii) BKC and the Franchisee Advisory Council shall meet annually to discuss and establish the components of Current Image for the Franchised Restaurant. The Current Image as established by BKC and the Franchisee Advisory Council, from time to time, shall be binding upon Franchisee. If BKC and the Franchisee Advisory Council do not agree on the Current Image, BKC and the Franchisee Association shall settle the matter by Arbitration by a sole arbitrator in accordance with the then current non-administered arbitration rules of the Center for Public Resources. The arbitration shall be governed by the United States Arbitration Act (U.S.A.A.), and judgment upon the decision rendered by the arbitrator shall be binding on Franchisee and BKC and except as provided in Section 10(a) of the U.S.A.A., shall not be appealable in any forum. The decision may be entered by any court having jurisdiction thereof. The place of arbitration shall be Miami, Florida. Failure of Franchisee to comply with the terms of this Section 5.B shall be deemed a material default of this Agreement.

**C. Signs**

The BURGER KING Marks will only be erected and displayed in the manner and at such locations as are approved and authorized by BKC, in writing. Franchisee agrees to maintain and display signs reflecting the Current Image of BURGER KING Restaurants and shall not place additional signs or posters at the Franchised Restaurant without the prior written consent of BKC. Only signs from sources approved by BKC may be utilized at the Franchised Restaurant. Franchisee shall discontinue the use of and destroy such signs as are declared obsolete by BKC within the reasonable time specified by BKC. Such signs are fundamental to the BURGER KING Restaurant System and Franchisee hereby grants to BKC the right to enter the Franchised Restaurant to remove and destroy unapproved or obsolete signs in the event that Franchisee has failed to do so within thirty (30) days after the written request of BKC.

**D. Equipment**

(1) Only equipment approved by BKC which meets the criteria and performance standards of the BURGER KING Restaurant System may be used in the Franchised Restaurant. The equipment shall be maintained in a condition that meets operational standards specified in the MOD Manual and, as equipment becomes obsolete or inoperable, Franchisee will replace the equipment with the types and kinds of equipment as are then approved for use in BURGER KING Restaurants. If BKC determines that additional or replacement equipment is needed because of a change in menu items or method of preparation and service or because of health or safety considerations, Franchisee will install the additional equipment or replacement equipment within the reasonable time specified by BKC. Prior to mandating the use of a new or additional piece of equipment, BKC shall use reasonable efforts to field test the proposed new equipment.

(2) Franchisee must, at its sole cost and expense: (a) at all times operate at the Franchised Restaurant POS Systems (as hereinafter defined) approved by BKC; (b) upgrade or replace in whole or in part any POS Systems as BKC may reasonably deem necessary or desirable in the interest of proper administration of Burger King Restaurants throughout the Burger King Restaurant System, within such reasonable time as may be specified by BKC; (c) use the approved POS Systems at all times to record and process such information as BKC may from time to time require, including information regarding any other business carried on in or from any Burger King Restaurant with the consent of BKC, keep such information available for access by BKC on the POS System for such minimum period as BKC may require, and maintain and provide to BKC such information in the format, and using such data exchange standards and protocols as BKC may require; (d) effect the Polling (as hereinafter defined) operation at such time or times as may be required by BKC, but BKC may itself initiate Polling whenever it deems appropriate; (e) permit BKC or its agents to Poll any information contained in the POS System at any time; (f) permit BKC or its agent to obtain all of the information referenced in this Section 5.D. that may be in the possession of any third party vendor from whom Franchisee obtained an approved POS System; and (g) if required by BKC, download the information referenced in this Section 5.D. into machine readable information compatible with the system operated by BKC or its agents and to deliver that information to BKC by such method and within such timescale as BKC reasonably requires if for any reason Polling is not practicable. For purposes of this Agreement, the term "POS System" means a point of sale computerized system consisting of electronic hardware and software technology, which captures, records and transmits sales, taxes on sales, number, date and time of transactions, products and combinations of products sold and employees using the system and such other related information as may be required by BKC from time to time. For purposes of this Agreement, the term "Polling" means any process acceptable to BKC by which information or data about the Franchised Restaurant may be transmitted to or from a POS System or other system operated by Franchisee into a computer or system operated by BKC or its agents.

**E. Vending Machines, Etc.**

Public telephones, newspaper racks, juke boxes, cigarette, gum and candy machines, rides, lottery ticket terminals, video games or any other games, or vending or amusement machines will not be installed at the Franchised Restaurant without the prior written approval of BKC. In the event such items are installed at the Franchised Restaurant, then all sums received by Franchisee in connection with these items shall be included within "Gross Sales" as defined herein.

**F. Menu and Service**

All menu items, including without limitation, promotional and premium products which BKC may deem appropriate to take full advantage of the potential market and achieve standardization in the BURGER KING Restaurant System will be served, and no items which are not set forth in the MOD Manual or otherwise authorized and approved by BKC in writing will be served. Franchisee shall only sell the approved menu items at retail to consumers from and through the Franchised Restaurant

and shall not sell such items for redistribution or resale. Franchisee shall adhere to all specifications contained in the MOD Manual or as otherwise prescribed by BKC as to ingredients, methods of preparation and service, weight and dimensions of products served, and standards of cleanliness, health and sanitation. All food, drink and other items will be served and sold in packaging that meets BKC's specifications. Only food, supplies, paper products and packaging from sources approved by BKC shall be used in the Franchised Restaurant.

**G. Hours of Operation**

The Franchised Restaurant shall be open for business at a minimum from 7:00 A.M. to 11:00 P.M., seven (7) days a week, fifty-two (52) weeks a year, unless otherwise authorized or directed by BKC or unless prohibited by applicable law. The Franchised Restaurant may be closed on Thanksgiving Day and/or Christmas Day if a majority of the BURGER KING Restaurants in the market area (A.D.I.) in which the Franchised Restaurant is located elect to close on the holiday.

**H. Uniforms**

All employees shall only wear uniforms of such design and color as are from time to time specified by BKC.

**I. Advertising and Promotional Materials**

Only those advertising and promotional materials or items which are authorized by BKC in writing prior to use shall be used, sold or distributed, and no display or use of the BURGER KING Marks shall be made without the prior written approval of BKC. All materials on which the BURGER KING Marks are used must include the designation ® or such other designation as BKC may specify.

**J. Right of Entry and Inspection**

BKC shall have the unrestricted right to enter the Franchised Restaurant to conduct such activities as it deems necessary to ascertain Franchisee's compliance with this Agreement. The inspections may be conducted without prior notice at any time when one of Franchisee's employees is at the Franchised Restaurant. The inspections will be performed in a manner which minimizes interference with the operation of the Franchised Restaurant.

**K. Interference with Employment Relations of Others**

Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

**L. Management of Franchised Restaurant**

(1) Franchisee acknowledges its understanding of BKC's requirement that an individual "Managing Director" approved by BKC, trained in the BURGER KING System and periodically retrained in the BURGER KING System, be identified by Franchisee to BKC and be granted the authority by Franchisee to direct any action necessary to ensure that the day-to-day operation of the Franchised Restaurant is in compliance with the MOD Manual, with this Agreement, and with the terms of any lease and any other agreements relating to the Franchised Restaurant. The Managing Director shall

devote full time and best efforts to the overall supervision of the Franchised Restaurant and any other BURGER KING Restaurants owned by Franchisee as to which he/she is the Managing Director. The Managing Director shall live in the "vicinity" of the Franchised Restaurant, as the term "vicinity" is defined for Managing Directors by BKC from time to time, in its reasonable discretion. The current Managing Director is designated in Exhibit B. Franchisee represents and warrants that the Managing Director presently has and will have, throughout the term of this Agreement, the authority to direct any action necessary to ensure that the day-to-day operation of the Franchised Restaurant is in compliance with the MOD Manual, with this Agreement, and with the terms of any lease and any other agreements relating to the Franchised Restaurant. Franchisee has not taken and agrees that it will not hereafter take, whether directly or indirectly, any action to avoid the authority requirement for the Managing Director through the entry of limiting board resolutions, management agreements, amendment of governing documents or any other similar device or arrangement. Franchisee agrees to furnish BKC with such evidence as BKC may request from time to time for the purpose of assuring BKC that the Managing Director's authority remains as represented in this Agreement and to require that the Managing Director attend such additional and periodic training as BKC may reasonably require of Managing Directors. If the position of Managing Director becomes vacant for any reason, the vacancy shall be filled within sixty (60) days by a new Managing Director trained in the BURGER KING System and approved by BKC.

(2) At all times during the Term of this Agreement, Franchisee shall employ at least one (1) individual (the "Restaurant Manager") who is responsible for the direct, personal supervision of the Franchised Restaurant and who, within six (6) months after becoming Restaurant Manager, successfully completes the training program described in Section 8.C.

**6. SERVICES AVAILABLE TO FRANCHISEE**

BKC agrees to provide the following services to Franchisee and to use reasonable efforts to provide them in a manner reasonably designed for the BURGER KING System, including the use of technology deemed by BKC to be competitive in the quick service restaurant industry. Prior to making material changes to the content of, and manner by which, the following items or services are delivered to Franchisee, BKC shall consult with the Franchisee Advisory Council to receive input as to the proposed change. The content of and manner by which the following services are to be delivered by BKC shall be within BKC's sole reasonable discretion:

A. A reproducible copy of either (i) the standard architectural building plans and specifications for current approved freestanding buildings or double drive thru buildings, or (ii) such other standard approved restaurant facility, whichever is applicable. Any modifications of the standard plans and specifications, whether requested or required by planning and zoning boards, building codes or otherwise, must be approved in writing by BKC and are to be paid for by Franchisee.

B. A pre-opening training program conducted at BKC training facilities and certified BURGER KING Restaurants.

C. Pre-opening and opening assistance by personnel of BKC at the Franchised Restaurant for a period of time as BKC deems appropriate under the circumstances. BKC may, in its reasonable discretion, consider the following factors: the experience of the Franchisee, the type of facility being operated, whether the assistance is for a new opening or the reopening after a transfer of ownership of an already operating restaurant, the prior BURGER KING System experience of Franchisee's management, the projected volume of the restaurant, as estimated by Franchisee, and any other factors that BKC deems appropriate for consideration.

D. Opening promotion program. Franchisee may be eligible for a credit to its account in exchange for implementing grand opening promotions conducted after the Franchised

Restaurant opens, in accordance with BKC's policy (if any) at the time of opening. Costs in excess of the amount of the credit (if any) incurred in implementing the program shall be Franchisee's responsibility.

E. BKC's MOD Manual in an approved format, a copy of which will be loaned to Franchisee for the Term of this Agreement.

F. Such merchandising, marketing and advertising research data and advice as may be developed from time to time by BKC and deemed by it to be helpful in the operation of a BURGER KING Restaurant.

G. Communication of new developments, techniques and improvements of BKC in food preparation, equipment, food products, packaging, service and restaurant management which are relevant to the operation of a BURGER KING Restaurant.

H. Such ongoing support as BKC deems reasonably necessary to continue to communicate and advise Franchisee as to the BURGER KING System including the operation of the Franchised Restaurant.

**7. THE FRANCHISED RESTAURANT**

The site at which Franchisee shall operate the Franchised Restaurant is more fully described in Exhibit A. During the Term of this Agreement the site shall be used exclusively for the purpose of operating a franchised BURGER KING Restaurant.

In the event the Franchised Restaurant shall be damaged or destroyed by fire or other casualty, or be required to be repaired or reconstructed by any governmental authority, Franchisee shall, at its own expense, repair or reconstruct the Franchised Restaurant within a reasonable time under the circumstances. The minimum acceptable appearance for the restored Franchised Restaurant will be that which existed just prior to the casualty; however, every effort should be made to have the restored Franchised Restaurant reflect the then Current Image, design and specifications of BURGER KING restaurants. If the Franchised Restaurant is substantially destroyed by fire, or other casualty, Franchisee may, with BKC's agreement, terminate the Agreement in lieu of Franchisee reconstructing the Franchised Restaurant.

**8. TRAINING**

**A. Managing Owner/Managing Director**

The Franchised Restaurant shall not open unless the Managing Director, the Restaurant Manager and, at BKC's option, the Managing Owner, have successfully completed BKC's training program in Miami, Florida or at such other locations as may be specified by BKC (the "Initial Training"). BKC may, in its sole discretion, waive the Initial Training requirement for the Restaurant Manager. BKC shall provide, and the Managing Owner and Managing Director shall attend, continuing operations training programs from time to time as may be directed by BKC to re-enforce operational standards ("Continuing Operations Training"). The required frequency, duration and subject matter of the Continuing Operations Training shall be specified by BKC (the Initial Training and Continuing Operations Training programs are hereinafter collectively referred to as "Training Programs"). BKC and the Franchisee Advisory Council shall periodically review the Training Programs and BKC will consult with the Franchisee Advisory Council prior to making any material changes to the Training Programs. Such programs may be in Miami, Florida or at such other locations as may be specified by BKC.

**B. Charges and Costs**

Franchisee shall be responsible for reasonable charges and costs of any sort associated with such training but not limited to all travel and living expenses, compensation of and worker's compensation insurance for the attendees enrolled in the training program, any other personal expenses, course materials, training facility charges, and training staff charges (if any). If the Managing Owner and Managing Director fail to complete the orientation session at the next scheduled session after opening or acquisition, as applicable, BKC may declare Franchisee to be in default of this Agreement, in addition to its other rights under this Agreement.

**C. Franchisee Training and Restaurant Staffing**

Franchisee shall implement a training program for Franchised Restaurant employees in accordance with training standards and procedures prescribed by BKC and shall staff the Franchised Restaurant at all times during the Term of this Agreement with a sufficient number of trained employees including at least one (1) Restaurant Manager who has, within six (6) months after becoming manager, successfully completed BKC's training program for restaurant managers at an accredited location to ensure that the BURGER KING operational standards are met. Requests for exemption from the manager training requirement will be considered on an individual basis and will be granted only in those situations where the employees have prior operational management experience in a BURGER KING Restaurant and demonstrate to BKC a thorough knowledge and understanding of the BURGER KING System.

**9. ROYALTY AND ADVERTISING CONTRIBUTION**

**A. Royalty**

During the term of this Agreement, Franchisee agrees to pay to BKC a royalty of 4.5% of Gross Sales ("Royalty") for the use of the BURGER KING System and the BURGER KING Marks. Royalties shall be paid monthly by the tenth (10th) day of each month based upon Gross Sales for the preceding month.

**B. Advertising, Sales Promotion and Public Relations**

(i) Franchisee shall pay to BKC an amount equal to four percent (4%) of Franchisee's monthly Gross Sales by the tenth (10th) day of each month based upon Franchisee's Gross Sales for the preceding month (the "Advertising Contribution"). This sum, less direct administrative expenses, will be used for (a) market research expenditures directly related to the development and evaluation of the effectiveness of Advertising and sales promotions, (b) creative, production and other costs incurred in connection with the development of Advertising, sales promotions and public relations (as limited by Section (vi) below), both in the market area of the Franchised Restaurant, as reasonably defined from time to time by BKC, and on a national basis and (c) various methods of delivering the Advertising or promotional message, including without limitation, television, radio, outdoor and print ("Media"). The allocation of the Advertising Contribution between national, regional and local expenditures shall made by BKC in its sole business judgment.

(ii) Periodically, but no less frequently than once per year, BKC shall meet with the Franchisee Advisory Council to discuss and attempt to establish (a) the types of Media to be used by BKC (the "Media Mix") and (b) the percentage of the total annual Advertising Contribution to be expended on Media (the "Media Spending Goal").

(iii) If BKC and the Franchisee Advisory Council are unable to mutually establish the Media Spending Goal, BKC shall, subject to the limitation set forth in Section (v) below, have the right, in its sole business judgment, to establish the Media Spending Goal.

(iv) If BKC and the Franchisee Advisory Council are unable to agree on the Media Mix, BKC shall have the right, in its sole business judgment, to establish the Media Mix. If BKC unilaterally establishes the Media Mix as provided above, BKC shall in no event spend more than ten percent (10%) of the prior fiscal year's national Media expenditures for new Media channels and any such new Media channel(s) must be accessible to no less than two-thirds (2/3) of the then established areas of dominant influence ("DMA's") in the United States.

(v) BKC shall use reasonable efforts to meet the Media Spending Goal, subject to circumstances beyond its control; provided, however, that BKC shall spend no less than sixty-five percent (65%) of the total annual Advertising Contribution on Media.

(vi) The annual expenditure on public relations shall not exceed one-half of one percent of the total annual Advertising Contribution.

(vii) Certain Advertising funds shall be allocated for approved grand opening promotions in accordance with current company policy.

(viii) From time to time, BKC may seek support from FRANCHISEE, and all other franchisees in the Designated Marketing Area ("DMA") where the Franchised Restaurant is located, for an Investment Spending Program ("IS"). In the event that 66.7% or more of the other franchised and BKC-operated company restaurants in the DMA where the Franchised Restaurant exists execute binding IS contracts which commit such other franchisees to place a fixed monthly dollar amount or a percentage of their Gross Sales into an IS account with such money to be spent on local DMA marketing initiatives in a given year, then in such case, Franchisee shall execute an IS contract on exactly the same terms. Franchisee acknowledges that the terms of the IS contracts may change from year to year but that under no circumstances will any IS contract (1) bind the Franchisee to pay more than 2% of their Gross Sales into an IS fund; or (2) bind the Franchisee for a term longer than one year.

**C. Gross Sales**

The term "Gross Sales" as used in this Agreement includes all sums charged by Franchisee for goods, merchandise or services sold at or from the Franchised Restaurant, including all premiums unless exempted by BKC. The sale of BURGER KING products away from the Franchised Restaurant is not authorized; however, should any such sales be approved in the future, they will be included within the definition of Gross Sales. Gross Sales excludes any federal, state, county or city tax, excise tax, or other similar taxes collected by Franchisee from customers based upon sales, and cash received as payment in credit transactions where the extension of credit itself has already been included in the figure upon which the royalty and advertising contribution is computed.

**D. Late Charge**

Any royalty and advertising and sales promotion contribution not paid when due shall bear a late charge at the maximum rate allowed by Florida law or, if no maximum rate relating to this transaction is in effect in the State of Florida, 18% per annum. Nothing in this Agreement shall be construed to mean that Franchisee is to pay, or has contracted to pay, any sum in excess of that which may lawfully be charged or contracted for under any applicable law. The intention of the parties is

to conform strictly to applicable usury laws and it is agreed that if an excess is inadvertently collected it shall be applied to reduce the amount owed under Sections 9.A. and 9.B. above.

**E. Payment; Credits**

All payments required to be made to BKC under this Agreement shall be made in Miami, Florida, or at such addresses and to such parties as BKC may designate in writing from time to time. BKC may, in its sole discretion, elect to pay any amount owed by BKC to Franchisee by crediting any account of Franchisee or reducing any financial obligation of Franchisee to BKC.

**F. Audit of Advertising Contributions**

Not more than once annually, the Franchisee Association shall have the right, following reasonable notice to BKC, to audit BKC's fiscal year-end results with regard to the income and expenditures of the Advertising Contribution received by BKC for BURGER KING restaurants located in the U.S.A. The audit shall be conducted in accordance with the criteria established by BKC following consultation with the Franchisee Advisory Council. The audit shall be at the sole cost of the Franchisee Association unless (i) the audit discloses a misappropriation of funds or (ii) a discrepancy resulting from an accounting error, which is in excess of three percent (3%) of the total annual Advertising Contribution received by BKC, in either of which events BKC shall reimburse the Franchisee Association for the reasonable costs of the audit. Only records of the past two fiscal years will be produced for the audit. The results of the audit will be made available, on request, to Franchisee. Franchisee shall have no independent right to audit, provided however, if no Franchisee Association exists, franchisees owning collectively at least thirty percent (30%) or more of all BURGER KING franchisee-owned and operated restaurants in the U.S.A. shall have the right to audit under the same terms and conditions set forth in this Section 9.F.

**G. Alternative Method Of Payment**

BKC may, at its option, require payment of the royalty or advertising and sales contribution or both by making direct monthly withdrawals in the form of an electronic or similar funds transfer in the appropriate amount(s) from Franchisee's bank account. In the event that this option is exercised, Franchisee agrees to execute and deliver to its bank and to BKC those documents necessary to authorize such withdrawals and to make payment or deposit as directed by BKC. Franchisee further agrees that it will not thereafter terminate such authorization so long as this Agreement is in effect. Franchisee agrees that it will not close such bank account without prior notice to BKC and the establishment of a substitute bank account permitting such withdrawals. Franchisee also agrees that in the event that a direct electronic funds transfer or other withdrawal program is not available at the bank at which it currently does its business, it will take all reasonable and necessary steps to establish an account at a bank which does have such a program. In addition, BKC may require payment of Royalty, Advertising Contribution and any other fees required to be paid pursuant to this Agreement using BKC's internet web portal called "BK® ePay", or any other electronic or digital payment method that BKC may require in the future.

## 10. ACCOUNTING PROCEDURES: RIGHT OF AUDIT

### A. Accounting

Franchisee agrees to keep true, accurate and complete records of its business in such form as BKC now or hereafter may require and to furnish BKC with a monthly and fiscal year to date profit and loss statement in the format prescribed by BKC. Franchisee shall also submit to BKC quarterly balance sheets, the first of which shall be for the period ending three (3) months after the Franchised Restaurant opens. All profit and loss statements and balance sheets should be prepared in accordance with generally accepted accounting principles and shall be submitted to BKC within twenty-five

(25) days after the end of the period covered by the report. In addition, Franchisee shall retain for a period of at least twenty-four (24) months and upon request submit to BKC copies of all state sales tax returns and all supporting data and records relating to sales made at or from the Franchised Restaurant and such other records as BKC may reasonably request from time to time. Franchisee shall also, upon request by BKC, provide BKC with detailed, itemized documentation showing the actual cost of building or remodeling the Franchised Restaurant.

**B. Annual Financial Statements**

Within one hundred twenty (120) days after the close of each fiscal year, Franchisee shall submit a full disclosure of all persons with any interest in the Franchised Restaurant and a complete annual financial statement for the Franchised Restaurant, which statement, if requested by BKC, shall be certified by a Certified Public Accountant.

**C. Audits**

Franchisee agrees that BKC or its representatives, at BKC's expense, shall, at all reasonable times, have the right to examine or audit the books, records, state sales tax returns or accounts of Franchisee. BKC shall similarly have the right to examine or audit the books, records, state sales tax return or accounts of any and all persons or entities who are guarantors of the Franchisee's performance under this Agreement in those instances in which Franchisee has failed to make payments of the royalty or advertising fees in a timely fashion or has otherwise defaulted under this Agreement. In the event the audit discloses an understatement of Gross Sales for any period or periods, Franchisee shall, within 15 days after receipt of the audit report, pay BKC the Royalty and advertising fee (including any IS fee) in the amount of the understatement plus the late charge identified in Section 9.D. of this Agreement from the date such payments were originally due. Additionally, in the event the audit discloses an understatement of Gross Sales which exceeds two percent (2%) for any period or periods, Franchisee shall, within fifteen (15) days after the receipt of the audit report, reimburse BKC for all costs of the audit including travel, lodging and wages, reasonably incurred.

**D. Release of Financial Information**

Except as otherwise provided in any lease between BKC, or any of its affiliates, and Franchisee, BKC shall not release to third parties financial or operational information specifically relating to Franchisee and/or the Franchised Restaurant without the consent of Franchisee unless otherwise required to do so by judicial or administrative order. If BKC is required to disclose such information, BKC shall use reasonable efforts to give Franchisee notice thereof. Notwithstanding the foregoing however, BKC may 1) release general financial or operational information relating to the BURGER KING System compiled in whole or in part from Franchisee and/or the Franchised Restaurant so long as Franchisee and/or the Franchised Restaurant are not specifically identified, and 2) publish operational metrics and scores of the Franchised Restaurant and its rank in comparison to other restaurants in the BURGER KING System as long as the publication of the metrics, scores and rankings are distributed only to other franchisees of BKC.

## 11. LIMITATIONS OF FRANCHISE

**A. Trademarks, Trade Names, Service Marks and Trade Secrets**

(1) Franchisee acknowledges that ownership of all right, title and interest to the BURGER KING System and the BURGER KING Marks, are and shall remain vested solely in BKC and Franchisee disclaims any right or interest therein or the good will derived therefrom. Franchisee

agrees that all materials loaned or otherwise made available to it and all disclosures made to Franchisee and not to the general public by or at the direction of BKC at any time before or during the Term of this Agreement relating to the BURGER KING System, including, without limitation, the MOD Manual in its entirety, financial information marketing strategy and marketing programs are to be considered trade secrets of BKC for purposes of this Agreement and shall be kept confidential and used by Franchisee only in connection with the operation of the Franchised Restaurant and other franchised BURGER KING Restaurants. Franchisee agrees not to divulge any of the trade secrets to any person other than its employees and then only to the extent necessary for the operation of the Franchised Restaurant and, specifically, that Franchisee will not, nor permit anyone to, reproduce, copy or exhibit any portion of the MOD Manual or any other trade secrets of BKC. At BKC's request, Franchisee shall require each Owner, and Managing Director to execute an agreement similar in substance to this Section in a form acceptable to BKC and naming BKC as a third party beneficiary with the independent right to enforce such agreement.

(2) Franchisee will not, directly or indirectly, at any time during the Term of this Agreement or thereafter, do or cause to be done any act or thing disputing, attacking or in any way impairing or tending to impair BKC's right, title or interest in the BURGER KING Marks or the BURGER KING System. Franchisee shall immediately notify BKC of all infringements or imitations of the BURGER KING Marks which come to Franchisee's attention or challenges to Franchisee's use of any of the BURGER KING Marks, and BKC shall exercise absolute discretion in deciding what action, if any, should be taken. Franchisee agrees to cooperate in the prosecution of any action to prevent the infringement, imitation, illegal use or misuse of the BURGER KING Marks and agrees to be named as a party in any such action if so requested by BKC. BKC agrees to bear the legal expenses incident to Franchisee's participation in such action, except for fees, expenses and other costs of Franchisee's personal legal counsel if Franchisee elects to be represented by counsel of its own choosing.

(3) Franchisee shall not use any of the BURGER KING Marks, any variations or abbreviations, or any words confusingly similar to the BURGER KING Marks as part of Franchisee's corporate or partnership name.

**B. Independent Contractor**

Franchisee is an independent contractor and is not an agent, partner, joint venturer, joint employer or employee of BKC, and no fiduciary relationship between the parties exists. ~~Franchisee shall be the sole and exclusive employer of its employees with the sole right to hire, discipline,~~ discharge and establish wages, hours, benefits, employment policies, and other terms and conditions of employment for its employees without consultation with or approval by BKC. Franchisee shall have no right to bind or obligate BKC in any way nor shall Franchisee represent that it has any right to do so. BKC shall have no control over the terms and conditions of employment of Franchisee's employees.

In all public records and in Franchisee's relationship with other persons, on stationery, business forms and checks Franchisee shall indicate independent ownership of the Franchised Restaurant and that it is operated under a Franchise granted by BKC.

Franchisee shall exhibit at the Franchised Restaurant in such places as may be designated by BKC, a notification that the Franchised Restaurant is operated by an independent operator and not by BKC.

**12. UNFAIR COMPETITION**

Franchisee acknowledges the uniqueness of the BURGER KING System and that BKC is making its knowledge, know-how and expertise available to it for the purpose of operating the Franchised Restaurant. Franchisee agrees that it would be an unfair method of competition for Franchisee

to use or duplicate or to allow others to use or duplicate any of the knowledge, know-how and expertise received from BKC for any use other than for the operation of franchised BURGER KING Restaurants. Franchisee, therefore, warrants that during the Term of this Agreement, it will utilize its best and continuing efforts to promote and develop the business at the Franchised Restaurant and during the Term hereof and at all times thereafter will not directly or indirectly engage in the operation of any restaurant, other than the Franchised Restaurant and other BURGER KING Restaurants franchised from BKC, which utilizes or duplicates the BURGER KING System, any trade secrets of BKC, the BURGER KING Marks or the present or any former BURGER KING Current Image.

## 13. INSURANCE; INDEMNIFICATION

### A. Insurance

Franchisee agrees to carry at its expense during the Term of this Agreement Comprehensive General Liability insurance, including Products Liability and Broad Form Contractual Liability, in an amount of not less than ONE MILLION ($1,000,000) DOLLARS per occurrence for bodily injury and FIVE HUNDRED THOUSAND ($500,000) DOLLARS per occurrence for property damage, or in such increased amounts as BKC may reasonably request from time to time during the Term of this Agreement. Each policy will name BKC and its subsidiaries, its affiliated and parent companies as additional insured, will provide that the policy cannot be canceled without thirty (30) days prior written notice to BKC, and will insure the contractual liability of Franchisee under Section 13.C. Additionally, Franchisee agrees to carry, at Franchisee's expense, umbrella coverage in an amount of ONE MILLION ($1,000,000) DOLLARS over the basic Comprehensive General Liability insurance per restaurant except that if Franchisee owns more than ten (10) BURGER KING Restaurants, the umbrella coverage applicable to all such restaurants need not exceed TEN MILLION ($10,000,000) DOLLARS. The insurance afforded by the policy or policies respecting liability shall not be limited in any way by reason of any insurance which may be maintained by BKC. Before the Commencement Date, Franchisee shall furnish to BKC Certificates of Insurance reflecting that the insurance coverage is in effect pursuant to the terms of this Agreement. All policies shall be renewed, and a renewal Certificate of Insurance mailed to BKC in Miami, Florida, or at such other location as may be specified by BKC prior to the expiration date of the policies. This obligation of Franchisee to maintain insurance is separate and distinct from its obligation to indemnify BKC under the provisions of Section 13.C.

### B. Worker's Compensation

Franchisee agrees to secure and pay premiums on a Worker's Compensation policy covering himself and all his employees, as required by law.

### C. Indemnity

(1) Franchisee is responsible for all losses or damages and contractual liabilities to third persons arising out of or in connection with possession, ownership or operation of the Franchised Restaurant, and for all claims or demands for damages to property or for injury, illness or death of persons directly or indirectly resulting therefrom. Franchisee agrees to defend, indemnify and save BKC and its subsidiaries, its affiliated and parent companies harmless of, from and with respect to any such claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages, (including but not limited to reasonable attorney's fees) unless resulting from the negligence of BKC. BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law. The indemnification of BKC by Franchisee shall not be limited by the amount of insurance required under Section 13.A. This indemnity obligation shall include, but not be limited to, claims related to the employment of Franchisee's employees.

This obligation of Franchisee to indemnify and defend BKC is separate and distinct from its obligation to maintain insurance under the provisions of Section 13.A.

(2) Franchisee agrees to defend, indemnify and save BKC and BKC's officers, directors, agents, employees, attorneys, and accountants, subsidiaries, affiliated and parent companies, harmless of, from and with respect to any claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages any of them may incur (including, but not limited to, reasonable attorney's fees) arising from or relating to the sale of securities of Franchisee, including but not limited to claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages arising from or related to any alleged violation of any federal or state securities law in connection with a sale of securities of Franchisee. BKC shall notify Franchisee of any claims, and Franchisee shall be given the opportunity to assume the defense of the matter. If Franchisee fails to assume the defense, BKC may defend the action in the manner it deems appropriate, and Franchisee shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense, in addition to any sum BKC may pay by reason of any settlement or judgment against BKC. BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law. BKC and the other indemnitees shall, in all instances, have the right to be represented by counsel of its/their own choosing, at Franchisee's expense, and to participate in the defense of any such claim.

**D. Defense of Claims**

BKC shall notify Franchisee of any claims, and Franchisee shall be given the opportunity to assume the defense of the matter; however, BKC shall have the right to participate in the defense of any claim or action against it which is assumed by Franchisee, at BKC's own cost and expense. If Franchisee fails to assume the defense of any claim covered by the indemnification provisions of Section 13.C., BKC may defend the action in the manner it deems appropriate, and Franchisee shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense, in addition to any sum which BKC may pay by reason of any settlement or judgment against BKC. No settlement of any claim against BKC shall be made by Franchisee which is in excess of the amount of insurance referred to in Section 13.A or which would subject BKC to liability in any amount not covered by such insurance without the prior written consent of BKC. If the indemnifiable claim involves multiple franchisees and BKC reasonably determines that consolidation of all such claims would be in the best interests of BKC and the affected franchisees, including Franchisee (in which case any liability of Franchisee hereunder would be on a pro rata basis), BKC shall have the right to defend the claim, action or demand by appropriate proceedings with sole power to direct and control such defense with respect to BKC, and Franchisee shall pay to BKC a pro rata share of all costs, including reasonable attorneys' fees, incurred by BKC in effecting such defense and any subsequent legal appeal, in addition to any sums which BKC may pay by reason of any settlement or judgment against BKC.

**14. TAXES**

Franchisee shall pay when due all taxes levied or assessed in connection with the possession, ownership or operation of the Franchised Restaurant or in connection with amounts paid or received under this Agreement, including without limitation any sales, use or other ad valorem taxes (other than any tax that is measured by or related to the net income of BKC or to its corporate status in a state). If any such tax shall be paid by BKC, Franchisee shall promptly reimburse BKC the amount paid. In the event of any bona fide dispute as to the liability for a tax assessed against Franchisee, Franchisee may contest the validity or the amount of the tax in accordance with procedures of the taxing authority. Franchisee shall not permit a tax sale or seizure against the Franchised Restaurant or equipment.

## 15. ASSIGNMENT: CONDITIONS AND LIMITATIONS

Any purported assignment or transfer not in full compliance with this Section 15 shall be null and void and shall constitute a material breach of this Agreement, for which BKC may immediately terminate without opportunity to cure pursuant to Section 18.A of this Agreement.

THE GOVERNING DOCUMENTS OF THE FRANCHISEE ENTITY AND THE PARENT, IF APPLICABLE, MUST STATE THAT THE ENTITY'S SOLE BUSINESS ACTIVITY WILL BE THE DEVELOPMENT AND OPERATION OF BURGER KING RESTAURANTS. IN ADDITION, THE GOVERNING DOCUMENTS MUST MANDATE THE DESIGNATION OF A MANAGING OWNER AND DESCRIBE THE MANAGING OWNER'S AUTHORITY, AS DEFINED IN THE GUIDELINES FOR APPROVAL OF FRANCHISEE OWNERSHIP FRANCHISE ENTITY APPLICATIONS, TO BIND THE FRANCHISEE ENTITY AND TO DIRECT ANY ACTIONS NECESSARY TO ENSURE COMPLIANCE WITH A BURGER KING FRANCHISE AGREEMENT OR ANCILLARY AGREEMENT. NO AMENDMENTS INCONSISTENT WITH THE GUIDELINES FOR APPROVAL OF FRANCHISEE OWNERSHIP FRANCHISE ENTITY APPLICATIONS MAY BE MADE TO THE ARTICLES OF INCORPORATION, BY-LAWS, PARTNERSHIP AGREEMENT, OR OTHER GOVERNING DOCUMENTS OF THE FRANCHISEE ENTITY OR THE PARENT, IF APPLICABLE. EACH SUCH ENTITY MUST NOTIFY BKC, AND AT BKC'S REQUEST PROVIDE COPIES, OF ANY AMENDMENTS TO ITS GOVERNING DOCUMENTS.

### A. Transfer by Franchisee

Except with the prior written consent of an authorized officer of BKC, Franchisee shall not (1) assign or pledge this Agreement, or assign any of Franchisee's rights or delegate any of its duties hereunder; or (2) sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any equity securities of Franchisee; or (3) sell, assign, transfer, convey or give away substantially all of the assets of the Franchised Restaurant.

### B. Transfer by Owners

Except with the prior written consent of an authorized officer of BKC, no Owner shall sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any direct or indirect interest in Franchisee.

### C. Transfer of Equity Securities

Equity securities of Franchisee may not be transferred by Franchisee or by any Owner unless, in addition to obtaining the prior written consent of an authorized officer of BKC as required above, such transferor complies with all policies or guidelines BKC may then have in effect for approval of a proposed distribution of securities of franchisees. Franchisee and any other participants in any offering of securities of Franchisee shall fully indemnify BKC in connection with such offering, as provided in Section 13.C(2) of this Agreement.

### D. Pledging of Franchise Agreement

Notwithstanding any consent granted by BKC pursuant to Sections 15.A, B and C above, neither Franchisee nor Owner shall pledge, mortgage, hypothecate, give as security for an obligation or in any manner encumber this Agreement or the franchise granted herein except with the express written consent of BKC given in connection with the execution of BKC's then current third party intercreditor agreement. Franchisee shall pay BKC a transfer fee of Two Thousand ($2,000) Dollars for the costs and expenses incurred by BKC in connection with facilitating the execution of the intercreditor agreement. This fee is in addition to the transfer fee referenced in Section 15.F(8) of this Agreement.

E. **Notice of Proposed Transfer**

The proposed transferor shall notify BKC in writing of any proposed transfer of an interest referred to in Section 15.A or 15.B, as applicable, before the proposed transfer is to take place, and shall provide such information and documentation relating to the proposed transfer as BKC may reasonably require.

F. **Conditions of Consent**

BKC shall use reasonable efforts to provide consent of the proposed transfer, or communicate to Franchisee, notice of disapproval, within ninety (90) days (for transactions involving less than ten (10) restaurants the time frame shall be sixty (60) days) of receipt by BKC of Franchisee's notice of the proposed transfer and the furnishing of all reasonably requested information. BKC may condition its consent to the proposed transfer of an interest referred to in Section 15.A or 15.B of this Agreement on satisfaction of any or all of the following requirements:

(1) That all of Franchisee's accrued monetary obligations and all other outstanding obligations to BKC and its affiliates, whether arising under this Agreement or otherwise, have been satisfied;

(2) That Franchisee is not in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and BKC or its affiliates;

(3) That the transferee (or, if applicable, such owners of the transferee as BKC may request), in BKC's sole judgment, satisfies all of BKC's business standards and requirements; has the aptitude and ability to operate the Franchised Restaurant; and has adequate financial resources and capital to do so; and that transferee complete and be approved through BKC's standard franchisee application and selection process including satisfactorily demonstrating to BKC that transferee meets the financial, character, managerial, ownership and such other criteria and conditions as BKC shall then be applying in considering applications for new franchises, including transferee, and/or if applicable, Managing Owner and Managing Director satisfactorily completing all BKC's training requirements.

(4) That the transferee, at BKC's election, consistent with then current BKC policy, (a) enter into a written assignment, in a form satisfactory to BKC, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement, or (b) execute, for a term ending on the expiration date of this Agreement, BKC's then-current BURGER KING Restaurant Franchise Agreement applicable to such transferee and such other ancillary agreements as BKC may require for the Franchised Restaurant; provided, however, that the royalty and advertising contribution rates shall be the same as stated herein. If the transferee is required to execute a new franchise agreement, such agreement shall supersede this Agreement in all respects;

(5) That the transferee (or, if applicable, such owners of the transferee as BKC may request) meet all of the BKC requirements then applicable to ownership of franchises and execute a guarantee of the performance of Franchisee's obligations to BKC and BKC's affiliates. For the purposes of determining compliance, BKC shall have the right to examine and approve the form and content of all governing documents.

(6) That the Franchisee and each transferor execute a general release, in a form satisfactory to BKC, of any and all claims against BKC, its affiliates, and their respective officers, directors, agents, and employees, in their corporate and individual capacities.

(7) That the transferee (or, if applicable, the owners of the transferee and its Restaurant Managers and proposed Managing Director), at the transferee's expense, complete any applicable orientation and training programs then required by BKC;

(8) That the transferor pay a transfer fee of Two thousand Dollars ($2,000) in consideration of BKC's expenses in reviewing the proposed transfer and Five Hundred ($500.00) Dollars for each additional restaurant involved in the same transaction. In the event the transferee is not an existing approved BURGER KING franchisee, Franchisee seller shall pay BKC a New Franchisee Training Fee of Two Thousand ($2,000.00) Dollars in connection with the transfer of the first restaurant involved in the transaction.

(9) Approval by BKC of the terms of the contract of sale which impact the sufficiency of cash flow from the business after payment of debt service to provide for, among other things, any needed repairs to or remodeling of the Franchised Restaurant.

**G. Consent to Transfer**

If BKC does not accept the offer under Section 16.A below, Franchisee may conclude the sale to the purchaser who made the offer provided BKC's consent to the assignment or sale of stock be first obtained, which consent will not be unreasonably withheld upon compliance with the conditions imposed by BKC on such assignments or sales. Conditions may include, but are not limited to, the conditions set forth in Section 15.F above.

**H. Continuing Liability**

In the event of a sale, transfer, or assignment of any interest in this Agreement or the Franchised Restaurant, or merger, consolidation or reorganization of Franchisee or a transfer of all or any part of an Owner's interest in the Franchised Restaurant, Franchisee and/or the Owner (hereinafter collectively "Transferor") shall remain personally liable for all Royalty, Advertising Contribution and other payments which come due during the periods of time hereinafter described, in accordance with the following criteria:

(1) If Transferor has transferred Transferor's interest pursuant to a contract of sale which provides that installment payments of the purchase price are to be made to the Transferor or the Transferor's designee, the liability of the Transferor will continue for the longer of (i) twelve (12) months from the date of the transfer, or (ii) such time as the payments are to be made, including any extensions; provided, however, that after the first anniversary of such transfer, the liability of the Transferor shall be limited to the total amount of the original installment payments to be made under the contract for sale or other instrument evidencing the debt. If the holder of the note or other evidence of debt deems the obligation satisfied, Transferor will simultaneously be released from liability to BKC under this Agreement for Royalty and Advertising payments. Any contract for sale which provides for installment payments shall provide that such payments are subordinate to the payment of Royalty and Advertising Contributions called for in this Agreement and that the note or other evidence of the obligation shall not be assignable by the holder or payee.

(2) If Transferor has transferred Transferor's interest pursuant to a contract of sale which provides for cash payment in full, upon transfer of the entire purchase price, the Transferor's liability shall continue for a period of twelve (12) months from the date of the transfer, and shall be limited to the amount of Royalty fees and Advertising fees which accrued during such period and are not paid by Transferee. Upon payment of such amount, Transferor shall be automatically released for any continuing liability under this Agreement for Royalty and Advertising fees.

**I. Right of Re-Entry**

Following a transfer of all of Franchisee's interest, in the event BKC seeks to enforce continuing liability pursuant to Section 15.H above, the immediately preceding transferor of an interest in the franchise against whom liability is sought, will be afforded an opportunity to cure the default and the right to reassume the position of franchisee under the terms of this Agreement provided all of the following conditions have been met:

(1) At the time of transfer, the transferor must have been in good standing with BKC in accordance with the operational criteria then in effect for Franchise Approval;

(2) At the time of proposed re-entry, the transferor must be in good standing and be able to satisfy BKC's then current Franchise Approval Criteria and Expansion Approval Criteria and deliver to BKC appropriate application forms and such other documents and agreements as BKC may reasonably require evidencing the assumption by transferor of the rights and obligations under the remaining term of the Franchise Agreement.

(3) At the time of re-entry, BKC shall be paid, in full, all sums past due and owing under this Franchise Agreement and any agreement related to the Franchised Restaurant, as well as any past due sums related to products or supplies sold by BKC for use in the Franchised Restaurant, including without limitation, any pre- and post-petition amounts due from any franchisee with regard to the Franchised Restaurant which is the subject of a proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally.

(4) Transferor must take possession of and acquire control and dominion over substantially all of the tangible real and personal property associated with the operation of the Franchised Restaurant.

**J. Notices to Transferor**

During the period of time in which transferor remains liable pursuant to Section 15.H above, BKC shall use reasonable efforts to send simultaneous copies of notices of default under this Franchise Agreement to transferor. Transferor shall use reasonable efforts to send simultaneous copies of notices of default under any installment payment due to transferor from transferee. Failure of either party to provide copies of the notices of default shall not be an event of default under the terms of this Franchise Agreement. Transferor shall be afforded the same opportunity to cure as is set forth in the Notice of Default.

**K. Acquisition of Additional Franchises**

In addition, Franchisee agrees that, prior to acquiring any other BURGER KING Restaurant franchise which may be offered to him for sale or which he may offer to purchase, such franchise will first be offered to BKC on the same terms, conditions and price in accordance with Section 15.

**L. Death or Mental Incapacity**

Upon the death or mental incapacity of an Owner, the executor, administrator, or personal representative of such Owner shall transfer the Owner's interest in Franchisee or the Parent to a third party approved by BKC within a reasonable time after the Owner's death or mental incapacity. Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to BKC's right of first refusal under Section 16, or, if such right is not exercised, the same conditions as may

A. Franchisee has given BKC written notice ("Notice") of its intention to exercise its Option to Obtain a Successor Franchise Agreement during the fourth year prior to the expiration of the Term of this Agreement.

B. Franchisee, at the time of the Notice and at the time of the expiration of the Term of this Agreement, is not in default of and has substantially complied with the terms and conditions of this Agreement and all other franchise agreements or other agreements with BKC that Franchisee, Managing Owner or Owners may be a party to consistently and throughout its Term, including but not limited to the following:

(1) Franchisee has operated the Franchised Restaurant in accordance with the terms and conditions of this Agreement, including, but not limited to, operating the Franchised Restaurant in compliance with the operating standards and specifications established from time to time by BKC as to quality of service, cleanliness, health and sanitation;

(2) Franchisee has satisfied, in a timely fashion, all financial obligations in accordance with the terms and conditions of this Agreement;

(3) Franchisee has maintained, improved, altered, replaced and remodeled the Franchised Restaurant including without limitation the Building, Premises, signs and equipment throughout the Term of this Agreement in accordance with the terms and conditions of this Agreement.

(4) Franchisee shall have completed, not more than three (3) years and not less than three (3) months prior to the expiration of the Term of this Agreement, the improvements, alterations, remodeling or rebuilding of the interior and exterior of the Franchised Restaurant so as to reflect the then Current Image of BURGER KING Restaurants, pursuant to such plans and specifications as BKC reasonably approves.

(5) Execution by Franchisee of a general release of BKC in a form satisfactory to BKC.

(6) Franchisee meets all then current financial ratios BKC uses to evaluate new franchisees for financial approval.

C. Within one hundred and twenty (120) days after receipt of the Notice, BKC shall advise Franchisee in writing if Franchisee is not eligible to obtain a Successor Franchise Agreement, specifying the reasons for such ineligibility, and identifying whether such deficiencies are capable of cure. Between the date of the Notice and the expiration date of the Term of this Agreement, if any act, circumstance or omission causes Franchisee to become ineligible to obtain a Successor Franchise Agreement then BKC shall advise Franchisee in writing thereof, specifying the deficiency and identifying a cure period if applicable.

D. Franchisee has the right to remain in possession of the Premises for the term of the Successor Franchise Agreement;

E. Franchisee shall execute the applicable form of the then current Successor Franchise Agreement, which may differ from this Agreement as to royalty, advertising contributions and ownership requirements, as well as other terms and conditions. Franchisee shall, upon execution of the Successor Franchise Agreement, pay to BKC the then current Franchise Fee.

## 18. DEFAULT AND EFFECT OF TERMINATION

### A. Default

If an act of default hereunder is committed by Franchisee, and Franchisee fails to cure the default after any required notice and within the cure period applicable, BKC may, at its option and without prejudice to any other rights or remedies provided for hereunder or by law, terminate this Franchise Agreement by written notice or otherwise. The applicable cure period shall be as described below but, if a cure period is not specifically mentioned, it shall be thirty (30) days. In some cases, as identified below, no cure period is allowed and no notice may be required. If any applicable law or rule requires a longer notice period or a longer cure period than that provided herein, then the period required under the law or rule shall be substituted for the requirements herein. The following are material acts of default and shall be good cause for termination:

(1) Franchisee fails to operate the Franchised Restaurant in accordance with the operating standards and specifications established from time to time by BKC as to service, cleanliness, health and sanitation. Franchisee shall have five (5) days after notice to cure the default. In the event that such default is deemed by BKC, in its reasonable discretion, to be of a nature so serious as to threaten the immediate safety or health of customers or employees of Franchisee, then, in such case, Franchisee will, after verbal notice from BKC to Franchisee, immediately cease operation of the Franchised Restaurant until such time as the serious health or safety default is rectified to BKC's satisfaction. Failure to close the Franchised Restaurant under these circumstances shall be an act of default. If this act of default shall occur, BKC shall have the right to immediately terminate this Agreement, such termination to be effective immediately and with no opportunity to cure.

(2) Franchisee sells any product which does not conform to BKC's specifications. Franchisee shall have five (5) days after notice to cure the default.

(3) Franchisee fails to sell products designated by BKC as required to be sold in the Franchised Restaurant. Franchisee shall have five (5) days after notice to cure the default, provided, however, if for reasons beyond the control of Franchisee, Franchisee is unable to obtain such products within the cure period, the default cure period shall be extended for a reasonable period of time provided Franchisee initiates and actively pursues substantial and continuing action within the cure period to cure such default.

(4) Franchisee sells products not approved by BKC. Franchisee shall have five (5) days after notice to cure the default.

(5) Franchisee uses equipment, uniforms or decor not approved by BKC.

(6) Franchisee fails to maintain the Franchised Restaurant in good condition and repair, or fails to make all improvements, alterations or remodelings as may be determined by BKC to be reasonably necessary to reflect the Current Image as provided in Section 5.B. of this Agreement, as and when required.

(7) Franchisee fails to pay when due any royalty or advertising and sales promotion contribution required to be paid under this Agreement. Franchisee shall have ten (10) days after notice to cure the delinquency.

(8) Franchisee (i) fails to submit any information required by Section 10 of this Agreement ("Accounting Procedures") or (ii) knowingly submits a financial statement or other

be imposed on any inter vivos transfer under this Section 15. In the case of transfer by devise or inheritance, if the heir is not approved or there is no heir, the executor shall use best efforts to transfer the Owner's interest to another party approved by BKC within twenty-four (24) months from the date of the Owner's death. If the conveyance of the Owner's interest to a party acceptable to BKC has not taken place within the twenty-four (24) month period, BKC shall have the option, to purchase the Owner's interest at fair market value.

**M. No Waiver**

BKC's consent to a transfer shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of BKC's right to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

**16. RIGHT OF FIRST REFUSAL**

A. In the event Franchisee or the Owners wish to accept a bona fide offer from a third party to purchase the Franchised Restaurant, or any portion thereof or interest therein, or any of the voting stock of Franchisee, Franchisee shall give BKC written notice setting forth the name and address of the prospective purchaser, the price and terms of the offer together with a franchisee application completed by the prospective purchaser, a copy of the Purchase and Sale Agreement, executed by both Franchisee and purchaser, and all exhibits, copies of any real estate purchase agreement or agreements, proposed security agreements and related promissory notes, assignment documents, title insurance commitment and any other information that BKC may request in order to evaluate the offer. BKC, its subsidiary or affiliated company (herein collectively "BKC") shall then have the prior option to purchase the interests covered by the offer at the price and upon the same terms of the offer. If the consideration is not money, the purchase price shall be cash equal to the fair market value of the consideration. BKC shall have twenty (20) business days, excluding weekends and federal holidays, after receipt of the notice of offer and the furnishing of all reasonably requested information within which to notify Franchisee or the Owners, as applicable, of BKC's intent to exercise its right hereunder. Silence on the part of BKC shall constitute rejection. If the proposed sale includes assets of Franchisee not related to the Franchised Restaurant, or the operation of other franchised BURGER KING Restaurants, BKC may, at its option, elect to purchase only the assets related to the operation of franchised BURGER KING Restaurants and an equitable purchase price shall be allocated to each asset included in the proposed sale. A bona fide offer from a third party includes any transfer, conveyance, assignment, consolidation, merger or any other transaction in which legal or beneficial ownership of Franchised Restaurant or the franchise granted by this Agreement is vested in a party other than Franchisee.

B. The election by BKC not to exercise its right of first refusal as to any offer shall not affect its right of first refusal as to any subsequent offer.

C. Any sale, attempted sale, assignment or other transfer of the interests described in Section 16.A. without first giving BKC the right of first refusal described above shall be void and of no force and effect.

**17. OPTION TO OBTAIN SUCCESSOR FRANCHISE AGREEMENT**

Franchisee shall have, exercisable on the expiration date of the Term of this Agreement, an option to obtain a Successor BURGER KING Franchise Agreement ("Successor Franchise Agreement") for a term of twenty (20) years, provided that:

sales report which understates Gross Sales. If Franchisee knowingly and intentionally submits a financial statement or other sales report which understates Gross Sales, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee and with no opportunity to cure.

(9) Franchisee abandons the franchise relationship without the prior consent of BKC at any time during the Term of this Agreement. Franchisee shall have five (5) days after notice to cure the default. The cessation of operation of the Franchised Restaurant on the Premises other than with the consent of BKC, whether the Premises remain vacant or are converted to another use, shall be considered abandonment of the franchise relationship provided, however, that the Franchised Restaurant shall not be deemed abandoned if the cessation is due to circumstances beyond Franchisee's reasonable control (such as lack of electrical power, weather conditions, earthquakes, strikes and the like) and Franchisee diligently undertakes to resume operations after the reason for such cessation has been abated.

(10) Franchisee ceases to occupy the Premises. Franchisee shall have five (5) days after notice to cure the default. If the loss of possession is the result of governmental exercise of eminent domain, Franchisee may, with BKC's consent and subject to availability, relocate to other premises in the same market area for the balance of the Term of this Agreement.

(11) Franchisee files a petition or application seeking any type of relief under the Bankruptcy Code or any state insolvency or similar law, or someone files a petition or application seeking to have Franchisee adjudicated a bankrupt, or seeking other relief against Franchisee under the Bankruptcy Code or any state insolvency or similar law and the petitioner application is not dismissed within ninety (90) days after it is filed. Subject to the applicable law, this Agreement shall terminate without notice or cure period upon the occurrence of this act of default as if that date were the expiration date and Franchisee expressly and knowingly waives any rights that it may have under the provisions of the Bankruptcy Code and consents to the termination of this Agreement or any other relief which may be sought in a Complaint filed by BKC to lift the provisions of the automatic stay of the Bankruptcy Code. Additionally, Franchisee agrees not to seek an Injunctive Order from any court in any jurisdiction relating to insolvency, reorganization or arrangement proceedings which would have the effect of staying or enjoining this provision.

(12) Franchisee admits in writing its inability to pay its debts as they mature or makes an assignment for the benefit of creditors, or a receiver (permanent or temporary) for any part of its property is appointed by a court of competent authority. If this act of default shall occur, BKC shall have the right to immediately terminate this Agreement without notice or cure period.

(13) A final judgment against Franchisee (including a final judgment in favor of BKC or any affiliated party of BKC) remains unsatisfied of record for thirty (30) days (unless a supersedeas or other appeal bond has been filed), or if a levy of execution is made upon the franchise granted by this Agreement or upon any property used in the Franchised Restaurant, and said levy it is not discharged within five (5) days of said levying.

(14) Conviction of either Franchisee or the Managing Owner in a court of competent jurisdiction of (i) an indictable offense punishable by a term of imprisonment in excess of one (1) year, or (ii) any offense, regardless of how punishable, for which a material element is fraud, dishonesty or moral turpitude. If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee and with no opportunity to cure.

(15) Franchisee or any Owner uses or duplicates the BURGER KING System or engages in unfair competition in violation of Section 12 of this Agreement or discloses any trade secrets of BKC in violation of Section 11.A(1) of this Agreement. If this act of default shall occur, BKC shall

have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee but with no opportunity to cure.

(16) Franchisee denies BKC the right to inspect the Franchised Restaurant or to audit the sales and accounting records of the Franchised Restaurant.

(17) Conduct by Franchisee, the Managing Owner or the Managing Director which is deleterious to or reflects unfavorably on Franchisee or the BURGER KING Restaurant System by exhibiting a reckless disregard for the physical and mental well being of employees, customers, BKC representatives or the public at large including, but not limited to, battery, assault, sexual harassment or other forms of threatening, outrageous, willfully discriminatory or unacceptable behavior. An act of default under this Section 18.A.(17) does not require any criminal action to be brought against Franchisee. If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee and with no opportunity to cure.

(18) Failure by Franchisee to maintain a responsible credit rating by failing to make prompt payment of undisputed bills, invoices and statements from suppliers of goods and services to the Franchised Restaurant.

(19) Any sale, assignment, merger or transfer in violation of Sections 15 or 16 of this Agreement including without limitation, a change of control of Franchisee which occurs by means of a tender offer for publicly-traded securities of Franchisee or at the direction of a receiver or trustee in bankruptcy. If this act of default shall occur, BKC shall have the right to terminate this Agreement effective upon notice to Franchisee without opportunity to cure. Failure by Franchisee to effect a transfer of an Owner's interest in accordance with Section 15.L. of this Agreement shall be a transfer in violation of Section 15 for purposes of this Section 18.A.(19).

(20) Franchisee, without the written consent of BKC, enters into a management agreement or consulting arrangement relating to the Franchised Restaurant.

(21) Failure to restore the Franchised Restaurant after damage or destruction as provided in Section 7 of this Agreement.

(22) The submission by Franchisee, Managing Owner, or Owners of any application and/or management commitment form and/or other form or report which contains any false or misleading material statement or omits any material fact. If this act of default occurs, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee but with no opportunity to cure.

(23) Repeated breaches of provisions of this Agreement. If BKC intends to terminate this Agreement under this Section 18.A.(23), BKC shall provide notice to Franchisee that BKC considers that Franchisee has repeatedly breached this Agreement, and that BKC intends to terminate this Agreement if Franchisee breaches the Agreement at any time after said notice. If Franchisee after receiving such notice, subsequently breaches this Agreement in any manner, BKC shall have the right to terminate this Agreement upon notice with no further opportunity to cure.

(24) The acquisition of an interest in a restaurant business in violation of Section 19 of this Agreement.

(25) Failure by Franchisee to conduct the business of the Franchised Restaurant in compliance with all laws and regulations as required under Section 21.C.(3) of this Agreement.

(26) Failure by Franchisee to comply with any other provisions of this Agreement or any other agreement with BKC relating to the Franchised Restaurant.

(27) Any false or misleading representation of Franchisee or the Owners with respect to the Franchise Entity Application (including, without limitation, any representation regarding the uses of equity capital raised pursuant to the Franchise Entity Application) or Franchisee or any Owner fails in any undertaking pursuant to the Franchise Entity Application. If this act of default shall occur, BKC shall have the right to terminate this Agreement, effective immediately upon notice to Franchisee and without opportunity to cure.

The failure of BKC to terminate this Agreement upon the occurrence of one or more acts of default will not constitute a waiver or otherwise affect the right of BKC to terminate this Agreement because of a continuing or subsequent failure to cure one or more of the aforesaid acts of default or any other default.

**B. Effect of Termination**

(1) Upon termination or expiration of this Agreement, Franchisee's right to use the BURGER KING Marks and the BURGER KING System shall terminate. Franchisee shall not thereafter identify itself as a BURGER KING franchisee or publicly identify itself as a former BURGER KING franchisee or use any of BKC's trade secrets, promotional materials, the BURGER KING Marks or any mark confusingly similar, nor shall Franchisee disclose any of BKC's trade secrets. Upon termination or expiration of this Agreement, Franchisee will immediately return to BKC the MOD Manual loaned to it, together with all other material containing trade secrets.

(2) Franchisee grants to BKC, upon termination or expiration of this Agreement, the option to purchase all usable paper goods, containers and printed menus bearing the BURGER KING Marks at Franchisee's cost, and to purchase the restaurant equipment, furniture, fixtures and signs at fair market value.

(3) If the parties do not enter into a Successor Franchise Agreement, Franchisee agrees to immediately upon termination or expiration of this Agreement, make such removals or changes in signs and the Building as BKC shall request, so as to effectively distinguish the Building and Premises from its former appearance and from any other BURGER KING Restaurant. In the event Franchisee fails to make the changes, Franchisee consents to BKC entering the Building and Premises to make non-structural changes at Franchisee's expense.

(4) In the event of termination for any default of Franchisee, any damage suffered by BKC shall be a lien in favor of BKC against the personal property, machinery, fixtures and equipment owned by Franchisee on the Premises at the time of default.

(5) The foregoing shall be in addition to any other rights or remedies of BKC that exist under statute, regulation or common law.

## 19. RESTRICTIVE COVENANT

Franchisee covenants and agrees for itself, its parent, subsidiaries and affiliated companies that during the Term of this Agreement they will not own, operate or have any interest in any hamburger business except other franchised BURGER KING Restaurants. Franchisee further covenants and agrees that for a period of one (1) year after any sale, assignment, transfer, termination or expiration of this Agreement, these entities will not own, operate or have any interest in any hamburger business, except other franchised BURGER KING Restaurants, either at or within two (2) miles of the Premises . At BKC's request, Franchisee shall require each Owner, and Managing Director to execute an agreement similar in substance to this Section in a form acceptable to BKC and naming BKC as a third party beneficiary with the independent right to enforce such agreement.

## 20. RESOLUTION OF DEVELOPMENT DISPUTES

### A. Non-Binding Mediation

BKC and Franchisee agree that they shall attempt to resolve any dispute ("Development Dispute") that arises out of a decision by BKC to develop or authorize development of a new restaurant ("Development Decision"), by negotiation between Franchisee and representatives of BKC who have authority to settle the Development Dispute. The BKC representative shall be at a higher level of management than the person with direct responsibility for the initial Development Decision. If the matter has not been resolved within Thirty (30) days of referral of the Development Dispute to the BKC representative for negotiation, BKC and Franchisee shall attempt to settle the Development Dispute by non-binding mediation. The mediation procedure to be followed by the parties shall be set forth in BKC's then current Procedures for Resolving Development Disputes (the "Procedures").

### B. Binding Dispute Resolution

The Procedures shall also set forth a binding dispute resolution process which may be initiated pursuant to the Procedures at the sole election of Franchisee in the event the dispute is not resolved through the mediation process. Subject to modifications made pursuant to Section 20.C. below, the Procedures shall remain valid and enforceable by Franchisee and BKC for the term of this Agreement.

### C. Modification of Procedures

The terms and conditions of the Procedures shall not be materially modified by BKC without the express written approval of the Franchisee Advisory Council.

### D. Institution of Legal Proceedings

Franchisee shall not institute any legal or administrative proceeding for claims arising out of a Development Decision without first attempting to resolve the Development Dispute through negotiation and non-binding mediation. If the Development Dispute has not been resolved through negotiation or mediation pursuant to Sections 20.A and Franchisee has not timely elected the optional binding dispute resolution pursuant to 20.B above, either party may initiate litigation.

## 21. MISCELLANEOUS: GENERAL CONDITIONS

### A. Interpretation

The Introduction and the addenda and amendments checked on the page entitled "List of Attachments" at the beginning of this document shall be considered a part of this Agreement. Section captions are used only for convenience and are in no way to be construed as part of this Agreement or as a limitation of the scope of the particular Sections to which they refer. Words of any gender used in this Agreement shall include any other gender, and words in the singular shall include the plural, where the context requires.

### B. Non-Waiver

The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by Franchisee with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of this Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement. The rights or remedies set forth in this Agreement are in addition to any other rights or remedies which may be granted by law.

### C. Governing Law, Forum and Compliance

(1) This Agreement shall become valid when executed and accepted by BKC. The parties agree that it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida.

(2) Franchisee and BKC acknowledge and agree that the U.S. District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Circuit (or its successor) in and for Miami-Dade County, Florida, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising either, directly or indirectly, under or in connection with this Franchise Agreement except to the extent otherwise provided in this Agreement and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

(3) Anything in this Agreement to the contrary notwithstanding, Franchisee shall conduct its business in a lawful manner and faithfully comply with applicable laws or regulations of the United States and the state, city or other political subdivision in which the Franchised Restaurant is located.

### D. Severability

BKC and Franchisee agree that if any provision of this Agreement may be construed in two ways, one of which would render the provision illegal or otherwise voidable or unenforceable and the other of which would render the provision valid and enforceable, such provision shall have the meaning which renders it valid and enforceable. The language of all provisions of this Agreement shall be construed according to its fair meaning and not strictly against BKC or Franchisee. It is the desire and intent of BKC and Franchisee that the provisions of this Agreement be enforced to the fullest extent, and should any provision be invalid or unenforceable under Florida law, but valid under the laws of the state where the Franchised Restaurant is located, the provision shall be governed by the law of that state. In the event any court shall determine that any provision in this Agreement is not enforceable as written, BKC and Franchisee agree that the provision shall be amended so that it is enforceable to the fullest extent permissible under the laws of the jurisdiction in which enforcement is sought. The provisions of this

Agreement are severable and this Agreement shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained in the Agreement, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable.

**E. Notices**

(1) All notices to BKC shall be in writing and shall be delivered or sent by registered or certified mail, postage fully prepaid, addressed to it at its offices at P.O. Box 020783, General Mail Facility, Miami, Florida 33102-0783, Attention: General Counsel, or at such other address as BKC shall from time to time designate in writing.

(2) All notices to Franchisee shall be in writing and shall be hand delivered or sent by registered or certified mail or telegraph, addressed to Franchisee at the Franchised Restaurant or Franchisee's last designated in writing mailing address.

(3) Notices shall be deemed delivered on the earlier of actual receipt or the third (3rd) day after being deposited in the U.S. Mail.

**F. Modification**

This Agreement may only be modified or amended by a written document executed by BKC and Franchisee.

**G. Binding Effect**

This Agreement shall be binding upon the parties and their successors or assigns.

**H. Survival**

Any provisions of this Agreement, including but not limited to the insurance and indemnification provisions of Section 13, which impose an obligation after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and be binding on the parties.

**I. Attorney's Fees**

In any litigation to enforce the terms of this Agreement, all costs and all attorney's fees (including those incurred on appeal) incurred as a result of the legal action shall be paid to the prevailing party by the other party.

**J. Entire Agreement**

This Agreement, together with the Target Reservation Agreement, Franchise Application, Capitalization Plan, the Franchise Entity Application, the Owner's Guaranty, and Contribution Agreement, if applicable, submitted by Franchisee to BKC upon which BKC is relying in granting this franchise, constitute the entire agreement of the parties and supersedes all prior agreements, negotiations, commitments, representations and undertakings of the parties with respect to the subject matter of this Agreement.

**BURGER KING CORPORATION**

By: ____________________
Print Name: REBECA DSUZA
Its: MANAGER

**FRANCHISEE:**

**JFM SPRING, LLC,**
a New Jersey limited liability company

By: ____________________
Ramesh P. Jethwa, Managing Owner

# EXHIBIT A

## LEGAL DESCRIPTION

# EXHIBIT B

## OWNERS

| | |
|---|---|
| Managing Owner | Ramesh P. Jethwa |
| Owners | Ranjana R. Jethwa |
| Managing Director | Roopali Jethwa |

**SUCCESSOR ADDENDUM
TO
BURGER KING® RESTAURANT FRANCHISE AGREEMENT**

**BURGER KING® RESTAURANT # 10481**

This SUCCESSOR ADDENDUM TO BURGER KING® RESTAURANT FRANCHISE AGREEMENT ("Addendum") is made as of the 27 day of July, 2015, by and between the undersigned parties.

This Addendum is part of the franchise agreement entered into by the parties on the same date herewith (the "Franchise Agreement") under which Franchisee is licensed to own and operate the BURGER KING® Restaurant referred to as BK# 10481 (the "Franchised Restaurant"). In the event of any conflicts between the Franchise Agreement and the terms of this Addendum, the terms of this Addendum shall control. This Addendum amends and supplements the Franchise Agreement, and all terms and conditions contained therein remain in full force and effect, except as amended hereby:

1. **DEFINITIONS.** Any capitalized terms used but not defined herein have the meanings given in the Franchise Agreement.

2. **SERVICES AVAILABLE TO FRANCHISEE.** Section 6 of the Franchise Agreement is hereby amended by

(a) deleting in their entirety the existing Sections 6.B., 6.C, and 6.D of the Franchise Agreement, and

(b) redesignating the existing Sections 6.E, 6.F, 6.G, and 6.H to Sections 6.B., 6.C, 6.D, and 6.E, respectively.

3. **ENTIRE AGREEMENT.** Section 21.K of the Franchise Agreement is hereby deleted in its entirety and replaced by the following:

**K. Entire Agreement**

This Agreement, together with the Successor Addendum to Burger King® Restaurant Franchise Agreement, and, if applicable, the Target Reservation Agreement, Franchise Application, Capitalization Plan and Contribution Agreement, submitted by Franchisee to BKC upon which BKC is relying in granting this franchise, constitute the entire agreement of the parties and supersedes all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter of this Agreement.

This Addendum is hereby executed by the parties effective on the date indicated above.

**BURGER KING CORPORATION**

By:____________________
Print Name: REBECA DURA
Its: MANAGER, PCM

**FRANCHISEE:**

**JFM SPRING, LLC**
a New Jersey, limited liability company

By:____________________
Ramesh P. Jethwa, Managing Owner

**IMAGE TRANSFORMATION PROGRAM 2**

**[Complete 20/20 Remodels]**

**ITP2 SUCCESSOR FRANCHISE**
**ADDENDUM**
**BURGER KING® Restaurant #10481**

This ITP2 SUCCESSOR FRANCHISE ADDENDUM ("Successor Franchise Addendum") is being entered into by the undersigned concurrently with the BURGER KING Restaurant Franchise Agreement for Burger King Restaurant #10481("Agreement") dated July 27, 2015 (the "Effective Date"). In the event of any conflicts between the Agreement and this Successor Franchise Addendum, the terms of this Successor Franchise Addendum shall control. This Addendum amends and supplements the Agreement, and is a part of the Agreement, and all terms and conditions contained in such Agreement remain in full force and effect except to the extent modified by this Successor Franchise Addendum.

**1. FRANCHISE GRANT: TERM AND LOCATION**

BKC grants to Franchisee and Franchisee accepts a franchise to use the BURGER KING System and the BURGER KING Marks only in the operation of a BURGER KING Restaurant at 160 SPRING VALLEY MARKTPLACE, SPRING VALLEY, NY 10977-5222, more fully described in Exhibit A of the Agreement (the "Franchised Restaurant"), (the term "Franchised Restaurant" includes the real estate described on Exhibit A of the Agreement (the "Premises"), the restaurant "Building" and all "Improvements" constructed thereon wherever the context permits or requires). Notwithstanding anything to the contrary contained in Section 1 of the Agreement, the term of the Agreement commences on March 16, 2015 (the "Commencement Date") and shall expire March 15, 2035 (the "Term") unless sooner terminated in accordance with the provisions of the Agreement. For purposes of this Successor Franchise Addendum and the Agreement, the terms "Commencement Date" and "Term" have the meaning given in this Section 1 of this Successor Franchise Addendum. Franchisee agrees to operate the Franchised Restaurant at the specified location for the entire Term. Franchisee accepts this franchise with the full and complete understanding that the franchise grant contains no promise or assurance of renewal. The sole and entire conditions under which Franchisee will have the opportunity of obtaining a Successor BURGER KING Franchise Agreement at expiration are those set forth in Section 17 of the Agreement. This franchise is for the specified location only and does not in any way grant or imply any area, market or territorial rights proprietary to Franchisee.

**2. FRANCHISE FEE**

Notwithstanding anything to the contrary contained in Section 2 of the Agreement, Franchisee acknowledges that the grant of this franchise constitutes the consideration for the payment by Franchisee to BKC of $23,113.01, and that this sum shall be fully earned by BKC upon the execution and delivery of the Agreement. Franchisee further acknowledges that such sum reflects a reduced franchise fee from BKC's current franchise fee, at a discount of one thousand two hundred fifty dollars ($1,250) per each year of the Term, exclusive of the remaining term of the previous franchise agreement for the Franchised Restaurant.

**3. CURRENT IMAGE**

Notwithstanding anything contained in Section 5.B.2 of the Agreement regarding the remodelings, improvements, and alterations to be done to the Franchised Restaurant to conform with the Current Image of BURGER KING restaurants at the halfway point of the Term of the Agreement, by

December 31 of the tenth (10th) year following the Effective Date, Franchisee shall improve, alter and remodel the Franchised Restaurant, as generally described on Exhibit A to this Successor Franchise Addendum (which guidelines BKC may change from time-to-time to reflect the Current Image of BKC then in effect), to bring the Franchised Restaurant into conformance with such Current Image then in effect (the "Interior/Exterior Refresh"). This Interior/Exterior Refresh shall qualify as the Current Image remodel referenced and required in Section 5.B.2 of the Agreement.

**4. ROYALTY AND ADVERTISING CONTRIBUTION**

**A.** __Royalty__. The following paragraphs replace Section 9.A of the Agreement:

During the Term of this Agreement, Franchisee agrees to pay to BKC, for the use of the BURGER KING System and the BURGER KING Marks during the Term, a royalty ("Royalty") equal to a percentage of Gross Sales. Royalties shall be paid monthly by the tenth (10th) day of each month based upon Gross Sales for the preceding month. Royalty shall be payable by Franchisee beginning the month following the dates set forth below:

(i) Subject to the Total Royalty Savings described below, for the period beginning on the Commencement Date and ending March 15, 2016, Franchisee shall pay BKC a Royalty equal to 3.7% of Gross Sales (the "Reduced Royalty Rate"), provided that, if Franchisee had time remaining under its original term in its previous franchise agreement, the Reduced Royalty Rate for this period shall instead be 0.8% less than the original royalty rate under such previous franchise agreement until such time as the previous franchise agreement would have expired. Thereafter, if the time remaining under Franchisee's original term in its previous franchise agreement was more than the duration of the Reduced Royalty Rate hereunder, then Franchisee shall pay BKC a Royalty equal to the original royalty rate set forth under such previous franchise agreement until September 20, 2016. For the balance of the Term, and ending on the expiration of the Term, Franchisee shall pay BKC a Royalty equal to 4.5% of Gross Sales.

(ii) The difference between the original royalty rate under the previous franchise agreement for the Franchised Restaurant and the Reduced Royalty Rate is hereinafter referred to as the "Total Royalty Savings." In each year of the Term, the Total Royalty Savings shall not exceed $11,000, and the Total Royalty Savings for the full Term shall not exceed $11,000.

**B.** __Advertising Contribution__. The following paragraphs replace Section 9.B.i of the Agreement:

(i) During the Term of this Agreement, Franchisee agrees to pay BKC an advertising contribution equal to a percentage of Gross Sales (the "Advertising Contribution"). The Advertising Contribution shall be paid monthly by the tenth (10th) day of each month based upon Franchisee's Gross Sales for the preceding month. This sum, less direct administrative expenses, will be used for (a) market research expenditures directly related to the development and evaluation of the effectiveness of Advertising and sales promotions, (b) creative, production and other costs incurred in connection with the development of Advertising, sales promotions and public relations (as limited by Section (vi) below), both in the market area of the Franchised Restaurant, as reasonably defined from time to time by BKC, and on a national basis, and (c) various methods of delivering the Advertising or promotional message, including without limitation, television, radio, outdoor and print ("Media"). The allocation of the Advertising Contribution between

national, regional and local expenditures shall be made by BKC in its sole business judgment. The Advertising Contribution shall be payable by Franchisee beginning the month following the dates set forth below:

(y) Subject to the Yearly Advertising Contribution Savings described below, during the first four (4) years following the Commencement Date, Franchisee shall pay BKC an Advertising Contribution equal to 3.6% of Gross Sales (the "Reduced Advertising Contribution"). Thereafter, for the balance of the Term, Franchisee shall pay BKC an Advertising Contribution equal to 4.0% of Gross Sales (the "Original Advertising Contribution").

(z) The difference between the Original Advertising Contribution under the previous franchise agreement (4%) and the Reduced Advertising Contribution (3.6%) is hereafter referred to as the "Yearly Advertising Contribution Savings." In each year of the Term of this Agreement, the Yearly Advertising Contribution Savings shall not exceed $6,000.

**5. BK® ePAY**

Section 9.G of the Agreement is hereby amended by adding the following sentence at the end of the paragraph:

In addition, BKC may require payment of Royalty, Advertising Contribution and any other fees required to be paid pursuant to this Agreement using BKC's internet web portal called "BK® ePay."

**6. DEFAULTS**

**A. <u>Default of Franchised Restaurant</u>**. Notwithstanding anything to the contrary in Section 4 of this Successor Franchise Addendum:

(i) If Franchisee fails to timely and successfully complete its "Complete 20/20 Remodel," pursuant to that certain ITP2 Master Program Agreement between the parties, but cures such default within ninety (90) days from the earlier of the date Franchisee purported such Complete 20/20 Remodel to be completed or the deadline to successfully complete such Complete 20/20 Remodel under such ITP2 Master Program Agreement, then, with respect to the Franchised Restaurant, the duration of the Reduced Royalty Rate is hereby reduced by one (1) year and the duration of the Reduced Advertising Contribution is hereby reduced by one (1) year, provided that all other terms of Section 4 of this Successor Franchise Addendum remain in full force and effect except to the extent modified by this Section 6 of this Successor Franchise Addendum.

(ii) If Franchisee fails to timely and successfully complete its "Complete 20/20 Remodel," pursuant to that certain ITP2 Master Program Agreement between the parties, and fails to cure such default within ninety (90) days from the earlier of the date Franchisee purported such Complete 20/20 Remodel to be completed or the deadline to successfully complete such Complete 20/20 Remodel under such ITP2 Master Program Agreement, then, with respect to the Franchised Restaurant, the second sentence of Section 2 of this Successor Franchise Addendum is null and void, Franchisee shall pay BKC a Royalty equal to 4.5% of Gross Sales throughout the Term and an Advertising Contribution of 4.0% of Gross Sales throughout the Term (as under the previous franchise agreement and irrespective of any lower Royalty rate or Advertising Contribution rate in Section 4 of this Successor Franchise Addendum), and, because Franchisee's timely and successful

completion of its Complete 20/20 Remodel was a condition precedent to BKC's granting of the financial incentives in Section 4 of this Successor Franchise Addendum,

(a) all benefits provided to Franchisee under this Successor Franchise Addendum, including, but not limited to those set forth in Section 4, shall immediately terminate;

(b) Franchisee shall immediately pay to BKC: the difference between any Reduced Royalty Rate, Early Completion Royalty Rate and Reduced Advertising Contribution and those Royalty and Advertising Contribution amounts which, but for this Successor Franchise Addendum were required to be paid under the Agreement, plus the difference between the then current franchise fee and the reduced franchise fee paid by Franchisee under the Agreement, plus any Open for Business Funds paid to Franchisee under Exhibit C to the Agreement, "Open for Business Funds Policy," plus any BKL capital contributions granted to Franchisee for BKL properties, if any; and

(c) the Term of the Agreement shall be modified to expire on the date the previous franchise agreement for the Franchised Restaurant was originally set to expire; provided, however, if the term of such previous franchise agreement would have already expired as of the date of such modification, then the Agreement shall immediately terminate but Franchisee shall still be liable to BKC for the amounts set forth in clause (b) above.

**B.** **<u>Default of Other ITP2 Program Restaurant(s)</u>**. Notwithstanding anything to the contrary in Section 4 and Section 6.A. of this Successor Franchise Addendum, if Franchisee failed to timely and successfully complete its "Complete 20/20 Remodel" for any other restaurant(s) participating in the "ITP2 Program," pursuant to that certain ITP2 Master Program Agreement between the parties, and failed to cure such default within ninety (90) days from the earlier of the date Franchisee purported such Complete 20/20 Remodel to be completed or the deadline to successfully complete such Complete 20/20 Remodel under such ITP2 Master Program Agreement, then, with respect to the Franchised Restaurant, the duration of the Reduced Royalty Rate is hereby reduced by one (1) year and the duration of the Reduced Advertising Contribution is hereby reduced by one (1) year, provided that all other terms of Section 4 of this Successor Franchise Addendum remain in full force and effect except to the extent modified by this Section 6 of this Successor Franchise Addendum.

This Successor Franchise Addendum is hereby executed by the parties effective on the date indicated above.

**BURGER KING CORPORATION:**

By: [signature]
Print Name:
Its:

**FRANCHISEE:**

**JFM SPRING, LLC,**
a New Jersey limited liability company

By: [signature]
Ramesh P. Jethwa, Managing Owner

## EXHIBIT A

** The actual scope of work required to complete the Interior/Exterior Refresh to bring the Franchised Restaurant into conformance with the Current Image upon the date set forth in Section 3 of the Successor Franchise Addendum will vary depending on the condition of the Franchised Restaurant and the Current Image then in effect on such date.*

**Interior Refresh**

1. Update Front and Drink Station Counters
2. Décor
   - Reconfigure dining room to updated image standard
   - Replace Table Tops
   - Replace seating, booths may not be required
   - Refurbish Booths (new back pads and seats)
3. Interior Walls / Ceiling:
   - Repair Wall Coverings (remove wall paper, repaint, replace wainscot, etc.)
4. Lighting
   - Repair interior lighting to a "like new condition"
5. Menu Boards
   - Paint Interior Menu Board Frame
6. Interior Equipment
   - Drink Machine must be in good working condition
7. Repair / Refurbish Interior Doors
8. Other
   - Install required Merchandising
9. Address all interior repair and maintenance issues according to BKC standards, including, but not limited to, the kitchen / back of house

**Exterior Refresh**

*Note: Building colors match the then current image standards.*

1. Signage:
   - Pylon and Monument Signs.
     - Paint pylon pole / monument base
     - ~~Paint pylon sign cabinet~~
   - Appendage Signs: Paint Cabinet
   - All signage needs to be compliant with BKC standards and in excellent condition
2. Reader Boards:
   - Paint Cabinet
3. Roof and Wall Mounted Channel Letter Signs
   - Paint Cabinet
4. Directional Signs
   - Paint Pole / Cabinet
5. Parking Lot and Site Conditions.
   - Seal and Stripe Parking Lot or overlay if required
6. Trash Enclosure
   - Paint Trash Enclosure and Gates
7. Playgrounds.
   - Paint playground fence
   - If playground is removed, create additional seating, parking or landscaping area as approved by BKC
8. Building Exterior and Walls

- Paint Walls - Brick / Block as necessary

9. Mansard Roof
    - Light band must be 100% functional and continuous LED lens
10. Update Exterior Merchandising as determined by BKC
11. Comply with all federal, state and local rules and regulations
12. Address all repair and maintenance issues according to BKC standards

## OWNER'S GUARANTY

This Owner's Guaranty is made and executed by the undersigned as of the 27 day of July, 2015. You, the undersigned (and each of you, if more than one) (hereinafter referred to as "you" or as "GUARANTOR") have an interest in JFM SPRING, LLC, a New Jersey limited liability company (hereinafter referred to as "FRANCHISEE"). FRANCHISEE is the franchisee under that certain BURGER KING® Restaurant Franchise Agreement (Entity) dated as of July 27, 2015 (the "Franchise Agreement") with respect to BURGER KING Restaurant #10481 (the "Restaurant") and, if applicable, that certain Lease/Sublease for the Restaurant premises (the "Lease") with Burger King Corporation, a Florida corporation (hereinafter referred to as "BKC"). This Owner's Guaranty is incorporated and made a part of the Franchise Agreement and Lease and will be attached thereto.

1. Acknowledgments. You acknowledge and agree that BKC has entered into the Franchise Agreement and Lease with FRANCHISEE solely on the condition that each Owner of FRANCHISEE (as defined in the Franchise Agreement) be personally obligated and jointly and severally liable with FRANCHISEE (and with each other Owner of FRANCHISEE) for the performance of each and every obligation of FRANCHISEE (and its Owners) under the Franchise Agreement, Lease, any amendments or modifications to the Franchise Agreement or Lease, any extensions or renewals of the Franchise Agreement or Lease, and under each and every agreement ancillary to the Franchise Agreement or Lease that has been or hereafter may be entered by FRANCHISEE with BKC (all such agreements are collectively referred to as the "BKC Agreements").

2. GUARANTOR'S Covenants, Representations and Guaranty. In consideration of and as an inducement to the execution of the Franchise Agreement and Lease by BKC, you hereby personally, irrevocably and unconditionally:

(a) represent and warrant to BKC that Exhibit B to the Franchise Agreement is accurate and complete;

(b) agree to guarantee the prompt payment and performance of all Obligations (as hereinafter defined) of FRANCHISEE to BKC and its successors and assigns; and

(c) agree to be personally bound by, and personally liable for the breach of, each and every provision in the Franchise Agreement and each and every provision in any other BKC Agreement, as if you were the FRANCHISEE, including, without limitation, the provisions of Sections 12 (Unfair Competition), 15 (Assignment) and 19 (Restrictive Covenant) of the Franchise Agreement.

The term "Obligations" means the payment of all debts, liabilities and obligations of FRANCHISEE to BKC arising under the BKC Agreements, whether direct, indirect, absolute, contingent, matured or unmatured, extended or renewed, wherever and however incurred, together with all costs of collection, compromise and enforcement, including reasonable attorneys' fees, and the prompt performance of each and every covenant, agreement and condition set forth in any of the BKC Agreements.

3. Waivers by GUARANTOR. You hereby waive:

(a) acceptance and notice of acceptance by BKC of the foregoing guaranty;

(b) notice of demand for payment of any indebtedness or nonperformance by FRANCHISEE of any of the Obligations;

(c) presentment or protest of any instrument and notice thereof; and notice of default or intent to accelerate with respect to the indebtedness or nonperformance of any of the Obligations;

(d) any right you may have to require that an action be brought against FRANCHISEE or any other person as a condition of liability;

(e) the defense of the statute of limitations in any action hereunder or for the collection or performance of any Obligation;

(f) any and all rights to payments, indemnities and claims for reimbursement or subrogation that you may have against FRANCHISEE arising from your execution of and performance under this Guaranty;

(g) any defense based on any irregularity or defect in the creation of any of the Obligations or modification of the terms and conditions of performance thereof;

(h) any defense based on the failure of BKC or any other party to take, protect, perfect or preserve any right against and/or security granted by the FRANCHISEE or any other party;

(i) any and all other notices and legal or equitable defenses to which you may be entitled; and

(j) the right to trial by jury in respect of any litigation based on, or arising out of, under or in connection with this Guaranty.

4. Further Agreements and Understandings. You hereby consent and agree that:

(a) Your direct and immediate liability under this Guaranty will be joint and several with FRANCHISEE and each other GUARANTOR of FRANCHISEE;

(b) The death or incapacity of any GUARANTOR will not modify, amend or terminate this Guaranty;

(c) ~~If you should die, become incapacitated, become insolvent or make a general~~ assignment for the benefit of creditors, or if a proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally shall be filed or commenced by, against or in respect of you or any other GUARANTOR hereunder, any and all obligations of the GUARANTOR shall, at BKC's option, immediately become due and payable without notice;

(d) If any payment or transfer to BKC which has been credited against any Obligation is voided or rescinded or required to be returned by BKC, whether or not in connection with any event or proceeding described in Section 4(c), this Guaranty will continue in effect or be reinstated as though such payment, transfer or recovery had not been made;

(e) You will render any payment or performance required under the Franchise Agreement or any other BKC Agreement upon demand if FRANCHISEE fails or refuses punctually to do so;

(f) Your liability hereunder will be construed as an absolute, unconditional, continuing and unlimited obligation without regard to the regularity, validity or

enforceability of any of the Obligations, and without regard to whether any Obligation is limited, modified, voided, released or discharged in any proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally;

(g) Your liability hereunder will not be contingent or conditioned upon BKC's pursuit of any remedies against FRANCHISEE or any other person;

(h) This Guaranty will continue in full force and effect for and as to any extension of or modification or amendment to the Franchise Agreement or any other BKC Agreement and you waive notice of any and all such extensions, modifications or amendments;

(i) Your liability hereunder will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence, or any waiver that BKC may from time to time grant to FRANCHISEE or to any other person, including without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims (including the release of other Owners or guarantors), or the taking of any action by BKC which may have the effect of increasing your obligations, none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Franchise Agreement and so long as any performance is or may be owed under any of the BKC Agreements by FRANCHISEE or its Owners and so long as BKC may have any cause of action against FRANCHISEE or its Owners, subject to paragraph (k) below;

(j) Any and all present and future debts and obligations of the FRANCHISEE to you or any other GUARANTORS are hereby subordinated to the full payment and performance of the Obligations; and

(k) If you transfer, in compliance with the Franchise Agreement, any interest in the Franchise Agreement or FRANCHISEE in an installment sale, your liability for the Obligations under the Franchise Agreement will terminate upon the later of (i) one year from the date of transfer or (ii) the date of payment of the final installment of any purchase money debt, provided that, after the first anniversary of such transfer, your liability will be limited to the original amount of the purchase money debt. If you transfer, in compliance with the Franchise Agreement, any interest in the Franchise Agreement or FRANCHISEE for payment in cash, your liability for the Obligations under the Franchise Agreement will terminate one year from the date of transfer, and your liability will be limited to the amount of accrued but unpaid royalty and advertising fees due and payable under the Franchise Agreement during such period. Notwithstanding the foregoing, your liability hereunder for Obligations under the Lease or the other BKC Agreements will continue in full force and effect until FRANCHISEE has fully paid and performed all obligations thereunder.

5. Choice of Law; Jurisdiction and Venue. This Guaranty shall be governed by and construed in accordance with the laws of the State of Florida. You hereby irrevocably submit to the jurisdiction of the Federal District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Court (or its successor) in and for Dade County, Florida, and any appellate court thereof in any action or proceeding arising out of or relating to the Guaranty. You hereby irrevocably waive, to the fullest extent you may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding and any right to jurisdiction on account of your place of residence or domicile. You agree that a final judgment in any such action or proceeding shall be

conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

6. Severability. If one or more provisions contained in this Owner's Guaranty shall be invalid, illegal or unenforceable, in any respect under the laws of any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

You now execute this Guaranty on the date shown above.

**GUARANTOR(S):**

Ramesh P. Jethwa

Ranjana R. Jethwa

# EXHIBIT C

**FRANCHISE AGREEMENT (Individual Owner-Operator)**
**CONTENTS**

**RESTAURANT #: 6090**
**ADDRESS: 12-14 SPRUCE STREET, PATERSON, NEW JERSEY 07501-1712**


| | |
|---|---|
| **INTRODUCTION** | 1 |
| **1. FRANCHISE GRANT: TERM AND LOCATION** | 1 |
| **2. FRANCHISE FEE** | 2 |
| **3. FRANCHISEE REPRESENTATIONS** | 2 |
| **4. FRANCHISEE ASSOCIATION AND ADVISORY COUNCIL** | 2 |
| **5. STANDARDS AND UNIFORMITY OF OPERATION** | 3 |
| A. M.O.D. Manual | 3 |
| B. Franchised Restaurant | 3 |
| 1. Repair and Maintenance. | 3 |
| 2. Current Image. | 4 |
| C. Signs | 4 |
| D. Equipment | 4 |
| E. Vending Machines, Etc. | 5 |
| F. Menu and Service | 5 |
| G. Hours of Operation | 5 |
| H. Uniforms | 6 |
| I. Advertising and Promotional Materials | 6 |
| J. Right of Entry and Inspection | 6 |
| K. Interference with Employment Relations of Others | 6 |
| **6. SERVICES AVAILABLE TO FRANCHISEE** | 6 |
| **7. THE FRANCHISED RESTAURANT** | 7 |
| **8. TRAINING** | 7 |
| **9. ROYALTY AND ADVERTISING CONTRIBUTION** | 8 |
| A. Royalty | 8 |
| B. Advertising, Sales Promotion and Public Relations | 8 |
| C. Gross Sales | 9 |
| D. Late Charge | 9 |
| E. Payment | 10 |
| F. Audit of Advertising Contributions | 10 |
| G. Alternative Method of Payment | 10 |
| **10. ACCOUNTING PROCEDURES: RIGHT OF AUDIT** | 10 |
| A. Accounting | 10 |
| B. Annual Financial Statements | 11 |
| C. Audits of Franchisee | 11 |
| D. Release of Financial Information | 11 |

**11. LIMITATIONS OF FRANCHISE** 12
A. Trademarks, Trade Names, Service Marks and Trade Secrets 12
B. Independent Contractor 12

**12. UNFAIR COMPETITION** 13

**13. INSURANCE; INDEMNIFICATION** 13
A. Insurance 13
B. Worker's Compensation 13
C. Indemnity 13
D. Defense of Claims 14

**14. TAXES** 14

**15. ASSIGNMENT AND TRANSFER: CONDITIONS AND LIMITATIONS** 15

**16. RIGHT OF FIRST REFUSAL** 22

**17. OPTION TO OBTAIN SUCCESSOR FRANCHISE AGREEMENT** 23

**18. DEFAULT AND EFFECT OF TERMINATION** 24
A. Default 24
B. Effect of Termination 27

**19. RESTRICTIVE COVENANT** 27

**20. RESOLUTION OF DEVELOPMENT DISPUTES** 28
A. Non-Binding Mediation 28
B. Binding Dispute Resolution 28
C. Modification of Procedures 28
D. Institution of Legal Proceedings 28

**21. MISCELLANEOUS: GENERAL CONDITIONS** 28
A. Interpretation 28
B. Non-Waiver 29
C Governing Law, Forum and Compliance 29
D. Severability 29
E. Notices 29
F. Liability of Multiple Franchisees 30
G. Modification 30
H. Binding Effect 30
I. Survival 30
J. Attorney's Fees 30
K. Entire Agreement 30

**EXHIBIT A - LEGAL DESCRIPTION** 32

**EXHIBIT B - BURGER KING CORPORATION GUIDELINES FOR PREPARATION OF CORPORATE GOVERNING INSTRUMENTS** 33

## LIST OF ATTACHMENTS

The items checked below are hereby incorporated into and are made a part of this Franchise Agreement:

- ☐ Non-Traditional Facility Addendum
- ☐ Big Box Non-Traditional Facility Addendum
- ☐ Base DIP 2015 Addendum
- ☐ Multi-Unit DIP 2015 Addendum
- ☐ Franchise Agreement Addendum (DIP)
- ☐ Replacement Franchise Addendum
- ☐ Investor Addendum
- ☐ ITP3 Successor Franchise Addendum
- ✓ ITP2 Successor Franchise Addendum
- ITP2A Successor Franchise Addendum
- ☐ SIO3 Successor Franchise Addendum
- ☐ Successor Franchise Addendum (Complete 20/20 Remodel)
- ☐ Successor Franchise Addendum (Phased 20/20 Remodel)
- ☐ Successor Franchise Addendum (BKLIP Complete 20/20 Remodel)
- ☐ Successor Incentive Addendum
- ☐ Successor Addendum
- ☐ Mall Incentive Program Addendum
- ☐ A-Site Incentive Addendum
- ☐ ERP Franchise Agreement Addendum
- ☐ Deferred Remodel Addendum
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of California
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of Illinois
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of Minnesota
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of North Dakota
- ☐ Amendment to Burger King Restaurant Franchise Agreement Required by the State of Washington

**BURGER KING® RESTAURANT**
**FRANCHISE AGREEMENT**

THIS BURGER KING® RESTAURANT FRANCHISE AGREEMENT (this "Agreement") is made as of the 26 day of February, 2015, by and between Burger King Corporation, a Florida corporation ("BKC") and Ramesh P. Jethwa ("Franchisee").

**INTRODUCTION**

A. BKC is the exclusive licensee of certain trademarks and service marks, including but not limited to BURGER KING and HOME OF THE WHOPPER®, which are registered or pending with the United States Patent and Trademark Office, and is the owner or exclusive licensee of other trademarks and service marks authorized for use in BURGER KING Restaurants (the "BURGER KING Marks").

B. BKC is engaged in the business of operating and granting franchises to operate BURGER KING Restaurants using the BURGER KING Marks and a uniform and comprehensive restaurant format and operating system, including a standardized design, decor, equipment system, color scheme, style of building and signage, as well as uniform operating and quality standards, specifications and procedures of operation, and uniformity of product and services offered, including all provisions of the Manual of Operating Data, as amended from time to time (the "MOD Manual")(the "BURGER KING System").

C. Franchisee desires to acquire a franchise to operate a BURGER KING Restaurant at the Premises for the entire Term specified in this Agreement. Franchisee acknowledges that Franchisee has received a copy of the Disclosure Document of BKC and has had a full and adequate opportunity to be thoroughly advised of the terms and conditions of this Agreement by financial and legal counsel of Franchisee's own choosing at least fourteen (14) calendar days prior to its execution, and is entering into this Agreement after having made an independent investigation of BKC's operations and not upon any representation as to profits and/or sales volume which Franchisee might be expected to realize, nor upon any representations or promises by BKC which are not contained in this Agreement.

In consideration of the mutual covenants contained in this Agreement, the parties agree as follows:

**1. FRANCHISE GRANT: TERM AND LOCATION**

BKC grants to Franchisee and Franchisee accepts a franchise for a period of years to use the BURGER KING System and the BURGER KING Marks only in the operation of a BURGER KING Restaurant at **12-14 Spruce Street, Paterson, New Jersey 007501-1712** more fully described in Exhibit A (the "Franchised Restaurant"), (the term "Franchised Restaurant" includes the real estate described on Exhibit A (the "Premises"), the restaurant "Building," and all "Improvements" constructed thereon wherever the context permits or requires. The term of this Agreement commences on December 29, 2014, (the "Commencement Date") and shall expire December 28, 2034 (the "Term") unless sooner terminated in accordance with the provisions of this Agreement. Franchisee agrees to operate the Franchised Restaurant at the specified location for the entire Term. Franchisee accepts this franchise with the full and complete understanding that the franchise grant contains no promise or assurance of renewal. The sole and entire conditions under which Franchisee will have the opportunity of obtaining a Successor BURGER KING Franchise Agreement at expiration are those set forth herein in Section 17. This franchise is for the specified location only and does not in any way grant or imply any area, market or territorial rights proprietary to Franchisee.

**2. FRANCHISE FEE**

Franchisee acknowledges that the grant of this franchise constitutes the consideration for the payment by Franchisee to BKC of seven thousand five hundred and no/100 ($7,500.00) Dollars, and that this sum shall be fully earned by BKC upon the execution and delivery of this Agreement.

**3. FRANCHISEE REPRESENTATIONS**

Franchisee acknowledges its understanding of BKC's franchising policy of requiring all individuals who have any interest in the Franchised Restaurant, whether directly, beneficially or contingently, to be named in and be a party to the Franchise Agreement. If Franchisee consists of more than one individual, the group must include an Operating Partner who, throughout the Term of the Agreement, lives in the locality of the Franchised Restaurant. The Operating Partner must have a minimum fifty percent (50%) unencumbered equity ownership (including profits) and a minimum fifty percent (50%) controlling interest through any voting apparatus in the Franchised Restaurant and must devote his full time and best efforts to the day-to-day operation of the Franchised Restaurant with no operational or management commitments in other businesses (except other BURGER KING Restaurants operated under franchises granted to such person by BKC). Franchisee agrees that it has not avoided and will not hereafter, directly or indirectly, avoid the financial interest requirements and the direct operation requirements set forth above through entry into a management agreement, consulting agreement or any other such artificial device or arrangement. Franchisee agrees to furnish BKC with such evidence as BKC may request from time to time for the purpose of assuring BKC that Franchisee's efforts and equity interest remain as represented in this Agreement.

**4. FRANCHISEE ASSOCIATION AND ADVISORY COUNCIL**

BKC shall, on a periodic basis, consult with representatives of an independent association whose membership is comprised of at least fifty-one percent (51%) of all franchisee-operated BURGER KING Restaurants in the U.S.A. (the "Franchisee Association") relative to those matters expressly described in Sections 5.B, 6, 8, 9 and 20.C of this Agreement. The representatives of the Franchisee Association shall be referred to herein as the "Franchisee Advisory Council." Membership by a Franchisee in the Franchisee Association shall be voluntary.

Franchisee agrees that BKC may consult with and consider the advice of the Franchisee Advisory Council.

For purposes of this Franchise Agreement, to qualify as the "Franchisee Association," the association must have been formed for the primary purpose of representing the rights of franchisees, and membership in such association must be limited solely to BURGER KING franchisees, or officers, directors, partners or shareholders of BURGER KING franchisees, who in either case are not owned or controlled by BKC or its parent, or any subsidiary or affiliate of BKC.

BKC shall not prohibit nor restrict Franchisee from associating with other franchisees, nor from forming, joining or participating in any franchisee trade association (the "Activities"). BKC shall not retaliate against Franchisee because Franchisee engages in the Activities. BKC's exercise and enforcement of its rights under any franchise agreement or the law shall not, by itself, constitute a breach of BKC's responsibilities under the preceding sentence.

## 5. STANDARDS AND UNIFORMITY OF OPERATION

BKC shall establish, and cause approved suppliers to the BURGER KING System to reasonably comply with, product, service and equipment specifications as established by BKC from time to time.

Suggestions from Franchisee for improving elements of the BURGER KING System, such as products, equipment, uniforms, restaurant facilities, service format and Advertising, are encouraged and may or may not be considered by BKC when adopting or modifying standards, specifications and procedures for the BURGER KING System. Franchisee acknowledges that any such suggestions made by Franchisee hereunder shall become the exclusive property of BKC. BKC shall have no obligation to utilize suggestions and no obligation to provide compensation for any suggestion. Franchisee may not utilize any such suggestions in the Franchised Restaurant without the prior written consent of BKC.

### A. M.O.D. Manual

Franchisee acknowledges and agrees that prompt adoption of and adherence to the BURGER KING System, including all of the provisions of the MOD Manual, as amended from time to time, are reasonable, necessary and essential to the image and success of all BURGER KING Restaurants. The MOD Manual, which is comprised of the BURGER KING Operations Manual, the Restaurant Equipment Manual, the RSI Equipment and Facilities E-Red Book, the Approved Brands and Distributors List, Approved Equipment List, the Brand Standards Guide, the Ops Emphasis Guide, alerts and amendments thereto, and applicable policies established by BKC, or the then-current equivalent printed or electronic versions of those documents, contains the official mandatory restaurant operating, equipment and product standards, specifications and procedures prescribed from time to time by BKC for the operation of a BURGER KING Restaurant. The MOD Manual and any revisions or updates thereto may be provided in electronic format including via internet, intranet, or other electronic means. Franchisee acknowledges that the MOD Manual is designed to protect BKC's standards, the BURGER KING System, and the BURGER KING Marks, and not to control the day-to-day operation of the Franchised Restaurant. Franchisee may not print a copy of the MOD Manual without BKC's prior written approval.

Franchisee agrees that changes in the standards, specifications and procedures may become necessary and desirable from time to time and agrees to accept and comply with such modifications, revisions and additions to the MOD Manual which BKC in the good faith exercise of its judgment believes to be desirable and reasonably necessary. The material and information set forth in the MOD Manual is confidential and proprietary to BKC and is to be used by Franchisee only in connection with the operation of the Franchised Restaurant and other franchised BURGER KING Restaurants. The MOD Manual and other specifications, standards and operating procedures communicated in writing or electronically to Franchisee shall be deemed a part of this Agreement.

### B. Franchised Restaurant

The Franchised Restaurant will be constructed and improved in the manner authorized and approved by BKC, and the appearance of the Franchised Restaurant will not thereafter be altered except as may be approved in writing by BKC.

#### 1. Repair and Maintenance.

Franchisee shall, at its expense, continuously throughout the Term of this Agreement maintain the Franchised Restaurant in good condition and repair in accordance with BKC's then current repair and maintenance standards.

**2. Current Image.**

Franchisee shall, improve, alter and remodel the Franchised Restaurant to bring it into conformance with the national and local plans, specifications and/or other standards for new or remodeled BURGER KING Restaurants as may hereafter be reasonably changed and defined from time to time by BKC ("Current Image") in accordance with the following timetable:

(i) During the tenth year of the Term, Franchisee shall remodel, improve and alter the exterior of the Franchised Restaurant to conform with the Current Image in effect on the ninth anniversary of the date of this Agreement.

(ii) BKC and the Franchisee Advisory Council shall meet annually to discuss and establish the components of Current Image for the Franchised Restaurant. The Current Image as established by BKC and the Franchisee Advisory Council, from time to time, shall be binding upon Franchisee. If BKC and the Franchisee Advisory Council do not agree on the Current Image, BKC and the Franchisee Association shall settle the matter by Arbitration by a sole arbitrator in accordance with the then current non-administered arbitration rules of the Center for Public Resources. The arbitration shall be governed by the United States Arbitration Act (U.S.A.A.), and judgment upon the decision rendered by the arbitrator shall be binding on Franchisee and BKC and except as provided in Section 10(a) of the U.S.A.A., shall not be appealable in any forum. The decision may be entered by any court having jurisdiction thereof. The place of arbitration shall be Miami, Florida.

Failure of the Franchisee to comply with the terms of this Section 5.B shall be deemed a material default of this Agreement.

**C. Signs**

The BURGER KING Marks will only be erected and displayed in the manner and at such locations as are approved and authorized by BKC, in writing. Franchisee agrees to maintain and display signs reflecting the Current Image of BURGER KING Restaurants and shall not place additional signs or posters at the Franchised Restaurant without the prior written consent of BKC. Only signs from sources approved by BKC may be utilized at the Franchised Restaurant. Franchisee shall discontinue the use of and destroy such signs as are declared obsolete by BKC within the reasonable time specified by BKC. Such signs are fundamental to the BURGER KING System and Franchisee hereby grants to BKC the right to enter the Franchised Restaurant to remove and destroy unapproved or obsolete signs in the event that Franchisee has failed to do so within thirty (30) days after the written request of BKC.

**D. Equipment**

(1) Only equipment approved by BKC which meets the criteria and performance standards of the BURGER KING System may be used in the Franchised Restaurant. The equipment shall be maintained in a condition that meets operational standards specified in the MOD Manual and, as equipment becomes obsolete or inoperable, Franchisee will replace the equipment with the types and kinds of equipment as are then approved for use in BURGER KING Restaurants. If BKC determines that additional or replacement equipment is needed because of a change in menu items or method of preparation and service or because of health or safety considerations, Franchisee will install the additional equipment or replacement equipment within the reasonable time specified by BKC. Prior to mandating the use of a new or additional piece of equipment, BKC shall use reasonable efforts to field test the proposed new equipment.

(2) Franchisee must, at its sole cost and expense: (a) at all times operate at the Franchised Restaurant POS Systems (as hereinafter defined) approved by BKC; (b) upgrade or replace

in whole or in part any POS Systems as BKC may reasonably deem necessary or desirable in the interest of proper administration of Burger King Restaurants throughout the Burger King Restaurant System, within such reasonable time as may be specified by BKC; (c) use the approved POS Systems at all times to record and process such information as BKC may from time to time require, including information regarding any other business carried on in or from any Burger King Restaurant with the consent of BKC, keep such information available for access by BKC on the POS System for such minimum period as BKC may require, and maintain and provide to BKC such information in the format, and using such data exchange standards and protocols as BKC may require; (d) effect the Polling (as hereinafter defined) operation at such time or times as may be required by BKC, but BKC may itself initiate Polling whenever it deems appropriate; (e) permit BKC or its agents to Poll any information contained in the POS System at any time; (f) permit BKC or its agent to obtain all of the information referenced in this Section 5.D. that may be in the possession of any third party vendor from whom Franchisee obtained an approved POS System; and (g) if required by BKC, download the information referenced in this Section 5.D. into machine readable information compatible with the system operated by BKC or its agents and to deliver that information to BKC by such method and within such timescale as BKC reasonably requires if for any reason Polling is not practicable. For purposes of this Agreement, the term "POS System" means a point of sale computerized system consisting of electronic hardware and software technology, which captures, records and transmits sales, taxes on sales, number, date and time of transactions, products and combinations of products sold and employees using the system and such other related information as may be required by BKC from time to time. For purposes of this Agreement, the term "Polling" means any process acceptable to BKC by which information or data about the Franchised Restaurant may be transmitted to or from a POS System or other system operated by Franchisee into a computer or system operated by BKC or its agents.

**E. Vending Machines, Etc.**

Public telephones, newspaper racks, juke boxes, cigarette, gum and candy machines, rides, lottery ticket terminals, video games or any other games, or vending or amusement machines will not be installed on the Franchised Restaurant without the prior written approval of BKC. In the event such items are installed on the Franchised Restaurant, then all sums received by Franchisee in connection with these items shall be included within "Gross Sales" as defined herein.

**F. Menu and Service**

All menu items, including without limitation, promotional and premium products, which BKC may deem appropriate to take full advantage of the potential market and achieve standardization in the BURGER KING System will be served, and no items which are not set forth in the MOD Manual or otherwise authorized and approved by BKC in writing will be served. Franchisee shall only sell the approved menu items at retail to consumers from and through the Franchised Restaurant and shall not sell such items for redistribution or resale. Franchisee shall adhere to all specifications contained in the MOD Manual or as otherwise prescribed by BKC as to ingredients, methods of preparation and service, weight and dimensions of products served, and standards of cleanliness, health and sanitation. All food, drink and other items will be served and sold in packaging that meets BKC's specifications. Only food, supplies, paper products and packaging from sources approved by BKC shall be used in the Franchised Restaurant.

**G. Hours of Operation**

The Franchised Restaurant shall be open for business at a minimum from 7:00 A.M. to 11:00 P.M., seven (7) days a week, fifty-two (52) weeks a year, unless otherwise authorized or directed by BKC or unless prohibited by applicable law. The Franchised Restaurant may be closed on

Thanksgiving Day and/or Christmas Day if a majority of the BURGER KING Restaurants in the market area (DMA) in which the Franchised Restaurant is located elect to close on the holiday.

**H. Uniforms**

All employees shall only wear uniforms of such design and color as are from time to time specified by BKC.

**I. Advertising and Promotional Materials**

Only those advertising and promotional materials or items which are authorized by BKC in writing prior to use shall be used, sold or distributed, and no display or use of the BURGER KING Marks shall be made without the prior written approval of BKC. All materials on which the BURGER KING Marks are used must include the designation® or such other designation as BKC may specify.

**J. Right of Entry and Inspection**

BKC shall have the unrestricted right to enter the Franchised Restaurant to conduct such activities as it deems necessary to ascertain Franchisee's compliance with this Agreement. The inspections may be conducted without prior notice at any time when Franchisee or one of his employees is at the Franchised Restaurant. The inspections will be performed in a manner which minimizes interference with the operation of the Franchised Restaurant.

**K. Interference with Employment Relations of Others**

Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

**6. SERVICES AVAILABLE TO FRANCHISEE**

BKC agrees to provide the following services to Franchisee and to use reasonable efforts to provide them in a manner reasonably designed for the BURGER KING System, including the use of technology deemed by BKC to be competitive in the quick service restaurant industry. Prior to making material changes to the content of, and manner by which, the following items or services are delivered to Franchisee, BKC shall consult with the Franchisee Advisory Council to receive input as to the proposed change. The content of and manner by which the following services are to be delivered by BKC shall be within BKC's sole reasonable discretion:

A. A reproducible copy of either (i) the standard architectural building plans and specifications for current approved freestanding buildings or double drive-thru buildings, or (ii) such other standard approved restaurant facility, whichever is applicable. Any modifications of the standard plans and specifications, whether requested or required by planning and zoning boards, building codes or otherwise, must be approved in writing by BKC and are to be paid for by Franchisee.

B. A pre-opening training program conducted at BKC training facilities and certified BURGER KING Restaurants.

C. Pre-opening and opening assistance by personnel of BKC at the Franchised Restaurant for a period of time as BKC deems appropriate under the circumstances. BKC may, in its reasonable discretion, consider the following factors: the experience of the Franchisee, the type of facility

being operated, whether the assistance is for a new opening or the reopening after a transfer of ownership of an already operating restaurant, the prior BURGER KING System experience of Franchisee's management, the projected volume of the restaurant, as estimated by Franchisee, and any other factors that BKC deems appropriate for consideration.

D. Opening promotion program. Franchisee may be eligible for a credit to its account in exchange for implementing grand opening promotions conducted after the Franchised Restaurant opens, in accordance with BKC's policy (if any) at the time of opening. Costs in excess of the amount of the credit (if any) incurred in implementing the program shall be Franchisee's responsibility.

E. BKC's MOD Manual, in an approved format a copy of which will be loaned to Franchisee for the Term of this Agreement.

F. Such merchandising, marketing and advertising research data and advice as may be developed from time to time by BKC and deemed by it to be helpful in the operation of a BURGER KING Restaurant.

G. Communication of new developments, techniques and improvements of BKC in food preparation, equipment, food products, packaging, service and restaurant management which are relevant to the operation of a BURGER KING Restaurant.

H. Such ongoing support as BKC deems reasonably necessary to continue to communicate and advise Franchisee as to the BURGER KING System including the operation of the Franchised Restaurant.

## 7. THE FRANCHISED RESTAURANT

The Franchised Restaurant shall at all times be under the direct, on premises supervision of Franchisee or its manager. During the Term of this Agreement the Franchised Restaurant shall be used exclusively for the purpose of operating a franchised BURGER KING Restaurant.

In the event the Franchised Restaurant shall be damaged or destroyed by fire or other casualty, or be required to be repaired or reconstructed by any governmental authority, Franchisee shall, at its own expense, repair or reconstruct the Franchised Restaurant within a reasonable time under the circumstances. The minimum acceptable appearance for the restored Franchised Restaurant will be that which existed just prior to the casualty; however, every effort should be made to have the restored Franchised Restaurant reflect the then Current Image, design and specifications of BURGER KING Restaurants. If the Franchised Restaurant is substantially destroyed by fire or other casualty, Franchisee may, with BKC agreement, terminate this agreement in lieu of Franchisee reconstructing the Franchised Restaurant.

## 8. TRAINING

The Franchised Restaurant shall not open unless the Operating Partner and a designated restaurant manager have successfully completed BKC's training program in Miami, Florida or at such other locations as may be specified by BKC (the "Initial Training"). Franchisee shall train the designated restaurant manager pursuant to BKC's then current "in-restaurant" operations training and certification program. BKC may, in its sole discretion, waive the Initial Training requirement for the designated restaurant manager.

BKC shall provide, and the Operating Partner shall attend, continuing operations training programs from time to time as may be directed by BKC to re-enforce operational standards ("Continuing

Operations Training"). The required frequency, duration and subject matter of the Continuing Operations Training shall be specified by BKC (the Initial Training and Continuing Operations Training programs are hereinafter collectively referred to as Training Programs), in its sole discretion, however. BKC and the Franchisee Advisory Council shall periodically review the Training Programs and BKC will consult with the Franchisee Advisory Council prior to making any material changes to the Training Programs. Such programs may be in Miami, Florida, or at such other locations as may be specified by BKC.

There shall be no charge for the Operating Partner to participate in the Training Programs and no charge for the designated restaurant manager to participate in the Initial Training. Franchisee shall be responsible for all travel and living expenses (including compensation of and worker's compensation insurance) for the Operating Partner and the manager while enrolled in any BKC Training Program and any other personal expenses. If the Operating Partner fails to complete the orientation session at the next scheduled session after opening or acquisition, as applicable, BKC may declare Franchisee to be in default of this Agreement, in addition to its other rights under this Agreement.

Franchisee shall implement a training program for Franchised Restaurant employees in accordance with training standards and procedures prescribed by BKC and shall staff the Franchised Restaurant at all times during the Term of this Agreement with a sufficient number of trained employees including at least one (1) manager who has, within six (6) months after becoming manager, successfully completed BKC's training program for restaurant managers at an accredited location to ensure that the BURGER KING operational standards are met. Requests for exemption from the manager training requirement will be considered on an individual basis and will be granted only in those situations where the employees have prior operational management experience in a BURGER KING Restaurant and demonstrate to BKC a thorough knowledge and understanding of the BURGER KING System.

## 9. ROYALTY AND ADVERTISING CONTRIBUTION

### A. Royalty

During the term of this Agreement, Franchisee agrees to pay to BKC a royalty of 4.5% of Gross Sales ("Royalty") for the use of the BURGER KING System and the BURGER KING Marks. Royalties shall be paid monthly by the tenth (10th) day of each month based upon Gross Sales for the preceding month.

### B. Advertising, Sales Promotion and Public Relations

(i) Franchisee shall pay to BKC an amount equal to four percent (4%) of Franchisee's monthly Gross Sales by the tenth (10th) day of each month based upon Franchisee's Gross Sales for the preceding month (the "Advertising Contribution"). This sum, less direct administrative expenses, will be used for (a) market research expenditures directly related to the development and evaluation of the effectiveness of Advertising and sales promotions, (b) creative, production and other costs incurred in connection with the development of Advertising, sales promotions and public relations (as limited by Section (vi) below), both in the market area of the Franchised Restaurant, as reasonably defined from time to time by BKC, and on a national basis and (c) various methods of delivering the Advertising or promotional message, including without limitation, television, radio, outdoor and print ("Media"). The allocation of the Advertising Contribution between national, regional and local expenditures shall made by BKC in its sole business judgment.

(ii) Periodically, but no less frequently than once per year, BKC shall meet with the Franchisee Advisory Council to discuss and attempt to establish (a) the types of Media to be used by BKC (the "Media Mix") and (b) the percentage of the total annual Advertising Contribution to be expended on Media (the "Media Spending Goal").

(iii) If BKC and the Franchisee Advisory Council are unable to mutually establish the Media Spending Goal, BKC shall, subject to the limitation set forth in Section (v) below, have the right, in its sole business judgment, to establish the Media Spending Goal.

(iv) If BKC and the Franchisee Advisory Council are unable to agree on the Media Mix, BKC shall have the right, in its sole business judgment, to establish the Media Mix. If BKC unilaterally establishes the Media Mix as provided above, BKC shall in no event spend more than ten percent (10%) of the prior fiscal year's national Media expenditures for new Media channels and any such new Media channel(s) must be accessible to no less than two-thirds (2/3) of the then established areas of dominant influence ("DMA's") in the United States.

(v) BKC shall use reasonable efforts to meet the Media Spending Goal, subject to circumstances beyond its control; provided, however, that BKC shall spend no less than sixty-five percent (65%) of the total annual Advertising Contribution on Media.

(vi) The annual expenditure on public relations shall not exceed one-half of one percent of the total annual Advertising Contribution.

(vii) Certain Advertising funds shall be allocated for approved grand opening promotions in accordance with current company policy.

(viii) From time to time, BKC may seek support from Franchisee, and all other franchisees in the Designated Marketing Area ("DMA") where the Franchised Restaurant is located, for an Investment Spending Program ("IS"). In the event that 66.7% or more of the other franchised and BKC-operated company restaurants in the DMA where the Franchised Restaurant exists execute binding IS contracts which commit such other franchisees to place a fixed monthly dollar amount or a percentage of their Gross Sales into an IS account with such money to be spent on local DMA marketing initiatives in a given year, then in such case, Franchisee shall execute an IS contract on exactly the same terms. Franchisee acknowledges that the terms of the IS contracts may change from year to year but that under no circumstances will any IS contract (1) bind the Franchisee to pay more than 2% of their Gross Sales into an IS fund; or (2) bind the Franchisee for a term longer than one year.

**C. Gross Sales**

The term "Gross Sales" as used in this Agreement includes all sums charged by Franchisee for goods, merchandise or services sold at or from the Franchised Restaurant, including all premiums unless exempted by BKC. The sale of BURGER KING products away from the Franchised Restaurant is not authorized; however, should any such sales be approved in the future, they will be included within the definition of Gross Sales. Gross Sales excludes any federal, state, county or city tax, excise tax, or other similar taxes collected by Franchisee from customers based upon sales, and cash received as payment in credit transactions where the extension of credit itself has already been included in the figure upon which the Royalty and Advertising Contribution is computed.

**D. Late Charge**

Any Royalty and Advertising and sales promotion Contribution not paid when due shall bear a late charge at the maximum rate allowed by Florida law or, if no maximum rate relating to this transaction is in effect in the State of Florida, 18% per annum. Nothing in this Agreement shall be construed to mean that Franchisee is to pay, or has contracted to pay, any sum in excess of that which may lawfully be charged or contracted for under any applicable law. The intention of the parties is to conform strictly to

applicable usury laws and it is agreed that if an excess is inadvertently collected it shall be applied to reduce the amount owed under Sections 9.A and 9.B above.

**E. Payment; Credits**

All payments required to be made to BKC under this Agreement shall be made in Miami, Florida, or at such addresses and to such parties as BKC may designate in writing from time to time. BKC may, in its sole discretion, elect to pay any amount owed by BKC to Franchisee by crediting any account of Franchisee or reducing any financial obligation of Franchisee to BKC.

**F. Audit of Advertising Contributions**

Not more than once annually, the Franchisee Association shall have the right, following reasonable notice to BKC, to audit BKC's fiscal year-end results with regard to the income and expenditures of the Advertising Contribution received by BKC for BURGER KING Restaurants located in the U.S.A. The audit shall be conducted in accordance with the criteria established by BKC following consultation with the Franchisee Advisory Council. The audit shall be at the sole cost of the Franchisee Association unless (i) the audit discloses a misappropriation of funds or (ii) a discrepancy resulting from an accounting error, which is in excess of three percent (3%) of the total annual Advertising Contribution received by BKC, in either of which events BKC shall reimburse the Franchisee Association for the reasonable costs of the audit. Only records of the past two fiscal years will be produced for the audit. The results of the audit will be made available, on request, to Franchisee. Franchisee shall have no independent right to audit, provided however, if no Franchisee Association exists, franchisees owning collectively at least thirty percent (30%) or more of all BURGER KING franchisee-owned and operated restaurants in the U.S.A. shall have the right to audit under the same terms and conditions set forth in this Section 9.F.

**G. Alternative Method of Payment**

BKC may, at its option, require payment of the royalty or advertising and sales contribution or both by making direct monthly withdrawals in the form of an electronic or similar funds transfer in the appropriate amount(s) from Franchisee's bank account. In the event that this option is exercised, Franchisee agrees to execute and deliver to its bank and to BKC those documents necessary to authorize such withdrawals and to make payment or deposit as directed by BKC. Franchisee further agrees that it will not thereafter terminate such authorization so long as this Agreement is in effect. Franchisee agrees that it will not close such bank account without prior notice to BKC and the establishment of a substitute bank account permitting such withdrawals. Franchisee also agrees that in the event that a direct electronic funds transfer or other withdrawal program is not available at the bank at which it currently does its business, it will take all reasonable and necessary steps to establish an account at a bank which does have such a program. In addition, BKC may require payment of Royalty, Advertising Contribution and any other fees required to be paid pursuant to this Agreement using BKC's internet web portal called "BK® ePay", or any other electronic or digital payment method that BKC may require in the future.

**10. ACCOUNTING PROCEDURES: RIGHT OF AUDIT**

**A. Accounting**

Franchisee agrees to keep true, accurate and complete records of his business in such form as BKC now or hereafter may require and to furnish BKC with a monthly and fiscal year to date profit and loss statement in the format prescribed by BKC. Franchisee shall also submit to BKC quarterly balance sheets, the first of which shall be for the period ending Three (3) months after the Franchised Restaurant opens. All profit and loss statements and balance sheets should be prepared in accordance with generally accepted accounting principles and shall be submitted to BKC within twenty-five (25) days

after the end of the period covered by the report. In addition, Franchisee shall retain for a period of at least twenty-four (24) months and upon request submit to BKC copies of all state sales tax returns and all supporting data and records relating to sales made at or from the Franchised Restaurant and such other records as BKC may reasonably request from time to time. Franchisee shall also, upon request by BKC, provide BKC with detailed, itemized documentation showing the actual cost of building or remodeling the Franchised Restaurant.

**B. Annual Financial Statements**

Within one hundred twenty (120) days after the close of each fiscal year, Franchisee shall submit a full disclosure of all persons with any interest in the Franchised Restaurant and a complete annual financial statement for the Franchised Restaurant, which statement, if requested by BKC, shall be certified by a Certified Public Accountant.

**C. Audits of Franchisee**

Franchisee agrees that BKC or its representatives, at BKC's expense, shall, at all reasonable times, have the right to examine or audit the books, records, state sales tax returns or accounts of Franchisee. BKC shall similarly have the right to examine or audit the books, records, state sales tax returns or accounts of any and all persons or entities who are guarantors, who have personal liability, or who have joint and severable liability under this Agreement in those instances in which Franchisee has failed to make payments of the Royalty or Advertising fees in a timely fashion or has otherwise defaulted under this Agreement. In the event the audit discloses an understatement of Gross Sales for any period or periods, Franchisee shall, within 15 days after receipt of the audit report, pay BKC the Royalty and advertising fee (including any IS fee) in the amount of the understatement plus the late charge identified in Section 9.D. of this Agreement from the date such payments were originally due. Additionally, in the event the audit discloses an understatement of Gross Sales which exceeds two percent (2%) for any period or periods, Franchisee shall, within fifteen (15) days after the receipt of the audit report, reimburse BKC for all costs of the audit including travel, lodging and wages, reasonably incurred.

**D. Release of Financial Information**

Except as otherwise provided in any lease between BKC, or any of its affiliates, and Franchisee, BKC shall not release to third parties financial or operational information specifically relating to Franchisee and/or the Franchised Restaurant without the consent of Franchisee unless otherwise required to do so by judicial or administrative order. If BKC is required to disclose such information, BKC shall use reasonable efforts to give Franchisee notice thereof. Notwithstanding the foregoing however, BKC may 1) release general financial or operational information relating to the BURGER KING System compiled in whole or in part from Franchisee and/or the Franchised Restaurant so long as Franchisee and/or the Franchised Restaurant are not specifically identified, and 2) publish operational metrics and scores of the Franchised Restaurant and its rank in comparison to other restaurants in the BURGER KING System as long as the publication of the metrics, scores and rankings are distributed only to other franchisees of BKC.

**11. LIMITATIONS OF FRANCHISE**

**A. Trademarks, Trade Names, Service Marks and Trade Secrets**

(1) Franchisee acknowledges that ownership of all right, title and interest to the BURGER KING System and the BURGER KING Marks, are and shall remain vested solely in BKC and Franchisee disclaims any right or interest therein or the good will derived therefrom. Franchisee agrees that all materials loaned or otherwise made available to him and all disclosures made to Franchisee and

not to the general public by or at the direction of BKC at any time before or during the Term of this Agreement relating to the BURGER KING System, including, without limitation, the MOD Manual in its entirety, financial information, marketing strategy and marketing programs are to be considered trade secrets of BKC for purposes of this Agreement and shall be kept confidential and used by Franchisee only in connection with the operation of the Franchised Restaurant and other franchised BURGER KING Restaurants. Franchisee agrees not to divulge any of the trade secrets to any person other than his employees and then only to the extent necessary for the operation of the Franchised Restaurant and, specifically, that Franchisee will not, nor permit anyone to, reproduce, copy or exhibit any portion of the MOD Manual or any other trade secrets of BKC.

(2) Franchisee will not, directly or indirectly, at any time during the Term of this Agreement or thereafter, do or cause to be done any act or thing disputing, attacking or in any way impairing or tending to impair BKC's right, title or interest in the BURGER KING Marks or the BURGER KING System. Franchisee shall immediately notify BKC of all infringements or limitations of the BURGER KING Marks which come to his attention or challenges to Franchisee's use of any of the BURGER KING Marks, and BKC shall exercise absolute discretion in deciding what action, if any, should be taken. Franchisee agrees to cooperate in the prosecution of any action to prevent the infringement, limitation, illegal use or misuse of the BURGER KING Marks and agrees to be named as a party in any such action if so requested by BKC. BKC agrees to bear the legal expenses incident to FRANCHISEE's participation in such action, except for fees, expenses and other costs of Franchisee's personal legal counsel if Franchisee elects to be represented by counsel of his own choosing.

(3) In the adoption of a corporate, partnership, or limited liability company name, Franchisee shall not use any of the BURGER KING Marks, any variations or abbreviations, or any words confusingly similar to the BURGER KING Marks.

**B. Independent Contractor**

Franchisee is an independent contractor and is not an agent, partner, joint venturer, joint employer, or employee of BKC, and no fiduciary relationship between the parties exists. Franchisee shall be the sole and exclusive employer of its employees with the sole right to hire, discipline, discharge, and establish wages, hours, benefits, employment policies, and other terms and conditions of employment for its employees without consultation with or approval by BKC. BKC shall have no control over the terms and conditions of employment of Franchisee's employees. Franchisee shall have no right to bind or obligate BKC in any way nor shall he represent that he has any right to do so.

In all public records and in Franchisee's relationship with other persons, on stationery, business forms and checks Franchisee shall indicate independent ownership of the Franchised Restaurant and that it is operated under a Franchise granted by BKC.

Franchisee shall exhibit at the Franchised Restaurant, in such places as may be designated by BKC, a notification that the Franchised Restaurant is operated by an independent operator and not by BKC.

**12. UNFAIR COMPETITION**

Franchisee acknowledges the uniqueness of the BURGER KING System and that BKC is making its knowledge, know-how and expertise available to him for the purpose of operating the Franchised Restaurant. Franchisee agrees that it would be an unfair method of competition for Franchisee to use or duplicate or to allow others to use or duplicate any of the knowledge, know-how and expertise received from BKC for any use other than for the operation of franchised BURGER KING Restaurants. Franchisee,

therefore, warrants that during the Term of this Agreement, he will utilize his best and continuing efforts to promote and develop the business at the Franchised Restaurant and during the Term hereof and at all times thereafter will not directly or indirectly engage in the operation of any restaurant, other than the Franchised Restaurant and other BURGER KING Restaurants franchised from BKC, which utilizes or duplicates the BURGER KING System, any trade secrets of BKC, the BURGER KING Marks or the present or any former BURGER KING Current Image.

**13. INSURANCE; INDEMNIFICATION**

**A. Insurance**

Franchisee agrees to carry at its expense during the Term of this Agreement Comprehensive General Liability insurance, including Products Liability and Broad Form Contractual Liability, in an amount of not less than ONE MILLION ($1,000,000) DOLLARS per occurrence for bodily injury and FIVE HUNDRED THOUSAND ($500,000) DOLLARS per occurrence for property damage, or in such increased amounts as BKC may reasonably request from time to time during the Term of this Agreement. Each policy will name BKC and its subsidiaries, its affiliated and parent companies as additional insured, will provide that the policy cannot be canceled without thirty (30) days prior written notice to BKC, and will insure the contractual liability of Franchisee under Section 13.C. Additionally, Franchisee agrees to carry, at Franchisee's expense, umbrella coverage in an amount of ONE MILLION ($1,000,000) DOLLARS over the basic Comprehensive General Liability insurance per restaurant except that if Franchisee owns more than ten (10) BURGER KING Restaurants, the umbrella coverage applicable to all such restaurants need not exceed TEN MILLION ($10,000,000) DOLLARS. The insurance afforded by the policy or policies respecting liability shall not be limited in any way by reason of any insurance which may be maintained by BKC. Before the Commencement Date, Franchisee shall furnish to BKC Certificates of Insurance reflecting that the insurance coverage is in effect pursuant to the terms of this Agreement. All policies shall be renewed, and a renewal Certificate of Insurance mailed to BKC in Miami, Florida, or at such other location as may be specified by BKC prior to the expiration date of the policies. This obligation of Franchisee to maintain insurance is separate and distinct from its obligation to indemnify BKC under the provisions of Section 13.C.

**B. Worker's Compensation**

Franchisee agrees to secure and pay premiums on a Worker's Compensation policy covering himself and all his employees, as required by law.

**C. Indemnity**

(1) Franchisee is responsible for all losses or damages and contractual liabilities to third persons arising out of or in connection with possession, ownership or operation of the Franchised Restaurant, and for all claims or demands for damages to property or for injury, illness or death of persons directly or indirectly resulting therefrom. Franchisee agrees to defend, indemnify and save BKC and its subsidiaries, its affiliated and parent companies harmless of, from and with respect to any such claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages, (including but not limited to reasonable attorney's fees) unless resulting from the negligence of BKC. BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law. The indemnification of BKC by Franchisee shall not be limited by the amount of insurance required under Section 13.A. This indemnity obligation shall include, but not be limited to, claims related to the employment of Franchisee's employees. This obligation of Franchisee to indemnify and defend BKC is separate and distinct from its obligation to maintain insurance under the provisions of Section 13.A.

(2) Franchisee agrees to defend, indemnify and save BKC and BKC's officers, directors, agents, employees, attorneys, and accountants, subsidiaries, affiliated and parent companies, harmless of, from and with respect to any claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages any of them may incur (including, but not limited to, reasonable attorney's fees) arising from or relating to the sale of securities of Franchisee, including but not limited to claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages arising from or related to any alleged violation of any federal or state securities law in connection with a sale of securities of Franchisee. BKC shall notify Franchisee of any claims, and Franchisee shall be given the opportunity to assume the defense of the matter. If Franchisee fails to assume the defense, BKC may defend the action in the manner it deems appropriate, and Franchisee shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense, in addition to any sum BKC may pay by reason of any settlement or judgment against BKC. BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law. BKC and the other indemnitees shall, in all instances, have the right to be represented by counsel of its/their own choosing, at Franchisee's expense, and to participate in the defense of any such claim.

**D. Defense of Claims**

BKC shall notify Franchisee of any claims, and Franchisee shall be given the opportunity to assume the defense of the matter; however, BKC shall have the right to participate in the defense of any claim or action against it which is assumed by Franchisee, at BKC's own cost and expense. If Franchisee fails to assume the defense of any claim covered by the indemnification provisions of Section 13.C., BKC may defend the action in the manner it deems appropriate, and Franchisee shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense, in addition to any sum which BKC may pay by reason of any settlement or judgment against BKC. No settlement of any claim against BKC shall be made by Franchisee which is in excess of the amount of insurance referred to in Section 13.A or which would subject BKC to liability in any amount not covered by such insurance without the prior written consent of BKC. If the indemnifiable claim involves multiple franchisees and BKC reasonably determines that consolidation of all such claims would be in the best interests of BKC and the affected franchisees, including Franchisee (in which case any liability of Franchisee hereunder would be on a pro rata basis), BKC shall have the right to defend the claim, action or demand by appropriate proceedings with sole power to direct and control such defense with respect to BKC, and Franchisee shall pay to BKC a pro rata share of all costs, including reasonable attorneys' fees, incurred by BKC in effecting such defense and any subsequent legal appeal, in addition to any sums which BKC may pay by reason of any settlement or judgment against BKC.

## 14. TAXES

Franchisee shall pay when due all taxes levied or assessed in connection with the possession, ownership or operation of the Franchised Restaurant or in connection with amounts paid or received under this Agreement, including without limitation any sales, use or other ad valorem taxes (other than any tax that is measured by or related to the net income of BKC or to its corporate status in a state). If any such tax shall be paid by BKC, Franchisee shall promptly reimburse BKC the amount paid. In the event of any bona fide dispute as to the liability for a tax assessed against Franchisee, Franchisee may contest the validity or the amount of the tax in accordance with procedures of the taxing authority. Franchisee shall not permit a tax sale or seizure against the Franchised Restaurant or equipment.

## 15. ASSIGNMENT AND TRANSFER: CONDITIONS AND LIMITATIONS

A. This Agreement and the franchise grant are personal to Franchisee, and Franchisee shall not sell, assign or transfer this Agreement or any right or ownership interest in the franchise

granted, nor permit any such assignment or transfer to occur directly, indirectly or contingently by agreement or operation of law without the prior written consent of an officer of BKC.

B. Franchisee shall not pledge, mortgage, hypothecate, give as security for an obligation or in any manner encumber this Agreement or the franchise granted herein except with the express written consent of BKC given in connection with the execution of BKC's then current third party intercreditor agreement. Franchisee shall pay BKC a transfer fee of Two Thousand ($2,000) Dollars for the costs and expenses incurred by BKC in connection with facilitating the execution of the intercreditor agreement.

C. In the event of the death or incapacity of Franchisee or, if this Agreement has been assigned to a corporation or a limited liability company, the death or incapacity of an owner of Voting Common Stock or Voting Units, BKC shall consent to a transfer of decedent's or incapacitated party's interest to his heirs, surviving spouse, partner, or shareholder owning at least twenty-five percent (25%) of the Voting Common Stock of a corporation or twenty-five percent (25%) of the Voting Units of a limited liability company (collectively and individually an "Heir"), subject to the following conditions:

(1) The Heir must complete and be approved through BKC's standard franchisee selection process, including satisfactorily demonstrating to BKC that the Heir meets the financial, character, and managerial criteria, as well as equity ownership and such other criteria and conditions as BKC shall then be applying in considering applications for new franchises.

(2) The Heir shall have successfully completed BKC's training for new Franchisees.

(3) The Heir shall agree, in writing, to assume liability for and to perform all the terms and conditions of this Agreement to the same extent as the original franchisee.

(4) If the Heir is not approved or there is no Heir, the estate of the deceased shall use its best efforts to sell the Franchised Restaurant to an acceptable party within twenty-four (24) months from the date of Franchisee's death or incapacity, and BKC shall have an option, but not the obligation, to operate and/or manage the Franchised Restaurant for the account of Franchisee's estate until the deceased or incapacitated Franchisee's interest is transferred to another party acceptable to BKC. Should BKC elect to operate and/or manage the Franchised Restaurant, BKC shall make a complete accounting and shall forward the net income from the operation to Franchisee's estate, less expenses and a reasonable management fee. If the conveyance of the Franchised Restaurant to a party acceptable to BKC has not taken place within the Twenty-Four (24)-month period, BKC shall have the option to purchase the Franchised Restaurant at fair market value.

D. With the prior written consent of BKC, Franchisee may assign this Agreement to a corporation ("Corporation") or a limited liability company ("LLC"). BKC may impose reasonable conditions on any assignment, including without limitation the conditions set forth below.

(1) If Franchisee requests that BKC approve an assignment of this Agreement to a Corporation:

(a) The assignment to the Corporation will not relieve Franchisee of personal liability to BKC for the performance of all obligations under this Franchise Agreement.

(b) For the purpose of determining compliance with this Agreement, BKC shall have the right at any time to examine and approve the form and content of the articles or certificate of incorporation and by-laws of the Corporation (the "Governing Instruments").

(c) The Corporation shall issue Voting Common Stock and may issue either Non-Voting Common Stock or Non-Voting Preferred Stock. The Corporation may not issue both Non-Voting Common Stock and Non-Voting Preferred Stock. As used herein, the term "Non-Voting Stock" refers to the Non-Voting Common Stock or the Non-Voting Preferred Stock and the term "Stock" refers collectively to Voting Common Stock and Non-Voting Stock.

(d) Franchisee shall own one hundred percent (100%) of the outstanding shares of Voting Common Stock. The Operating Partner must remain the owner of not less than fifty percent (50%) of the outstanding shares of Voting Common Stock after any transfer or issuance of shares of the Corporation.

(e) Shares of Non-Voting Stock may be issued to, owned and held only by the spouse and/or children of the Franchisee ("Immediate Family Member") and key employees of FRANCHISEE's franchised BURGER KING Restaurant(s). Prior to the issuance of any and all Stock, Franchisee shall take all steps reasonably necessary to comply with applicable state and federal laws and regulations including any applicable disclosure requirements.

(f) A Corporation issuing Non-Voting Stock shall adopt and use the provisions set forth in BKC's "Guidelines For The Preparation Of Corporate Governing Instruments" (the "Corporation Guidelines"), receipt of a copy of which is hereby acknowledged by Franchisee.

(g) Neither the governing instruments nor any other agreement shall grant to owners of shares of Non-Voting Stock the ability to prevent the approval of an action otherwise approved by the owners of all the shares of Voting Common Stock.

(h) Franchisee shall cause the Corporation to comply with the provisions of this Agreement, including the Corporation Guidelines and the governing instruments. If the Corporation fails or is unable to comply with these provisions, including but not limited to the provisions limiting the voting rights of owners of shares of Stock, the provisions limiting the number of owners of Voting Common Stock, the provisions limiting the payment of dividends and the provisions requiring redemption or repurchase of shares of Stock, then the Franchisee shall take action to cause substantial compliance, which action may include the purchase by Franchisee of shares of Non-Voting Stock and, if Franchisee fails or is unable to cause substantial compliance, then BKC may declare Franchisee and the Corporation in default under this Franchise Agreement and any other Franchise Agreement similarly affected by FRANCHISEE's failure or inability.

(i) Immediate Family Members and key employees shall not be required to become personally liable for the performance of the terms and conditions of the Franchise Agreement as a result of their ownership of shares of Non-Voting Stock.

(j) Under the provisions set forth in the Guidelines, the governing instruments shall require that the Corporation shall redeem Non-Voting Stock at such time as the holder ceases to be a key employee or an Immediate Family Member.

(k) No shares of Stock may be pledged, mortgaged, hypothecated, given as security for an obligation or in any manner encumbered.

(l) Any sale, transfer, assignment or issuance of shares of Voting Common Stock shall be subject to BKC's approval. In the case of an acquisition of additional shares by the Operating Partner, this requirement shall be satisfied by BKC being given written notice describing the transaction within seven (7) days following the transfer or issuance. At no time shall the Corporation have

more than five (5) holders of shares of Voting Common Stock unless otherwise authorized in writing by the Chief Executive Officer of BKC. Notwithstanding the foregoing, BKC may, in the exercise of its reasonable discretion, permit more than five holders of shares of Voting Common Stock upon compliance with each of the following conditions:

(i) The additional holder ("Additional Holder") is an Immediate Family Member of an individual, original franchisee ("Original Franchisee"). No more than one Additional Holder shall be permitted per Original Franchisee.

(ii) The Additional Holder is approved as a BURGER KING Franchisee in accordance with then current BKC standards for approving new franchisees.

(iii) The Additional Holder agrees, in writing, to assume liability and to perform all the terms and conditions of the Franchise Agreement to the same extent as the Original Franchisee.

In no event shall there be more than five (5) Additional Holders nor at any time shall the combined total of Original Franchisees and Additional Holders exceed ten (10).

(m) The Corporation shall not engage in any business activity other than that which is directly related to the ownership and operation of FRANCHISEE's franchised BURGER KING Restaurant(s).

(n) The governing instruments of the Corporation shall reflect the limitation in the number of shareholders of Voting Common Stock and that the issuance and transfers of shares of Voting Common Stock are restricted and may be issued or transferred only with the written consent of BKC.

(o) All Stock certificates shall include the following legend:

THE OWNERSHIP AND TRANSFER OF THIS STOCK IS SUBJECT TO THE TERMS AND CONDITIONS OF THE ARTICLES OF INCORPORATION, THE BY-LAWS OF THIS CORPORATION AND OF A FRANCHISE AGREEMENT WITH BURGER KING CORPORATION. REFERENCE IS MADE TO SUCH FRANCHISE AGREEMENT AND THE PROVISIONS OF THE ARTICLES OF INCORPORATION AND BY-LAWS OF THIS CORPORATION, COPIES OF WHICH ARE ON FILE WITH THE RECORDS OF THE CORPORATION.

(p) Franchisee shall comply with the requirements of Section 11.A(3) of this Agreement in the adoption of any corporate name.

(2) If Franchisee requests that BKC approve an assignment of this Agreement to a LLC:

(a) The assignment to the LLC will not relieve Franchisee of personal liability to BKC for the performance of all obligations under this Franchise Agreement.

(b) For the purpose of determining compliance with this Agreement, BKC shall have the right at any time to examine and approve the form and content of the articles of organization and operating agreement or "regulations" of the LLC (the "Governing Instruments").

(c) The LLC shall issue voting membership interests and may issue non-voting membership interests, provided, however, that such issuance is in compliance with the limited

liability company enabling statute of the state in which the LLC is created. As used herein, the term "Voting Units" refers to any "voting membership interests," "Non-Voting Units" refers to any non-voting membership interests, and the term "Units" refers collectively to Voting Units and Non-Voting Units. The LLC may also grant certain members preferential rights with respect to distributions of the LLC, provided, however, that such grant is in compliance with the applicable enabling statute and that such preferential rights be granted to members who hold only Non-Voting Units.

(d) Franchisee shall own one hundred percent (100%) of the outstanding Voting Units. The Operating Partner must remain the owner of not less than fifty percent (50%) of the outstanding Voting Units after any transfer or issuance of Units of the LLC.

(e) Non-Voting Units may be issued to, owned and held only by the spouse and/or children of the Franchisee ("Immediate Family Members") and key employees of Franchisee's franchised Burger King Restaurant(s) ("Key Employees"). Prior to the issuance of any and all Units, Franchisee shall take all steps reasonably necessary to comply with applicable state and federal laws and regulations including any applicable disclosure requirements.

(f) An LLC issuing Non-Voting Units shall adopt and use the applicable provisions set forth in BKC's "Guidelines For The Preparation of Limited Liability Company Governing Instruments" (the "Guidelines"), receipt of a copy of which is hereby acknowledged by Franchisee.

(g) Neither the Governing Instruments nor any other agreement shall grant to owners of Non-Voting Units the ability to prevent the approval of an action otherwise approved by the owners of all the Voting Units.

(h) Franchisee shall cause the LLC to comply with the provisions of this Agreement, including the Guidelines and the Governing Instruments. If the LLC fails or is unable to comply with these provisions, including but not limited to the provisions limiting the voting rights of owners of Units, the provisions limiting the number of owners of Voting Units and the provisions requiring redemption or repurchase of Units, then the Franchisee shall take action to cause substantial compliance, which action may include the purchase by Franchisee of Non-Voting Units and, if Franchisee fails or is unable to cause substantial compliance, then BKC may declare Franchisee and the LLC in default under this Franchise Agreement and any other Franchise Agreement similarly affected by Franchisee's failure or inability.

(i) Immediate Family Members and Key Employees shall not be required to become personally liable for the performance of the terms and conditions of the Franchise Agreement as a result of their ownership of Non-Voting Units.

(j) Under the provisions set forth in the Guidelines, the Governing Instruments shall require that the LLC redeem Non-Voting Units at such time as the holder ceases to be a Key Employee or an Immediate Family Member.

(k) No Units may be pledged, mortgaged, hypothecated, given as security for an obligation or in any manner encumbered.

(l) Any sale, transfer, assignment or issuance of Voting Units shall be subject to BKC's approval. In the case of an acquisition of additional Units by the Operating Partner, this requirement shall be satisfied by BKC being given written notice describing the transaction within seven (7) days following the transfer or issuance. At no time shall the LLC have more than five (5) holders of Voting Units unless otherwise authorized in writing by the Chief Executive Officer of BKC. Notwithstanding the foregoing, BKC may, in the exercise of its reasonable discretion, permit more than five holders of Voting Units upon compliance with each of the following conditions:

(i) The additional holder ("Additional Holder") is an Immediate Family Member of an individual, original franchisee ("Original Franchisee"). No more than one Additional Holder shall be permitted per Original Franchisee.

(ii) The Additional Holder is approved as a Burger King Franchisee in accordance with then current BKC standards for approving new franchisees.

(iii) The Additional Holder agrees, in writing, to assume liability and to perform all the terms and conditions of the Franchise Agreement to the same extent as the Original Franchisee.

In no event shall there be more than five (5) Additional Holders nor at any time shall the combined total of Original Franchisees and Additional Holders exceed ten (10).

(m) LLC shall not engage in any business activity other than that which is directly related to the ownership and operation of Franchisee's franchised Burger King Restaurant(s).

(n) The Governing Instruments of the LLC shall reflect the limitation in the number of holders of Voting Units and that the issuance and transfers of Voting Units are restricted and may be issued or transferred only with the written consent of BKC.

(o) Franchisee shall comply with the requirements of Paragraph 11.A(3) of this Agreement in the adoption of any name for the LLC.

(p) Franchisee shall deliver an opinion letter to BKC from the LLC's legal counsel, which legal counsel shall be reasonably acceptable to BKC, as to the LLC's due organization, good standing and authority to enter into the Franchise Agreement. .

(q) Franchisee shall pay to BKC an initial one-time processing fee of Two Thousand Five Hundred Dollars ($2,500.00) and a transfer fee of Five Hundred Dollars ($500.00) at the time of the request for assignment.

(r) Franchisee shall have completed all deferred repair and maintenance requirements at the Franchised Restaurant at the time of the request for assignment.

(s) There are no material defaults under this Agreement or any other agreements between Franchisee and BKC at the time of the request for assignment.

(t) All monetary obligations to BKC of any kind, whether arising under this Franchise Agreement or otherwise, shall be paid in full at the time of the request for assignment.

(u) Franchisee shall otherwise satisfy all of BKC's standard requirements for Franchise Approval (other than financial approval) at the time of the request for assignment.

E. If more than one (1) individual comprises the Franchisee, the assignment, in whole or in part, by any such individual (the "Individual Seller") of his ownership interest in the Franchised Restaurant (or if this Agreement has been assigned to a Corporation or LLC pursuant to Section 15.D herein, the assignment of his stock of the Corporation or Voting Units of the LLC) shall be subject to the prior written consent of BKC, which consent will not be unreasonably withheld upon compliance with the conditions required by BKC on the assignment. BKC shall use reasonable efforts to provide to Franchisee consent to the assignment, or communicate notice of disapproval, within ninety (90) days (for transactions

involving less than ten (10) restaurants, the time frame shall be sixty (60) days) of receipt by BKC of Franchisee's notice of assignment and the furnishing by Franchisee of all information reasonably requested by BKC. Conditions on the assignment may include but are not limited to the following:

(1) For the purpose of determining compliance with this Agreement, BKC shall have the right at any time to examine and approve the form and content of the governing instruments.

(2) All obligations of Franchisee to BKC, whether arising under this Agreement or otherwise, must be satisfied at the time of transfer.

(3) Prospective assignee must complete and be approved through BKC's standard franchisee selection process including satisfactorily demonstrating to BKC that he or she meets the financial, character, managerial, equity ownership and such other criteria and conditions as BKC shall then be applying in considering applications for new franchises.

(4) Prospective assignee shall have satisfactorily completed BKC's training for new franchisees.

(5) Approval by BKC of the terms of the contract of sale which impact the sufficiency of cash flow from the business after payment of debt service to provide for, among other things, any needed remodeling of the Franchised Restaurant.

(6) Franchisee shall pay BKC an assignment fee of Two Thousand ($2,000.00) Dollars for the costs and expenses incurred by BKC in connection with the transfer of the first BURGER KING Restaurant involved in the transaction and Five Hundred ($500.00) Dollars for each additional BURGER KING Restaurant involved in the same transaction. In the event the prospective assignee is not an existing approved BURGER KING Franchisee, Franchisee seller shall also pay BKC a New Franchisee Training Fee of Two Thousand ($2,000.00) Dollars in connection with the transfer of the first BURGER KING Restaurant involved in the transaction.

(7) Execution by Franchisee seller of a general release of BKC in a form satisfactory to BKC.

F. If BKC does not accept the offer to purchase the Franchised Restaurant as provided in Section 16, Franchisee, or an Individual Seller may conclude the sale to the purchaser who made the offer provided BKC's consent to the assignment be first obtained, which consent will not be unreasonably withheld upon compliance with the conditions imposed by BKC on the assignment. The conditions on the assignment may include, but are not limited to, the conditions set forth in Section E above. BKC shall use reasonable efforts to provide to Franchisee consent of the assignment, or communicate notice of disapproval, within ninety (90) days (for transactions involving less than ten (10) restaurants the time frame shall be sixty (60) days) of receipt by BKC of Franchisee's notice of assignment and the furnishing by Franchisee of all information reasonably requested by BKC.

G. In the event of a transfer, sale, assignment, merger or consolidation by Franchisee of all of Franchisee's interest in this Agreement, the Franchised Restaurant, or a transfer of all or part of an Individual Seller's interest in the Franchised Restaurant (or all or part of the stock of a corporation or membership interests in a LLC), Franchisee or Individual Seller (hereinafter "Transferor") shall remain personally liable for all Royalty, Advertising Contribution and other payments which come due during the periods of time hereinafter described, in accordance with the following criteria:

(1) If Transferor has transferred Transferor's interest pursuant to a contract of sale which provides that installment payments of the purchase price are to be made to the Transferor or

Transferor's designee, liability will continue for the longer of (i) twelve (12) months from the date of assignment, or (ii) such time as the payments are to be made, including any extensions, provided, however, that after the first anniversary of such transfer, the liability of the Transferor shall be limited to the total amount of the original installment payments to be made under the contract for sale or other instrument evidencing the debt. In the event the holder of the note or other evidence of debt deems the obligation satisfied, Transferor will simultaneously be released from liability to BKC under this Agreement for Royalty and Advertising payments. Any contract for sale which provides for installment payments of the purchase price shall provide that such payments are subordinate to the payment of Royalty and Advertising Contributions called for in this Agreement and that the note or other evidence of the obligation shall not be assignable by the holder or payee.

(2) If the Transferor has transferred Transferor's interest pursuant to a contract of sale which provides for cash payment in full, upon transfer, of the entire purchase price, the Transferor's liability shall continue for a period of twelve (12) months from the date of the transfer, and shall be limited to the amount of Royalty fees and Advertising fees which accrued during such period and are not paid by Transferee. Upon payment of such amounts, Transferor shall be automatically released from any continuing liability under this Agreement for Royalty and Advertising payments.

H. Following a transfer of Transferor's interest, in the event BKC seeks to enforce continuing liability pursuant to Section 15.G of this Agreement against a transferor, the immediately preceding Transferor of an interest in the franchise will be afforded an opportunity to cure the default and the right to reassume the position of franchisee under the terms of this Franchise Agreement provided all of the following conditions have been met:

(1) At the time of transfer, the Transferor must have been in good standing with BKC in accordance with the operational expansion criteria then in effect for Franchise Approval;

(2) At the time of proposed re-entry, the Transferor must be in good standing and be able to satisfy BKC's then current Franchise Approval Criteria and Expansion Approval Criteria and deliver to BKC appropriate application forms and such other documents and agreements as BKC may reasonably require evidencing the assumption by Transferor of the rights and obligations under the remaining term of the Franchise Agreement.

(3) At the time of re-entry, BKC shall be paid, in full, all sums past due and owing under this Franchise Agreement and any agreement related to the Franchised Restaurant, as well as any past due sums related to products or supplies sold by BKC for use in the Franchised Restaurant, including without limitation, any pre- and post-petition amounts due from any franchisee with regard to the Franchised Restaurant which is the subject of a proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally.

(4) Transferor must take possession of and acquire control and dominion over substantially all of the tangible real and personal property associated with the operation of the Franchised Restaurant.

I. During the period of time in which Transferor remains liable pursuant to Section 15.G above, BKC shall use reasonable efforts to send simultaneous copies of notices of default under this Franchise Agreement to Transferor. Transferor shall use reasonable efforts to send simultaneous copies of notices of default under any installment payment due to Transferor from Transferee. Failure of either party to provide copies of the notices of default shall not be an event of default under the terms of this Franchise Agreement. Transferor shall be afforded the same opportunity to cure as is set forth in the Notice of Default.

J. In addition, Franchisee agrees that, prior to acquiring any other BURGER KING Restaurant franchise which may be offered to him for sale or which he may offer to purchase, such franchise will first be offered to BKC on the same terms, conditions and price in accordance with Section 16.

**16. RIGHT OF FIRST REFUSAL**

A. In the event Franchisee receives an acceptable bona fide offer from a third party to purchase the Franchised Restaurant or any portion thereof or interest therein, Franchisee shall give BKC written notice setting forth the name and address of the prospective purchaser, the price and terms of the offer together with a franchise application completed by the prospective purchaser, a copy of the Purchase and Sale Agreement, executed by both Franchisee and purchaser, and all exhibits, copies of any real estate purchase agreement or agreements, proposed security agreements and related promissory notes, assignment documents, title insurance commitment and any other information that BKC may request in order to evaluate the offer. BKC shall then have the prior option to purchase Franchisee's interest covered by the offer at the price and upon the same terms of the offer. If the consideration is not money, the purchase price shall be cash equal to the fair market value of the consideration. BKC shall have twenty (20) business days, excluding weekends and Federal holidays, after receipt of Franchisee's notice of offer and the furnishing of all reasonably requested information within which to notify Franchisee of its intent to accept or reject the offer. Silence on the part of BKC shall constitute rejection. If the proposed sale includes assets of Franchisee not related to the Franchised Restaurant or the operation of franchised BURGER KING Restaurants, BKC may, at its option, elect to purchase only the assets related to the operation of franchised BURGER KING Restaurants and an equitable purchase price shall be allocated to each asset included in the proposed sale. This right of first refusal shall apply to any transfer, conveyance, assignment, consolidation, merger or any other transaction in which legal or beneficial ownership of the Franchised Restaurant or the franchise granted by this Agreement is vested in other than the individual Franchisee. If this Agreement has been assigned to a Corporation or LLC in accordance with Section 15 of this Agreement, then this right of first refusal shall also apply if Voting Common Stock in the Corporation, or Voting Units in the LLC, is sold, assigned or transferred to individuals or entities other than those approved by BKC as owners of the Voting Common Stock or Voting Units.

B. The election by BKC not to exercise its right of first refusal as to any offer shall not affect its right of first refusal as to any subsequent offer.

C. Any sale, attempted sale, assignment or other transfer of the franchise grant other than a transfer pursuant to Section 15.C or 15.D effected without first giving BKC the right of first refusal described above shall be void and of no force and effect. If this Agreement has been assigned to a Corporation or LLC in accordance with Section 15 of this Agreement, any sale, attempted sale, assignment or other transfer of Voting Common Stock in the Corporation or Voting Units in the LLC to individuals or entities other than those approved by BKC as owners of Voting Common Stock or Voting Units without first giving BKC the right of first refusal described above shall be void and of no force and effect.

**17. OPTION TO OBTAIN SUCCESSOR FRANCHISE AGREEMENT**

Franchisee shall have, exercisable on the expiration date of the Term of this Agreement, an option to obtain a Successor BURGER KING Restaurant Franchise Agreement ("Successor Franchise Agreement") for a term of twenty (20) years, provided that:

A. Franchisee has given BKC written notice ("Notice") of its intention to exercise its Option to Obtain a Successor Franchise Agreement during the fourth year prior to the expiration of the Term of this Agreement.

B. Franchisee, at the time of the Notice and at the time of the expiration of the Term of this Agreement, is not in default of and has substantially complied with the terms and conditions of this Agreement and all other franchise agreements or other agreements with BKC that Franchisee, Operating Partner may be a party to consistently and throughout its Term, including but not limited to the following:

(1) Franchisee has operated the Franchised Restaurant in accordance with the terms and conditions of this Agreement, including, but not limited to, operating the Franchised Restaurant in compliance with the operating standards and specifications established from time to time by BKC as to quality of service, cleanliness, health and sanitation;

(2) Franchisee has satisfied, in a timely fashion, all financial obligations in accordance with the terms and conditions of this Agreement;

(3) Franchisee has maintained, improved, altered, replaced and remodeled the Franchised Restaurant, including, without limitation the Premises, Improvements, signs and equipment, throughout the Term of this Agreement in accordance with the terms and conditions of this Agreement.

(4) Franchisee shall have completed, not more than three (3) years and not less than three (3) months prior to the expiration of the Term of this Agreement, the improvements, alterations, remodeling or rebuilding of the interior and exterior of the Franchised Restaurant so as to reflect the then Current Image of BURGER KING Restaurants, pursuant to such plans and specifications as BKC reasonably approves.

(5) Execution by Franchisee of a general release of BKC in a form satisfactory to BKC.

(6) Franchisee meets all then current financial ratios BKC uses to evaluate new franchisees for financial approval.

C. Within one hundred and twenty (120) days after receipt of the Notice, BKC shall advise Franchisee in writing if Franchisee is not eligible to obtain a Successor Franchise Agreement, specifying the reasons for such ineligibility and identifying whether such deficiencies are capable of cure. Between the date of the Notice and the expiration date of the Term of this Agreement, if any act, circumstance or omission causes Franchisee to become ineligible to obtain a Successor Franchise Agreement, then BKC shall advise Franchisee in writing thereof, specifying the deficiency and identifying a cure period if applicable.

D. Franchisee has the right to remain in possession of the Franchised Restaurant for the term of the Successor Franchise Agreement.

E. Franchisee shall execute the then current form of Successor Franchise Agreement, which may differ as to Royalty and Advertising Contributions, as well as other terms and conditions. Franchisee shall, upon execution of the Successor Franchise Agreement, pay to BKC the then current Franchise Fee.

## 18. DEFAULT AND EFFECT OF TERMINATION

### A. Default

If an act of default hereunder is committed by Franchisee, or otherwise occurs, and Franchisee fails to cure the default after any required notice and within the cure period applicable, BKC may, at its option and without prejudice to any other rights or remedies provided for hereunder or by law,

terminate the Franchise Agreement by written notice or otherwise. The applicable cure period shall be as described below but, if a cure period is not specifically mentioned, it shall be thirty (30) days. In some cases, as identified below, no cure period is allowed and no notice may be required. If any applicable law or rule requires a longer notice period or a longer cure period than that provided herein, then the period required under the law or rule shall be substituted for the requirements herein. The following are material acts of default and shall be good cause for termination:

(1) Franchisee fails to operate the Franchised Restaurant in accordance with the operating standards and specifications established from time to time by BKC as to service, cleanliness, health and sanitation. Franchisee shall have five (5) days after notice to cure the default. In the event that such default is deemed by BKC, in its reasonable discretion, to be of a nature so serious as to threaten the immediate safety or health of customers or employees of Franchisee, then, in such case, Franchisee will, after verbal notice from BKC to Franchisee, immediately cease operation of the Franchised Restaurant until such time as the serious health or safety default is rectified to BKC's satisfaction. Failure to close the Franchised Restaurant under these circumstances shall be an act of default. If this act of default shall occur, BKC shall have the right to immediately terminate this Agreement, such termination to be effective immediately and with no opportunity to cure.

(2) Franchisee sells any product which does not conform to BKC's specifications. Franchisee shall have five (5) days after notice to cure the default.

(3) Franchisee fails to sell any product designated by BKC as required to be sold in the Franchised Restaurant. Franchisee shall have five (5) days after notice to cure the default, provided, however, if for reasons beyond the control of Franchisee, Franchisee is unable to obtain such products within the cure period, the default cure period shall be extended for a reasonable period of time provided Franchisee initiates and actively pursues substantial and continuing action within the cure period to cure such default.

(4) Franchisee sells products not approved by BKC. Franchisee shall have five (5) days after notice to cure the default.

(5) Franchisee uses equipment, uniforms or decor not approved by BKC.

(6) Franchisee fails to maintain the Franchised Restaurant in good condition and repair, or fails to make all improvements, alterations or remodelings as may be determined by BKC to be reasonably necessary to reflect the Current Image as provided in Section 5.B, as and when required.

(7) Franchisee fails to pay when due any Royalty or Advertising and sales promotion Contribution required to be paid under this Agreement. Franchisee shall have ten (10) days after notice to cure the delinquency.

(8) Franchisee (i) fails to submit any information required by Section 10 above ("Accounting Procedures") or (ii) knowingly submits a financial statement which understates Gross Sales. If the act of default set forth in (ii) occurs, BKC shall have the right to immediately terminate this Agreement without notice and Franchisee shall have no right to cure.

(9) Franchisee abandons the franchise relationship without the prior consent of BKC at any time during the Term of this Agreement. Franchisee shall have five (5) days after notice to cure the default. The cessation of operation of the Franchised Restaurant on the Premises other than with the consent of BKC, whether the Premises remain vacant or are converted to another use, shall be considered abandonment of the franchise relationship; provided, however, that the Franchised Restaurant shall not be deemed abandoned if the cessation is due to circumstances beyond Franchisee's reasonable

control (such as lack of electrical power, weather conditions, earthquakes, strikes and the like) and Franchisee diligently undertakes to resume operations after the reason for such cessation has been abated.

(10) Franchisee ceases to occupy the Franchised Restaurant. Franchisee shall have five (5) days after notice to cure the default. If the loss of possession is the result of governmental exercise of eminent domain, Franchisee may, with BKC's consent and subject to availability, relocate to other premises in the same market area for the balance of the term of this Agreement.

(11) Franchisee or, if Franchisee consists of more than one person, the Operating Partner, (or, if the franchise has been assigned to a Corporation or LLC, the Corporation or LLC) files a petition or application seeking any type of relief under the Bankruptcy Code or any state insolvency or similar law, or someone files a petition or application seeking to have Franchisee adjudicated a bankrupt, or seeking other relief against Franchisee under the Bankruptcy Code or any state insolvency or similar law and the petitioner application is not dismissed within ninety (90) days after it is filed. Subject to the applicable law, the Franchise shall terminate without notice or cure period upon the occurrence of this act of default as if that date were the expiration date and Franchisee expressly and knowingly waives any rights that he may have under the provisions of the Bankruptcy Code and consents to the termination of this Agreement or any other relief which may be sought in a Complaint filed by BKC to lift the provisions of the automatic stay of the Bankruptcy Code. Additionally, Franchisee agrees not to seek an Injunctive Order from any court in any jurisdiction relating to insolvency, reorganization or arrangement proceedings which would have the effect of staying or enjoining this provision.

(12) Franchisee admits in writing his inability to pay his debts as they mature or makes an assignment for the benefit of creditors, or a receiver (permanent or temporary) for any part of his property is appointed by a court of competent authority. If this act of default shall occur, BKC shall have the right to immediately terminate this Agreement without notice or cure period.

(13) A final judgment against Franchisee (including a final judgment in favor of BKC or any affiliated party of BKC) remains unsatisfied of record for thirty (30) days (unless a supersedeas or other appeal bond has been filed), or a writ or levy of execution is made upon the franchise granted by this Agreement or upon any property used in the Franchised Restaurant, and such writ or levy is not discharged within five (5) days of said levying.

(14) Conviction of Franchisee, the Operating Partner, or, if this Agreement has been assigned to a Corporation or LLC, conviction of the Corporation or LLC, or an officer, director, shareholder, or member of the Corporation or LLC, in a court of competent jurisdiction of (i) an indictable offense punishable by a term of imprisonment in excess of one (1) year, or (ii) any offense for which a material element is fraud, dishonesty or moral turpitude. If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee and with no opportunity to cure.

(15) Franchisee uses or duplicates the BURGER KING System or engages in unfair competition in violation of Section 12 of this Agreement or discloses any trade secrets of BKC in violation of Section 11.A(1) of this Agreement. If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee and with no opportunity to cure.

(16) Franchisee denies BKC the right to inspect the Franchised Restaurant or to audit the sales and accounting records of the Franchised Restaurant.

(17) Conduct by Franchisee or the Operating Partner which is deleterious or reflects unfavorably on Franchisee or the BURGER KING System by exhibiting a reckless disregard for the

physical and mental well being of employees, customers, BKC representatives or the public at large including, but not limited to, battery, assault, sexual harassment or other forms of threatening, outrageous, willfully discriminatory or unacceptable behavior. An act of default under this Section 18.A.(17) does not require any criminal action to be brought against Franchisee or the Operating Partner. If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee and with no opportunity to cure.

(18) Failure by Franchisee to maintain a responsible credit rating by failing to make prompt payment of undisputed bills, invoices and statements from suppliers of goods and services to the Franchised Restaurant.

(19) The sale, assignment, merger or transfer of any interest of Franchisee in this Agreement in violation of Sections 3, 15 or 16 of this Agreement, and, if this Agreement has been assigned to a Corporation or a LLC, the creation, sale, assignment, or transfer of the stock of the Corporation, or membership interests in the LLC in violation of Sections 3, 15 or 16 of this Agreement. The failure of an Heir to be approved by BKC under Section 15.C. of this Agreement, or to transfer the Franchised Restaurant to an approved Franchisee, within twenty-four (24) months of the Franchisee's death or incapacity shall be in violation of Section 15 of this Agreement for purposes of this Section 18.A.(19).

(20) Franchisee, without the written consent of BKC, enters into a management agreement or consulting arrangement relating to the Franchised Restaurant.

(21) Failure to restore the Franchised Restaurant after damage or destruction as provided in Section 7 of this Agreement.

(22) The knowing and intentional submission by Franchisee of a franchise application and/or management commitment form which contains any false or misleading material statements or omits any material fact. If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee but with no opportunity to cure.

(23) Repeated breaches of provisions of this Agreement. If BKC intends to terminate this Agreement under this Section 18.A.(23), BKC shall provide notice to Franchisee that BKC considers that Franchisee has repeatedly breached this Agreement, and that BKC intends to terminate this Agreement if Franchisee breaches the Agreement at any time after said notice. If Franchisee after receiving such notice, subsequently breaches this Agreement in any manner, BKC shall have the right to terminate this Agreement upon notice with no further opportunity to cure.

(24) The acquisition of an interest in a business in violation of Section 19 of this Agreement.

(25) Failure by Franchisee to conduct the business of the Franchised Restaurant in compliance with all laws and regulations as required under Section 21.C.(3) of this Agreement.

(26) Failure by Franchisee to comply with any other provisions of this Agreement or any other agreement with BKC relating to the Franchised Restaurant.

The failure of BKC to terminate this Agreement upon the occurrence of one or more events of default will not constitute a waiver or otherwise affect the right of BKC to terminate this Agreement because of a continuing or subsequent failure to cure one or more of the aforesaid events of default or any other default.

**B. Effect of Termination**

(1) Upon termination or expiration of this Agreement, Franchisee's right to use the BURGER KING Marks and the BURGER KING System shall terminate. Franchisee shall not thereafter identify himself as a BURGER KING franchisee or publicly identify himself as a former BURGER KING franchisee or use any of BKC's trade secrets, promotional materials, the BURGER KING Marks or any mark confusingly similar, nor shall Franchisee disclose any of BKC's trade secrets. Upon termination or expiration of this Agreement, Franchisee will immediately return to BKC the MOD Manual loaned to him, together with all other material containing trade secrets.

(2) Franchisee grants to BKC, upon termination or expiration of this Agreement, the option to purchase all usable paper goods, containers and printed menus bearing the BURGER KING Marks at Franchisee's cost, and to purchase the restaurant equipment, furniture, fixtures and signs at fair market value.

(3) If the parties do not enter into a Successor Franchise Agreement, Franchisee agrees to immediately upon termination or expiration of this Agreement, make such removals or changes in signs and the Building as BKC shall request, so as to effectively distinguish the Building and Premises from its former appearance and from any other BURGER KING Restaurant. In the event Franchisee fails to make the changes, Franchisee consents to BKC entering the Building and Premises to make non-structural changes at Franchisee's expense.

(4) In the event of termination for any default of Franchisee, any damage suffered by BKC shall be a lien in favor of BKC against the personal property, machinery, fixtures and equipment owned by Franchisee on the Premises at the time of default.

(5) The foregoing shall be in addition to any other rights and remedies of BKC that exist under statute, regulation or common law.

**19. RESTRICTIVE COVENANT**

Franchisee covenants and agrees that during the Term of this Agreement he will not own, operate or have any interest in any hamburger business except other franchised BURGER KING Restaurants. Franchisee further covenants and agrees that for a period of one (1) year after any sale, assignment, transfer, termination or expiration of this Agreement, Franchisee will not own, operate or have any interest in any fast-food business, except other franchised BURGER KING Restaurants, either at or within two (2) miles of the Franchised Restaurant. The restrictive covenant shall remain an individual obligation of each individual Franchisee under this Agreement, and shall not be effected in any way by the transfer or assignment of this Agreement to a Corporation or LLC in accordance with Sections 15.D of this Agreement.

**20. RESOLUTION OF DEVELOPMENT DISPUTES**

**A. Non-Binding Mediation**

BKC and Franchisee agree that they shall attempt to resolve any dispute ("Development Dispute") that arises out of a decision by BKC to develop or authorize development of a new restaurant ("Development Decision"), by negotiation between Franchisee and representatives of BKC who have authority to settle the Development Dispute. The BKC representative shall be at a higher level of management than the person with direct responsibility for the initial Development Decision. If the matter has not been resolved within thirty (30) days of referral of the Development Dispute to the BKC representative for negotiation, BKC and Franchisee shall attempt to settle the Development Dispute by non-

binding mediation. The mediation procedure to be followed by the parties shall be set forth in BKC's then current Procedures for Resolving Development Disputes (the "Procedures").

**B. Binding Dispute Resolution**

The Procedures shall also set forth a binding dispute resolution process which may be initiated pursuant to the Procedures at the sole election of Franchisee in the event the dispute is not resolved through the mediation process. Subject to modifications made pursuant to Section 20.C. below, the Procedures shall remain valid and enforceable by Franchisee and BKC for the term of this Agreement.

**C. Modification of Procedures**

The terms and conditions of the Procedures shall not be materially modified by BKC without the express written approval of the Franchisee Advisory Council.

**D. Institution of Legal Proceedings**

Franchisee shall not institute any legal or administrative proceeding for claims arising out of a Development Decision without first attempting to resolve the Development Dispute through negotiation and non-binding mediation. If the Development Dispute has not been resolved through negotiation or mediation pursuant to Sections 20.A and Franchisee has not timely elected the optional binding dispute resolution pursuant to 20.B above, either party may initiate litigation.

**21. MISCELLANEOUS: GENERAL CONDITIONS**

**A. Interpretation**

The Introduction and the addenda and amendments checked on the page entitled "List of Attachments" at the beginning of this document shall be considered a part of this Agreement. Section captions are used only for convenience and are in no way to be construed as part of this Agreement or as a limitation of the scope of the particular Sections to which they refer. Words of any gender used in this Agreement shall include any other gender, and words in the singular shall include the plural, where the context requires.

**B. Non-Waiver**

The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by Franchisee with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of this Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement. The rights or remedies set forth in this Agreement are in addition to any other rights or remedies which may be granted by law.

**C. Governing Law, Forum and Compliance**

(1) This Agreement shall become valid when executed and accepted by BKC. The parties agree that it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida.

(2) Franchisee and BKC acknowledge and agree that the U.S. District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Circuit (or its

successor) in and for Dade County, Florida, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising, either directly or indirectly, under or in connection with this Franchise Agreement except to the extent otherwise provided in this Agreement and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

(3) Anything in this Agreement to the contrary notwithstanding, Franchisee shall conduct his business in a lawful manner and faithfully comply with applicable laws or regulations of the United States and the state, city or other political subdivision in which the Franchised Restaurant is located.

**D. Severability**

BKC and Franchisee agree that if any provision of this Agreement may be construed in two ways, one of which would render the provision illegal or otherwise voidable or unenforceable and the other of which would render the provision valid and enforceable, such provision shall have the meaning which renders it valid and enforceable. The language of all provisions of this Agreement shall be construed according to its fair meaning and not strictly against BKC or Franchisee. It is the desire and intent of BKC and Franchisee that the provisions of this Agreement be enforced to the fullest extent, and should any provision be invalid or unenforceable under Florida law, but valid under the laws of the state where the Franchised Restaurant is located, the provision shall be governed by the law of that state. In the event any court shall determine that any provision in this Agreement is not enforceable as written, BKC and Franchisee agree that the provision shall be amended so that it is enforceable to the fullest extent permissible under the laws of the jurisdiction in which enforcement is sought. The provisions of this Agreement are severable and this Agreement shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained in the Agreement, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable.

**E. Notices**

(1) All notices to BKC shall be in writing and shall be delivered or sent by registered or certified mail, postage fully prepaid, addressed to it at its offices at P.O. Box 020783, Miami, Florida 33102-0783, Attention: General Counsel, or at such other address as BKC shall from time to time designate in writing.

(2) All notices to Franchisee shall be in writing and shall be hand delivered or sent by registered or certified mail or telegraph, addressed to Franchisee at the Franchised Restaurant or Franchisee's last designated in writing mailing address.

(3) Notices shall be deemed delivered on the earlier of actual receipt or the third (3rd) day after being deposited in the U.S. Mail.

**F. Liability of Multiple Franchisees**

If Franchisee consists of more than one person, each partner's liability and obligation under this Agreement shall be joint and several.

**G. Modification**

This Agreement may only be modified or amended by a written document executed by BKC and Franchisee.

**H. Binding Effect**

This Agreement shall be binding upon the parties, their heirs, executors, personal representatives, successors or assigns.

**I. Survival**

Any provisions of this Agreement which impose an obligation after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and be binding on the parties.

**J. Attorney's Fees**

In any litigation to enforce the terms of this Agreement, all costs and all attorney's fees (including those incurred on appeal) incurred as a result of the legal action shall be paid to the prevailing party by the other party.

**K. Entire Agreement**

This Agreement, together with the Target Reservation Agreement, Franchise Application, Capitalization Plan and Contribution Agreement, if applicable, submitted by Franchisee to BKC upon which BKC is relying in granting this franchise, constitute the entire agreement of the parties and supersedes all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter of this Agreement.

**BURGER KING CORPORATION**

By: [signature]
Print Name: [illegible]
Its: [illegible]

**Franchisee:**

[signature]
Ramesh P. Jethwa

**EXHIBIT A**

**LEGAL DESCRIPTION**

## EXHIBIT B

## BURGER KING CORPORATION GUIDELINES FOR PREPARATION OF CORPORATE GOVERNING INSTRUMENTS

The BURGER KING Restaurant Franchise Agreement (the "Agreement") provides, at Section 15.D that the Franchisee may, with the prior written consent of Burger King Corporation ("BKC") assign the Agreement to a corporation (the "Corporation") so long as certain reasonable BKC conditions, including but not limited to those set forth in the Agreement are met. The Agreement also provides, at Section 15.D(6) that if the Corporation wishes to issue either Non-Voting Common Stock or Non-Voting Preferred Stock (it may not issue both), articles or certificate of incorporation and the by-laws of the Corporation (herein the "governing instruments") must contain *at least* the provisions set forth in these Guidelines For Preparation Of Corporate Governing Instruments.

**Before setting forth the required provisions, a note of CAUTION is in order. The issuance of stock to family members and key employees may involve and invoke security registration and sales laws, "blue sky" disclosure laws, wage and hour laws and numerous other federal, state and local laws and regulations. A Franchisee should not, under any circumstances, issue, sell or give away Voting or Non-Voting Stock of any sort without first discussing the matter in depth with an attorney and following his or her instructions carefully.**

The required provisions have been divided into those which relate to Non-Voting Common Stock and those which relate to Non-Voting Preferred Stock. Under Section 15.D(3) of the Agreement, the Corporation may not issue both Non-Voting Common Stock and Non-Voting Preferred Stock.

It should also be noted that Section 11.A.(3) of the Agreement requires that in the adoption of a corporate or partnership name, the Franchisee may not use any of the BURGER KING Marks, or any variation, abbreviation, or words confusingly similar to the BURGER KING Marks.

**Provisions Regarding Non-Voting Common Stock**

A. The aggregate number of authorized shares of stock of the Corporation shall be (corporation will insert number) of which (a) (insert number) shall be designated shares of Voting Common Stock of the par value of (insert number) per share (the "Voting Common Stock"), and (b) (insert number) shall be designated shares of Non-Voting Common Stock of the par value of (insert number) per share.

B. So long as the Corporation is the assignee of any BURGER KING Franchise, the relative rights, preferences and limitations of the Voting Common Stock and the Non-Voting Common Stock are as follows:

**1. Voting Common Stock**

(a) Voting Common Stock shall only be issued to and held by those natural persons who are approved as franchisees by Burger King Corporation. No more than five natural persons may hold shares of Voting Common Stock. Notwithstanding the foregoing, BKC may, in the exercise of its reasonable discretion, permit more than five holders of shares of Voting Common Stock upon compliance with each of the following conditions:

(i) The additional holder ("Additional Holder") is an Immediate Family Member of an individual, original franchisee ("Original Franchisee"). No more than one Additional Holder shall be permitted per Original Franchisee.

(ii) The Additional Holder is approved as a BURGER KING Franchisee in accordance with then current BKC standards for approving new franchisees.

(iii) The Additional Holder agrees, in writing, to assume liability and to perform all the terms and conditions of the Franchise Agreement to the same extent as the Original Franchisee.

In no event shall there be more than five (5) Additional Holders nor at any time shall the combined total of Original Franchisees and Additional Holders exceed ten (10). If a holder of shares of Voting Common Stock is not a natural person approved as a franchisee by Burger King Corporation, the shares of Voting Common Stock shall be deemed to be shares of Non-Voting Stock until they are repurchased pursuant to Section 3.

(b) The holders of shares of Voting Common Stock shall be entitled to receive, out of the funds of the Corporation legally available for such purpose, dividends as and when declared by the Board of Directors.

(c) In the event of any liquidation, dissolution or distribution of the assets of the Corporation the holders of shares of the Voting Common Stock together with holders of the Non-Voting Common Stock (whose rights are limited as set forth in Section 2(d)) shall be entitled to share ratably in the distribution of all remaining assets of the Corporation available for distribution.

**2. Non-Voting Common Stock**

(a) Non-Voting Common Stock shall only be issued to and held by either (1) a member of the immediate family (which consists of the spouse and children) of the holder of shares of Voting Common Stock, or (2) a "key employee" of the Corporation.

(b) The aggregate number of outstanding shares of Non-Voting Common Stock shall not exceed 25% of the sum of (a) the aggregate number of outstanding shares of Voting Common Stock and (b) the aggregate number of outstanding shares of Non-Voting Common Stock.

(c) Except as specifically required by applicable law, holders of Non-Voting Common Stock shall not have the right to vote. If the holders of shares of Non-Voting Common Stock have the right to vote on an action under applicable law, they shall vote as a single class with the holders of shares of Voting Common Stock.

(d) In the event of any liquidation, dissolution or distribution of the assets of the Corporation the holders of shares of Non-Voting Common Stock together with the holders of the shares of Voting Common Stock shall be entitled to share ratably in the distribution of all remaining assets of the Corporation available for distribution, except that no holder of shares of Non-Voting Common Stock may receive, in its capacity as a holder of shares of Non-Voting Common Stock, any interest in the BURGER KING Franchise other than an interest in the proceeds of any disposition thereof.

(e) Except as set forth in Section 2(c) and 2(d), the holders of shares of Non-Voting Common Stock shall have all the rights and privileges of holders of shares of Voting Common Stock.

**3. Repurchase**

To the extent permitted by law, the Corporation shall repurchase shares of Non-Voting Common Stock at such time as the holder thereof ceases to be a key employee of the Corporation or a member of the immediate family of a holder of Voting Common Stock and shall repurchase shares of Voting Common Stock at such time as the holder thereof ceases to be a person meeting the requirements hereunder of a holder of shares of Voting Common Stock, for an amount per share (corporation will insert an applicable

pricing mechanism) provided, however, that such amount per share shall not exceed: (i) the aggregate of net income and net losses reported to the Internal Revenue Service less taxes paid or payable, dividends previously paid, declared or accrued and prior redemptions and repurchases of shares of capital stock of the Corporation, divided by (ii) the total number of shares of Voting Common Stock and Non-Voting Common Stock outstanding immediately prior to such proposed repurchase.

**Provisions Regarding Non-Voting Preferred Stock**

A. The aggregate number of shares of all classes of stock which the Corporation shall have authority to issue is (corporation will insert number), to be divided into two classes consisting of (insert number) shares of a class designated "Preferred Stock", of the par value of (insert number) per share, and (insert number) shares of a class designated "Common Stock", of the par value of (insert number) per share.

B. So long as the Corporation is the assignee of any BURGER KING Franchise, the relative rights, preferences and limitations of the shares of each class are as follows:

**1. Preferred Stock**

The Preferred Stock may be issued from time to time in one or more series, with such designation or title, in such number of shares and with the relative rights and preferences (a) as may be fixed by resolution of the Board of Directors without further action by shareholders, (b) as may be fixed by the shareholders, or (c) as set forth below; provided, however, that in no event will holders of outstanding shares of Preferred Stock have rights more extensive than the following:

(a) Holders of shares of Preferred Stock shall be either (1) a member of the immediate family (which consists of the spouse and children) of the holders of the shares of Common Stock or (2) a "key employee" of the Corporation.

(b) Shares of Preferred Stock shall not be convertible into shares of Common Stock.

(c) Except with respect to amendments to this instrument which adversely affect the relative rights and preferences of holders of shares of Preferred Stock, for any action on which the holders of shares of Preferred Stock are entitled to vote under applicable law, the holders of outstanding shares of Preferred Stock so entitled to vote shall vote, for these purposes only, with the holders of outstanding shares of Common Stock, and the maximum vote which all such holders of shares of Preferred Stock shall have is 25% of the aggregate number of outstanding shares of Preferred Stock and Common Stock, taken as a whole, entitled to vote on such action.

(d) Upon liquidation, dissolution or distribution of the assets of the Corporation, the holders of all outstanding shares of Preferred Stock shall not be entitled to receive more than 25% of the proceeds upon such liquidation, dissolution or distribution; provided, however, that in no event will the holders of shares of Preferred Stock be entitled to receive upon liquidation, dissolution or distribution of assets any interest in the BURGER KING Franchise other than an interest in the proceeds from any disposition thereof.

**2. Common Stock**

(a) Common Stock shall only be issued to and held by those natural persons who are approved as franchisees by Burger King Corporation. No more than five natural persons may hold shares of Common Stock. If a holder of shares of Common Stock is not a natural person approved by Burger King Corporation, the shares of Common Stock so held shall be subject to repurchase pursuant to Section 3.

(b) Subject to the prior payment or provision therefor of dividends on the Preferred Stock, the holders of shares of Common Stock shall be entitled to receive out of the funds of the Corporation legally available for such purpose dividends as and when declared by the Board of Directors.

(c) In the event of any liquidation, dissolution or distribution of the assets of the Corporation and after satisfaction of the preferential requirements of the Preferred Stock, the holders of shares of Common Stock shall be entitled to share ratably in the distribution of all remaining assets of the Corporation available for distribution.

**3. Redemption and Repurchase**

(a) To the extent permitted by law, the Corporation shall redeem shares of Preferred Stock for (corporation will insert an applicable redemption price or pricing mechanism) at such time as the holder thereof ceases to be a key employee of the Corporation or a member of the immediate family of a holder of Voting Common Stock; provided, however, that the amount per share to be paid upon such redemption shall not exceed 25% times (i) the aggregate of net income and net losses previously reported by the Corporation to the Internal Revenue Service, less taxes paid or payable with respect to such reported net income less the sum of dividends paid, declared or accrued and prior redemption and repurchases of shares of Preferred Stock and Common Stock, divided by (ii) the total number of shares of Preferred Stock outstanding at such time, including the shares to be redeemed.

(b) To the extent permitted by law, the Corporation shall repurchase shares of Common Stock at such time as the holder thereof ceases to be a person approved by Burger King Corporation as a franchisee, for an amount per share (corporation will insert applicable pricing mechanism); provided, however, that such amount per share shall not exceed: (i) the aggregate of net income and net losses previously reported by the Corporation to the Internal Revenue Service less taxes paid or payable with respect to such reported net income, less the sum of amounts paid or payable for dividends previously paid, declared or accrued and prior redemptions and repurchases of shares of capital stock of the Corporation, and amounts which may be payable preferentially to holders of all outstanding shares of Preferred Stock under Sections 1 and 3(a), divided by (ii) the total number of shares of Common Stock outstanding immediately prior to such proposed repurchase.

**IMAGE TRANSFORMATION PROGRAM 2**

**[Complete 20/20 Remodels]**

**ITP2 SUCCESSOR FRANCHISE**
**ADDENDUM**
**BURGER KING® Restaurant # 6090**

This ITP2 SUCCESSOR FRANCHISE ADDENDUM ("Successor Franchise Addendum") is being entered into by the undersigned concurrently with the BURGER KING Restaurant Franchise Agreement for Burger King Restaurant # **6090** ("Agreement") dated 26th February, 2015 (the "Effective Date"). In the event of any conflicts between the Agreement and this Successor Franchise Addendum, the terms of this Successor Franchise Addendum shall control. This Addendum amends and supplements the Agreement, and is a part of the Agreement, and all terms and conditions contained in such Agreement remain in full force and effect except to the extent modified by this Successor Franchise Addendum.

**1. FRANCHISE GRANT: TERM AND LOCATION**

BKC grants to Franchisee and Franchisee accepts a franchise to use the BURGER KING System and the BURGER KING Marks only in the operation of a BURGER KING Restaurant at 12-14 Spruce Street, Paterson, New Jersey 07501-1712, more fully described in Exhibit A of the Agreement (the "Franchised Restaurant"), (the term "Franchised Restaurant" includes the real estate described on Exhibit A of the Agreement (the "Premises"), the restaurant "Building" and all "Improvements" constructed thereon wherever the context permits or requires). Notwithstanding anything to the contrary contained in Section 1 of the Agreement, the term of the Agreement commences on December 29, 2014, (the "Commencement Date") and shall expire December 28, 2034, (the "Term") unless sooner terminated in accordance with the provisions of the Agreement. For purposes of this Successor Franchise Addendum and the Agreement, the terms "Commencement Date" and "Term" have the meaning given in this Section 1 of this Successor Franchise Addendum. Franchisee agrees to operate the Franchised Restaurant at the specified location for the entire Term. Franchisee accepts this franchise with the full and complete understanding that the franchise grant contains no promise or assurance of renewal. The sole and entire conditions under which Franchisee will have the opportunity of obtaining a Successor BURGER KING Franchise Agreement at expiration are those set forth in Section 17 of the Agreement. This franchise is for the specified location only and does not in any way grant or imply any area, market or territorial rights proprietary to Franchisee.

**2. FRANCHISE FEE**

Notwithstanding anything to the contrary contained in Section 2 of the Agreement, Franchisee acknowledges that the grant of this franchise constitutes the consideration for the payment by Franchisee to BKC of $7,500.00, and that this sum shall be fully earned by BKC upon the execution and delivery of the Agreement. Franchisee further acknowledges that such sum reflects a reduced franchise fee from BKC's current franchise fee, at a discount of one thousand two hundred fifty dollars ($1,250) per each year of the Term, exclusive of the remaining term of the previous franchise agreement for the Franchised Restaurant.

**3. CURRENT IMAGE**

Notwithstanding anything contained in Section 5.B.2 of the Agreement regarding the remodelings, improvements, and alterations to be done to the Franchised Restaurant to conform with the Current Image of BURGER KING restaurants at the halfway point of the Term of the Agreement, by

December 31 of the tenth (10th) year following the Effective Date, Franchisee shall improve, alter and remodel the Franchised Restaurant, as generally described on Exhibit A to this Successor Franchise Addendum (which guidelines BKC may change from time-to-time to reflect the Current Image of BKC then in effect), to bring the Franchised Restaurant into conformance with such Current Image then in effect (the "Interior/Exterior Refresh"). This Interior/Exterior Refresh shall qualify as the Current Image remodel referenced and required in Section 5.B.2 of the Agreement.

**4. ROYALTY AND ADVERTISING CONTRIBUTION**

**A.** **Royalty**. The following paragraphs replace Section 9.A of the Agreement:

During the Term of this Agreement, Franchisee agrees to pay to BKC, for the use of the BURGER KING System and the BURGER KING Marks during the Term, a royalty ("Royalty") equal to a percentage of Gross Sales. Royalties shall be paid monthly by the tenth (10th) day of each month based upon Gross Sales for the preceding month. Royalty shall be payable by Franchisee beginning the month following the dates set forth below:

(i) Subject to the Total Royalty Savings described below, for the period beginning on the Commencement Date and ending December 28, 2016, Franchisee shall pay BKC a Royalty equal to 3.7% of Gross Sales (the "Reduced Royalty Rate"), provided that, if Franchisee had time remaining under its original term in its previous franchise agreement, the Reduced Royalty Rate for this period shall instead be 0.8% less than the original royalty rate under such previous franchise agreement until such time as the previous franchise agreement would have expired. Thereafter, if the time remaining under Franchisee's original term in its previous franchise agreement was more than the duration of the Reduced Royalty Rate hereunder, then Franchisee shall pay BKC a Royalty equal to the original royalty rate set forth under such previous franchise agreement until December 28, 2034. For the balance of the Term, and ending on the expiration of the Term, Franchisee shall pay BKC a Royalty equal to 4.5% of Gross Sales.

(ii) The difference between the original royalty rate under the previous franchise agreement for the Franchised Restaurant and the Reduced Royalty Rate is hereinafter referred to as the "Total Royalty Savings." In each year of the Term, the Total Royalty Savings shall not exceed $11,000, and the Total Royalty Savings for the full Term shall not exceed $22,000.00.

**B.** **Advertising Contribution**. The following paragraphs replace Section 9.B.i of the Agreement:

(i) During the Term of this Agreement, Franchisee agrees to pay BKC an advertising contribution equal to a percentage of Gross Sales (the "Advertising Contribution"). The Advertising Contribution shall be paid monthly by the tenth (10th) day of each month based upon Franchisee's Gross Sales for the preceding month. This sum, less direct administrative expenses, will be used for (a) market research expenditures directly related to the development and evaluation of the effectiveness of Advertising and sales promotions, (b) creative, production and other costs incurred in connection with the development of Advertising, sales promotions and public relations (as limited by Section (vi) below), both in the market area of the Franchised Restaurant, as reasonably defined from time to time by BKC, and on a national basis, and (c) various methods of delivering the Advertising or promotional message, including without limitation, television, radio,

outdoor and print ("Media"). The allocation of the Advertising Contribution between national, regional and local expenditures shall be made by BKC in its sole business judgment. The Advertising Contribution shall be payable by Franchisee beginning the month following the dates set forth below:

(y) Subject to the Yearly Advertising Contribution Savings described below, during the first four (4) years following the Commencement Date, Franchisee shall pay BKC an Advertising Contribution equal to 3.6% of Gross Sales (the "Reduced Advertising Contribution"). Thereafter, for the balance of the Term, Franchisee shall pay BKC an Advertising Contribution equal to 4.0% of Gross Sales (the "Original Advertising Contribution").

(z) The difference between the Original Advertising Contribution under the previous franchise agreement (4%) and the Reduced Advertising Contribution (3.6%) is hereafter referred to as the "Yearly Advertising Contribution Savings." In each year of the Term of this Agreement, the Yearly Advertising Contribution Savings shall not exceed $6,000.

5. **BK® ePAY**

Section 9.G of the Agreement is hereby amended by adding the following sentence at the end of the paragraph:

In addition, BKC may require payment of Royalty, Advertising Contribution and any other fees required to be paid pursuant to this Agreement using BKC's internet web portal called "BK® ePay."

6. **DEFAULTS**

**A.** **<u>Default of Franchised Restaurant</u>**. Notwithstanding anything to the contrary in Section 4 of this Successor Franchise Addendum:

(i) If Franchisee fails to timely and successfully complete its "Complete 20/20 Remodel," pursuant to that certain ITP2 Master Program Agreement between the parties, but cures such default within ninety (90) days from the earlier of the date Franchisee purported such Complete 20/20 Remodel to be completed or the deadline to successfully complete such Complete 20/20 Remodel under such ITP2 Master Program Agreement, then, with respect to the Franchised Restaurant, the duration of the Reduced Royalty Rate is hereby reduced by one (1) year and the duration of the Reduced Advertising Contribution is hereby reduced by one (1) year, provided that all other terms of Section 4 of this Successor Franchise Addendum remain in full force and effect except to the extent modified by this Section 6 of this Successor Franchise Addendum.

(ii) If Franchisee fails to timely and successfully complete its "Complete 20/20 Remodel," pursuant to that certain ITP2 Master Program Agreement between the parties, and fails to cure such default within ninety (90) days from the earlier of the date Franchisee purported such Complete 20/20 Remodel to be completed or the deadline to successfully complete such Complete 20/20 Remodel under such ITP2 Master Program Agreement, then, with respect to the Franchised Restaurant, the second sentence of Section 2 of this Successor Franchise Addendum is null and void, Franchisee shall pay BKC a Royalty equal to 4.5% of Gross Sales throughout the Term and an Advertising Contribution of 4.0% of Gross Sales throughout the Term (as under the previous franchise agreement and irrespective of any lower Royalty rate or Advertising Contribution rate in Section 4 of this Successor Franchise Addendum), and, because Franchisee's timely and successful

completion of its Complete 20/20 Remodel was a condition precedent to BKC's granting of the financial incentives in Section 4 of this Successor Franchise Addendum,

(a) all benefits provided to Franchisee under this Successor Franchise Addendum, including, but not limited to those set forth in Section 4, shall immediately terminate;

(b) Franchisee shall immediately pay to BKC: the difference between any Reduced Royalty Rate, Early Completion Royalty Rate and Reduced Advertising Contribution and those Royalty and Advertising Contribution amounts which, but for this Successor Franchise Addendum were required to be paid under the Agreement, plus the difference between the then current franchise fee and the reduced franchise fee paid by Franchisee under the Agreement, plus any Open for Business Funds paid to Franchisee under Exhibit B to the Agreement, "Open for Business Funds Policy," plus any BKL capital contributions granted to Franchisee for BKL properties, if any; and

(c) the Term of the Agreement shall be modified to expire on the date the previous franchise agreement for the Franchised Restaurant was originally set to expire; provided, however, if the term of such previous franchise agreement would have already expired as of the date of such modification, then the Agreement shall immediately terminate but Franchisee shall still be liable to BKC for the amounts set forth in clause (b) above.

**B.** <u>**Default of Other ITP2 Program Restaurant(s)**</u>. Notwithstanding anything to the contrary in Section 4 and Section 6.A. of this Successor Franchise Addendum, if Franchisee failed to timely and successfully complete its "Complete 20/20 Remodel" for any other restaurant(s) participating in the "ITP2 Program," pursuant to that certain ITP2 Master Program Agreement between the parties, and failed to cure such default within ninety (90) days from the earlier of the date Franchisee purported such Complete 20/20 Remodel to be completed or the deadline to successfully complete such Complete 20/20 Remodel under such ITP2 Master Program Agreement, then, with respect to the Franchised Restaurant, the duration of the Reduced Royalty Rate is hereby reduced by one (1) year and the duration of the Reduced Advertising Contribution is hereby reduced by one (1) year, provided that all other terms of Section 4 of this Successor Franchise Addendum remain in full force and effect except to the extent modified by this Section 6 of this Successor Franchise Addendum.

This Successor Franchise Addendum is hereby executed by the parties effective on the date indicated above.

**BURGER KING CORPORATION:**

By: [signature]
Print Name: KEREJAQUAH
Its: MANAGER EM

**FRANCHISEE:**

By: [signature]
Print Name: RAMESH P. JETHWA

**EXHIBIT A**

** The actual scope of work required to complete the Interior/Exterior Refresh to bring the Franchised Restaurant into conformance with the Current Image upon the date set forth in Section 3 of the Successor Franchise Addendum will vary depending on the condition of the Franchised Restaurant and the Current Image then in effect on such date.*

**Interior Refresh**

1. Update Front and Drink Station Counters
2. Décor
   - Reconfigure dining room to updated image standard
   - Replace Table Tops
   - Replace seating, booths may not be required
   - Refurbish Booths (new back pads and seats)
3. Interior Walls / Ceiling:
   - Repair Wall Coverings (remove wall paper, repaint, replace wainscot, etc.)
4. Lighting
   - Repair interior lighting to a "like new condition"
5. Menu Boards
   - Paint Interior Menu Board Frame
6. Interior Equipment
   - Drink Machine must be in good working condition
7. Repair / Refurbish Interior Doors
8. Other
   - Install required Merchandising
9. Address all interior repair and maintenance issues according to BKC standards, including, but not limited to, the kitchen / back of house

**Exterior Refresh**
*Note: Building colors match the then current image standards.*

1. Signage:
   - Pylon and Monument Signs.
     - Paint pylon pole / monument base
     - Paint pylon sign cabinet
   - Appendage Signs: Paint Cabinet
   - All signage needs to be compliant with BKC standards and in excellent condition
2. Reader Boards:
   - Paint Cabinet
3. Roof and Wall Mounted Channel Letter Signs
   - Paint Cabinet
4. Directional Signs
   - Paint Pole / Cabinet
5. Parking Lot and Site Conditions.
   - Seal and Stripe Parking Lot or overlay if required
6. Trash Enclosure
   - Paint Trash Enclosure and Gates
7. Playgrounds.
   - Paint playground fence
   - If playground is removed, create additional seating, parking or landscaping area as approved by BKC
8. Building Exterior and Walls

- Paint Walls - Brick / Block as necessary

9. Mansard Roof
   - Light band must be 100% functional and continuous LED lens
10. Update Exterior Merchandising as determined by BKC
11. Comply with all federal, state and local rules and regulations
12. Address all repair and maintenance issues according to BKC standards

# CONDITIONAL CONSENT TO ASSIGNMENT OF FRANCHISE AGREEMENTS AND LEASES

AGREEMENT made this 26 day of February, 2015 but effective 26 Feb., 2015, by and between BURGER KING CORPORATION ("BKC"), the individual, individuals, entity, and/or entities whose names and addresses are set forth on Schedule 1 (individually, the "Assignor" and collectively, the "Assignors"), the individual, individuals, entity, and/or entities whose names and addresses are set forth on Schedule 2 (individually, a "Guarantor" and collectively, the "Guarantors"), the individual, individuals, entity, and/or entities whose names and addresses are set forth on Schedule 3 (individually, an "Assignee" and collectively, the "Assignees"), and the individual, individuals, entity, and/or entities, if any, whose names and addresses are set forth on Schedule 4 (individually, an "Owner" and collectively, the "Owners").

## INTRODUCTION

A. Each Guarantor owns an equity interest in Assignors.

B. Each Assignor is a party to certain franchise agreements (the "Franchise Agreements") with BKC relating to the operation of Burger King Restaurants (the "Restaurants"). A list of the Franchise Agreements and Restaurants is set forth on Schedule 5.

C. Each Assignor may also be a party to certain lease agreements (the "Leases") with BKC whereby Assignors lease the premises upon which certain of the Restaurants are located. A list of the Leases, if any, is set forth on Schedule 5.

D. Guarantors have jointly and severally guaranteed all of the obligations of Assignors to BKC.

E. Each Owner owns an equity interest in Assignees.

F. Assignors and Guarantors have requested that BKC consent to an assignment of the Franchise Agreements and Leases to Assignees.

## COVENANTS AND AGREEMENTS

In consideration of the foregoing, the parties agree as follows:

1. Assignment and Assumption. Each Assignor assigns all of its right, title and interest in the Franchise Agreements, Leases and, if applicable, any Investment Spending Contracts and Franchise Commitments relating to the Restaurants to Assignees, and Assignees assume all of Assignors' duties and obligations under those agreements. BKC consents to this assignment and assumption on the terms and conditions set forth in this Agreement.

2. General Release of BKC. Each of the Owners, Guarantors, Assignors and Assignees jointly and for themselves, their successors, assigns, heirs, personal representatives and affiliates (collectively, the "Releasing Parties") unconditionally and absolutely releases and forever discharges BKC, its successors, predecessors, counsel, insurers, assigns, officers, directors, employees, parent company, affiliates, subsidiaries and agents, past or present (collectively, the "Released Parties") from and against any and all claims, actions, causes of action, demands, damages, costs, suits, debts, covenants, controversies, and any other liabilities, whether known or unknown, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal or equitable, which the Releasing Parties may have that relate to or arise out of this Agreement, the Franchise Agreements, Leases, the operation of the Restaurants, or any other matter, cause or circumstance whatsoever from the beginning of the world through the date of this

Agreement, including without limitation any claim that BKC has made representations regarding any right to exclusive territory or trading areas, the economic viability or profitability of the Restaurants or current or potential sales at the Restaurants.

3. Unlimited Guaranty by Owners. Each Owner agrees to jointly, severally, irrevocably and unconditionally guarantee the payment and performance of all debts, obligations and liabilities of the Assignees to BKC arising pursuant to the Franchise Agreements, Leases, Investment Spending Contracts or any other agreement with BKC relating directly or indirectly to the Restaurants (the "BKC Agreements"), together with all costs of collection, compromise or enforcement, including reasonable attorneys' fees, incurred with respect to any such debts, obligations or liabilities or with respect to this or any other guaranty thereof or any proceeding under the United States Bankruptcy Code or any other proceeding or action affecting the rights of the Assignee's creditors generally (all of the foregoing being referred to collectively as the "Obligations"). This guaranty by the Owners shall continue in full force and effect until Assignees have fully paid and performed all of the Obligations.

4. Partial Release of Assignors and Guarantors. Nothing contained in this Agreement shall (a) release Assignors from continued liability under the Leases or (b) release any Assignor or any Guarantor from its liability for damages for any breach of the Franchise Agreements or Leases prior to the date of this Agreement. Except as provided below, Assignors and Guarantors are released from all other liability to BKC under the Franchise Agreements, unless an Assignor shall remain a franchisee under the Franchise Agreements, in which case such Assignor shall also be liable to BKC for any breach of the Franchise Agreements after the date of this Agreement.

5. Limited Guaranty of Assignors and Guarantors. Each Guarantor and Assignor agrees to jointly, severally, irrevocably and unconditionally guaranty the payment and performance of the Obligations by Assignees. Provided, however, that the guaranty by each Guarantor and Assignor of the obligations of Assignees under the Franchise Agreements only, and not their guaranty of the Obligations of Assignees under the Leases or any of the other BKC Agreements, shall terminate upon the later of (a) one year from the date of this Agreement or (b) the date of payment of the final installment of any purchase money debt owed by Assignees to Assignors, if, and only if, Assignees pay when due all financial obligations to BKC under the BKC Agreements between the date of this Agreement and such termination date, unless an Assignor or Guarantor is also an Owner, in which case this Paragraph shall be inapplicable and Paragraph 3 of this Agreement shall control.

6. General Terms and Conditions of Guaranties. In connection with the guaranties set forth above in Paragraphs 3 and 5 (collectively the "Guaranties"), the Owners, the Guarantors, and the Assignors hereby agree as follows:

(a) The Guaranties shall not be impaired by any modification, supplement, renewal, extension or amendment of the BKC Agreements or any of the Obligations, nor by any modification, release or other alteration of any of the Obligations hereby guaranteed, nor by any agreements or arrangements whatever with Assignees or any one else, nor by BKC's and any Assignee's execution of new franchise agreements which shall supersede and replace any and all of the Franchise Agreements;

(b) The liability of each guarantor hereunder is primary, direct and unconditional and may be enforced without requiring BKC first to resort to any other right, remedy or security;

(c) No guarantor hereunder shall have any right of subrogation, reimbursement or indemnity whatsoever, unless and until the Obligations are paid or performed in full;

(d) If any guarantor hereunder should at any time die, become incapacitated, become insolvent or make a composition, trust mortgage or general assignment for the benefit of creditors, or if a proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally shall be filed or commenced by, against or in respect of any guarantor

hereunder, any and all obligation of that guarantor shall, at BKC's option, immediately become due and payable without notice;

(e) If any payment or transfer to BKC which has been credited against any Obligation, is voided or rescinded or required to be returned by BKC, whether or not in connection with any event or proceeding described in Section 6(d), the Guaranties shall continue in effect or be reinstated as though such payment, transfer or recovery had not been made;

(f) Except as otherwise provided in this Agreement, each of the Guaranties shall be construed as an absolute, unconditional, continuing and unlimited obligation of the each guarantor hereunder without regard to the regularity, validity or enforceability of any of the Obligations, and without regard to whether any Obligation is limited, modified, voided, released or discharged in any proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally;

(g) Any termination of the Guaranties shall be applicable only to Obligations accruing after termination or having their inception after the effective date of such termination and shall not affect Obligations having their inception prior to such date;

(h) The death or incapacity of any guarantor hereunder shall not result in the termination of the Guaranties;

(i) Any and all present and future debts and obligations of the Assignee to any guarantor hereunder are hereby waived and postponed in favor of and subordinated to the full payment and performance of the Obligations;

(j) Each guarantor hereunder waives to the greatest extent permitted by law: notice of acceptance hereof; presentment and protest of any instrument, and notice thereof; notice of default or intent to accelerate; notice of foreclosure; notice of any modification, release or other alteration of any of the Obligations or of any security therefor and all other notices to which any guarantor hereunder might otherwise be entitled; and

(k) Each guarantor hereunder waives to the greatest extent permitted by law: any defense arising by virtue of the lack of authority, death or disability of such guarantor or any Assignee; or any defense based upon an election of remedies by BKC which destroys or otherwise impairs the subrogation rights of such guarantor or the right of such guarantor to proceed against the Assignees for reimbursement, or both.

7. Operating Partner. The person set forth on Schedule 6 hereto is designated as the Assignees' "Operating Partner" under each of the Franchise Agreements.

8. No Default. Each Assignor represents and warrants that the Assignor is not in default under the Franchise Agreements, Leases, or any of the BKC Agreements.

9. Compliance with Guidelines. Assignors, Assignees, Guarantors and Owners each represent and warrant that they have complied with the Guidelines for Preparation of Corporate Governing Instruments or Guidelines for Approval of Franchisee Ownership Distribution Plans, if applicable.

10. Equity Ownership and Transfer Restrictions.

(a) Assignees and Owners each hereby represent and warrant that the equity ownership of the Assignees is as set forth on Schedule 7 and that they shall each comply with all of the provisions of the Franchise Agreements regarding restrictions on the transfer, pledge and encumbrance of equity interests in Assignees.

(b) Any breach of the provisions of this Paragraph 10 shall constitute a material default under each of the BKC Agreements.

11. Proprietary Information, Etc. Assignees, Assignors, Owners, and Guarantors each represent and warrant that they shall comply and continue to comply with all of the provisions of the Franchise Agreements regarding the confidentiality of all proprietary property and information the restriction on the use of such information, and the limitation on competition with BKC. Any breach by any party of its obligations under this Paragraph 11 shall also constitute a material default under each of the BKC Agreements.

12. Accounts Receivable/Transfer Fee. Assignees, Assignors, Guarantors, and Owners each acknowledge and agree that the transfer fee and any New Franchisee Training Fee set forth in the Franchise Agreements and all currently due or past due charges payable to BKC must be paid in full upon execution of this Agreement, and that:

(a) There are certain charges, including royalties, advertising contributions, rent, real estate taxes, investment spending and other charges under the Franchise Agreements and Leases which have accrued, been assessed or otherwise become liabilities under the BKC Agreements, but are not yet due;

(b) Each Assignee, Assignor, Guarantor, and Owner is jointly and severally liable for such charges;

(c) BKC currently expects that Assignee shall pay such charges when due;

(d) Any proration, escrow or prepayment of such charges is the Assignees' sole responsibility;

(e) The failure to so prorate, escrow or prepay shall not excuse Assignees from paying such charges when due; and

(f) BKC has made no representation or warranty that such charges do not exist or exist in a specific amount.

13. Franchise Application. Assignees and Owners each represent and warrant that the representations set forth in their applications to BKC for approval as a BKC franchisee and for approval of the transaction referenced in Paragraph F above are true and correct as of the date hereof.

14. Miscellaneous.

(a) Choice of Law; Jurisdiction and Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida. The parties hereto acknowledge and agree that the United States District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Court (or its successor) in and for Dade County, Florida, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising, either directly or indirectly, under or in connection with this Agreement, the Franchise Agreements, Leases, related documentation, or any other agreement with BKC, and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement, related documentation or any other agreement between BKC and Assignor, Assignee, Owners, and/or Guarantors in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

(b) Amendment. This Agreement and the other documents being executed and delivered pursuant hereto constitute the full and entire agreement and understanding between the parties

hereto with respect to the subject matter hereof. No amendment hereto shall be effective unless it is in writing and signed by all of the parties hereto.

(c) Binding Effect. Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, successors, assigns, executors, personal representatives and administrators.

(d) Headings. The headings of the provisions of this Agreement are for convenience or reference only and are not to be considered in construing this Agreement.

(e) Severability. If one or more of the provisions contained in this Agreement or in any document contemplated hereby, or any application thereof, shall be invalid, illegal or unenforceable, in any respect under the laws of any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein and therein, and any application thereof, shall not in any way be affected or impaired thereby or under the laws of any other jurisdiction.

(f) Integration. This Agreement incorporates all prior discussions and negotiations among the parties hereto and constitutes the entire agreement among the parties hereto with respect to the subject matter of this Agreement. There are no other agreements of any kind whether oral or in writing between BKC and any other party, with respect to the matters covered herein.

(g) Assignability. The parties each agree that the rights and obligations of BKC under this Agreement and any related agreement shall be freely assignable by BKC without the consent of any other party. The other parties may not assign their rights or obligations under said agreements.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as a document under seal dated as of the day and year first written above.

**BURGER KING CORPORATION**

By: ____________________
Print Name: REKELA OCWA
Its: MANAGER, PCM

**OWNERS:**

____________________
Ramesh P. Jethwa

**GUARANTORS:**
N/A

[SIGNATURES TO CONTINUE ON THE NEXT PAGE]

BK # 6090/JP/02/09/2015

**ASSIGNORS:**

______________________
Ramesh P. Jethwa

**ASSIGNEES:**

**J. F. M. 6090, Inc.**
a New Jersey corporation

By: ______________________
Print Name: RAMESH P. JETHWA
Title: PRESIDENT

**SCHEDULE 1**
**TO CONSENT TO ASSIGNMENT**

| Assignors | Address | Percentage of Ownership |
|---|---|---|
| Ramesh P. Jethwa | 6 Wills Avenue<br>Wayne, New Jersey<br>07470 | 100% |

**SCHEDULE 2**
**TO CONSENT TO ASSIGNMENT**

| Guarantors | Address |
|---|---|
| N/A | |

**SCHEDULE 3**
**TO CONSENT TO ASSIGNMENT**

| Assignees | Address | Percentage of Ownership |
| --- | --- | --- |
| **J. F. M. 6090, Inc.** | P.O. Box 1130<br>West Paterson, NJ<br>07242-8130 | 100% |

**SCHEDULE 4**
**TO CONSENT TO ASSIGNMENT**

| Owners | Address |
| --- | --- |
| Ramesh P. Jethwa | 6 Wills Avenue<br>Wayne, New Jersey<br>07470 |

**SCHEDULE 5**
**TO CONSENT TO ASSIGNMENT**

| BK # | Address | Date of Franchise Agreement | Date of Amendments If Any | Date of Lease If Any | Date of Amendments If Any |
|---|---|---|---|---|---|
| 6090 | 12-14 Spruce Street, Paterson, New Jersey 07501-1712 | February 26, 2015 | N/A | N/A | N/A |

**SCHEDULE 6**
**TO CONSENT ASSIGNMENT**

Operating Partner: Ramesh P. Jethwa

**SCHEDULE 7**

**TO CONSENT TO ASSIGNMENT**

Equity Ownership in Assignee:

| Owner | Type of Equity Interest | Percentage Ownership |
|---|---|---|
| Ramesh P. Jethwa | Voting Common Stock/ Membership Interest | 100% |

# EXHIBIT D

# SETTLEMENT AGREEMENT

THIS AGREEMENT (the "Agreement") executed this 31st day of July, 2023 (the "Effective Date"), by and among **BURGER KING COMPANY LLC**, a Florida limited liability company, whose principal place of business is 5707 Blue Lagoon Drive, Miami, Florida 33126 ("BKC"), the franchisee entities listed on Schedule "1" attached hereto (each a "Franchisee" and collectively, the "Franchisees"), whose principal place of business is 2 Market Street, 2nd Floor, Paterson, New Jersey 07501, and **RANJANA JETHWA**, in an individual capacity and as the representative of the Estate of Ramesh Jethwa ("Guarantor," and together with BKC and Franchisee, the "Parties").

## WITNESSETH

WHEREAS, Franchisees and BKC entered those certain BURGER KING® Restaurant Franchise Agreements described on Schedule "1" attached hereto (each, a "Franchise Agreement", and collectively, the "Franchise Agreements") for BURGER KING® Restaurants enumerated on Schedule "1" attached hereto (each, a "Franchised Restaurant", and collectively, the "Franchised Restaurants"); and

WHEREAS, Guarantor, pursuant to certain Owner's Guarantees and Conditional Consents to Assignment of Franchise Agreement enumerated on Schedule "1" attached hereto, personally, unconditionally and irrevocably, guaranteed the payment and performance of all of the obligations of Franchisees in any agreement with BKC relating to the Franchised Restaurants except with respect to Restaurant Number 6090; and

WHEREAS, Franchisees and Guarantor, jointly and severally, are hereinafter collectively referred to as the "Licensee" or "Licensees;" and

WHEREAS, in BKC's view, Licensee is currently in default of the Franchise Agreements as a result of Licensee's failure to transfer the interest of Mr. Ramesh Jethwa in the Franchisees within 24 months of his death; and

WHEREAS, the Licensees dispute and deny the existence of any default under the Franchise Agreements; and

WHEREAS, on or about January 8, 2022, BKC, Guarantor and JFM Carlstadt 19850, LLC ("JFM Carlstadt"), an affiliate of Franchisees, entered into that certain Agreement of Cancellation and Termination of Franchise Agreement and General Release (the "Carlstadt Termination Agreement") pursuant to which BKC consented to an early termination of the Franchise Agreement for Burger King® Restaurant #25964 located at 245 Market Street, Paterson, NJ 07505 (the "Paterson Restaurant") and the waiver of $206,144.00 of future income due with respect to the Paterson Restaurant (the "Paterson Future Income") provided JFM Carlstadt and Guarantor meet certain conditions set forth in Carlstadt Termination Agreement; and

WHEREAS, Guarantor and JFM Carlstadt are in default of the Carlstadt Termination Agreement for failing to (i) sell BURGER KING® Restaurants #1877, 10481 and 13439 to a purchaser approved by BKC by no later than November 30, 2022 as set forth in the Carlstadt Termination Agreement, (ii) name a new Managing Owner or Operating Partner, as applicable, for each of the Franchised Restaurants approved by BKC pursuant to BKC's current criteria for approving Managing Owners or Operating Partners, (iii) submit to BKC such information and documentation as is required by BKC to evidence any transfer of ownership interests in the Franchisees that occurred prior to the effective date of the Carlstadt Termination Agreement in accordance with, and subject to the condition set forth in, Section 15 of each Franchise Agreement, and (iv) make payment to BKC of any portion of the Paterson Future Income as required pursuant the Carlstadt Termination Agreement; and

WHEREAS, BKC is not waiving its position that Mrs. Ranjana Jethwa has not been approved by BKC as the Managing Owner of the Franchised Restaurants and does not meet BKC's qualifications to be approved as the Managing Owner of the Franchised Restaurants (the "Existing Default); and

WHEREAS, before the Effective Date of this Agreement, JFM Hamburg, LLC ("JFM Hamburg"), an affiliate of Franchisees, filed a voluntary chapter 11 petition on January 4, 2023 (the "Petition Date"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"), commencing Case No. 23-10057 (JKS) (the "Bankruptcy Case"); and

WHEREAS, also on the Petition Date, JFM Hamburg filed a Verified Complaint for Injunctive and Declaratory Relief, commencing Adversary Proceeding No. 23-1004 (JKS) (the "Adversary Proceeding") seeking, *inter alia*, to enjoin Popeyes Louisiana Kitchen, Inc., an affiliate of BKC, from terminating JFM Hamburg's Popeyes Louisiana Kitchen Franchise Agreement dated December 16, 2008; and

WHEREAS, the Guarantor, JFM Hamburg and PLK engaged in settlement negotiations with the assistance of the Subchapter V Trustee appointed in the Bankruptcy Case, and resolved their respective disputes including as set forth in the Adversary Proceeding, subject to Bankruptcy Court approval and the Parties' entering into this Agreement (the "JFM Hamburg Settlement Agreement").

NOW THEREFORE, with the intent of being legally bound hereby, in consideration of the mutual covenants and promises hereinafter set forth, and other good and valuable consideration, which the parties acknowledge is sufficient to create a legally binding agreement, the Parties agree as follows:

## I. ACKNOWLEDGMENTS AND WAIVERS

A. The Parties agree that all of the above recitals are true and correct and are hereby incorporated by reference as if each were fully set forth herein.

B. Licensee acknowledges, agrees, and confirms that they have no further authority or right to operate any of the Franchised Restaurants except as specifically set forth in this Agreement.

C. Licensee further acknowledges and agrees that any support given by BKC to the Franchised Restaurants prior to the execution of this Agreement is not a waiver of BKC's rights under the Franchise Agreements, or any other agreement between Licensee and BKC (collectively, the "Burger King Agreements") or the law and shall not be deemed to be so.

D. Licensee acknowledges and agrees that, subject to the terms herein, BKC shall have the right to disclose to any potential operator or purchaser of the Franchised Restaurants operated by Licensee any information, financial statements, scopes of work, report, schedules, analysis or agreements supplied to or prepared by BKC or by Licensee and their lenders, landlords, accountants, lawyers and advisors regarding the Franchised Restaurants or any related assets (including assets controlled by related or affiliated companies). Licensee agrees that any confidentiality provisions under any agreement they have with BKC shall be deemed waived with respect to any restrictions those provisions may have on BKC disclosing such information to any potential operator or purchaser of the Franchised Restaurants.

E. Notwithstanding the termination of the Franchise Agreements on the terms and conditions set forth herein, and except with respect to Restaurant # 11649 located at 3623 Palisades Center Dr. West Nyack, NY 10994 (the "Palisades Center Location"), which BKC has consented to an early closure without any early closure or termination penalty or payment of future income with respect thereto, Licensee shall have a temporary license to operate the Franchised Restaurants in accordance with the terms of the terminated Franchise Agreements until the Sale Date (as hereinafter defined), so as to provide Franchisee with an opportunity to sell the Franchised Restaurants in accordance with the terms of this Agreement.

F. The Franchise Agreement for the Palisades Center Location is hereby terminated as of the Effective Date of this Agreement and JFM Nyack LLC shall comply with all of the post-termination covenants set forth in the Franchise Agreement for the Palisades Center Location; provided, however Licensees acknowledge and agree that, from and after the Effective Date, BKC may freely engage in conversations with JFM Nyack LLC's former landlord at the Palisades Center Location to facilitate the leasing and franchising of the Palisades Center Location to any approved BURGER KING ® franchisee that may desire to continue to operate a BURGER KING® Restaurant at such location.

G. Licensee warrants and represents that this Agreement constitutes a valid and binding obligation enforceable in accordance with its terms.

## II. LIMITED LICENSE

A. Termination of Franchise Agreements. The Parties acknowledge and agree that the Franchise Agreements are terminated effective at 12:01 a.m. on the Effective Date of this Agreement (the "Termination Date"), and the rights as granted therein are of no further force and effect except as specifically set forth in this Agreement.

B. Limited Right to Operate. Except with respect to the Palisades Center Location, BKC hereby grants Licensee a limited license (the "Limited License") to continue to operate the Franchised Restaurants from the Termination Date for a period through and including May 31, 2025 (the "Sale Date") on the same terms and conditions (other than term and right of successor or renewal) as originally set forth in the Franchise Agreements.

C. Extension of the Sale Date. Licensee acknowledges and agrees that BKC has no obligation to extend the Sale Date except as set forth in this Article II. C., and that Licensee has no right to, or expectation of, any extension of the Sale Date beyond the date set forth above.

1. Without limiting the generality of the foregoing, if Licensee presents BKC with one or more "Bona Fide Asset Purchase and Sale Agreements" (as defined in Article IV. B.) on or before the Sale Date (the "Bona Fide Offer") and the proposed sale transaction(s) are not approved or disapproved by BKC prior to the expiration of the Sale Date, then the Sale Date shall be extended until such time as BKC approves or disapproves the Bona Fide Offer sale transaction(s).

2. If BKC approves the proposed Bona Fide Offer sale transaction(s), the Sale Date shall be further extended through the closing date established in accordance with the terms of this Agreement.

3. If BKC disapproves the proposed Bona Fide Offer sale transaction(s), then the Sale Date shall expire on the Sale Date.

D. Terms Controlling Limited License. All terms of the Franchise Agreements (other than term and right of successor or renewal) not inconsistent with this Agreement are incorporated herein and shall be binding between BKC and Licensee.

## III. THE PARTIES' OBLIGATIONS

In consideration of agreeing to enter into this Agreement, the Parties unconditionally and irrevocably agree that they shall be bound by all terms and conditions in the Franchise Agreements except as such terms are specifically modified herein.

## IV. SALE OF THE FRANCHISED RESTAURANTS

A. The Parties acknowledge and agree that, except as specifically set forth in this Agreement, the Franchisees' right to sell the Franchised Restaurants as BURGER KING® Franchised Restaurants is subject to and controlled by the terms of the Franchise Agreements. Licensee must sell the Franchised Restaurants to one or more existing BURGER KING® franchisees with existing operations in the Franchised Restaurants' local marketing area(s) that BKC has determined are eligible for expansion under BKC's internal expansion policy and that receives approval with respect to the proposed transaction(s) (each, a "Proposed Purchaser") by timely submitting one or more Bona Fide Purchase and Sale Agreements to BKC for approval. Licensee acknowledges and agrees that no current shareholder, investor, partner, beneficial owner, and/or equitable owner of any of the Franchised Restaurants shall have any ownership interest as shareholder, partner, investor, beneficial owner, and/or equitable owner of any Proposed Purchaser of the Franchised Restaurants. Licensee further agree that Licensee must hire a licensed broker for the sale the Franchised Restaurants by no later than the date that is sixty (60) days following the Effective Date.

B. Licensee further agrees that its right to sell the Franchised Restaurants under this Agreement is subject to the following express conditions:

1. For purposes of this Agreement, a "Bona Fide Purchase and Sale Agreement" means a purchase and sale agreement (1) containing all terms, conditions, and obligations of sale including, without limitation, those required of the Proposed Purchaser and Licensee pursuant to this Agreement; (2) accompanied by all applications and financial data set forth in this Agreement; and (3) executed by Licensee and the Proposed Purchaser.

2. The sale of the Franchised Restaurants must be accomplished in accordance with BKC's standard documents used in connection with a sale of a franchised BURGER KING® Franchised Restaurant including all appropriate applications and associated documentation to be completed by the Proposed Purchaser.

3. Licensee acknowledges and agrees that the sale transaction(s) must be approved in accordance with BKC's current franchise approval process and standards, that no closing shall occur without BKC's standard approval process for sales of a franchised BURGER KING® Franchised Restaurant from franchisee-to-franchisee, and that the sale of the Franchised Restaurants shall close no later than the earlier of 30 calendar days after BKC approves the sale transaction(s) should BKC approve the transaction(s) or the Sale Date.

C. Licensee acknowledges and agrees that BKC may not approve any proposed Bona Fide Purchase and Sale Agreement that also does not contain the Proposed Purchaser's agreement to:

1. pay all applicable transfer fees and other fees associated with a sale of a BURGER KING® Franchised Restaurant at closing to BKC;

2. execute a general release in favor of BKC in the form provided by BKC;

3. complete, on or before the date noted on the franchisee-to-franchisee walk-through inspection report or otherwise in writing by BKC, all reasonable remodeling and deferred repair and maintenance items for the Franchised Restaurants as required by BKC within a reasonable period of time following the execution of this Agreement; and

4. execute BKC's then current BURGER KING® Restaurant Franchise Agreement for the BURGER KING® system at the closing of the sale of the Franchised Restaurants.

D. Licensee authorizes BKC to provide to the Proposed Purchaser(s) all information regarding historical gross sales at the Franchised Restaurants, past and present operational issues existing at the Franchised Restaurants, and all remodeling, repair, and maintenance issues existing at the Franchised Restaurants.

E. Licensee acknowledges and agrees that BKC has not made, and does not make, any assurances that the proposed sale transaction(s) will be approved, and that BKC's strict adherence to its standard criteria or policies in approving the Proposed Purchaser(s) or the Bona Fide Asset Purchase Agreement(s) shall never be deemed a breach of this Agreement.

F. Should BKC approve the proposed Bona Fide Purchase and Sale Agreement, BKC will issue to the Proposed Purchaser(s), at closing, the then current BURGER KING® Restaurant Franchise Agreement for the BURGER KING® system for a term which shall be coterminous with the terminated Franchise Agreement for each of the Franchised Restaurants.

G. Licensee acknowledges and agrees that any sale of the Franchised Restaurants is subject to BKC's right of first refusal, including, without limitation the following terms and conditions:

1. BKC shall have 30 days after receipt of (1) the Bona Fide Purchase and Sale Agreement, (2) all appropriate applications and associated documentation to be completed by the Proposed Purchaser, and (3) all reasonably requested information from the Proposed Purchaser to notify Licensee of its intent to exercise its right of first refusal;

2. Licensee acknowledges and agrees that it will not include any term which is either unreasonable or unrelated to the operation of the Franchised Restaurants in the Bona Fide Purchase and Sale Agreement(s). Further, if the proposed transaction(s) include assets of Licensee or terms not related to the operation of the Franchised Restaurants, BKC may elect, at its option, to purchase only those assets of Licensee related to the operation of the Franchised Restaurants and/or to reject any term not related to the operation of the Franchised Restaurants (i.e. BKC may reject management, employment, or consulting agreements and real property or equipment unrelated to the operation of the Franchised Restaurants); and

3. In the event BKC exercises its right of first refusal as set forth in the Franchise Agreements to acquire the Franchised Restaurants and BKC is unable to close the purchase on or before the date on which the relevant limited license expires, then the limited license for the Franchised Restaurants shall be extended until the closing date reasonably established by BKC.

H. BKC acknowledges and agrees that in connection with the settlement of the Bankruptcy Case and Adversary Proceeding, JFM Hamburg and PLK have agreed to permit JFM Hamburg to sell PLK #10895 to a purchaser approved by PLK by no later than August 31, 2023 (the "PLK Sale"). If, in connection with such a sale of PLK #10895 to a PLK-approved purchaser, Licensee desires to sell the adjoining premises at which BURGER KING® Restaurant #9526 ("BK #9526) is located jointly therewith to such an approved purchaser, BKC shall consent to an early closure of BK #9526 without any early closure or termination penalty or payment of future income with respect thereto.

I. Licensee covenants and agrees that, at the closing of the PLK Sale, JFM Hamburg and Licensee shall instruct the closing/escrow agent for such PLK Sale to remit a portion of the sale proceeds in the amount of $200,000.00 (the "Escrowed Funds") to an escrow agent (the "Escrow Agent") reasonably acceptable to BKC and Licensee. The Escrowed Funds shall be held and disbursed by Escrow Agent in accordance with the provisions of this Section IV.I as follows:

1. At the closing of the sale of each of the following four (4) Franchised Restaurants to a Proposed Purchaser pursuant to a Bona Fide Purchase and Sale Agreement, Escrow Agent shall disburse to Licensee $50,000.00 from the Escrowed Funds per each such Franchised Restaurant being sold in accordance with the terms of this Agreement: BURGER KING® Restaurants #1877, 6090, 10481, and 13439 (collectively, the "Escrow Restaurants").

2. In the event Licensee (i) fails to sell any of the Escrow Restaurants to a Proposed Purchaser by the Sale Date pursuant to a Bona Fide Purchase and Sale Agreement, (ii) closes or abandons any such Escrow Restaurant for any reason without the prior written consent of BKC at or prior to the Sale Date, or (iii) commits any Default (as hereinafter defined) under this Agreement and fails to cure such Default before the Cure Date (as hereinafter defined) resulting in a termination of this Agreement in accordance

with the provisions of Section V.C. below, any remaining Escrowed Funds being held by Escrow Agent upon the earlier of the Sale Date or termination date of this Agreement, as applicable, shall promptly be disbursed to BKC as a reduced sum representing a portion of the net present value of BKC's expected future income under the terminated Franchise Agreements for the Escrow Restaurants.

## V. DEFAULT AND TERMINATION

A. Default

Licensee acknowledges and agrees that its failure to (1) comply with any term of the Burger King Agreements (as modified herein) other than the Existing Default or (2) comply with any term or condition of this Agreement is a "Default."

B. Notice and an Opportunity to Cure a Default

Upon the occurrence of a Default during the term of this Agreement and after written notice of such default by BKC to Licensee, Licensee shall have the earlier of either the time period provided for under the Franchise Agreement (as incorporated herein) or the expiration of the Limited License, in which to cure the Default, whichever period is shorter.

C. Effect of Failure to Timely Cure Default

Should Licensee commit any Default and fail to timely cure such Default, then the Limited License and all rights conferred thereby will automatically terminate upon written notice as of the day immediately following the expired cure period (the "Cure Date"). Additionally, BKC shall be entitled following written notice to Licensee to the immediate entry of a judgment against Licensee for (a) damages for all unpaid sums due and owing under this Agreement and all other sums due BKC including, without limitation, prejudgment interest, (b) permanent injunctive relief with respect to Licensee's operation of the Franchised Restaurants, and (c) an award to BKC of reasonable attorneys' fees and costs incurred by BKC. Licensee agrees that BKC may prove all such amounts and facts ex parte by affidavit or declaration, as appropriate. Finally, should Licensee fail to cure any Default before the Cure Date, BKC may immediately seek to enforce its rights and remedies under this Agreement, at law or in equity, whether to enforce the payment of sums due under this Agreement or the Burger King Agreements, or to enforce any other legal or equitable rights or remedies BKC may have. Without limiting the foregoing, should Licensee commit any Default, BKC may, in its sole and absolute discretion upon written notice to Licensee, elect to solely terminate with immediate effect the Limited License and all rights conferred thereby for the Franchised Restaurant with respect to which the Default occurred, whereupon Licensee shall have no further right to operate such Franchised Restaurant.

D. Improper Sale

Licensee specifically acknowledges and agrees that any transfer, sale, conveyance, or assignment made in violation of this Agreement shall constitute a Non-Curable Default and is a material breach of this Agreement. Upon such breach, BKC is immediately entitled following written notice to any and all remedies permitted by law or equity, including injunctive relief to enjoin any such unauthorized transfer, sale, conveyance, or assignment.

E. Irreparable Harm

Licensee acknowledges and agrees that monetary damages will be inadequate to remedy the damage caused to BKC in the event that Licensee operates any Franchised Restaurant after the termination of the Limited License without BKC's written authorization. Accordingly, Licensee acknowledges and agrees that BKC is entitled to injunctive relief including the issuance of a temporary restraining order and/or preliminary injunction issued by a court of competent jurisdiction. In light of the nature of this Agreement and the potential need for BKC to take prompt action to abate a dangerous condition and/or mitigate the damage to its trademarks and service marks, Licensee acknowledges and agrees that any bond required by the court issuing injunctive relief to BKC shall be in a nominal amount not to exceed $5,000.

F. Failure to Terminate

BKC's failure to terminate the Limited License granted herein and/or seek a judgment in accordance with this Agreement upon any occurrence of a Default, or termination will not constitute a waiver or otherwise affect the right of BKC to terminate the Limited License and seek the judgment contemplated herein because of either a continuing or subsequent Default.

## VI. RELEASES

IN FURTHER CONSIDERATION OF BKC'S EXECUTION OF THIS AGREEMENT, LICENSEE, ITS SUCCESSORS, ASSIGNS, HEIRS, PERSONAL REPRESENTATIVES AND AFFILIATES (INDIVIDUALLY AND COLLECTIVELY, THE "RELEASING PARTIES"), REMISE, RELEASE, ACQUIT, SATISFY AND FOREVER DISCHARGES BKC, ITS SUCCESSORS, PREDECESSORS, COUNSEL, INSURERS, ASSIGNS, OFFICERS, DIRECTORS, EMPLOYEES, PARENT, FRANCHISEES, AFFILIATES, SUBSIDIARIES AND AGENTS, PAST AND PRESENT (INDIVIDUALLY AND COLLECTIVELY, THE "RELEASED PARTIES") FROM AND AGAINST ALL CLAIMS, ACTIONS, CAUSES OF ACTION, DEMANDS, DAMAGES, COSTS, SUITS, DEBTS, COVENANTS, CONTROVERSIES, AND ANY OTHER LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, LIQUIDATED, FIXED, CONTINGENT, MATURED, UNMATURED, DISPUTED, UNDISPUTED, LEGAL OR EQUITABLE (HEREINAFTER "CLAIMS"), WHICH THE RELEASING PARTIES EVER HAD, NOW HAVE, CAN, SHALL OR MAY HAVE, AGAINST ANY OR ALL OF THE RELEASED PARTIES FOR, UPON OR BY REASON OF

ANY MATTER, CAUSE OR THING WHATSOEVER, FROM THE BEGINNING OF THE WORLD TO THE DATE OF THIS AGREEMENT. LICENSEE, ON BEHALF OF ITSELF AND THE RELEASING PARTIES, WAIVE ANY RIGHTS AND BENEFITS CONFERRED BY ANY APPLICABLE PROVISION OF LAW EXISTING UNDER ANY FEDERAL, STATE OR POLITICAL SUBDIVISION THEREOF WHICH WOULD INVALIDATE ALL OR ANY PORTION OF THE RELEASE CONTAINED IN THIS AGREEMENT BECAUSE SUCH RELEASE MAY EXTEND TO CLAIMS THAT THE RELEASING PARTIES DO NOT KNOW OR SUSPECT TO EXIST IN THEIR FAVOR AT THE TIME OF EXECUTION OF THIS AGREEMENT.

BKC HEREBY RELEASES, DISCHARGES AND AGREES NOT TO SUE OR PROCEED IN ANY MANNER AGAINST THE LICENSEE OF AND FROM ANY AND ALL CLAIMS OR CAUSES OF ACTION AND DAMAGES WHICH BKC HAD, NOW HAVE, OR MAY HAVE, AGAINST ANY OR ALL OF THE LICENSEES, FROM THE BEGINNING OF TIME UNTIL THE DATE OF THIS AGREEMENT, ONLY WITH RESPECT TO THE BANKRUPTCY CASE, THE ADVERSARY PROCEEDING, THE CARLSTADT TERMINATION AGREEMENT, THE FRANCHISE AGREEMENTS AND THE GUARANTEES. NOTWITHSTANDING THE FOREGOING, BKC SPECIFICALLY RETAINS ITS RIGHT TO SUE LICENSEES FOR: (1) ENFORCEMENT OF ITS POST-TERMINATION RIGHTS AS SET FORTH IN THE FRANCHISE AGREEMENTS, INCLUDING BUT NOT LIMITED TO LICENSEE'S INDEMNIFICATION OBLIGATIONS AND COVENANTS NOT TO COMPETE; (2) ANY FRAUD OR MISREPRESENTATION COMMITTED BY LICENSEES ARISING PRIOR TO THE DATE OF THIS AGREEMENT, TO THE EXTENT SUCH FRAUD OR MISREPRESENTATION WAS RELIED UPON BY BKC AS AN INDUCEMENT TO ENTER INTO THIS AGREEMENT; AND/OR (3) ENFORCEMENT OF THE TERMS OF THIS AGREEMENT.

## VII. WAIVER OF RIGHT TO TRIAL BY JURY

THE PARTIES HERETO EACH HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE THE RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT, THE FRANCHISE AGREEMENTS, OR ANY OTHER AGREEMENT AMONG BKC AND LICENSEES, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY TO THIS AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING THIS AGREEMENT.

## VIII. JURISDICTION AND VENUE

A. The Parties acknowledge and agree that this Agreement is deemed entered into in Miami, Florida and is governed by Florida law, and that the U.S. District Court for the Southern District of Florida shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising, either directly or indirectly, under or in connection with this Agreement. If such court lacks jurisdiction, then the 11th Judicial

Circuit (or its successor) in and for Miami-Dade County, Florida shall be the exclusive venue and proper forum for any such case or controversy.

B. The Parties further agree that, in the event of litigation arising out of or in connection with this Agreement in these courts, they will neither contest nor challenge the jurisdiction or venue of these courts.

C. To the extent there is a conflict between this Agreement and the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 et seq. (the "NJFPA"), this Agreement shall govern.

## IX. NOTICE

All notices, consents, or other communications under this Agreement must be in writing and shall be deemed sufficiently given if delivered or sent via a nationally-recognized overnight delivery service or registered or certified mail, postage fully prepaid, as follows:

If to BKC:
Burger King Company LLC
Post Office Box 020783
Miami, Florida 33102
Attn: Legal Department

If to Licensee:
2 Market Street, 2nd Floor,
Paterson, New Jersey 07501

Notice shall be deemed delivered upon receipt of the overnight delivery or the registered or certified mail delivery.

## X. GENERAL

A. This Agreement has been prepared after extensive negotiations between the parties hereto, and if any ambiguity is contained herein then in resolving such ambiguity no weight shall be given in favor of or against any party on account of its drafting this Agreement.

B. All of the provisions of this Agreement shall be binding upon the respective parties, their heirs, and assigns.

C. This Agreement may be executed in one or more counterparts and by different parties in separate counterparts. All of such counterparts shall constitute one and the same agreement and shall become effective when one or more of the counterparts of this Agreement have been signed by each of the signatories. The parties may execute this

Agreement in any number of actual or telecopied counterparts and by the different parties on separate counterparts, each of which when so executed shall be an original.

D. The parties to this Agreement have had the opportunity to consult with legal counsel and have reached this agreement to resolve the matters set forth herein, and agree to enter into this Agreement as evidence of that resolution. Licensees specifically acknowledge and agree that their counsel advised them of the legal risks associated with the general release set forth above, and that they, with knowledge of the risks and upon advise of counsel, fully released BKC of all unknown and unanticipated claims arising from their relationship.

E. No party to this Agreement has relied upon any oral statement or agreement in making the decision to execute this Agreement. Licensees represent and warrant that they have reviewed with their attorney the financial and legal risks associated with entering into this Agreement, including the general release, and releasing BKC from any and all known and unknown claims arising from their relationship, and that they are entering this Agreement freely, and with knowledge and acceptance of such risks.

F. The foregoing constitutes the entire agreement of the parties with respect to the matter stated herein and there are no other oral or written agreements between the parties which are supplemental or contrary to this Agreement. There are no contemporaneous oral promises, representations, or agreements not set forth herein inducing entry into this Agreement and all prior negotiations, discussions, statements, and representations are merged herein. This Agreement may only be modified by a written modification signed by each party. Reliance by any party on oral communications accordingly is unwarranted.

G. In the event that any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect or for any reason, the validity, legality, and enforceability of any provision in every other respect and of the remaining provisions of this Agreement shall not be in any way impaired.

F. The effectiveness of this Agreement is subject to the execution of the JFM Hamburg Settlement Agreement by the parties thereto, as well as the approval of the JFM Hamburg Settlement Agreement by the United States Bankruptcy Court for the District of New Jersey.

[NO FURTHER TEXT ON THIS PAGE]

READ, ACKNOWLEDGED, AND AGREED TO as of the date first above written.

**BURGER KING COMPANY LLC,**
a Florida limited liability company

By: [signature]
Name: .........Clayton Lawrence
Title: .........General Manager, Northeast Division

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was acknowledged before me this 31 day of July 2023, by Clayton Lawrence as General Manager of Burger King Company LLC, a Florida limited liability company. He/She is personally known to me or has produced a __________ as identification.

(SEAL)

SHARALEA ANDRADE
MY COMMISSION # GG 980779
EXPIRES: June 20, 2024
Bonded Thru Notary Public Underwriters

[signature: Sharalea Andrade]
Notary Public
My Commission Expires: 6/20/24

[SIGNATURES CONTINUE ON NEXT PAGE]

[SIGNATURES CONTINUE]

Ranjana Rjethwa

Ranjana Jethwa, in her individual capacity
and as the representative of
Ramesh Jethwa's Estate

State of New Jersey
)ss
County of Passaic)

SWORN TO AND SUBSCRIBED before me this 31th day of July, 2022 by Ranjana Jethwa who is personally known to me or did present Driver License as identification.

Notary Public
Commission Stamp:

DANIEL ALBARRAN
Notary Public, State of New Jersey
My Commission Expires Dec 15, 2027

7/31/23

[SIGNATURES CONTINUE ON NEXT PAGE]

[SIGNATURES CONTINUE]

**JFM SPARTA, LLC**, a New Jersey limited liability company

By: Rayjana Rjethwa
Title: ____________________

Attest: ____________________
Title: ____________________

STATE OF New Jersey
COUNTY OF Passaic

BEFORE ME, the undersigned authority, personally appeared Rayjana Jethwa and ____________________ to me well known and known to me to be the individuals described in and who executed the foregoing instrument on behalf of JFM Sparta LLC, a New Jersey limited liability company, and severally acknowledged to and before me that they executed such instrument and that the seal affixed to the foregoing instrument is the corporate seal of said corporation, and that it was affixed to said instrument by due and regular corporate authority, and that said instrument is the free act and deed of said corporation.

WITNESS my hand and official seal this 31th day of July, 2023.

(SEAL)

____________________
Notary Public
My Commission Expires:

DANIEL ALBARRAN
Notary Public, State of New Jersey
My Commission Expires Dec 15, 2027

7/31/23

[SIGNATURES CONTINUE]

**J.F.M. 6090, Inc.**, a New Jersey corporation

By: Ranjana Rethwa
Title: ______________________

Attest: ______________________
Title: ______________________

STATE OF New Jersey
COUNTY OF Passaic

BEFORE ME, the undersigned authority, personally appeared Ranjana Jethwa and ______________________ to me well known and known to me to be the individuals described in and who executed the foregoing instrument on behalf of J.F.M. 6090, Inc., a New Jersey corporation, and severally acknowledged to and before me that they executed such instrument and that the seal affixed to the foregoing instrument is the corporate seal of said corporation, and that it was affixed to said instrument by due and regular corporate authority, and that said instrument is the free act and deed of said corporation.

WITNESS my hand and official seal this 31th day of July, 2023.

(SEAL)

______________________
Notary Public
My Commission Expires:

DANIEL ALBARRAN
Notary Public, State of New Jersey
My Commission Expires Dec 15, 2027

7/31/23

[SIGNATURES CONTINUE]

**JFM WAYNE, LLC**, a New Jersey limited liability company

By: Rayana Rothman
Title: ______________________

Attest: ______________________
Title: ______________________

STATE OF New Jersey
COUNTY OF Passaic

BEFORE ME, the undersigned authority, personally appeared Renjana Rothman and ______________________ to me well known and known to me to be the individuals described in and who executed the foregoing instrument on behalf of JFM Wayne, LLC, a New Jersey limited liability company, and severally acknowledged to and before me that they executed such instrument and that the seal affixed to the foregoing instrument is the corporate seal of said corporation, and that it was affixed to said instrument by due and regular corporate authority, and that said instrument is the free act and deed of said corporation.

WITNESS my hand and official seal this 31th day of July, 2023.

(SEAL)

______________________
Notary Public
My Commission Expires:

DANIEL ALBARRAN
Notary Public, State of New Jersey
My Commission Expires Dec 15, 2027

7/31/23

[SIGNATURES CONTINUE]

**JFM NYACK, LLC**, a New York
limited liability company

By: Rajan Rjethwa
Title: ______________________

Attest: ______________________
Title: ______________________

STATE OF New Jersey
COUNTY OF Passaic

BEFORE ME, the undersigned authority, personally appeared Rajan Jethwa and ______________________ to me well known and known to me to be the individuals described in and who executed the foregoing instrument on behalf of JFM Nyack LLC, a New York limited liability company, and severally acknowledged to and before me that they executed such instrument and that the seal affixed to the foregoing instrument is the corporate seal of said corporation, and that it was affixed to said instrument by due and regular corporate authority, and that said instrument is the free act and deed of said corporation.

WITNESS my hand and official seal this 31th day of July, 2023.

(SEAL)

______________________
Notary Public
My Commission Expires:

DANIEL ALBARRAN
Notary Public, State of New Jersey
My Commission Expires Dec 15, 2027

7/31/23

[SIGNATURES CONTINUE]

**JFM HALEDON, LLC,** a New Jersey limited liability company

By: Rajana Rothwa
Title: ____________________

Attest: ____________________
Title: ____________________

STATE OF New Jersey
COUNTY OF Passaic

BEFORE ME, the undersigned authority, personally appeared Benjamin Johns and ____________________ to me well known and known to me to be the individuals described in and who executed the foregoing instrument on behalf of JFM Haledon LLC, a New Jersey limited liability company, and severally acknowledged to and before me that they executed such instrument and that the seal affixed to the foregoing instrument is the corporate seal of said corporation, and that it was affixed to said instrument by due and regular corporate authority, and that said instrument is the free act and deed of said corporation.

WITNESS my hand and official seal this 31th day of July, 2023.

(SEAL)

____________________
Notary Public
My Commission Expires:

DANIEL ALBARRAN
Notary Public, State of New Jersey
My Commission Expires Dec 15, 2027

7/31/23

[SIGNATURES CONTINUE]

**JFM SPRING, LLC**, a New York limited liability company

By: Rayana Rvtekhva
Title: ______________________

Attest: ______________________
Title: ______________________

STATE OF New Jersey
COUNTY OF Passaic

BEFORE ME, the undersigned authority, personally appeared Rayana Tekhva and ______________________ to me well known and known to me to be the individuals described in and who executed the foregoing instrument on behalf of JFM Spring, LLC, a New York limited liability company, and severally acknowledged to and before me that they executed such instrument and that the seal affixed to the foregoing instrument is the corporate seal of said corporation, and that it was affixed to said instrument by due and regular corporate authority, and that said instrument is the free act and deed of said corporation.

WITNESS my hand and official seal this 31th day of July, 2023.

(SEAL)

______________________
Notary Public
My Commission Expires:

DANIEL ALBARRAN
Notary Public, State of New Jersey
My Commission Expires Dec 15, 2027

7/31/23

**SCHEDULE 1**

THE FRANCHISED RESTAURANTS AND FRANCHISE AGREEMENTS

| **BURGER KING® Franchised Restaurant Unit No.** | **Address** | | **Date of Franchise Agreement** | **Date of Owner's Guaranty, if any** | **Date of Conditional Consent to Assignment of Franchise Agreement, if any** |
|---|---|---|---|---|---|
| 1877 | 49 Sparta Avenue<br>Sparta, NJ 07871-1822 | JFM Sparta LLC | 7/13/2015 | 7/13/2015 | N/A |
| 6090 | 12-14 Spruce Street<br>Paterson, NJ 07501 | J.F.M. 6090, Inc. | 2/26/2015 | N/A | 2/26/2015 |
| 9526* | 1046 Hamburg Tpke.<br>Wayne, NJ 07470 | JFM Wayne LLC | 4/20/2018 | 4/20/2028 | N/A |
| 10481 | 160 Spring Valley Marketplace<br>Spring Valley, NY 10977 | JFM Spring, LLC | 7/27/2015 | 7/27/2015 | N/A |
| 11649 | 3623 Palisades Center Dr.<br>West Nyack, NY 10994 | JFM Nyack LLC | 6/4/2018 | 6/4/2018 | N/A |
| 13439 | 168 Belmont Avenue<br>Haledon, NJ 07508 | JFM Haledon, LLC | 3/28/2016 | 3/28/2018 | N/A |

# EXHIBIT E

E-mail: DMencia@rbi.com

April 2, 2026

**VIA FEDERAL EXPRESS,**
**AND ELECTRONIC MAIL:** roopali.jethwa@gmail.com, jethwafoods@aol.com

JFM Sparta LLC
J.F.M. 6090, Inc.
JFM Spring, LLC
2 Market Street, 2nd Floor
Paterson, New Jersey 07501
ATTN: Ranjana R. Jethwa

RE: **SETTLEMENT AGREEMENT:** Dated July 31, 2023
**LICENSEE SET FORTH ON SCHEDULE 1 ATTACHED HERETO FOR THE RESTAURANT LOCATIONS LISTED ON SCHEUDLE 1 ATTACHED HERETO**

**NOTICE OF DEFAULT**

Ladies and Gentlemen:

Burger King Company LLC ("BKC") and the Licensee listed above ("Licensee") are parties to the Settlement Agreement (as at any time amended, the "Settlement Agreement") described above, with respect to the operation of the BURGER KING® Restaurants described above (the "Restaurants"). Any capitalized term used in this letter that is not defined herein shall have the meaning set forth in the Settlement Agreement.

Notice is hereby given the Licensee is currently in DEFAULT under the terms and conditions if Section IV ("Sale of the Franchised Restaurants") of the License Agreement for failing to sell the Restaurants by March 31, 2026 (the "Sale Date Default").

This notice constitutes formal "NOTICE OF DEFAULT" pursuant to **Section V** of the Settlement Agreement. In the event the foregoing Sale Date Default is not cured by closing the transaction within 60 (sixty) days from delivery of this notice to Licensee, BKC may elect, in its sole discretion, to terminate the Settlement Agreement with immediate effect, and/or take any other actions permitted by the terms of the Settlement Agreement, by providing written confirmation of such termination or other action to Licensee.

If BKC terminates the Settlement Agreement, Licensee will be expected to comply with all post-termination covenants and obligations under the Settlement Agreement.

Nothing contained herein nor the failure of BKC to exercise any power reserved to it under the Settlement Agreement or to insist upon Licensee's strict compliance with any obligation or condition of the Settlement Agreement, and no custom or practice of BKC or Licensee at variance with the terms of the Settlement Agreement shall constitute a waiver of BKC's rights to demand Licensee's compliance with the Settlement Agreement. Waiver by BKC of any particular breach or default by Licensee shall not affect or impair BKC's rights with respect to any subsequent default of the same, similar, or different nature; nor shall any delay, forbearance, or omission of BKC to exercise any power or right arising out of any breach or default by Licensee of any of the terms, provisions, or covenants of the Settlement Agreement, affect or impair BKC's rights under the Settlement Agreement, at law or in equity. BKC waives no rights, including without limitation, BKC's right to collect interest on all amounts due. BKC reserves the right to pursue all remedies available to it under the Settlement Agreement and under applicable law, including its attorneys' fees and costs, on account of Licensee's breach of, or default under, the Settlement Agreement.

Please appreciate that BKC has not authorized any of its employees, attorneys or agents to verbally modify the terms of this letter. This letter may only be modified in writing under my signature or the signature of another BKC attorney. Accordingly, any reliance by you on alleged oral communications is unwarranted.

Very truly yours,

**BURGER KING COMPANY LLC**

By: ______________________________
Dylan Mencia
Counsel, Franchising and Real Estate, U.S.

cc: Clayton Lawrence (via electronic mail)
Mike Zepp (via electronic mail)
Alexander Kenkel (via electronic mail)
Natalie Moussa (via electronic mail)
Juan Montes de Oca (via electronic mail)

**SCHEDULE 1**

| BURGER KING® Restaurant Number | Address | Licensee |
|---|---|---|
| 1877 | 49 Sparta Avenue<br>Sparta, New Jersey 07871 | JFM Sparta LLC |
| 6090 | 12 14 Spruce Street<br>Paterson, New Jersey 07501 | J.F.M. 6090, Inc. |
| 10481 | 160 Spring Valley Marketplace<br>Spring Valley, New York 10977 | JFM Spring, LLC |

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**
**DEPUTY COMMISSIONER FOR TRADEMARK EXAMINATION POLICY**

**In re Application of** Ranjana Jethwa

**Mark:** JUMBO KING BURGER

**Serial No.:** 99871702

**Filed:** June 8, 2026

**Filing Basis:** Section 1(b)

**LETTER OF PROTEST**

In accordance with Section 1715 of the Trademark Manual of Examining Procedure ("TMEP"), Section 1(f) of the Lanham Act, 15 U.S.C. § 1051(f), and 37 C.F.R. § 2.149, the Protestor, Burger King Company LLC ("Protestor"), with an address at 5707 Blue Lagoon Drive, Miami, Florida, 33126 respectfully submits this Letter of Protest for the above-referenced application, U.S. Trademark Application Serial No. 99871702 for the mark JUMBO KING BURGER ("Applicant's Mark") (the "Application"), to advise the U.S. Patent and Trademark Office of material facts relevant to the examination of the Application, which was filed on June 8, 2026.

By this Letter of Protest, Protestor submits relevant objective evidence showing that Applicant's Application for JUMBO KING BURGER is confusingly similar to Protestor's senior BURGER KING, BURGER KING & Crescent Logo, and BURGER KING & Hamburger Refresh Design marks (the "BURGER KING Marks"), which are the subject of U.S. Registration Nos. 0869775, 2428846, and 6397840, among others detailed below and cover goods and services that are related to the goods/services in the Application. The concurrent use of the mark in the Application with the applied-for services would result in a likelihood of confusion, mistake, or deception, in violation of Trademark Act Section 2(d). Accordingly, pursuant to Section 2(d) of the Trademark Act, the Examiner should refuse the Application, resolving any doubts as to the issue of likelihood of confusion in favor of the Protestor as the prior rights owner.

Protestor requests that the factual and objective evidence submitted with this Letter of Protest be forwarded to the Examining Attorney with directions that the information be considered prior to the publication of the mark and any final decision as to the registrability of the Application.

## I. BACKGROUND

Since 1954, Protestor has offered under the BURGER KING name and marks quick service restaurant services featuring hamburgers, fries, chicken sandwiches, frozen confections,

and other similar menu items. Protestor has continuously used its mark in connection with its goods and services since 1954, and applied for its earliest active registration in the U.S. on September 9, 1968.

Protestor's rights in and to the BURGER KING Marks have been recognized by the USPTO, which has issued the following registrations, some of which have since become incontestable (the "BURGER KING Registrations"):

| Country | Mark | Status | Nice Classes | Owner |
|---|---|---|---|---|
| United States (Federal) | BURGER KING | Registered<br>77128236<br>3355280<br>03-12-2007<br>12-18-2007<br>"BURGER" | 43 | BURGER KING COMPANY LLC |

Goods/Services

43 Restaurant services

| Country | Mark | Status | Nice Classes | Owner |
|---|---|---|---|---|
| United States (Federal) | BURGER KING | Registered<br>72306090<br>0869775<br>09-09-1968<br>05-20-1969<br>APPLICANT DISCLAIMS THE WORD "BURGER" APART FROM THE MARK AS SHOWN, WITHOUT SACRIFICING ANY COMMON LAW RIGHTS. | 29,32 | BURGER KING COMPANY LLC |

Goods/Services

SOFT DRINKS OF ALL VARIETIES HAMBURGER SANDWICHES

| Country | Mark | Status | Nice Classes | Owner |
|---|---|---|---|---|
| United States (Federal) | BURGER KING<br>The mark consists of the stacked, stylized words "BURGER KING" in the color red in between two orange hamburger buns. The color white represents background and is not claimed as a feature of the mark. | Registered<br>88896712<br>6397841<br>05-01-2020<br>06-22-2021<br>"BURGER" | 29,30,43 | BURGER KING COMPANY LLC |

Goods/Services

29 chicken pieces; potato fries; French fried potatoes; hash brown potatoes; garden salads; milk and milk products excluding ice cream, ice milk, and frozen yogurt; milk shakes; milk-based beverages; onion rings; processed apples; whipped topping; jellies; jams; eggs; cheese; mozzarella sticks; pickles; processed onions; prepared meals consisting primarily of meat, fish, and poultry; constituents for meals, namely, beef, chicken, and fish burger patties; plant-based veggie burger patties; all of the foregoing sold in restaurants for consumption on or off the premises
30 hamburger sandwiches; fish sandwiches; chicken sandwiches; veggie burger sandwiches; plant-based sandwiches; breakfast sandwiches; hot sandwiches; burritos; sandwiches; wrap sandwiches; burgers contained in bread rolls; French toast; pancakes; condiments, namely, pickle relish and sandwich relish; mustard; ketchup; mayonnaise; salad dressings; oatmeal; cinnamon rolls, doughnuts; pies; desserts consisting primarily of ice cream and ice milk and including a variety of customer-selected toppings, namely, coffee flavored syrup, cookie crumbs, cake, marshmallow topping, and flavored, prepared and processed nuts; milk products, namely, ice cream, ice milk and frozen yogurt; appetizers, namely, breaded and fried appetizers consisting primarily of macaroni and cheese; all of the foregoing sold in restaurants for consumption on or off the premises
43 services of providing food and drink; cafe and coffee bar services; food and drink preparation services; food and drink take-out restaurant services; restaurant services; fast-food restaurant services; quick service restaurant services; providing prepared meals; preparation of food and meals for consumption on or off the premises

| Country | Mark | Status | Nice Classes | Owner |
|---|---|---|---|---|
| United States (Federal) | BURGER KING<br><br>The mark consists of the stacked, stylized words "BURGER KING" in between two hamburger buns. | Registered<br>88896710<br>6397840<br>05-01-2020<br>06-22-2021<br>"BURGER" | 29,30,43 | BURGER KING COMPANY LLC |

<u>Goods/Services</u>

29 chicken pieces; potato fries; French fried potatoes; hash brown potatoes; garden salads; milk and milk products excluding ice cream, ice milk, and frozen yogurt; milk shakes; milk-based beverages; onion rings; processed apples; whipped topping; jellies; jams; eggs; cheese; mozzarella sticks; pickles; processed onions; prepared meals consisting primarily of meat, fish, and poultry; constituents for meals, namely, beef, chicken, and fish burger patties; plant-based veggie burger patties; all of the foregoing sold in restaurants for consumption on or off the premises
30 hamburger sandwiches; fish sandwiches; chicken sandwiches; veggie burger sandwiches; plant-based sandwiches; breakfast sandwiches; hot sandwiches; burritos; sandwiches; wrap sandwiches; burgers contained in bread rolls; French toast; pancakes; condiments, namely, pickle relish and sandwich relish; mustard; ketchup; mayonnaise; salad dressings; oatmeal; cinnamon rolls, doughnuts; pies; desserts consisting primarily of ice cream and ice milk and including a variety of customer-selected toppings, namely, coffee flavored syrup, cookie crumbs, cake, marshmallow topping, and flavored, prepared and processed nuts; milk products, namely, ice cream, ice milk and frozen yogurt; appetizers, namely, breaded and fried appetizers consisting primarily of macaroni and cheese; all of the foregoing sold in restaurants for consumption on or off the premises
43 services of providing food and drink; cafe and coffee bar services; food and drink preparation services; food and drink take-out restaurant services; restaurant services; fast-food restaurant services; quick service restaurant services; providing prepared meals; preparation of food and meals for consumption on or off the premises

| Country | Mark | Status | Nice Classes | Owner |
|---|---|---|---|---|
| United States (Federal) | BURGER KING | Registered<br>72328416<br>0901311<br>05-27-1969<br>10-20-1970<br>WITHOUT WAIVING COMMON LAW RIGHTS APPLICANT DISCLAIMS THE WORD "BURGER" | 42 | BURGER KING COMPANY LLC |

| | | | | |
|---|---|---|---|---|
| | | APART FROM THE MARK AS SHOWN. | | |

Goods/Services

RESTAURANT SERVICES, MORE SPECIFICALLY SELF-SERVICE RESTAURANTS

| Country | Mark | Status | Nice Classes | Owner |
|---|---|---|---|---|
| United States (Federal) | BURGER KING<br>The mark consists of the term "Burger King" in red lettering, set between yellow hamburger buns with a blue crescent design. | Registered<br>76468010<br>2755927<br>11-12-2002<br>08-26-2003<br>"BURGER" | 43 | BURGER KING COMPANY LLC |

Goods/Services

43 Restaurant services

| Country | Mark | Status | Nice Classes | Owner |
|---|---|---|---|---|
| United States (Federal) | BURGER KING | Registered<br>73076655<br>1057250<br>02-09-1976<br>01-25-1977<br>APPLICANT DISCLAIMS ANY RIGHTS IN THE WORD "BURGER" SEPARATE AND APART FROM THE MARK AS SHOWN, BUT WITHOUT RELINQUISHING ANY OF ITS COMMON LAW RIGHTS. | 42 | BURGER KING COMPANY LLC |

Goods/Services

42 RESTAURANT AND CARRY-OUT FOOD SERVICES

| Country | Mark | Status | Nice Classes | Owner |
|---|---|---|---|---|
| United States (Federal) | BURGER KING | Registered<br>75655962<br>2428846<br>03-08-1999<br>02-13-2001<br>"BURGER" | 42 | BURGER KING COMPANY LLC |

Goods/Services

42 RESTAURANT AND CARRY OUT FOOD SERVICES

| Country | Mark | Status | Nice Classes | Owner |
|---|---|---|---|---|
| United States (Federal) | BURGER KING | Registered<br>75656416 | 32 | BURGER KING COMPANY LLC |

| | | | | |
|---|---|---|---|---|
| | | 2449825<br>03-09-1999<br>05-08-2001 | | |

Goods/Services

32 Soft Drinks

| Country | Mark | Status | Nice Classes | Owner |
|---|---|---|---|---|
| United States (Federal) | BURGER KING | Registered<br>75656417<br>2449826<br>03-09-1999<br>05-08-2001<br>"BURGER" | 30 | BURGER KING COMPANY LLC |

Goods/Services

30 Hamburger sandwiches, chicken sandwiches, fish sandwiches, breakfast sandwiches, bakery goods, fruit pies, and coffee

| Country | Mark | Status | Nice Classes | Owner |
|---|---|---|---|---|
| United States (Federal) | BURGER KING | Registered<br>75656619<br>2448248<br>03-09-1999<br>05-01-2001 | 29 | BURGER KING COMPANY LLC |

Goods/Services

29 French fried potatoes, hash brown potatoes, onion rings, and chicken pieces

| Country | Mark | Status | Nice Classes | Owner |
|---|---|---|---|---|
| United States (Federal) | BURGER KING<br>The mark consists of the words "BURGER KING" between two hamburger buns all surrounded by a crescent design. | Registered<br>77570881<br>3611863<br>09-16-2008<br>04-28-2009 | 29 | BURGER KING COMPANY LLC |

Goods/Services

29 Potato-based Snack Foods

Applicant filed the Application on an intent-to-use basis on June 8, 2026, many years after Protestor filed for or started using the BURGER KING Marks in the United States. Accordingly, Protestor has priority over the Application. Compare **Exhibit A** (Certificates of Registration for the BURGER KING Marks) with **Exhibit B** (Applicant's Application filed on

June 8, 2026). According to the Office's publicly viewable records, the Applicant's Application is pending examination.

Notwithstanding Protestor's long-established and prior rights in the BURGER KING Marks, Applicant subsequently filed the Application on June 8, 2026. The Application identifies services that are identical, highly related, and/or complementary to the goods and services covered by Protestor's BURGER KING Registrations and which are likely to be sold to the same consumers via the same trade channels.

## II. CONCURRENT USE OF THE MARKS IS LIKELY TO CAUSE CONFUSION

Trademark Act Section 2(d) bars the registration of an applied-for mark that so resembles a registered mark and that is likely to cause confusion, mistake, or deception as to the source of goods or services. *See* 15 U.S.C. §1052(d). Principal factors to be considered in determining whether a likelihood of confusion exists are highlighted in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (C.C.P.A. 1973). *See* TMEP §1207.01. Depending on the evidence of record, not all factors may be relevant or of equal weight, and any one factor may be dominant in a given case. *In re Majestic Distilling Co.*, 315 F.3d 1311, 1315, 65 USPQ2d 1201, 1204 (Fed. Cir. 2003); *see In re E. I. du Pont*, 476 F.2d at 1361-62, 177 USPQ at 567.

Here, the following factors are most relevant: the similarity of the marks, goods/services, trade channels, and consumers. *See In re Opus One, Inc.*, 60 USPQ2d 1812 (TTAB 2001); *In re Dakin's Miniatures Inc.*, 59 USPQ2d 1593 (TTAB 1999); *In re Azteca Rest. Enters., Inc.*, 50 USPQ2d 1209 (TTAB 1999); *In re E. I. du Pont*, 476 F.2d at 1361-62; TMEP §§1207.01 *et seq.*

### A. The Marks Are Identical or Highly Similar

Using the likelihood of confusion factors set forth in *In re E. I. du Pont de Nemours & Co.,* 177 USPQ 563, 567 (C.C.P.A. 1973) and adopted by the USPTO in TMEP § 1207.01(b), there is no question that there would be a likelihood of confusion between Protestor's BURGER KING Marks and Applicant's Mark. It is undeniable that the parties' respective marks are highly similar visually, aurally, connotatively, and in terms of overall commercial impression. Indeed, a mere side-by-side comparison of these marks readily demonstrates their confusing similarity.

In particular, Applicant's Mark wholly contains the BURGER KING Mark, simply inverting the words BURGER and KING, and adding the term JUMBO. The inclusion of Protestor's distinctive and famous BURGER KING Mark drives the overall commercial impression of Applicant's Mark, and the addition of the highly descriptive term "JUMBO" is insufficient to avoid confusion. To the contrary, using the likelihood of confusion factors set forth in *In re E. I. du Pont de Nemours & Co.*, 177 USPQ 563, 567 (C.C.P.A. 1973) and adopted by the USPTO in TMEP § 1207.01(b), it is clear that a likelihood of confusion between Applicant's Mark and the BURGER KING Marks exists. Accordingly, the parties' marks are confusingly similar in sight, sound, and overall commercial impression.

### B. The Goods and Services Are Identical, Highly Related, and/or Complementary

In order to find a likelihood of confusion, the goods and services identified in the pending application and the registered marks need not be identical or even competitive. *In re Iolo Techs., LLC*, 95 USPQ2d 1498, 1499 (TTAB 2010); *In re G.B.I. Tile & Stone, Inc.*, 92 USPQ2d 1366, 1368 (TTAB 2009), as adopted by the USPTO in TMEP § 1207.01(a)(i). They need only be related in some manner, or the conditions surrounding their marketing be such that they could be encountered by the same purchasers, under circumstances that could give rise to the mistaken belief that the goods and/or services come from a common source. *In re Martin's Famous Pastry Shoppe, Inc*., 223 USPQ 1289 (Fed. Cir. 1984); *In re Corning Glass Works*, 229 USPQ 65 (TTAB 1985); *In re Rexel Inc*., 223 USPQ 830 (TTAB 1984).

In addition, where the relevant goods and/or services at issue have complementary uses—such as travelling in the same channels of trade and/or sharing a commonality of purchasers for the same or related purposes—likelihood of confusion may be found. *See In re Martin's Famous Pastry Shoppe, Inc.*, 223 USPQ at 1290 (holding bread and cheese to be related because they are often used in combination and noting that "[s]uch complementary use has long been recognized as a relevant consideration in determining a likelihood of confusion"); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1272 (TTAB 2009) (holding medical MRI diagnostic apparatus and medical ultrasound devices to be related, based in part on the fact that such goods have complementary purposes because they may be used by the same medical personnel on the same patients to treat the same disease). Further, since Applicant's Mark and the BURGER KING Marks are nearly identical or confusingly similar, these marks "are likely to engender the same connotation and overall commercial impression" when considered in connection with the parties' respective goods and services (as discussed below). *See In re i.am.symbolic, llc,* 116 USPQ2d 1406, 1411 (TTAB 2015), *aff'd,* 866 F.3d 1315, 123 USPQ2d 1744 (Fed. Cir. 2017). In this regard, the respective marks have "the potential to be used […] in exactly the same manner." *Id*.

Protestor's BURGER KING Registrations and Applicant's Application identify goods and services that are identical, highly related, and/or complementary to one another. Specifically, several of Protestor's BURGER KING Registrations cover restaurant services as well as food items typically offered at quick service restaurants. Applicant's Application covers nearly identical services, namely, "fast food restaurant services; restaurant services; restaurant services in the nature of a fast food burger restaurant." The services in both the BURGER KING Registrations and the Application are not limited in scope or industry or limited to a certain subset of consumers. This is despite Protestor's senior rights in its BURGER KING Marks.

Accordingly, Applicant's services and Protestor's goods and services must be considered related for likelihood of confusion purposes. *See, e.g.*, *In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1202-04 (TTAB 2009); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1268-69, 1271-72 (TTAB 2009). Given the identical, highly related, and/or complementary goods and services, registration of Applicant's Mark is likely to cause confusion, mistake, or deception as to the source of Applicant's goods, in violation of Section 2(d) of the Trademark Act.

### C. The Goods/Services Are Likely to be Sold to the Same Consumers in the Same Trade Channels

As the parties' respective goods/services are identical, highly related, and/or complementary, and Applicant has not indicated any limitations in the Application, the parties' goods and services are presumed to be sold to the same consumers and through the same channels of trade, further supporting a likelihood of confusion finding. *See In Re Night Wines, LLC*, No. 87084959, 2018 WL 3528383, at *3 (June 20, 2018) ("Because Applicant's and Registrant's goods are identical, we must presume that the channels of trade and classes of customers for the wine are the same."); *see also In Re Blue Buffalo Co., Ltd.*, No. 85935706, 2014 WL 5908007, at *2 (Oct. 31, 2014) ("Because the goods of Applicant and Registrant are in part identical, without any limitations on the trade channels or the purchasers to whom they are sold, we must assume those goods will travel in all of the same, normal channels of trade for pet food and will be offered to the same classes of purchasers, namely, pet owners."). Accordingly, the *du Pont* factors involving trade channels for restaurant services to which Protestor's and Applicant's goods and services are or will be sold favor finding a likelihood of confusion.

Because the Examining Attorney must resolve any doubt as to the issue of likelihood of confusion in favor of Protestor, the owner of the prior filed registrations for the BURGER KING Marks, and against Applicant, Protestor requests that the Examining Attorney do so here. *Burroughs Wellcome Co. v. Warner-Lambert Co*., 203 USPQ 191 (TTAB 1979) ("any doubt as to the issue of likelihood of confusion must necessarily be resolved against respondent, the newcomer, who had '…a legal duty to select a mark which is totally dissimilar to trademarks already being used in the field.'"), quoting *Jockey International, Inc. v. Burkard*, 185 USPQ 201 (S.D. Calif. 1975).

## III. CONCLUSION

Based on the foregoing, including the obvious similarities in the parties' marks and goods/services in particular, the Application for the mark JUMBO KING BURGER should be refused based on a likelihood of consumer confusion with Protestor's earlier BURGER KING Marks. In addition, Protestor respectfully requests that the factual and objective evidence presented herein be forwarded to the Examining Attorney for consideration and issuance of an appropriate Office Action refusal of the Applicant's Application.

Respectfully submitted,

Dated: July 29, 2026

Luna M. Samman
ArentFox Schiff LLP
1717 K Street NW
Washington, DC 20036
(202) 857-6000
TMDocket@afslaw.com
*Attorneys for Protestor*

**INDEX OF EVIDENCE TO LETTER OF PROTEST**

**IN RE SERIAL NO. 99871702 FOR THE MARK**

**JUMBO KING BURGER**

**EXHIBITS**

**Exhibit A**: Certificate of Registration for Protestor's BURGER KING Marks

**Exhibit B**: TSDR Status for the Applicant's U.S. Trademark Application Serial No. 99871702 for JUMBO KING BURGER

**EXHIBIT A**

**From:** TMOfficialNotices@USPTO.GOV
**Sent:** Friday, January 12, 2018 11:03 PM
**To:** XXXX
**Cc:** XXXX; XXXX
**Subject:** Official USPTO Notice of Acceptance and Renewal Sections 8 and 9: U.S. Trademark RN 3355280: BURGER KING: Docket/Reference No. 034153.03385

**U.S. Serial Number:** 77128236
**U.S. Registration Number:** 3355280
**U.S. Registration Date:** Dec 18, 2007
**Mark:** BURGER KING
**Owner:** BURGER KING CORPORATION

Jan 12, 2018

## NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

## NOTICE OF REGISTRATION RENEWAL UNDER SECTION 9

The renewal application filed for the above-identified registration meets the requirements of Section 9 of the Trademark Act, 15 U.S.C. §1059. **The registration is renewed.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
043

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION IN SUCCESSIVE TEN-YEAR PERIODS

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date. See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

*****THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS. THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.*****

To check the status of this registration, go to https://tsdr.uspto.gov/#caseNumber=77128236&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to https://tsdr.uspto.gov/#caseNumber=77128236&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=documentSearch NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

* **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

**Int. Cl.: 43**

**Prior U.S. Cls.: 100 and 101**

**Reg. No. 3,355,280**

**United States Patent and Trademark Office** **Registered Dec. 18, 2007**

**SERVICE MARK**
**PRINCIPAL REGISTER**

# BURGER KING

BURGER KING BRANDS, INC. (DELAWARE CORPORATION)
5505 BLUE LAGOON DRIVE
MIAMI, FL 33126

FOR: RESTAURANT SERVICES, IN CLASS 43 (U.S. CLS. 100 AND 101).

FIRST USE 7-28-1953; IN COMMERCE 6-5-1955.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 901,311, 1,076,177 AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "BURGER", APART FROM THE MARK AS SHOWN.

SER. NO. 77-128,236, FILED 3-12-2007.

AMEETA JORDAN, EXAMINING ATTORNEY

**From:** TMOfficialNotices@USPTO.GOV
**Sent:** Friday, April 12, 2019 11:02 PM
**To:** XXXX
**Cc:** XXXX; XXXX; XXXX
**Subject:** Official USPTO Notice of Acceptance and Renewal Sections 8 and 9: U.S. Trademark RN 0869775: BURGER KING

**U.S. Serial Number:** 72306090
**U.S. Registration Number:** 0869775
**U.S. Registration Date:** May 20, 1969
**Mark:** BURGER KING
**Owner:** BURGER KING CORPORATION

Apr 12, 2019

## NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

## NOTICE OF REGISTRATION RENEWAL UNDER SECTION 9

The renewal application filed for the above-identified registration meets the requirements of Section 9 of the Trademark Act, 15 U.S.C. §1059. **The registration is renewed.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
045, 046

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION IN SUCCESSIVE TEN-YEAR PERIODS

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date. See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

*****THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS. THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.*****

To check the status of this registration, go to https://tsdr.uspto.gov/#caseNumber=72306090&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to https://tsdr.uspto.gov/#caseNumber=72306090&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=documentSearch NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

* **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

# United States Patent Office

869,775
Registered May 20, 1969

## PRINCIPAL REGISTER
## Trademark

Ser. No. 306,090, filed Sept. 9, 1968

## BURGER KING

Burger King Corporation (Florida corporation)
7100 N. Kendall Drive
Miami, Fla. 33156

For: SOFT DRINKS OF ALL VARIETIES, in CLASS 45 (INT. CL. 32).

For: HAMBURGER SANDWICHES, in CLASS 46 (INT. CL. 29).

First use July 28, 1953; in commerce June 5, 1955.

Applicant disclaims the word "Burger" apart from the mark as shown, without sacrificing any common law rights.

Owner of Reg. No. 722,375.

A. G. DIETZ, *Examiner*.

# United States of America
## United States Patent and Trademark Office

BURGER KING

**Reg. No. 6,397,841**

**Registered Jun. 22, 2021**

**Int. Cl.: 29, 30, 43**

**Service Mark**

**Trademark**

**Principal Register**

Burger King Corporation (FLORIDA CORPORATION)
5707 Blue Lagoon Drive
Miami, FLORIDA 33126

CLASS 29: Chicken pieces; potato fries; French fried potatoes; hash brown potatoes; garden salads; milk and milk products excluding ice cream, ice milk, and frozen yogurt; milk shakes; milk-based beverages; onion rings; processed apples; whipped topping; jellies; jams; eggs; cheese; mozzarella sticks; pickles; processed onions; prepared meals consisting primarily of meat, fish, and poultry; constituents for meals, namely, beef, chicken, and fish burger patties; plant-based veggie burger patties; all of the foregoing sold in restaurants for consumption on or off the premises

FIRST USE 6-1-1969; IN COMMERCE 6-1-1969

CLASS 30: Hamburger sandwiches; fish sandwiches; chicken sandwiches; veggie burger sandwiches; plant-based sandwiches; breakfast sandwiches; hot sandwiches; burritos; sandwiches; wrap sandwiches; burgers contained in bread rolls; French toast; pancakes; condiments, namely, pickle relish and sandwich relish; mustard; ketchup; mayonnaise; salad dressings; oatmeal; cinnamon rolls, doughnuts; pies; desserts consisting primarily of ice cream and ice milk and including a variety of customer-selected toppings, namely, coffee flavored syrup, cookie crumbs, cake, marshmallow topping, and flavored, prepared and processed nuts; milk products, namely, ice cream, ice milk and frozen yogurt; Appetizers, namely, breaded and fried appetizers consisting primarily of macaroni and cheese; all of the foregoing sold in restaurants for consumption on or off the premises

FIRST USE 6-1-1969; IN COMMERCE 6-1-1969

CLASS 43: Services of providing food and drink; cafe and coffee bar services; food and drink preparation services; food and drink take-out restaurant services; restaurant services; fast-food restaurant services; quick service restaurant services; providing prepared meals; preparation of food and meals for consumption on or off the premises

UNITED STATES PATENT AND TRADEMARK OFFICE
DEPARTMENT OF COMMERCE

Performing the Functions and Duties of the
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

FIRST USE 6-1-1969; IN COMMERCE 6-1-1969

The color(s) red and orange is/are claimed as a feature of the mark.

The mark consists of the stacked, stylized words "BURGER KING" in the color red in between two orange hamburger buns. The color white represents background and is not claimed as a feature of the mark.

OWNER OF U.S. REG. NO. 0901311, 1057250, 2262585

No claim is made to the exclusive right to use the following apart from the mark as shown: "BURGER"

SER. NO. 88-896,712, FILED 05-01-2020

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

- ***First Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- ***Second Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

***ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

# United States of America
## United States Patent and Trademark Office

BURGER KING

**Reg. No. 6,397,840**

**Registered Jun. 22, 2021**

**Int. Cl.: 29, 30, 43**

**Service Mark**

**Trademark**

**Principal Register**

Burger King Corporation (FLORIDA CORPORATION)
5707 Blue Lagoon Drive
Miami, FLORIDA 33126

CLASS 29: Chicken pieces; potato fries; French fried potatoes; hash brown potatoes; garden salads; milk and milk products excluding ice cream, ice milk, and frozen yogurt; milk shakes; milk-based beverages; onion rings; processed apples; whipped topping; jellies; jams; eggs; cheese; mozzarella sticks; pickles; processed onions; prepared meals consisting primarily of meat, fish, and poultry; constituents for meals, namely, beef, chicken, and fish burger patties; plant-based veggie burger patties; all of the foregoing sold in restaurants for consumption on or off the premises

FIRST USE 1-3-1969; IN COMMERCE 1-3-1969

CLASS 30: Hamburger sandwiches; fish sandwiches; chicken sandwiches; veggie burger sandwiches; plant-based sandwiches; breakfast sandwiches; hot sandwiches; burritos; sandwiches; wrap sandwiches; burgers contained in bread rolls; French toast; pancakes; condiments, namely, pickle relish and sandwich relish; mustard; ketchup; mayonnaise; salad dressings; oatmeal; cinnamon rolls, doughnuts; pies; desserts consisting primarily of ice cream and ice milk and including a variety of customer-selected toppings, namely, coffee flavored syrup, cookie crumbs, cake, marshmallow topping, and flavored, prepared and processed nuts; milk products, namely, ice cream, ice milk and frozen yogurt; Appetizers, namely, breaded and fried appetizers consisting primarily of macaroni and cheese; all of the foregoing sold in restaurants for consumption on or off the premises

FIRST USE 1-3-1969; IN COMMERCE 1-3-1969

CLASS 43: Services of providing food and drink; cafe and coffee bar services; food and drink preparation services; food and drink take-out restaurant services; restaurant services; fast-food restaurant services; quick service restaurant services; providing prepared meals; preparation of food and meals for consumption on or off the premises

UNITED STATES PATENT AND TRADEMARK OFFICE · DEPARTMENT OF COMMERCE

Performing the Functions and Duties of the
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

FIRST USE 1-3-1969; IN COMMERCE 1-3-1969

The mark consists of the stacked, stylized words "BURGER KING" in between two hamburger buns.

OWNER OF U.S. REG. NO. 0901311, 1057250, 2262585

No claim is made to the exclusive right to use the following apart from the mark as shown: "BURGER"

SER. NO. 88-896,710, FILED 05-01-2020

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

**Requirements in the First Ten Years***
**What and When to File:**

- ***First Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- ***Second Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

***ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

**From:** TMOfficialNotices@USPTO.GOV
**Sent:** Sunday, May 16, 2021 11:28 PM
**To:** XXXX
**Cc:** XXXX; XXXX; XXXX
**Subject:** Official USPTO Notice of Acceptance and Renewal Sections 8 and 9: U.S. Trademark RN 0901311: BURGER KING (Stylized/Design): Docket/Reference No. 034153.02369

**U.S. Serial Number:** 72328416
**U.S. Registration Number:** 0901311
**U.S. Registration Date:** Oct 20, 1970
**Mark:** BURGER KING (Stylized/Design)
**Owner:** BURGER KING CORPORATION

May 16, 2021

## NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

## NOTICE OF REGISTRATION RENEWAL UNDER SECTION 9

The renewal application filed for the above-identified registration meets the requirements of Section 9 of the Trademark Act, 15 U.S.C. §1059. **The registration is renewed.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
100

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION IN SUCCESSIVE TEN-YEAR PERIODS

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date. See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

*****THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS. THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.*****

To check the status of this registration, go to
https://tsdr.uspto.gov/#caseNumber=72328416&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to
https://tsdr.uspto.gov/#caseNumber=72328416&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=documentSearch NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

* **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

# United States Patent Office

**901,311**
**Registered Oct. 20, 1970**

## PRINCIPAL REGISTER
## Service Mark

**Ser. No. 328,416, filed May 27, 1969**

BURGER
KING

Burger King Corporation (Florida corporation)
7100 N. Kendall Drive
Miami, Fla. 33156

For: RESTAURANT SERVICES, MORE SPECIFICALLY SELF-SERVICE RESTAURANTS, in CLASS 100 (INT. CL. 42).

First use Dec. 6, 1968; in commerce Jan. 3, 1969.

Without waiving common law rights applicant disclaims the word "Burger" apart from the mark as shown.

Owner of Reg. Nos. 722,375 and 869,775.

**From:** TMOfficialNotices@USPTO.GOV
**Sent:** Wednesday, September 6, 2023 11:17 PM
**To:** XXXX
**Cc:** XXXX; XXXX; XXXX
**Subject:** Official USPTO Notice of Acceptance and Renewal Sections 8 and 9: U.S. Trademark RN 2755927: BURGER KING (Stylized/Design): Docket/Reference No. 034153.03365

**U.S. Serial Number:** 76468010
**U.S. Registration Number:** 2755927
**U.S. Registration Date:** Aug 26, 2003
**Mark:** BURGER KING (Stylized/Design)
**Owner:** BURGER KING COMPANY LLC

Sep 6, 2023

## NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

## NOTICE OF REGISTRATION RENEWAL UNDER SECTION 9

The renewal application filed for the above-identified registration meets the requirements of Section 9 of the Trademark Act, 15 U.S.C. §1059. **The registration is renewed.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
043

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION IN SUCCESSIVE TEN-YEAR PERIODS

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date. See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

*****THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS. THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.*****

To check the status of this registration, go to
https://tsdr.uspto.gov/#caseNumber=76468010&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to
https://tsdr.uspto.gov/#caseNumber=76468010&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=documentSearch NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

* **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

**Int. Cl.: 43**

**Prior U.S. Cls.: 100 and 101**

**Reg. No. 2,755,927**

**United States Patent and Trademark Office** **Registered Aug. 26, 2003**

## SERVICE MARK
### PRINCIPAL REGISTER

BURGER KING BRANDS, INC. (DELAWARE CORPORATION)
5505 BLUE LAGOON DRIVE
MIAMI, FL 33126

FOR: RESTAURANT SERVICES, IN CLASS 43 (U.S. CLS. 100 AND 101).

FIRST USE 4-16-1999; IN COMMERCE 4-16-1999.

OWNER OF U.S. REG. NOS. 2,428,846, 2,445,014 AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "BURGER", APART FROM THE MARK AS SHOWN.

THE MARK CONSISTS OF THE TERM "BURGER KING" IN RED LETTERING, SET BETWEEN YELLOW HAMBURGER BUNS WITH A BLUE CRESCENT DESIGN.

SER. NO. 76-468,010, FILED 11-12-2002.

ZACHARY BELLO, EXAMINING ATTORNEY

**From:** TMOfficialNotices@USPTO.GOV
**Sent:** Tuesday, September 5, 2017 11:02 PM
**To:** XXXX
**Cc:** XXXX; XXXX
**Subject:** Official USPTO Notice of Acceptance and Renewal Sections 8 and 9: U.S. Trademark RN 1057250: BURGER KING (Stylized/Design): Docket/Reference No. 034153.03331

**U.S. Serial Number:** 73076655
**U.S. Registration Number:** 1057250
**U.S. Registration Date:** Jan 25, 1977
**Mark:** BURGER KING (Stylized/Design)
**Owner:** BURGER KING CORPORATION

Sep 5, 2017

## NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

## NOTICE OF REGISTRATION RENEWAL UNDER SECTION 9

The renewal application filed for the above-identified registration meets the requirements of Section 9 of the Trademark Act, 15 U.S.C. §1059. **The registration is renewed.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
042

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION IN SUCCESSIVE TEN-YEAR PERIODS

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date. See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

*****THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS. THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.*****

To check the status of this registration, go to https://tsdr.uspto.gov/#caseNumber=73076655&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to https://tsdr.uspto.gov/#caseNumber=73076655&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=documentSearch NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

* **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

Int. Cl.: 42

Prior U.S. Cl.: 100

Reg. No. 1,057,250

# United States Patent Office

Registered Jan. 25, 1977

## SERVICE MARK

Principal Register

Burger King Corporation (Florida corporation)
P.O. Box 520783
Biscayne Facility
Miami, Fla. 33152

For: RESTAURANT AND CARRY-OUT FOOD SERVICES, in CLASS 42 (U.S. CL. 100).

First use at least as early as June 1, 1969; in commerce at least as early as June 1, 1969.

Applicant disclaims any rights in the words "Burger" separate and apart from the mark as shown, but without relinquishing any of its common law rights.

The drawing is lined for the colors red and orange.

Owner of Reg. Nos. 722,375, 961,014, and others.

Ser. No. 76,655, filed Feb. 9, 1976.

I. S. SIGLIN, Jr., Examiner

**From:** TMOfficialNotices@USPTO.GOV
**Sent:** Saturday, June 19, 2021 11:01 PM
**To:** XXXX
**Cc:** XXXX
**Subject:** Official USPTO Notice of Acceptance and Renewal Sections 8 and 9: U.S. Trademark RN 2428846: BURGER KING (Stylized/Design): Docket/Reference No. 034153.03352

**U.S. Serial Number:** 75655962
**U.S. Registration Number:** 2428846
**U.S. Registration Date:** Feb 13, 2001
**Mark:** BURGER KING (Stylized/Design)
**Owner:** BURGER KING CORPORATION

Jun 19, 2021

## NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

## NOTICE OF REGISTRATION RENEWAL UNDER SECTION 9

The renewal application filed for the above-identified registration meets the requirements of Section 9 of the Trademark Act, 15 U.S.C. §1059. **The registration is renewed.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
042

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION IN SUCCESSIVE TEN-YEAR PERIODS

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date. See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

*****THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS. THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.*****

To check the status of this registration, go to https://tsdr.uspto.gov/#caseNumber=75655962&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to https://tsdr.uspto.gov/#caseNumber=75655962&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=documentSearch NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

* **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

**Int. Cl.: 42**

**Prior U.S. Cls.: 100 and 101**

**Reg. No. 2,428,846**

# United States Patent and Trademark Office

**Registered Feb. 13, 2001**

## SERVICE MARK
## PRINCIPAL REGISTER

BURGER KING BRANDS, INC. (DELAWARE CORPORATION)
818 WASHINGTON STREET
WILMINGTON, DE 19801

FOR: RESTAURANT AND CARRY OUT FOOD SERVICES, IN CLASS 42 (U.S. CLS. 100 AND 101).

FIRST USE 4–16–1999; IN COMMERCE 4–16–1999.

OWNER OF U.S. REG. NOS. 901,311, 1,802,390, AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "BURGER", APART FROM THE MARK AS SHOWN.

SN 75–655,962, FILED 3–8–1999.

GI HYUN AN, EXAMINING ATTORNEY

**From:** TMOfficialNotices@USPTO.GOV
**Sent:** Tuesday, September 7, 2021 11:02 PM
**To:** XXXX
**Cc:** XXXX; XXXX; XXXX; XXXX
**Subject:** Official USPTO Notice of Acceptance and Renewal Sections 8 and 9: U.S. Trademark RN 2449825: BURGER KING (Stylized/Design): Docket/Reference No. 034153.03353

**U.S. Serial Number:** 75656416
**U.S. Registration Number:** 2449825
**U.S. Registration Date:** May 8, 2001
**Mark:** BURGER KING (Stylized/Design)
**Owner:** BURGER KING CORPORATION

Sep 7, 2021

## NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

## NOTICE OF REGISTRATION RENEWAL UNDER SECTION 9

The renewal application filed for the above-identified registration meets the requirements of Section 9 of the Trademark Act, 15 U.S.C. §1059. **The registration is renewed.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
032

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION IN SUCCESSIVE TEN-YEAR PERIODS

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date. See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

*****THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS. THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.*****

To check the status of this registration, go to https://tsdr.uspto.gov/#caseNumber=75656416&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to https://tsdr.uspto.gov/#caseNumber=75656416&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=documentSearch NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

* **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

**Int. Cl.: 32**

**Prior U.S. Cls.: 45, 46, and 48**

**Reg. No. 2,449,825**

**United States Patent and Trademark Office** **Registered May 8, 2001**

## TRADEMARK
### PRINCIPAL REGISTER

BURGER KING BRANDS, INC. (DELAWARE CORPORATION)
818 WASHINGTON STREET
WILMINGTON, DE 19801

FOR: SOFT DRINKS, IN CLASS 32 (U.S. CLS. 45, 46 AND 48).

FIRST USE 6-28-1999; IN COMMERCE 7-1-1999.

OWNER OF U.S. REG. NOS. 901,311, 1,057,250, AND OTHERS.

SN 75-656,416, FILED 3-9-1999.

GI HYUN AN, EXAMINING ATTORNEY

**From:** TMOfficialNotices@USPTO.GOV
**Sent:** Tuesday, September 7, 2021 11:02 PM
**To:** XXXX
**Cc:** XXXX; XXXX; XXXX; XXXX
**Subject:** Official USPTO Notice of Acceptance and Renewal Sections 8 and 9: U.S. Trademark RN 2449826: BURGER KING (Stylized/Design): Docket/Reference No. 034153.03354

**U.S. Serial Number:** 75656417
**U.S. Registration Number:** 2449826
**U.S. Registration Date:** May 8, 2001
**Mark:** BURGER KING (Stylized/Design)
**Owner:** BURGER KING CORPORATION

Sep 7, 2021

## NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

## NOTICE OF REGISTRATION RENEWAL UNDER SECTION 9

The renewal application filed for the above-identified registration meets the requirements of Section 9 of the Trademark Act, 15 U.S.C. §1059. **The registration is renewed.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
030

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION IN SUCCESSIVE TEN-YEAR PERIODS

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date. See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

*****THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS. THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.*****

To check the status of this registration, go to https://tsdr.uspto.gov/#caseNumber=75656417&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to https://tsdr.uspto.gov/#caseNumber=75656417&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=documentSearch NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

- **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

**Int. Cl.: 30**

**Prior U.S. Cl.: 46**

**Reg. No. 2,449,826**

# United States Patent and Trademark Office

**Registered May 8, 2001**

## TRADEMARK
### PRINCIPAL REGISTER

BURGER KING BRANDS, INC. (DELAWARE CORPORATION)
818 WASHINGTON STREET
WILMINGTON, DE 19801

FOR: HAMBURGER SANDWICHES, CHICKEN SANDWICHES, FISH SANDWICHES, BREAKFAST SANDWICHES, BAKERY GOODS, FRUIT PIES, AND COFFEE, IN CLASS 30 (U.S. CL. 46).

FIRST USE 4-16-1999; IN COMMERCE 7-1-1999.

OWNER OF U.S. REG. NOS. 901,311, 1,057,250, AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "BURGER", APART FROM THE MARK AS SHOWN.

SN 75-656,417, FILED 3-9-1999.

GI HYUN AN, EXAMINING ATTORNEY

**From:** TMOfficialNotices@USPTO.GOV
**Sent:** Saturday, June 19, 2021 11:01 PM
**To:** XXXX
**Cc:** XXXX
**Subject:** Official USPTO Notice of Acceptance and Renewal Sections 8 and 9: U.S. Trademark RN 2448248: BURGER KING (Stylized/Design): Docket/Reference No. 034153.03355

**U.S. Serial Number:** 75656619
**U.S. Registration Number:** 2448248
**U.S. Registration Date:** May 1, 2001
**Mark:** BURGER KING (Stylized/Design)
**Owner:** BURGER KING CORPORATION

Jun 19, 2021

## NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

## NOTICE OF REGISTRATION RENEWAL UNDER SECTION 9

The renewal application filed for the above-identified registration meets the requirements of Section 9 of the Trademark Act, 15 U.S.C. §1059. **The registration is renewed.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
029

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION IN SUCCESSIVE TEN-YEAR PERIODS

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date. See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

*****THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS. THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.*****

To check the status of this registration, go to
https://tsdr.uspto.gov/#caseNumber=75656619&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to
https://tsdr.uspto.gov/#caseNumber=75656619&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=documentSearch NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

* **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

**Int. Cl.: 29**

**Prior U.S. Cl.: 46**

**Reg. No. 2,448,248**

**United States Patent and Trademark Office**

**Registered May 1, 2001**

## TRADEMARK
### PRINCIPAL REGISTER

BURGER KING BRANDS, INC. (DELAWARE CORPORATION)
818 WASHINGTON STREET
WILMINGTON, DE 19801

FOR: FRENCH FRIED POTATOES, HASH BROWN POTATOES, ONION RINGS, AND CHICKEN PIECES, IN CLASS 29 (U.S. CL. 46).

FIRST USE 6-28-1999; IN COMMERCE 7-1-1999.

OWNER OF U.S. REG. NOS. 901,311, 1,057,250, AND OTHERS.

SN 75-656,619, FILED 3-9-1999.

GI HYUN AN, EXAMINING ATTORNEY

| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Thursday, March 14, 2019 11:03 PM |
| **To:** | XXXX |
| **Cc:** | XXXX; XXXX; XXXX |
| **Subject:** | Official USPTO Notice of Acceptance and Renewal Sections 8 and 9: U.S. Trademark RN 3611863: BURGER KING (Stylized/Design): Docket/Reference No. 034153.3400 |

**U.S. Serial Number:** 77570881
**U.S. Registration Number:** 3611863
**U.S. Registration Date:** Apr 28, 2009
**Mark:** BURGER KING (Stylized/Design)
**Owner:** BURGER KING CORPORATION

Mar 14, 2019

## NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

## NOTICE OF REGISTRATION RENEWAL UNDER SECTION 9

The renewal application filed for the above-identified registration meets the requirements of Section 9 of the Trademark Act, 15 U.S.C. §1059. **The registration is renewed.**

**The registration will remain in force for the class(es) listed below, unless canceled by an order of the Commissioner for Trademarks or a Federal Court, as long as the requirements for maintaining the registration are fulfilled as they become due.**

**Class(es):**
029

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION IN SUCCESSIVE TEN-YEAR PERIODS

**WARNING: Your registration will be canceled if you do not file the documents below during the specified statutory time periods.**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date. See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

*****THE USPTO IS NOT REQUIRED TO SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS. THE OWNER SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.*****

To check the status of this registration, go to
https://tsdr.uspto.gov/#caseNumber=77570881&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=statusSearch or contact the Trademark Assistance Center at 1-800-786-9199.

To view this notice and other documents for this registration on-line, go to
https://tsdr.uspto.gov/#caseNumber=77570881&caseSearchType=US_APPLICATION&caseType=SERIAL_NO&searchType=documentSearch NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

* **For further information, including information on filing and maintenance requirements for U.S. trademark applications and registrations and required fees, please consult the USPTO website at https://www.uspto.gov/trademark/ or contact the Trademark Assistance Center at 1-800-786-9199.**

**Int. Cl.: 29**

**Prior U.S. Cl.: 46**

**Reg. No. 3,611,863**

**United States Patent and Trademark Office** **Registered Apr. 28, 2009**

## TRADEMARK
### PRINCIPAL REGISTER

BURGER KING BRANDS, INC. (DELAWARE CORPORATION)
5505 BLUE LAGOON DRIVE
MIAMI, FL 33126

FOR: POTATO-BASED SNACK FOODS, IN CLASS 29 (U.S. CL. 46).

FIRST USE 10-29-2007; IN COMMERCE 10-29-2007.

OWNER OF U.S. REG. NOS. 2,428,846, 2,449,826 AND OTHERS.

THE MARK CONSISTS OF THE WORDS "BURGER KING" BETWEEN TWO HAMBURGER BUNS ALL SURROUNDED BY A CRESCENT DESIGN.

SER. NO. 77-570,881, FILED 9-16-2008.

AMOS T. MATTHEWS, JR., EXAMINING ATTORNEY

**EXHIBIT B**

For assistance with TSDR, email teas@uspto.gov and include your serial number, the document you are looking for, and screenshot of any error messages you have received.

STATUS | DOCUMENTS | Back to Search | Print

| | | | |
|---|---|---|---|
| **Generated on:** | This page was generated by TSDR on 2026-07-28 16:28:12 EDT | | |
| **Mark:** | JUMBO KING BURGER | | JUMBO KING BURGER |
| **US Serial Number:** | 99871702 | **Application Filing Date:** | Jun. 08, 2026 |
| **Filed as Base Application:** | Yes | **Currently Base Application:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Service Mark | | |
| **TM5 Common Status Descriptor:** | LIVE/APPLICATION/Awaiting Examination<br>The trademark application has been accepted by the Office (has met the minimum filing requirements) and has not yet been assigned to an examiner. | | |
| **Status:** | New application awaiting assignment to an examining attorney. See current trademark processing wait times for more information. | | |
| **Status Date:** | Jun. 08, 2026 | | |

## Mark Information

Collapse All

| | |
|---|---|
| **Mark Literal Elements:** | JUMBO KING BURGER |
| **Standard Character Claim:** | Yes. The mark consists of standard characters without claim to any particular font style, size, or color. |
| **Mark Drawing Type:** | 4 - STANDARD CHARACTER MARK |

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:

- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

| | | | |
|---|---|---|---|
| **For:** | fast food restaurant services; restaurant services; restaurant services in the nature of a fast food burger restaurant | | |
| **International Class(es):** | 043 - Primary Class | **U.S Class(es):** | 100, 101 |
| **Class Status:** | ACTIVE | | |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | No | **Currently Use:** | No |
| **Filed ITU:** | Yes | **Currently ITU:** | Yes |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |
| **Filed 66A:** | No | **Currently 66A:** | No |
| **Filed No Basis:** | No | **Currently No Basis:** | No |

Feedback

## Current Owner(s) Information

| | | | |
|---|---|---|---|
| **Owner Name:** | Ranjana Jethwa | | |
| **Owner Address:** | 2 Market Street<br>FL 2<br>Paterson, NEW JERSEY UNITED STATES 07501 | | |
| **Legal Entity Type:** | INDIVIDUAL | **Citizenship:** | The data cannot be loaded |

## Attorney/Correspondence Information

**Attorney of Record**

| | | | |
|---|---|---|---|
| **Attorney Name:** | James Klobucar | **Docket Number:** | 5347R05TM1US |
| **Attorney Primary Email Address:** | james@gearhartlaw.com | **Attorney Email Authorized:** | Yes |

**Correspondent**

| | | | |
|---|---|---|---|
| **Correspondent Name/Address:** | James Klobucar<br>Gearhart Law<br>41 River Road<br>Summit, NEW JERSEY United States 07901 | | |
| **Correspondent e-mail:** | james@gearhartlaw.com ustmdocket2@gearhartlaw.com steven@gearhartlaw.com ustmdocket@gearhartlaw.com | **Correspondent e-mail Authorized:** | Yes |

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Jun. 08, 2026 | APPLICATION FILING RECEIPT MAILED | |
| Jun. 08, 2026 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Jun. 08, 2026 | NEW APPLICATION ENTERED | |

## TM Staff and Location Information

**TM Staff Information**

| | | | |
|---|---|---|---|
| **TM Attorney:** | | **Law Office Assigned:** | Not Assigned |

**File Location**

| | | | |
|---|---|---|---|
| **Current Location:** | Not Found | **Date in Location:** | Jun. 08, 2026 |

**Generated on:** This page was generated ...

**Mark:** JUMBO KING BURGER

JUMBO KING BURGER

| | | | |
|---|---|---|---|
| **US Serial Number:** | 99871702 | **Application Filing Date:** | Jun. 08, 2026 |
| **Filed as Base Application:** | Yes | **Currently Base Application:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Service Mark | | |

**TM5 Common Status Descriptor:**

LIVE/APPLICATION/Awaiting Examination

The trademark application has been accepted by the Office (has met the minimum filing requirements) and has not yet been assigned to an examiner.

**Status:** New application awaiting assignment to an examining attorney. **See current trademark processing wait times** for more information.

**Status Date:** Jun. 08, 2026

## Mark Information

Collapse All

**Mark Literal Elements:** JUMBO KING BURGER

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** fast food restaurant services; restaurant services; restaurant services in the nature of a fast food burger restaurant

| | | | |
|---|---|---|---|
| **International Class(es):** | 043 - Primary Class | **U.S Class(es):** | 100, 101 |
| **Class Status:** | ACTIVE | | |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | No | **Currently Use:** | No |
| **Filed ITU:** | Yes | **Currently ITU:** | Yes |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |
| **Filed 66A:** | No | **Currently 66A:** | No |
| **Filed No Basis:** | No | **Currently No Basis:** | No |

Feedback

## Current Owner(s) Information

**Owner Name:** Ranjana Jethwa

**Owner Address:** 2 Market Street
FL 2
Paterson, NEW JERSEY UNITED STATES 07501

| | | | |
|---|---|---|---|
| **Legal Entity Type:** | INDIVIDUAL | **Citizenship:** | The data cannot be loaded |

## Attorney/Correspondence Information

**Attorney of Record**

| | | | |
|---|---|---|---|
| **Attorney Name:** | James Klobucar | **Docket Number:** | 5347R05TM1US |
| **Attorney Primary Email Address:** | james@gearhartlaw.com | **Attorney Email Authorized:** | Yes |

**Correspondent**

**Correspondent Name/Address:** James Klobucar
Gearhart Law
41 River Road
Summit, NEW JERSEY United States 07901

| | | | |
|---|---|---|---|
| **Correspondent e-mail:** | james@gearhartlaw.com ustmdocket2@gearhartlaw.com steven@gearhartlaw.com ustmdocket@gearhartlaw.com | **Correspondent e-mail Authorized:** | Yes |

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Jun. 08, 2026 | APPLICATION FILING RECEIPT MAILED | |
| Jun. 08, 2026 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Jun. 08, 2026 | NEW APPLICATION ENTERED | |

## TM Staff and Location Information

**TM Staff Information**

| | | | |
|---|---|---|---|
| **TM Attorney:** | | **Law Office Assigned:** | Not Assigned |

**File Location**

| | | | |
|---|---|---|---|
| **Current Location:** | Not Found | **Date in Location:** | Jun. 08, 2026 |

## Assignment Abstract Of Title Information - Click to Load

## Proceedings - Click to Load

# EXHIBIT F